## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DOC SOCIETY<br>20 Jay Street, Suite 1008<br>Brooklyn, NY 11201,<br><br>INTERNATIONAL DOCUMENTARY<br>ASSOCIATION<br>3470 Wilshire Boulevard, Suite 980<br>Los Angeles, CA 90010,<br><br>               Plaintiffs,<br><br>     v.<br><br>MICHAEL R. POMPEO, in his official<br>capacity as Secretary of State<br>2201 C Street, NW<br>Washington, D.C. 20520,<br><br>CHAD F. WOLF, in his official capacity as<br>Acting Secretary of Homeland Security<br>245 Murray Lane, SW, Mail Stop 0485<br>Washington, D.C. 20528-0485,<br><br>               Defendants. | **COMPLAINT FOR**<br>**DECLARATORY AND**<br>**INJUNCTIVE RELIEF**<br><br>Case No. _____19-3632_____ |

## <u>COMPLAINT</u>

1.      This lawsuit challenges U.S. Department of State ("State Department") rules requiring nearly all individuals who apply for U.S. visas from abroad to register their social media identifiers with the U.S. government. These rules require an estimated 14.7 million visa applicants each year to disclose on their application forms all social media identifiers, including pseudonymous ones, they have used on any of twenty social media platforms during the preceding five years (the "Registration Requirement"). The Registration Requirement applies even to those with substantial connections to the United States, including to those already residing in the United

States who apply for new visas from abroad. The information collected through the Registration Requirement is retained in records systems of the State Department and U.S. Department of Homeland Security ("DHS"), shared within the U.S. government, and also disseminated, in some circumstances, to other governments. The Registration Requirement is the cornerstone of a far-reaching digital surveillance regime that enables the U.S. government to monitor visa applicants' constitutionally protected speech and associations not just at the time they apply for visas, but even after they enter the United States.

2.      The Registration Requirement violates the expressive and associational rights of visa applicants by compelling them to facilitate the government's access to what is effectively a live database of their personal, creative, and political activities online. As the Supreme Court has observed, social media platforms are now among the "most important places . . . for the exchange of views." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). Billions of people from around the world use social media to share information and opinions across borders, petition government officials, and advocate for social, religious, and political change. With access to visa applicants' social media identifiers, the government can develop a detailed picture of their political and religious views; map their professional, political, and other networks; and closely track their speech and associations in real time.

3.      The Registration Requirement, along with related retention and dissemination policies, chills protected speech. Because of the requirement and related policies, some visa applicants who would otherwise use social media to speak to others, and to share their views about personal or political topics, refrain from doing so or publicly share less than they otherwise would. The implications of the Registration Requirement are especially significant for those who use pseudonymous identifiers. Many people use pseudonyms on social media so that they can speak

anonymously about sensitive or controversial issues, and so that they can shield themselves or their families or associates from possible reprisals by state or private actors. The Registration Requirement effectively conditions their eligibility for U.S. visas on their readiness to surrender their online anonymity.

4.      Plaintiffs Doc Society and the International Documentary Association ("IDA") bring this challenge because the Registration Requirement and related retention and dissemination policies violate their rights as well as the rights of their members and partners inside and outside the United States. Doc Society and IDA are U.S.-based documentary film organizations that regularly collaborate with non-U.S. filmmakers and other partners, including by inviting them to screen and discuss their work in the United States. For example, Doc Society hosts "Good Pitch" events throughout the year to facilitate filmmaking partnerships and launch social justice impact campaigns while raising funds to support these efforts. Similarly, IDA's "Getting Real" conference brings hundreds of filmmakers from around the world together in Los Angeles to share their skills and their stories with each other.

5.      Many of Plaintiffs' members and partners use social media to show their work; draw attention to human rights abuses; connect with other filmmakers, artists, and advocates; and engage with the same social and political issues that they address in their films. The Registration Requirement has a significant chilling effect on their use of social media, especially for political speech. Plaintiffs' members and partners who anticipate applying for U.S. visas must consider the risk that a U.S. official will misinterpret their speech on social media, impute others' speech to them, or subject them to additional scrutiny or delayed processing because of the views they or their contacts have expressed. Those who use pseudonymous identifiers must take into account that they will have to relinquish their online anonymity to U.S. officials when they submit their

visa applications, and they must also consider the risk that U.S. officials will disclose their social media identifiers to foreign governments, reveal the identifiers inadvertently, or fail to protect the identifiers from third parties who might access them unlawfully. In recent months, authoritarian and other rights-abusing regimes, including some U.S. allies, have used information gleaned from social media to identify, locate, and detain human rights advocates, journalists, and political dissidents—and even, in some instances, to have them killed.

6.    Because of the Registration Requirement, some of Plaintiffs' members and partners now use social media more cautiously, use it less, or no longer use it at all for speech that could be construed as controversial or political. In addition, some of Plaintiffs' members and partners who had considered applying for visas to visit or work in the United States have decided against doing so to avoid having to surrender their social media identifiers to the U.S. government and submit to indefinite surveillance of their speech and associations. The Registration Requirement impairs their professional activities, including their ability to collaborate with Plaintiffs. Plaintiffs' members and partners cannot challenge the Registration Requirement themselves, however, because doing so would require them to give up the very anonymity or obscurity that they seek to protect.

7.    The Registration Requirement, along with related retention and dissemination policies, also directly infringes Plaintiffs' expressive and associational rights, as well as those of their members, partners, and audiences here in the United States. The requirement burdens Plaintiffs' ability to discover and spotlight the work of non-U.S. members and partners and to learn about issues confronting their filmmaking communities. It also deprives Plaintiffs' U.S. members and partners of the opportunity to hear the speech that non-U.S. members and partners otherwise would have shared on social media. Additionally, because some will no longer apply for visas to

come to the United States, the requirement limits which non-U.S. members and partners the Plaintiff organizations can include in their flagship events, thereby compromising their ability to promote those events and their organizations, and depriving their U.S. members, partners, and audiences of the opportunity to engage with those foreign filmmakers and other partners in person in the United States.

8.      While the implications of the Registration Requirement for individual rights are profound, the requirement is not necessary to serve the government's legitimate interests in adjudicating visa applications, enforcing the immigration laws, or protecting national security. In adopting the Registration Requirement, the State Department cited no evidence that it is likely to be an effective, let alone necessary, means of serving those interests. Indeed, the State Department disregarded contrary evidence in the administrative record, including public comments explaining the difficulties of interpreting social media information across different languages, customs, and cultural norms, and public comments highlighting DHS's documented failures in establishing the usefulness of screening social media information in connection with visa eligibility determinations.

9.      As described further below, the Registration Requirement violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), because it exceeds the Secretary of State's authority under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, because it is contrary to constitutional right, and because it is arbitrary and capricious. The Registration Requirement, as well as related retention and dissemination policies, also violates the First Amendment to the U.S. Constitution. Plaintiffs respectfully request that the Court declare the Registration Requirement and related retention and dissemination policies to be unlawful, and enjoin the government from enforcing or relying on them. While Plaintiffs acknowledge that there

may be circumstances in which the government could lawfully investigate specific visa applicants' use of social media on the basis of individualized concerns of fraud or other wrongdoing, a mandate that requires nearly all visa applicants to register their social media identifiers, including pseudonymous ones, and that enables continuing surveillance of their speech and associations, even after they enter the country, cannot be reconciled with Defendants' statutory authority or the Constitution.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiffs' constitutional and federal statutory claims pursuant to 28 U.S.C. § 1331. The Court also has jurisdiction pursuant to the Administrative Procedure Act, 5 U.S.C. § 702.

11.     This Court has authority to issue declaratory and injunctive relief pursuant to 5 U.S.C. § 706, 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers. The Court has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (e)(1).

## PARTIES

### *Plaintiffs*

13.     Plaintiff Doc Society is a non-profit organization committed to supporting documentary filmmakers and connecting them with global audiences. Doc Society is based in New York, New York, and London, England.

14.     Plaintiff International Documentary Association ("IDA") is a non-profit, membership-based association of documentary filmmakers. IDA is based in Los Angeles, California.

*Defendants*

15.     Defendant Michael R. Pompeo is the Secretary of State. The State Department is an agency of the federal government of the United States located in Washington, D.C. Defendant Pompeo has authority over all State Department policies and practices, including those challenged here. Plaintiffs sue him in his official capacity.

16.     Defendant Chad F. Wolf is the Acting Secretary of Homeland Security. DHS is an agency of the federal government of the United States located in Washington, D.C. Defendant Wolf has authority over all DHS policies and practices, including those challenged here. Plaintiffs sue him in his official capacity.

## FACTUAL BACKGROUND

### *U.S. Visa Applications*

17.     The INA requires applicants for immigrant and nonimmigrant visas to submit certain information in order to establish their identities and their eligibility for the visas they seek. The INA provides that an applicant for an *immigrant* visa must submit:

> his full and true name, and any other name which he has used or by which he has been known; age and sex; the date and place of his birth; and such additional information necessary to the identification of the applicant and the enforcement of the immigration and nationality laws as may be by regulations prescribed.

8 U.S.C. § 1202(a). The INA provides that an applicant for a *nonimmigrant* visa must submit:

> his full and true name, the date and place of birth, his nationality, the purpose and length of his intended stay in the United States; his marital status; and such additional information necessary to the identification of the applicant, the determination of his eligibility for a nonimmigrant visa, and the enforcement of the immigration and nationality laws as may be by regulations prescribed.

*Id.* § 1202(c).

18.     State Department regulations elaborate on the INA's visa application requirements,

specifying the forms that visa applicants must submit and authorizing consular officers to require applicants to answer questions or provide additional information as necessary to determine their visa eligibility.

19.     With respect to *immigrant* visas, State Department regulations require applicants to submit Form DS-260, the Electronic Application for Immigrant Visa and Alien Registration. 22 C.F.R. § 42.63(a)(1). Form DS-260 poses a series of specific questions that directly relate to the applicant's identity and eligibility for a visa, including questions regarding the applicant's family, health, travel, work history, and criminal history, as well as questions related to national security.

20.     The State Department's regulations provide that immigrant visa applicants may be required to provide additional information if necessary to verify their identities or to determine their visa eligibility. Specifically, the regulations provide that consular officers "may require the submission of additional information or question the [applicant] on any relevant matter whenever the officer believes that the information provided in . . . Form DS-260 is inadequate to determine the [applicant's] eligibility to receive an immigrant visa." *Id.* § 42.63(c).

21.     With respect to *nonimmigrant* visas, State Department regulations require applicants to submit Form DS-160, the Online Application for Nonimmigrant Visa. *Id.* § 41.103(a)(1). Like Form DS-260, Form DS-160 poses a series of questions directly relating to the applicant's identity and eligibility for a visa, including questions regarding the applicant's family, health, travel, work history, and criminal history, as well as questions related to national security.

22.     The State Department's regulations provide that nonimmigrant visa applicants may be required to provide additional information if necessary to verify their identities or to determine their visa eligibility. Most applicants are required to appear for a personal interview, at which they

must "provide a biometric, which will serve to authenticate identity and additionally verify the accuracy and truthfulness of the statements in the application at the time of interview." *Id.* § 41.103(b)(2). The regulations further provide that a consular officer "may require the submission of additional necessary information or question an [applicant] on any relevant matter whenever the consular officer believes that the information provided in the application is inadequate to permit a determination of the [applicant's] eligibility to receive a nonimmigrant visa." *Id.*

23.     Regardless of nationality and with only narrow exceptions, all individuals applying from abroad for immigrant visas must complete Form DS-260, and all individuals applying from abroad for nonimmigrant visas must complete Form DS-160. For a variety of reasons, it is common for non-citizens who live in the United States to apply for new visas, or to renew their existing visas, from abroad. To the extent they do this, they, too, are required to submit Form DS-260 or Form DS-160, as applicable.

### The Registration Requirement

24.     In recent years, federal agencies have experimented with the use of social media surveillance for visa-related purposes. In December 2015, for example, DHS established a task force to test the effectiveness of social media screening in assessing the eligibility of certain visa applicants and nonimmigrant visa holders through pilot programs conducted by U.S. Citizen and Immigration Services ("USCIS"), Immigration and Customs Enforcement ("ICE"), and Customs and Border Protection ("CBP"). In February 2017, however, the DHS Inspector General reported that these pilot programs had failed to establish that social media screening was an effective tool for screening visa applicants or identifying national security threats and thus were an inadequate basis on which to build broader initiatives.

25.     Notwithstanding the lack of evidence demonstrating the effectiveness of social

media screening for visa-related purposes, the State Department subsequently introduced the Registration Requirement as part of a broader effort to implement President Trump's so-called "extreme vetting" program. On March 6, 2017, President Trump issued an executive order and signed a memorandum directing the Secretary of State and other Cabinet officials to implement procedures for the "enhanced" vetting of applications for visas and other immigration benefits. *See* Executive Order 13,780, 82 Fed. Reg. 13,209, 13,215 (Mar. 9, 2017) (signed Mar. 6, 2017); Memorandum for the Secretary of State, the Attorney General, and the Secretary of Homeland Security, 82 Fed. Reg. 16,279, 16,279 (Apr. 3, 2017) (signed Mar. 6, 2017). Citing President Trump's March 6, 2017 executive order and memorandum, the State Department proposed the Registration Requirement in two notices issued on March 30, 2018. 60-Day Notice of Proposed Information Collection: Application for Immigrant Visa and Alien Registration, 83 Fed. Reg. 13,806 (Mar. 30, 2018); 60-Day Notice of Proposed Information Collection: Application for Nonimmigrant Visa, 83 Fed. Reg. 13,807 (Mar. 30, 2018).

26.     The March 2018 notices received over ten thousand public comments, the vast majority of which opposed the Registration Requirement. Over six thousand comments raised concerns that the new requirement would undermine the freedoms of speech, expression, and association, invade individuals' privacy, or deter travel to the United States. Additionally, hundreds of comments highlighted evidence showing that social media communications are difficult, if not impossible, to interpret accurately—especially in the context of foreign languages and cultures. Relying on the government's own reports, many comments observed that social media screening is an ineffective and unreliable means of verifying individuals' identities, confirming their eligibility for visas, and assessing any threat they might pose to national security. Only eighty-seven comments expressed support for the Registration Requirement.

27.     The State Department nonetheless updated Form DS-260 and Form DS-160 to include the Registration Requirement on May 31, 2019. In its final supporting statements, the State Department wrote that the Registration Requirement would enable consular officers, in coordination with State Department officials and other federal agencies, to confirm applicants' identities and determine their visa eligibility under U.S. law. Despite a conclusory statement that visa applicants' social media information "is necessary to make these determinations," however, the State Department cited no evidence indicating that social media screening of the kind made possible by the Registration Requirement is a reliable means of identifying visa applicants or determining their visa eligibility. Nor did the State Department explain the necessity of imposing the Registration Requirement on millions of visa applicants each year whose identification and eligibility determinations pose no difficulties for consular officers. Nor did the State Department explain why the retention of visa applicants' social media information *beyond* their visa eligibility determinations is necessary for those purposes.

28.     Since the Registration Requirement took effect, nearly all individuals applying for U.S. visas from abroad have been compelled to disclose on Form DS-260 or Form DS-160, as applicable, all social media identifiers they have used on the following social media platforms in the five years preceding their applications: Facebook, Flickr, Google+, Instagram, LinkedIn, Myspace, Pinterest, Reddit, Tumblr, Twitter, Vine, and YouTube; the Chinese sites Douban, QQ, Sina Weibo, Tencent Weibo, and Youku; the Russian social network VK; the Belgian site Twoo; and the Latvian site Ask.fm. Applicants are also asked to provide identifiers they have used on other, non-listed platforms if they "wish" to do so.

29.     The Registration Requirement appears on Form DS-260 as follows:



30.    The Registration Requirement appears on Form DS-160 as follows:



31.    The Registration Requirement is mandatory and makes no exception for applicants who use pseudonymous social media identifiers. The State Department has made clear that visa applicants who have used any of the social media platforms listed on Form DS-260 or Form DS-

160 in the preceding five years are required to provide the associated social media identifiers on the application form, and that failure to provide complete and truthful responses to visa application questions may result in denial of a visa.

32.     The Registration Requirement applies nearly universally, with only a few narrow exceptions for, *e.g.*, diplomatic and official travelers. It applies even in contexts in which consular officers do not need any additional information, including social media information, to confirm applicants' identities or determine their visa eligibility. The State Department has estimated that the Registration Requirement applies to more than 14 million applicants each year.

33.     The Registration Requirement makes no exception for applicants who have established significant voluntary connections to the United States. The requirement applies to those who reside in the United States but renew their visas or apply for new ones from abroad; those who have pursued undergraduate or graduate degrees in the United States; those who have worked for years in the United States and who hope to continue their careers in the United States; and those with extensive familial connections to the United States.

### *Retention and Dissemination of Visa Applicants' Social Media Information*

34.     State Department and DHS policies contemplate that information collected through the Registration Requirement will be retained indefinitely, disseminated widely within the U.S. government, and, in some circumstances, disclosed to foreign governments. For example:

35.     The State Department stores information collected through the Registration Requirement in its Consular Consolidated Database ("CCD"), which contains the agency's visa records system. In addition to the State Department, agencies that can access the visa records system for a wide range of purposes include DHS, the U.S. Department of Justice, the U.S. Department of Defense, and the U.S. Department of Commerce. The State Department also makes

information from the visa records system available in certain circumstances to Congress; to state, local, and tribal government officials; and to foreign governments.

36.     DHS maintains copies of the State Department's nonimmigrant and immigrant visa data stored in the CCD in its own Automated Targeting System ("ATS"), a system of records that "allows users to search data across many different databases and systems to provide a consolidated view of data about a person or entity." U.S. Dep't of Homeland Security, DHS/CBP/PIA-006(e), Privacy Impact Assessment Update for the Automated Targeting System 1 (Jan. 13, 2017). DHS sometimes discloses information in ATS to other agencies, as well as to foreign governments. At least seventy-eight foreign governments may obtain information from ATS pursuant to Customs Mutual Assistance Agreements.

37.     On information and belief, DHS retains social media information collected through the Registration Requirement in the Alien File, Index, and National File Tracking System of Records. This system of records houses individuals' "official immigration record[s]," called "A-Files," for 100 years after their dates of birth, at which point the records are archived. DHS uses the data stored in A-Files to facilitate the administration of immigration benefits and determination of employment eligibility, among other purposes. In September 2017, DHS issued a System of Records Notice in the Federal Register indicating that A-Files include "social media handles, aliases, associated identifiable information, and search results." U.S. Dep't of Homeland Security System of Records Notice, 82 Fed. Reg. 43,556, 43,557 (Sept. 18, 2017). DHS policy permits the dissemination of A-File information not only to other DHS components with a "need to know" the information, but also to "appropriate Federal, State, local, tribal, territorial, foreign, or international government agencies," and to current and prospective employers, among other third parties. *Id.* at 43,558, 43,562.

38.     On information and belief, Defendants and their components rely on information collected through the Registration Requirement to monitor visa applicants' social media activities even after they enter the United States. For example, ICE recently launched a program to monitor the social media activities of visa holders and applicants for immigration benefits. In May 2018, ICE announced that it would seek to hire about 180 people to monitor the social media activity of 10,000 people per year.

## PLAINTIFFS

39.     Plaintiffs are U.S.-based documentary film organizations that carry out their missions by producing conferences, screenings, filmmaking labs, and film projects in close collaboration with filmmakers and other partners from around the world. Plaintiffs bring this suit on behalf of (i) themselves; (ii) their non-U.S. members and partners who have applied for U.S. visas since the Registration Requirement went into effect; who intend to apply for U.S. visas in the near future; or who will no longer apply for U.S. visas because of the Registration Requirement; and (iii) their U.S. members, partners, and audiences who wish to engage with their non-U.S. members and partners online or in person.

### *Plaintiffs and their Members and Partners*

40.     Founded in 2005, Doc Society seeks to enable the creation of documentary films that drive social change and to connect those films to global audiences. Doc Society accomplishes its mission by partnering with filmmakers, activists, foundations, philanthropists, and policymakers around the world. Doc Society provides its partners with funding for film projects, educational and promotional resources, and cross-sector networking opportunities at forums hosted all over the world. For example, Doc Society hosts "Good Pitch" events throughout the year to connect filmmakers with potential funders and supporters in order to forge coalitions and

campaigns that will drive change. To date, Good Pitch events have featured over 130 film projects from sixty different countries. Over 5,137 organizations have participated in these events, leading to more than 1,700 partnerships and 119 social justice impact campaigns. All told, Good Pitch events have raised $30 million over the past ten years. Doc Society also recognizes documentary films that have had significant and measurable social impact with its "Doc Impact Hi5" awards program. Through the Doc Impact Hi5 awards, Doc Society seeks to engage new fans with the selected films; to attract new partners for the films' social impact campaigns; and to share best practices for social impact campaigns with Doc Society's community.

41.    Founded in 1982, IDA is a non-profit organization whose mission is to support a global community of documentary filmmakers in order to foster a more informed, compassionate, and connected world. Its community of filmmakers includes over 2,700 dues-paying members across fifty-three countries. In service of its mission, IDA funds films and filmmakers and hosts dozens of screenings, conferences, workshops, and other events throughout the United States each year. In the past year alone, IDA organized over thirty events in Los Angeles, New York City, and Austin. These events included workshops on grant writing, new technologies, and legal issues; a conversation series with renowned documentary filmmakers; awards events; and film screenings. Every two years, IDA partners with the Academy of Motion Picture Arts and Sciences to host the "Getting Real" conference, where peers throughout the documentary field share skills and information and build networks to help accelerate their careers and amplify their stories. Each year, IDA holds the IDA Documentary Awards ceremony in Los Angeles to recognize outstanding documentary films. Building international bridges across the documentary community through in-person interactions at these events and online interactions beyond these events is central to IDA's mission.

42.     Many of Plaintiffs' non-U.S. members and partners had plans to come to the United States, or have plans to come to the United States in the near future, to take advantage of professional or educational opportunities, including collaborating with Plaintiffs or participating in Plaintiffs' events. These members and partners are nationals of, among other countries, Australia, Canada, Chile, Denmark, England, Finland, India, Kenya, Palestine, Mexico, Spain, and Turkey. A number of these members and partners intend or intended to apply for O-1 visas as artists of extraordinary ability or for I visas as representatives of the foreign media. Some of them have recently applied or are currently applying for U.S. visas.

43.     Many of Plaintiffs' non-U.S. members and partners have substantial connections to the United States. Some already live in the United States but must renew their visas to continue their lives and their work here. Some have family members in the United States. Some have spent several years pursuing arts, journalism, or other degrees at U.S. universities. Others have significant work experience in the United States, shooting films on social or human rights issues or participating in artist residency programs. As a result of their work, many have built personal and professional networks within the United States.

44.     Plaintiffs' U.S. members and partners benefit from their close collaborations with non-U.S. members and partners. Often, the success of these collaborations turns on the ability of Plaintiffs' U.S. members and partners to meet with Plaintiffs' non-U.S. members and partners in person. IDA's U.S. members often work with members from other countries. For example, IDA is currently funding a film set in Zimbabwe by a Danish directing team working with a U.S. producer. And the 2019 IDA Documentary Awards will honor Syrian filmmaker Waad al-Kateab with the Courage Under Fire Award for her film documenting the siege of Aleppo, which was a United States, United Kingdom, and Syrian co-production for the Public Broadcasting Service and UK

Channel 4. Based on Doc Society's experience working to generate support for documentary film projects, it understands that such support depends on documentary filmmakers' ability to build rapport with potential funders or activists who share the filmmakers' objectives, for which there is no acceptable substitute to uninhibited, face-to-face discussion.

45.     Plaintiffs' U.S. members and partners, as well as their U.S. audiences, participate in Plaintiffs' events and attend Plaintiffs' screenings so that they can hear from and engage with non-U.S. members and partners in person. Plaintiffs and their U.S. members, partners, and audiences thus depend on the willingness and ability of non-U.S. members and partners to travel to the United States and attend these programs.

### Use of Social Media by Plaintiffs and Their Members and Partners

46.     Social media is an indispensable research, education, and communication tool for Plaintiffs. Plaintiffs rely on social media to discover new projects and partners, promote their events, share resources with filmmakers, and announce available funding for new film projects.

47.     Doc Society uses social media to learn about the work of filmmakers, advocates, activists, and other partners in order to inform its decisions about whom to invite to its events and about what kind of programming to offer. Doc Society also uses Twitter, Instagram, and Facebook to provide live coverage of its events and disseminate information to its broader community. It regularly conducts searches on these platforms to identify potential supporters for its films or programs. It also uses these platforms to amplify the messages of others, including filmmakers Doc Society has previously supported and individuals and organizations whose aims Doc Society shares.

48.     Similarly, IDA uses Twitter, Facebook, LinkedIn, YouTube, and Instagram to communicate with its members around the world. On these platforms, IDA researches issues

impacting filmmakers, issues calls for action to protect filmmakers in jeopardy, provides information about resources available to filmmakers, promotes its grantees' films, and facilitates interactions between its members.

49.      Plaintiffs' U.S. members and partners, as well as their U.S. audiences, likewise rely on social media to learn about new projects from filmmakers working around the world and to engage with Plaintiffs' non-U.S. members and partners about their work. Plaintiffs and their U.S. members, partners, and audiences thus depend on the willingness of non-U.S. members and partners to share information and interact with others on social media.

50.      In turn, Plaintiffs' non-U.S. members and partners engage on social media in a near-constant, cross-platform exchange of views and information. They use social media to share and promote their work; meet and network with other artists, activists, journalists, film subjects, funders, and policymakers; engage in debate on political and social issues, especially issues related to their work; and raise awareness about those issues. One IDA member, for example, uses social media to make people aware of important issues addressed in her work—focused on social issues with particular impact on women and children—as well as to connect with other people in the documentary film industry. Another IDA member who engages with political activists and filmmakers in the Middle East and North Africa has used social media in connection with political demonstrations. Doc Society's partners often use social media to build coalitions and campaigns for social impact issues, including issues related to human rights. One Doc Society partner who earned her undergraduate degree in the United States uses social media to remain engaged with U.S. domestic issues, such as mass incarceration and the Black Lives Matter movement, as well as to communicate with professional contacts and to promote her work.

51.      Some of Plaintiffs' members and partners use pseudonymous identifiers to protect

their identities, their associations, or their speech on social media. One Doc Society partner, for example, has used pseudonymous social media accounts to conduct sensitive research for a film about Nazis online, including joining discussion groups and contacting members of known Nazis' families. An IDA member from Syria uses pseudonymous accounts as a safety measure against political persecution. At least three other IDA members use pseudonymous accounts to share their views on political and social issues: one uses pseudonymous accounts to express solidarity with political protests in his home country; another uses pseudonymous social media identifiers to anonymously discuss concerns about the Trump administration, as well as to discuss various other political issues such as gun laws, abortion rights, and the selection of Supreme Court justices; and another engages on YouTube and other public forums anonymously to minimize the risk of stalking or other threatening behavior.

### *Burdens on the Speech and Association of Plaintiffs' Non-U.S. Members and Partners*

52.     The Registration Requirement, together with related retention and dissemination policies, directly burdens the speech and association of Plaintiffs' non-U.S. members and partners by compelling them to disclose their social media identifiers, thereby subjecting their online expressive activities to government surveillance of indefinite scope and duration.

53.     The Registration Requirement also deprives Plaintiffs' non-U.S. members and partners who use pseudonymous social media identifiers of their online anonymity and associational privacy. These filmmakers have no choice but to identify themselves to the U.S. government in connection with their speech and associations on social media if they apply for U.S. visas from abroad. In public comments opposing the Registration Requirement, Twitter emphasized that one of the platform's "hallmarks is that users may engage in anonymous speech to express opinions that may be challenging or unpopular, or to otherwise comment on issues without fear of reprisal." Twitter, Inc., Comment Letter on Proposed Information Collection:

Application for Nonimmigrant Visa (May 28, 2018), https://perma.cc/9NGU-8YAV. If visa applicants "are forced to disclose Twitter handles associated with otherwise anonymous accounts," Twitter's comments stated, "the value of Twitter's platform for such users evaporates," which "chills global conversation and negatively impacts the utility and value of Twitters [sic] platform for all users." *Id.*

54.     The Registration Requirement results in significant self-censorship. Because the Registration Requirement is mandatory and nearly universally applicable, Plaintiffs' non-U.S. members and partners know that their speech and associations will be subject to review in connection with their visa applications and potentially to ongoing monitoring by the U.S. government. In addition, some of Plaintiffs' non-U.S. members and partners also fear that their political speech and associations on social media may subject them to additional scrutiny or delays in the processing of their visa applications. As a result, many of Plaintiffs' non-U.S. members and partners now refrain from expressing themselves and engaging with others on social media as freely as they once did.

55.     Many of Plaintiffs' non-U.S. members and partners have deleted past posts, altered or limited their speech, or entirely dropped out of certain groups on social media. Because of the Registration Requirement, one IDA member currently residing in the U.S. Midwest reviewed three years of social media activity and deleted posts criticizing the current U.S. administration in order to avoid any delays on future visa applications. One Doc Society partner now avoids posting original political content on social media, instead limiting her social media activity to sharing non-original content, out of concern that her speech on social media could result in visa-processing delays that would prevent her from attending workshops or events in the United States and compromise her ability to continue partnering with U.S. funders and collaborators. Others among

Plaintiffs' non-U.S. members and partners have stopped posting or commenting on political or social issues entirely. Concerned that their political views will be used against them during the visa process, they self-censor to avoid being associated with controversial ideas or sensitive topics. A Doc Society partner who has shot two films and attended multiple film festivals in the United States applied for an I visa one week after the Registration Requirement took effect in the hope of continuing his work in the United States. Because of the Registration Requirement, he has all but stopped expressing his views and interacting with others on social media, though he previously used social media to promote his projects and to share his political views.

56.     Some of Plaintiffs' members and partners are no longer applying for U.S. visas— and are forgoing personal, educational, and professional opportunities—because they do not want to disclose their social media identifiers to Defendants and fear the consequences of doing so. Because of the Registration Requirement, one IDA member has decided not to accept future work in the United States despite significant past work experience as a journalist here. Likewise, a Turkish IDA member who is currently working on a documentary project with U.S. partners abroad has decided against applying for a U.S. visa, though visiting the United States would allow him to deepen his collaboration with his U.S. partners.

57.     The Registration Requirement's chilling effects stem in part from the risk that U.S. officials will misinterpret visa applicants' social media activity. In light of this risk, a Doc Society partner who recently applied for a J-1 visa under the new Registration Requirement reviewed two years' worth of Twitter posts, deleting posts that were critical of U.S. policy and might be misconstrued by U.S. officials. Other filmmakers have also stopped posting or commenting on any content about American politics or President Trump's administration for the same reason. This risk of misinterpretation is significant. An individual's expressive activity on social media may

include posts tailored for particular audiences, and may fail to accurately portray their age, physical attributes, profession, beliefs, or other characteristics. Social media posts can be prohibitively difficult to interpret without a nuanced understanding of the context in which they were made. Interpreting these posts is particularly challenging when the content comes from different countries, appears in different languages, and has meanings informed by layers of regional, cultural, and societal norms. And the fact that so much activity on social media consists of non-verbal actions—sharing others' posts, joining groups, using icons or buttons to "like" or express other attitudes towards others' posts, etc.—makes the interpretive task yet more challenging. When an individual reacts with an "angry" emoji to a Facebook post critical of a public official, for example, it may be unclear whether the individual is expressing anger at the public official or at the criticism of the public official. Reliance on automated review tools further exacerbates the risk of misinterpretation. Even the best natural language processing tools, which are used to determine the meaning of text, misinterpret speech 20 to 30 percent of the time. According to recent reports, USCIS instructs officers to screen refugees' social media posts using commonly available translation tools such as Google Translate, which Google itself cautions is not intended to replace human translators, given its inability to interpret slang or idiomatic language and its inability to convey nuance, among other shortcomings. The U.S. government and other governments have sometimes misinterpreted social media activity with significant negative consequences. *See, e.g.*, J. David Goodman, *Travelers Say They Were Denied Entry to U.S. for Twitter Jokes*, N.Y. Times (Jan. 30, 2012), https://perma.cc/4T79-VBTZ.

58.    The Registration Requirement's chilling effects also stem in part from the risk that U.S. officials will impute to visa applicants the speech of others linked to them on social media. One IDA member is less willing to participate in screenings and "Question & Answer" sessions

because his comments may be mischaracterized by others, shared on social media, and then read by the government. Other members and partners are more cautious in associating with others online. An individual's social media accounts may display photos, comments, "likes," or other content from hundreds or thousands of other individuals, and any of this content may be misattributed to the account holder. An individual's social media accounts may also link that individual to hundreds or thousands of other people, and any of these connections may be misconstrued. For example, although all connections on a particular platform may be designated as "friends," those connections may include acquaintances, co-workers, members of the same online groups, people whom the account holder has never met in person or even engaged with online, or people whom the account holder follows specifically because of ideological disagreements. Government actors have imputed speech and inferred real-world relationships based on social media connections, at times depriving individuals of life-altering opportunities and even their freedom on those bases. *See, e.g.*, Shera S. Avi-Yonah & Delano R. Franklin, *Incoming Harvard Freshman Deported After Visa Revoked*, The Crimson, Aug. 27, 2019, https://perma.cc/UY97-TU35; Ben Popper, *How the NYPD Is Using Social Media To Put Harlem Teens Behind Bars*, The Verge (Dec. 10, 2014), https://perma.cc/5JDR-7WV7.

59.    The Registration Requirement's chilling effects stem in part from the risk that consular officers will exercise their considerable discretion to subject visa applicants to additional scrutiny or delay application processing, even if consular officers do not ultimately deny them visas. According to recent reports, the U.S. government tracked the social media activities of journalists, advocates, and activists who called attention to issues surrounding the treatment of migrants at the U.S.-Mexico border. A number of those individuals then faced additional questioning by U.S. officials when crossing the border, and some even had their passports flagged

or their visas revoked, significantly limiting their ability to travel.

60.     The Registration Requirement's chilling effects also stem in part from the risk that the U.S. government will disseminate social media information to repressive foreign governments with a history of retaliating against online critics. Plaintiffs' non-U.S. members and partners include filmmakers who use pseudonymous social media identifiers to enable them to speak freely about political matters without fear of reprisal or retribution. One IDA member from Syria, for example, used pseudonymous social media identifiers to guard against persecution by the Syrian regime. These fears of retaliation are well founded. For example, in August 2019, a Myanmar court reportedly sentenced Burmese filmmaker Min Htin Ko Ko Gyi, founder and director of the Myanmar Human Rights Human Dignity Film Festival, to a year's hard labor as punishment for Facebook posts critical of the country's armed forces. The Turkish government's "virtual patrol squad" has now imprisoned more than 7,000 individuals based on their social media posts, including Kurdish journalist Rawin Sterks, who was charged with conducting propaganda for a terrorist organization based on a Facebook post about his documentary on the Kurdish Peshmerga (the military forces of Iraqi Kurdistan). Saudi Arabia, Vietnam, and Russia have likewise targeted online critics for retaliation, sometimes going to great lengths to identify dissidents who use pseudonymous account handles.

61.     Finally, the Registration Requirement's chilling effects stem in part from the demonstrated vulnerability of U.S. databases to hacking and other security breaches. An internal State Department cybersecurity investigation in 2016 showed that the CCD lacked the security necessary to protect visa applicants' information, which now includes information obtained through the Registration Requirement. DHS and some of its components have also experienced significant breaches in the past few years. Earlier in 2019, for example, CBP acknowledged that

unidentified actors had hacked into a database containing traveler photographs and license plate images stored on a subcontractor's network.

62.     The chilling effect of the Registration Requirement is more severe because of the requirement's dragnet nature. Because it applies to nearly all visa applicants, the Registration Requirement enables the government to compile a database of millions of people's speech and associations, which it can cross-reference to glean more information about any given visa applicant. The more information the government collects about other individuals, the more connections the government is able to draw about any given individual's familial, social, professional, and political life.

63.     The government's indefinite retention of information collected through the Registration Requirement further exacerbates the requirement's chilling effect because it facilitates surveillance into the future. Relying in part on information collected through the Registration Requirement, the State Department engages in ongoing screening of visa applicants, even after they have submitted their applications, to determine their continued eligibility to travel to the United States. Moreover, visa applicants may be the targets of ongoing surveillance even after they enter the United States. For instance, as noted above, ICE has made clear its intent to conduct continuous monitoring of 10,000 visa applicants' and visa holders' social media and other online activities each year. The knowledge that the government will retain the information collected through the Registration Requirement indefinitely chills visa applicants' expressive and associational activities before they enter the United States, and it is likely to chill their expressive and associational activities after they enter the United States as well.

64.     Although the Registration Requirement severely burdens the speech and associational rights of Plaintiffs' non-U.S. members and partners, those non-U.S. members and

partners cannot realistically challenge the requirement themselves. Challenging the requirement would require them to draw the government's attention to their expressive and associational activities—that is, to surrender the very anonymity or obscurity they seek to protect.

### *Harms to Plaintiffs and Their U.S. Members, Partners, and Audiences*

65.    When Plaintiffs' non-U.S. members and partners censor their online speech or decline opportunities to participate in U.S.-based programs, Plaintiffs, their U.S. members and partners, and U.S. audiences are deprived of the opportunity to view these filmmakers' and collaborators' work and to hear from them on important platforms for expression.

66.    *First*, by chilling the expressive and associational activities of Plaintiffs' non-U.S. members and partners on social media, the Registration Requirement burdens Plaintiffs' ability to learn about the work of their members and partners around the world, to foster cross-border discussion within their global communities, and to promote their events.

67.    The Registration Requirement impedes Doc Society's efforts to identify films to honor at its awards ceremonies, to research issues to explore in new programs, and to disseminate resources throughout its broader community. Doc Society sponsors the Doc Impact Hi5 awards, which honor films for the effectiveness of their impact campaigns. Doc Society measures the impact of these films in part through the quality and quantity of social media engagement they generate. Doc Society also relies on social media to identify new issues to address in its programs. Through Twitter, Doc Society identified key members of the global community concerned with climate change, including scientists, indigenous and faith leaders, lawyers, and campaign organizers, whom it then connected with documentary filmmakers at a new "Climate Story Lab" program it co-hosted in New York City in the summer of 2019. Additionally, Doc Society uses social media to disseminate its "Safe + Secure" resources. These resources, which Doc Society's

non-U.S. partners have previously shared with their own online networks, provide tools for both filmmakers and funders to help mitigate risks associated with their work, including digital, legal, and journalistic risks, and risks related to their safety and health. Because the Registration Requirement deters Doc Society's non-U.S. partners from sharing information and interacting with others on social media, it makes it more difficult for Doc Society to rely on social media for these research and outreach purposes.

68.     The Registration Requirement likewise impedes IDA's efforts to circulate information about resources available to its members, to learn about issues confronting its members around the world, and to promote its events. IDA uses Twitter and Facebook to share budgeting techniques for documentary filmmakers, flag resources for legal representation, and provide details about grants funded by IDA and other organizations. IDA uses LinkedIn to post job opportunities on its organizational page and to connect its members and staff through its group page. IDA's YouTube page features not only clips from interviews and screenings, but also educational videos for filmmakers, such as video series titled "Using Graphics to Tell Your Story" and "Get the Most out of Your Film's Release." Overall, IDA's social media pages serve as hubs where its members and followers can network and learn from each other. IDA itself follows numerous documentary filmmakers on Twitter and Instagram, as well as relevant industry hashtags on Instagram such as #documentaryfilmmaker, #documentaryfilm, and #documentaryfilmmaking. IDA pays close attention to what filmmakers are saying on Twitter and Facebook to inform its educational and advocacy efforts on their behalf. For example, through social media IDA has discovered a number of cases of filmmaker censorship, which IDA has then investigated in order to assist the censored filmmakers and to alert its membership to the threats they may face in different countries. IDA addresses these and similar issues in sessions during the Getting Real

conference, in its magazine, and through its own social media accounts. Because the Registration Requirement deters IDA's non-U.S. members from sharing information and interacting with others on social media, it makes it more difficult for IDA to rely on social media for these educational, advocacy, and programming purposes.

69.     For the same reasons, the Registration Requirement deprives Plaintiffs' U.S. members and partners of opportunities to hear from and engage with their non-U.S. members and partners online. Individuals within Plaintiffs' communities view their online interactions with non-U.S. members and partners as a significant benefit of their affiliation with Plaintiffs' organizations. Because the Registration Requirement deters Plaintiffs' non-U.S. members and partners from sharing information and interacting with others on social media, however, Plaintiffs' U.S. members and partners no longer enjoy that benefit to the same extent they previously did.

70.     *Second*, by deterring Plaintiffs' non-U.S. members and partners from applying for visas to attend Plaintiffs' flagship and other events in the United States, the Registration Requirement burdens Plaintiffs' ability to attract participants and, ultimately, audiences to these events.

71.     The Registration Requirement jeopardizes the success of Doc Society's U.S.-based events, which depends on the in-person participation of non-U.S. partners. Doc Society expends time and resources recruiting non-U.S. filmmakers and other partners to participate in Good Pitch events in the United States, sending invitations six to nine months in advance to enable the participants to make any necessary travel arrangements. Since 2016, Doc Society has hosted three large-scale Good Pitch events in the United States—two in New York City (on November 15, 2016, and October 22, 2019), and one in Miami (on June 20, 2017)—in addition to four smaller Good Pitch events (called Good Pitch Locals) held in the United States. A third of the films

showcased at the large-scale U.S. events were from non-U.S. film teams or addressed non-U.S. subjects. In 2016, six non-U.S. nationals were invited to the Good Pitch New York event, all of whom attended. In 2017, 278 non-U.S. nationals were invited to the Good Pitch Miami event, of whom 73 attended. In 2019, 15 non-U.S. nationals were invited to the Good Pitch New York event, of whom 13 attended. Because the Registration Requirement deters Doc Society's non-U.S. partners from traveling to the United States to participate in Doc Society's U.S.-based Good Pitch events, it diminishes the impact of these events, making them less attractive to potential audience members and making Doc Society less attractive to potential funders.

72.     The Registration Requirement likewise jeopardizes the success of IDA's events, which depends on the in-person participation of non-U.S. members. IDA's Getting Real conference, hosted in Los Angeles, offers filmmakers the opportunity to meet face-to-face with other filmmakers from around the world. It also features case studies of non-U.S. film projects and sessions highlighting advocacy efforts on behalf of filmmakers facing censorship in different countries. In part because of the global networking opportunities and internationally focused programming, Getting Real typically attracts over 1,000 attendees, approximately ten to fifteen percent of whom are based outside of the United States. In 2018, Getting Real brought documentary artists, activists, and journalists from twenty different countries together. IDA will hold the next Getting Real conference in September 2020, and it is currently working with a funder to support the attendance of filmmakers from Yemen, Palestine, and Afghanistan. IDA also assists non-U.S. filmmakers with travel to the United States to attend the IDA Documentary Awards, which recognize outstanding documentary films and programs from around the world. The 35th annual IDA Documentary Awards will be held in Los Angeles on December 7, 2019, and will honor films in fifteen categories from 785 submissions, forty percent of which are international

productions or co-productions. In particular, the 2019 awards will honor Syrian filmmaker Waad al-Kateab with the Courage Under Fire Award for her films documenting the siege of Aleppo. Six out of ten nominees in the Best Feature category, and four out of five nominees in the Best Director category, are also from outside the United States. IDA's film screenings, too, feature the work of non-U.S. filmmakers. During its 2019 "Screening Series," hosted in Los Angeles and New York City, IDA screened sixty-one documentary shorts and features, over a quarter of which are non-U.S. productions, and all of which were accompanied by in-person conversations with the filmmakers. IDA's February 2019 "DocuDay," hosted in Los Angeles, featured ten films, including two non-U.S. productions, with all of the filmmakers in attendance. IDA will host the next DocuDay in Los Angeles in February 2020 but now anticipates greater challenges in attracting non-U.S. participants. Because the Registration Requirement deters IDA's non-U.S. members from traveling to the United States to participate in IDA's U.S.-based events, it diminishes the impact of these events, making them less attractive to other members and broader audiences.

73.     For the same reasons, the Registration Requirement deprives Plaintiffs' U.S. members, partners, and audiences of opportunities to hear from and engage with non-U.S. members and partners at Plaintiffs' U.S.-based events. Many U.S. members, partners, and audience members attend these events to view films from around the world and to hear from and respond to the creators and subjects themselves. Because the Registration Requirement deters Plaintiffs' non-U.S. members and partners from traveling to the United States to participate in their U.S.-based events, U.S. members, partners, and audiences no longer have as many opportunities to engage with those individuals in person.

74.     Finally, the Registration Requirement chills the expressive and associational activity of Plaintiffs' U.S. members and partners themselves. In reviewing the social media activity

of Plaintiffs' non-U.S. members, consular officers will inevitably review and consider the posts, "likes," shares, and tags of their contacts on social media. The Registration Requirement thus implicates the speech of many more individuals than the millions of visa applicants directly subject to it, including some of Plaintiffs' U.S. members and partners, resulting in even broader chilling effects across Plaintiffs' organizations.

*     *     *

75.    As a result of all of the facts described above, the Registration Requirement forces Doc Society and IDA to divert time, staff resources, and funding to find and engage with members and partners who are now reluctant to speak publicly on social media or travel to the United States; to support and promote the work of their members and partners; and to recruit new members, partners, and projects. Regardless of the additional time and resources that Plaintiffs expend, however, they anticipate that their online engagement with non-U.S. members and partners will decrease, as will participation in their U.S.-based programs and partnership opportunities across their organizations.

76.    In these ways, the Registration Requirement burdens Plaintiffs' efforts to carry out their mandates. The requirement disrupts Plaintiffs' relationships with their members and partners, which Plaintiffs have spent years working to develop and strengthen. The requirement thus weakens Doc Society's ability to support the creation of documentary films and to connect those films to global audiences. It likewise weakens IDA's ability to support a global community of documentary filmmakers.

### COUNT I

### APA Claims

77.    The Registration Requirement exceeds Defendant Pompeo's statutory jurisdiction and authority, and/or limitations set forth in the INA, 8 U.S.C. §§ 1202(a), (c), violates the First

33

Amendment, and is arbitrary and capricious. It must therefore be set aside under the APA. *See* 5 U.S.C. §§ 706(2)(A)–(C).

**COUNT II**

**First Amendment Claims**

78.     The Registration Requirement, and related retention and dissemination policies, violate the First Amendment because they deny the rights to anonymous speech and private expressive association; because they deter expressive and associational activity and are not sufficiently tailored to any legitimate government interest; and because they are overbroad.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court:

A.     Declare that the Registration Requirement violates the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)–(C).

B.     Declare that the Registration Requirement and related retention and dissemination policies violate the First Amendment to the Constitution.

C.     Enjoin Defendants from enforcing the Registration Requirement and related retention and dissemination policies.

D.     Order Defendants to expunge all information collected through the Registration Requirement.

E.     Award Plaintiffs reasonable attorneys' fees and costs incurred in this action.

F.     Grant such other and further relief as the Court deems just and proper.

Dated: December 5, 2019

Sincerely,

/s/ Faiza Patel
Faiza Patel*
Harsha Panduranga*
Brennan Center for Justice
    at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271
patelf@brennan.law.nyu.edu
(646) 292-8310

/s/ Carrie DeCell
Carrie DeCell (D.C. Bar No. 1015491)
Jameel Jaffer (D.C. Bar No. MI0067)
Katie Fallow*
Anna Diakun*
Leena Charlton*
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302–304
New York, NY 10115
carrie.decell@knightcolumbia.org
(646) 745-8500

/s/ Rachel Levinson-Waldman
Rachel Levinson-Waldman*
Brennan Center for Justice
    at NYU School of Law
1140 Connecticut Avenue, NW
11th Floor, Suite 1150
Washington, D.C. 20036
levinsonr@brennan.law.nyu.edu
(202) 249-7190

/s/ Paul Curnin
Paul Curnin*
Sarah Eichenberger (D.C. Bar No. D00430)
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
pcurnin@stblaw.com
(212) 455-2000

*Counsel for Plaintiffs*

*pro hac vice* application forthcoming