**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION,<br><br>       Plaintiffs,<br><br>       v.<br><br>MICHAEL R. POMPEO, in his official capacity as Secretary of State, CHAD. F. WOLF, in his official capacity as Acting Secretary of Homeland Security,<br><br>       Defendants. | Civil Action No. 19-cv-3632 (TJK) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

### TABLE OF CONTENTS

INTRODUCTION...........................................................................................................1

BACKGROUND ..........................................................................................................2

I.      SOCIAL MEDIA IDENTIFIERS COLLECTION POLICY ...............................2

II.     RETENTION AND DISSEMINATION OF INFORMATION COLLECTED..................8

III.    PLAINITFFS' COMPLAINT ...............................................................................8

ARGUMENT ..............................................................................................................9

I.      PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS IN THIS CASE.........10

A.      Standard of review for Rule 12(b)(1)...............................................................10

B.      Neither Plaintiff has established standing to sue on behalf of its members.......................11

        1.   Plaintiffs cannot establish associational standing by alleging injury to their
             audiences, partners, and unidentified members ............................................11

        2.   Even if IDA had identified one or more allegedly injured members, its
             allegations would be insufficient to establish associational standing ...........................13

             a.   *The alleged chilling effect on IDA members' speech does not create
                  standing* ...............................................................................14

             b.   *The alleged burdens on the ability of IDA members in the U.S. to hear
                  from and engage with non-U.S. individuals do not create standing* .................17

C.      Neither Plaintiff has established standing to sue in its capacity as an organization. ...........21

        1.   Neither Plaintiff has plausibly alleged an injury-in-fact ...............................21

             a.   *The social media policy has not injured either organization's interest in
                  promoting its mission* .......................................................................22

             b.   *Doc Society and IDA have not adequately alleged that they diverted
                  resources to counteract the effects of the social media policy* .........................25

        2.   Plaintiffs' alleged injuries were not caused by the social media policy .......................26

II.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER EITHER THE APA OR
        FIRST AMENDMENT...............................................................................28

A.    Standard of review for Rule 12(b)(6) ................................................28

B.    Plaintiffs' APA claims fail as a matter of law because they cannot overcome
      threshold barriers under the APA and because the claims are legally insufficient .............29

      1.   Plaintiffs' claims are not subject to review under the APA ...........................29

           a.   *The Secretary's authority under 8 U.S.C. § 1202 is committed to agency
                discretion by law, as the D.C. Circuit has recognized* ......................29

           b.   *Plaintiffs' Asserted Organizational Interests Fall Outside the Zone of
                Interests Regulated by § 1202* .........................................32

      2.   Plaintiffs' APA claims fail as a matter of law ..............................................34

           a.   *The Secretary's decision to issue the social media policy was not
                arbitrary or capricious but was instead the product of reasoned
                decision-making* ................................................................35

           b.   *The Secretary's decision to issue the social media policy was not in
                excess of statutory authority* ................................................39

C.    Plaintiffs fail to state a First Amendment claim ..................................................40

      1.   Supreme Court precedent makes clear that a deferential standard of review
           applies to the social media policy, given its foreign affairs and national security
           implications ..................................................................................40

      2.   Because they are plausibly related to the objectives of strengthening screening
           protocols and enforcing immigration law, the social media policy and related
           uses of information collected satisfy rational basis review ...........................43

           a.   *The social media policy is plausibly related to strengthening vetting
                protocols and enforcing immigration laws* .....................................43

**CONCLUSION** .....................................................................................45

## TABLE OF AUTHORITIES

**CASES**

*Abhe & Svoboda, Inc. v. Chao,*
    508 F.3d 1052 (D.C. Cir. 2007) ...................................................................................3

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach,*
    469 F.3d 129 (D.C. Cir. 2006) .............................................................................22, 23

*Bigail Alliance for Better Access to Developmental DRUGS AND Washington Legal Foundation
v. Von Eschenbach,*
    445 F.3d 470 (D.C. Cir. 2006),
    *vacated on reh'g en banc,* 495 F.3d 695 (D.C. Cir. 2007) ...........................................23

*Abourezk v. Reagan,*
    785 F.2d 1043 (D.C. Cir. 1986) .................................................................................34

*Allen v. Wright,*
    468 U.S. 737 (1984).....................................................................................................17

*Am. Civil Liberties Union of Ill. v. Alvarez,*
    679 F.3d 583 (7th Cir. 2012)......................................................................................18

*Am. Legal Found. v. FCC,*
    808 F.2d 84 (D.C. Cir. 1987) ...............................................................................11, 13

*Am. Library Ass'n v. Barr,*
    956 F.2d 1178 (D.C. Cir. 1992) ...........................................................................16, 17

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,*
    659 F.3d 13 (D.C. Cir. 2011) ...............................................................................22, 26

*Arbaugh v. Y&H Corp.,*
    546 U.S. 500 (2006)................................................................................................... 10

*Arcara v. Cloud Books, Inc.,*
    478 U.S. 697 (1986).....................................................................................................19

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) .....................................................................................26

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).......................................................................................26, 28, 34

*Babbitt v. United Farm Workers Nat. Union,*
    442 U.S. 289 (1979).....................................................................................................14

*Balt. Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983) ........................................................................................................35

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982) ................................................................................................18, 19

*\*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................34, 45

*Cato Inst. v. United States Sec. & Exch. Comm'n*,
   --- F. Supp. 3d ---, No. CV 19-0047 (ABJ), 2020 WL 619793 (D.D.C. Feb. 10, 2020) .......18, 19

*Chamber of Commerce of U.S. v. EPA*,
   642 F.3d 192 (D.C. Cir. 2011) ........................................................................................12

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................................................36

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ........................................................................................................39

*\*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................16, 17, 26, 27

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987) ........................................................................................................33

*Common Cause v. FEC*,
   108 F.3d 413 (D.C. Cir. 1997) ........................................................................................21

*Competitive Enter. Inst. v. U.S. Dep't of Transp.*,
   856 F.2d 1563 (D.C. Cir. 1988) ......................................................................................18

*Conservative Baptist Ass'n of Am., Inc. v. Shinseki*,
   42 F. Supp. 3d 125 (D.D.C. 2014) ..................................................................................13

*Ctr. for Law & Educ. v. Dep't of Educ.*,
   396 F.3d 1152 (D.C. Cir. 2005) ......................................................................................15

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ........................................................................................................17

*Delta Air Lines, Inc. v. Ex.-Im. Bank of U.S.*,
   718 F.3d 974 (D.C. Cir. 2013) ........................................................................................29

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
   883 F.3d 895 (D.C. Cir. 2018) ........................................................................................32

*DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.,
    887 F.2d 275 (D.C. Cir. 1989) ......................................................................12, 13, 39

Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,
    266 F. Supp. 3d 297 (D.D.C.),
    aff'd on other grounds, 878 F.3d 371 (D.C. Cir. 2017) .............................................16

Equal Rights Ctr. v. Post Properties, Inc.,
    633 F.3d 1136 (D.C. Cir. 2011) ...........................................................................22, 25

Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.,
    28 F.3d 1268 (D.C. Cir. 1994) .............................................................................26, 27

FCC v. Fox Television Stations, Inc.,
    556 U.S. 502 (2009) .....................................................................................................35

Fed'n for Am. Immigration Reform, Inc. v. Reno,
    93 F.3d 897 (D.C. Cir. 1996) ......................................................................................33

Fiallo v. Bell,
    430 U.S. 787 (1977) .....................................................................................................40

Food & Water Watch, Inc. v. Vilsack,
    808 F.3d 905 (D.C. Cir. 2015) ..............................................................................23, 24

Fund Democracy, LLC v. SEC,
    278 F.3d 21 (D.C. Cir. 2002) ...............................................................................11, 13

Grand Lodge of Fraternal Order of Police v. Ashcroft,
    185 F. Supp. 2d 9 (D.D.C. 2001) ................................................................................10

Gregg v. Barrett,
    771 F.2d 539 (D.C. Cir. 1985) ....................................................................................19

Haig v. Agee,
    453 U.S. 280 (1981) .....................................................................................................31

Haitian Refugee Ctr. v. Gracey,
    809 F.2d 794 (D.C. Cir. 1987) .......................................................................... passim

Hampton v. Mow Sun Wong,
    426 U.S. 88 (1976) .......................................................................................................40

Harisiades v. Shaughnessy,
    342 U.S. 580 (1952) .....................................................................................................42

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .................................................................................22

*Hazardous Waste Treatment Council v. Thomas*,
  885 F.2d 918 (D.C. Cir. 1989) ..................................................................33

*Hedges v. Obama*,
  724 F.3d 170 (2d Cir. 2013).................................................................16, 17

*Herron v. Fannie Mae*,
  861 F.3d 160 (D.C. Cir. 2017) ..................................................................28

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010)................................................................................32, 37

*\*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977)............................................................................11, 13

*In re Application of Dow Jones & Co., Inc.*,
  842 F.2d 603 (2d Cir. 1988).................................................................18, 19

*James Madison Ltd. by Hecht v. Ludwig*,
  82 F.3d 1085 (D.C. Cir. 1996) ..................................................................10

*Jefferson v. Harris*,
  170 F. Supp. 3d 194 (D.D.C. 2016) ...........................................................44

*Kerry v. Din*,
  576 U.S. 86, 135 S. Ct. 2128 (2015) ..........................................................41

*\*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)...............................................................12, 20, 40, 41

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994)...................................................................................10

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
  624 F.3d 1083 (9th Cir. 2010)....................................................................27

*\*Laird v. Tatum*,
  408 U.S. 1 (1972)................................................................................16, 17

*Landon v. Plasencia*,
  459 U.S. 21 (1982).....................................................................................12

*\*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*,
  104 F.3d 1349 (D.C. Cir. 1997) ......................................................30, 32, 39

*Libertarian Nat'l Comm., Inc. v. FEC*,
  924 F.3d 533 (D.C. Cir. 2019) ................................................................................18

*\*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...............................................................................10, 15, 26

*Marouf v. Azar*,
  391 F. Supp. 3d 23 (D.D.C. 2019) ...........................................................................11

*Marsh v. Ore. Nat. Res. Council*,
  490 U.S. 360 (1989)................................................................................................35

*Martin v. EPA*,
  271 F. Supp. 2d 38 (D.D.C. 2002) ...........................................................................18

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012)................................................................................................33

*Mathews v. Diaz*,
  426 U.S. 67 (1976)..................................................................................................40

*Mayor & City Council of Balt. v. Trump*,
  416 F. Supp. 3d 452 (D. Md. 2019) .........................................................................42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)..................................................................................................35

*Narenji v. Civiletti*,
  617 F.2d 745 (D.C. Cir. 1979) .................................................................................41

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) .....................................................................................25

*Nat'l Fair Hous. All. v. Carson*,
  330 F. Supp. 3d 14 (2018)........................................................................................25

*Nat'l Star Route Mail Contractors Ass'n, Inc. v. USPS*,
  223 F. Supp. 3d 14 (D.D.C. 2016) ...........................................................................11

*\*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ............................................................................26, 27

*\*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C.Cir.1996) ..........................................................................22, 23, 25

*New LifeCare Hosps. of N. Carolina LLC v. Azar*,
    416 F. Supp. 3d 11 (D.D.C. 2019) ............................................................36

*Penn. Family Inst, Inc. v. Black*,
    489 F.3d 156 (3d Cir. 2007) ......................................................................18

*People for the Ethical Treatment of Animals v. USDA.*,
    797 F.3d 1087 (D.C. Cir. 2015) .......................................................... *passim*

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ....................................................................................38

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    489 F.3d 1279 (D.C. Cir. 2007) ................................................................15

*Pub. Citizen, Inc. v. Trump*,
    297 F. Supp. 3d 6 (D.D.C. 2018) ..............................................................12

*Raines v. Byrd*,
    521 U.S. 811 (1997) ..................................................................................10

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) .............................................................................19, 20

*Sierra Club v. Jackson*,
    648 F.3d 848 (D.C. Cir. 2011) ..................................................................29

*Spann v. Colonial Vill., Inc.*,
    899 F.2d 24 (D.C. Cir. 1990) ....................................................................22

*Steenholdt v. FAA*,
    314 F.3d 633 (D.C. Cir. 2003) ..................................................................29

*Styrene Info. & Research Ctr., Inc. v. Sebelius*,
    944 F. Supp. 2d 71 (D.D.C. 2013) ............................................................30

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .............................................................................12, 13

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ..................................................................................14

*Telecomm. Research & Action Ctr. v. Allnet Commc'n Servs., Inc.*,
    806 F.2d 1093 (D.C. Cir. 1986) ................................................................11

*\*Tex. Low Income Hous. Info. Serv. v. Carson*,
    --- F. Supp. 3d ----, No. 18-644 (TJK), 2019 WL 6498816 (D.D.C. Dec. 3, 2019) .............24, 25

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ..................................................................................... *passim*

Twin Rivers Paper Co. v. SEC,
   934 F.3d 607 (D.C. Cir. 2019) .....................................................................................33

United Presbyterian Church in the U.S.A. v. Reagan,
   738 F.2d 1375 (D.C. Cir. 1984) .............................................................................16, 17

United States ex rel. Turner v. Williams,
   194 U.S. 279 (1904) .....................................................................................12

United States v. Simon,
   664 F. Supp. 780 (S.D.N.Y. 1987) .....................................................................................19

United States v. Verdugo-Urquidez,
   494 U.S. 259 (1990) .....................................................................................12

Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,
   425 U.S. 748 (1976) .............................................................................18, 19

Ward v. D.C. Dep't of Youth Rehab. Servs.,
   768 F. Supp. 2d 117 (D.D.C. 2011) .....................................................................................2

Wells v. Hense,
   235 F. Supp. 3d 1 (D.D.C. 2017) .....................................................................................28

Yaman v. U.S. Dep't of State,
   786 F. Supp. 2d 148 (D.D.C. 2011) .....................................................................................12

Zemel v. Rusk,
   381 U.S. 1 (1965) .....................................................................................19

## STATUTES

5 U.S.C. § 702 .....................................................................................29

5 U.S.C. § 706 .............................................................................9, 34

8 U.S.C. § 1182 .....................................................................................44

8 U.S.C. § 1202 ..................................................................................... *passim*

44 U.S.C. § 3506 .....................................................................................4

44 U.S.C. § 3507 .....................................................................................4

**REGULATIONS**

5 C.F.R. part 1320 ...................................................................................................4

30-Day Notice of Proposed Information Collection: Application for Nonimmigrant Visa,
    83 Fed. Reg. 43,951 (Aug. 28, 2018) ...............................................................4

30-Day Notice of Proposed Information Collection: Electronic Application for Immigrant Visa
    and Alien Registration,
    83 Fed. Reg. 43,952 (Aug. 28, 2018) ...............................................................4

60-Day Notice of Proposed Information Collection:  Application for Immigrant Visa and Alien
    Registration,
    83 Fed. Reg. 13,806 (March 30, 2018) ...........................................................4

60-Day Notice of Proposed Information Collection:  Application for Nonimmigrant Visa,
    83 Fed. Reg. 13,807 (March 30, 2018) ...........................................................4

Pres. Mem.,
    82 Fed. Reg. 16,279 (Mar. 6, 2017) ....................................................3, 38, 44, 45

Privacy Impact Statement, Consular Consolidated Database (October 2018) .................................8

**RULES**

Fed. R. Civ P 12 .......................................................................................... *passim*

**INTRODUCTION**

In 2017, the President undertook an Executive Branch-wide effort to strengthen screening protocols and procedures for the visa application process and the enforcement of immigration laws generally.  Most relevant to this case, the President directed certain Cabinet officials, including the Secretaries of State and Homeland Security, to ensure that such screening protocols and procedures prevent the entry of foreign nationals who may commit or otherwise support criminal or terrorist acts, and to ensure that all grounds for the inadmissibility or deportability of foreign nationals are more rigorously evaluated.

As part of this broader effort, the Secretary of State proposed and, following a notice-and-comment period, enacted a policy of requiring that most visa applicants disclose on immigrant and nonimmigrant visa applications their social media identifiers for twenty platforms.  Plaintiffs, two documentary film organizations purporting to sue on behalf of themselves and their members, brought the instant lawsuit, challenging the Secretary's action as having violated certain requirements of the Administrative Procedure Act ("APA").  In addition, Plaintiffs allege that this collection of information, as well as policies that allow for the retention and dissemination of that information, violate the First Amendment.

Plaintiffs' claims should not advance past the pleading stage.  First, the allegations in the Complaint fail to establish Article III standing.  Plaintiffs lack associational standing because neither they nor their members have demonstrated the requisite harm to sustain this Court's jurisdiction.  Nor have Plaintiffs established organizational standing.  The policy does not impair their organizational interest in promoting documentary filmmaking, and their assertion that they have diverted time and resources to address the policy is conclusory.  Moreover, Plaintiffs have not demonstrated causation between the policy and their alleged organizational injuries, which are

rooted in speculative fears about how third parties may respond to this policy.  For these reasons alone, the Court should dismiss the case for lack of jurisdiction.

Even if the Plaintiffs could establish standing, the case should still be dismissed for failure to state a claim.  Plaintiffs have no viable cause of action under the APA.  As a threshold matter, decisions about what information should be required as part of immigrant and nonimmigrant visa applications are committed to the discretion of the Executive Branch, and Plaintiffs—as two organizations specializing in documentary filmmaking—fall outside the zone of interests protected by the relevant provisions of the immigration statutes.  In any event, Plaintiffs' claims under the APA, along with their free-standing First Amendment challenge, fail on their own terms.  For all of these reasons, Plaintiffs have no legally viable cause of action to take forward in this case.

## BACKGROUND

## I.    SOCIAL MEDIA IDENTIFIERS COLLECTION POLICY

The social media policy at issue in this case is part of a broader Executive Branch effort to improve the security of the United States by strengthening screening and vetting protocols for foreign nationals seeking to enter the country and the enforcement of immigration laws generally. On March 6, 2017, the President issued an Executive Order stating that such protocols and procedures associated with the visa application process "play a crucial role in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States."  Exec. Order No. 13780, 82 Fed. Reg. 13,209, 13,209 (Mar. 6, 2017) (attached as Exhibit 1).[1]  That Order went on to direct the heads of various agencies, including

---

[1] For the Court's convenience, Defendants have included with their motion several documents to which Plaintiffs refer in their Complaint.  The Court may consider these materials when ruling on Defendants' motion, including Defendants' motion to dismiss pursuant to Rule 12(b)(6).  *See Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (noting that, when considering a Rule 12(b)(6) motion, courts may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint" or

the Secretaries of State and Homeland Security, to develop "a uniform baseline for screening and vetting standards and procedures" to ensure "the proper collection of all information necessary for a rigorous evaluation of all grounds of inadmissibility or grounds for the denial of other immigration benefits." *Id.* at 13215.

That same day, the President issued a memorandum to the Secretaries of State and Homeland Security, as well as the Attorney General, concerning the strengthening of screening and vetting protocols. Specifically, the President directed these officials, "as soon as practicable," to implement protocols and procedures "that in their judgment will enhance the screening and vetting of applications for visas and all other immigration benefits, so as to increase the safety and security of the American people." Pres. Memo., 82 Fed. Reg. 16,279, 16,279 (Mar. 6, 2017) (attached as Exhibit 2). Echoing the dictates of the Executive Order, the Memorandum stated that the additional screening protocols and procedures were to focus on the following issues:

> (a) preventing the entry into the United States of foreign nationals who may aid, support, or commit violent, criminal, or terrorist acts; and

> (b) ensuring the proper collection of all information necessary to rigorously evaluate all grounds of inadmissibility or deportability, or grounds for the denial of other immigration benefits.

*Id.* The Memorandum went on to direct the Secretaries and the Attorney General "to rigorously enforce all existing grounds of inadmissibility and to ensure subsequent compliance with related laws after admission." *Id.* at 16280.

---

"documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss" (internal quotation marks and citations omitted)). These and other documents attached to this motion as exhibits are also matters of public record, of which the Court may take judicial notice, thereby providing an additional basis for the Court to consider them in ruling upon Defendants' motion. *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

Consistent with these orders, the Department of State published notice on March 30, 2018 that it was proposing to modify the Electronic Application for Immigrant Visa and Alien Registration (also known as "DS-260"), which collects a range of information, including biographical information from foreign nationals seeking immigrant visas, and is used by consular officers in making determinations about an applicant's eligibility for a visa. *See* 60-Day Notice of Proposed Information Collection:  Application for Immigrant Visa and Alien Registration, 83 Fed. Reg. 13,806, 13,806 (Mar. 30, 2018) (attached as Exhibit 3).[2]  As relevant here, the Department proposed adding to the form a requirement that applicants provide all identifiers they have used on twenty different social media platforms in the past five years.  *Id*.  The Department further noted that the collected information would be used "for identity resolution and vetting purposes based on statutory eligibility standards."  *Id*.  Also on March 30, 2018, the Department published notice that it would be asking the same question of most foreign nationals who apply for a nonimmigrant visa using a form known as DS-160, which, like DS-260, collects a range of information from foreign nationals and is used by consular officers in making visa eligibility determinations.  *See* 60-Day Notice of Proposed Information Collection:  Application for Nonimmigrant Visa, 83 Fed. Reg. 13,807, 13,807 (March 30, 2018) (attached as Exhibit 4).[3]

---

[2] Because the changes to the immigrant and nonimmigrant visa application forms constituted a collection of new information, the Department of State was required under Office of Management and Budget ("OMB") rules implementing the Paperwork Reduction Act to allow for a notice-and-comment period and to obtain approval from the Office of Information and Regulatory Affairs ("OIRA").  *See* 44 U.S.C. §§ 3506(c), 3507(a); 5 C.F.R. part 1320.

[3] As required by OMB rules, the Department of State held 60-day comment periods for the information collection, but the Secretary conducted an additional 30-day comment period following the original commenting period.  *See* 30-Day Notice of Proposed Information Collection: Application for Nonimmigrant Visa, 83 Fed. Reg. 43,951, 43,951 (Aug. 28, 2018) (attached as Exhibit 5); 30-Day Notice of Proposed Information Collection: Electronic Application for Immigrant Visa and Alien Registration, 83 Fed. Reg. 43,952, 43,952 (Aug. 28, 2018) (attached as Exhibit 6).

As part of the process for seeking approval of an information collection, on April 22, 2019, the Department of State provided the Office of Information and Regulatory Affairs ("OIRA") with Supporting Statements related to its proposal to collect social media identifiers for certain platforms[4] on the immigrant and nonimmigrant visa applications (collectively referred to throughout as "the social media policy").  *See* Supporting Statement for Paperwork Reduction Act Submission, Application for Immigrant Visa ("Immigrant Visa Supporting Statement" or "IVSS") (attached as Exhibit 7); Supporting Statement for Paperwork Reduction Act Submission, Application for Nonimmigrant Visa ("Nonimmigrant Visa Supporting Statement" or "NIVSS") (attached as Exhibit 8).[5]  These Statements explain the Secretary of State's justification for collecting this information and respond to comments received during the two comment periods.  Citing the 2017 Executive Order and Presidential Memorandum, the Supporting Statements make clear that collecting social media identifiers is "essential for confirming [a visa] applicant's identity and determining whether an applicant is eligible for a [] visa."  IVSS at 3; NIVSS at 3.  The Statements further explain that the information collected "will be assessed in the context of existing U.S. government information holdings, responsible U.S. agencies' knowledge of the identity of applicants, and an understanding of existing and evolving threats to national security, to enable more rigorous evaluation of

---

[4] Both forms require disclosure of profiles on twenty social media platforms:  ASKfm, douban, Facebook, Flickr, Google+, Instagram, LinkedIn, Myspace, Pinterest, Qzone, Reddit, Sina Weibo, Tencent Weibo, Tumblr, Twitter, Twoo, Vine, VKontakte, Youku, and YouTube.  *See* DS-260 IV Application, OIRA Submission (attached as Exhibit 11) at 12 (screenshot of social media question on application for immigrant visa); Screenshot of Nonimmigrant Visa Application (DS-160) (attached as Exhibit 12), at 5.  These screenshots of the immigrant and nonimmigrant visa application forms were included as part of the Department of State's submission to OIRA.  *See* https://www.reginfo.gov/public/do/PRAViewIC?ref_nbr=201905-1405-002&icID=189203 (immigrant visa application);  https://www.reginfo.gov/public/do/PRAViewIC?ref_nbr=201905-1405-001&icID=184376 (nonimmigrant visa application).

[5] The two Supporting Statements are publicly available from the OIRA website.  *See* https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201905-1405-002 (IVSS); https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201905-1405-001 (NIVSS).

applicants." IVSS at 5; NIVSS at 6. The eligibility determinations with which social media information would prove helpful include validating legitimate relationships or employment where those relationships are the basis for visa eligibility, identifying indicia of fraud, and identifying misrepresentations that disguise potential threats. *Id*. In addition, information gleaned from social media profiles can be used to determine activity, ties, or intent that would be grounds for visa denial, including criminal acts. IVSS at 10; NIVSS at 10-11. The Supporting Statements emphasize that visa eligibility determinations are made "based on the totality of the circumstances" and with an awareness that social media postings must be understood in light of "the context and circumstances of the applicant, culture, country conditions, and nature of the account." *Id*. Applicants for certain visa applications, such as most diplomatic and official visa applicants, are exempt from the requirement. *See* NIVSS at 23.

In response to privacy concerns raised in the public comments, the Supporting Statements made two important clarifications about the social media policy. First, the Department of State will use social media identifiers to review only publicly accessible information available to all users of the platform viewing an applicant's account. IVSS at 8; NIVSS at 8-9. Visa applicants are not required to provide—indeed, they are specifically instructed not to disclose—passwords that would allow consular officers access to information on a social media account that is not available to the general public. *Id*. Second, as with all information provided by a foreign national on a visa application form, social media identifiers are treated as confidential information pursuant to 8 U.S.C. § 1202(f). *Id*. Social media identifiers are also collected with the awareness that some individuals maintain social media accounts anonymously, and Department officials are instructed to collect this information "in a manner that best safeguards its transmission." IVSS at 8; NIVSS at 8.

OIRA approved the social media policy on April 11, 2019. Notice of Office of Management and Budget Action, Electronic Application for Immigrant Visa and Alien Registration (Apr. 11,

2019) (attached as Exhibit 9); Notice of Office of Management and Budget Action, Online Application for Nonimmigrant Visa (Apr. 11, 2019) (attached as Exhibit 10).[6]

The Department of State is not the only Government agency to have used social media as a screening tool in connection with enforcing immigration policies.  As Plaintiffs note in their Complaint, *see* Compl. ¶ 24, in 2015 the Department of Homeland Security ("DHS") created a task force to analyze the use of social media for screening and other purposes throughout DHS and how it could be optimized.  Department of Homeland Security Office of Inspector General, *DHS's Pilots for Social Media Screening Need Increased Rigor to Ensure Scalability and Long-term Success* (Feb. 27, 2017) ("DHS OIG Report") (attached as Exhibit 13).  The genesis for this effort was the 2015 terrorist attack in San Bernardino, California, and a request from New Hampshire Senator Jeanne Shaheen and twenty-four other senators that DHS expand social media background checks to "screen[] for visa determinations."  *Id*. at 1.  As part of this effort, U.S. Citizenship and Immigration Services began a pilot program to expand social media screening of certain immigrant benefit applicants, and U.S. Immigration and Customs Enforcement began a separate pilot program for social media screening of nonimmigrant visa holders.[7]  *Id*. at DHS OIG Highlights.  The

---

[6] The Department of State also asks for social media identifiers in the DS-5535 form, which contains a set of supplemental questions given to some visa applicants.  The documents related to the approval of that information collection are available on the OIRA website.  *See* https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201711-1405-006.  Plaintiffs do not challenge this information collection.

[7] Plaintiffs mischaracterize the conclusions in the OIG report, claiming that it found that the pilot programs "failed to establish that social media screening was an effective tool for screening visa applicants or identifying national security threats."  Compl. ¶ 24.  To the contrary, the report made no such findings about the efficacy of social media screening as a tool but instead concluded that the pilot programs "lack[ed] criteria for measuring performance to ensure they meet their objectives."  DHS OIG Report at DHS OIG Highlights.  Rather than discouraging the use of social media screening in the future, the Report recommended that DHS develop "a clearly defined performance evaluation" to ensure that the Department is able to implement an "effective social media screening program."  *Id*. at 4.

Department of State was aware of the DHS pilot programs and OIG Report when it promulgated the social media policy.  *See* IVSS at 5; NIVSS at 6.

## II.    RETENTION AND DISSEMINATION OF INFORMATION COLLECTED

Like all Department of State records pertaining to the issuance or refusal of a visa, information collected pursuant to the social media policy is protected from disclosure by statute and may "be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States."  8 U.S.C. § 1202(f).  The statute further authorizes limited disclosures to courts and to foreign countries under certain circumstances, *id*., including preventing and investigating criminal acts and acts of terrorism, *id*. § 1202(f)(2)(A).

Information obtained from the visa application process is housed in the Department of State's Consular Consolidated Database ("CCD").  *See* Privacy Impact Statement, Consular Consolidated Database (Oct. 2018) (attached as Exhibit 14), at 9.[8]  Applicants are notified on the application forms that the information they provide on the visa application form is collected and will be retained in the CCD.  *Id*. at 10-11.  Information retained in the CCD can be accessed internally within the Department of State and is shared externally with interagency partners, pursuant to safe-handling restrictions on the use and transmission of the information.  *Id*. at 12-14.

## III.   PLAINTIFFS' COMPLAINT

Plaintiffs, two non-profit organizations involved in documentary filmmaking, filed their Complaint challenging the social media policy on December 5, 2019.  Compl., ECF No. 1, ¶¶ 13-14.  Plaintiffs bring two types of claims.  First, Plaintiffs contend that the social media policy violates the APA because it was enacted in excess of the Department of State's statutory authority, violates the First Amendment, and is arbitrary and capricious.  *Id*. ¶ 33 (citing 5 U.S.C. § 706(2)(A)-(C)).

---

[8] The Privacy Impact Statement is publicly available at https://www.state.gov/wp-content/uploads/2019/05/Consular-Consolidated-Database-CCD.pdf.

Second, Plaintiffs argue that the social media policy as well as "related retention and dissemination policies" violate the First Amendment by denying the right to anonymous speech, deterring expressive and associational activity, and being overbroad.  *Id*. ¶ 78.

Plaintiffs' claims are not premised on any obligation that they themselves disclose information.  Rather, Plaintiffs claim that the social media policy will deter their foreign members and partners from applying for visas and/or engaging in expressive activity on their social media accounts, which will in turn harm Plaintiffs and their members.  *See id*. ¶¶ 65-76.

## ARGUMENT

Plaintiffs' Complaint must be dismissed for two principal reasons.  First, Plaintiffs have failed to establish Article III standing, so the Court lacks jurisdiction to hear this case.  Plaintiffs have not adequately demonstrated that either they or their members were harmed in a way that would give rise to associational or organizational standing.  Dismissal of this case without examination of the merits of Plaintiffs' claims is therefore warranted.

Second, even if Plaintiffs had standing, their Complaint should still be dismissed because they have failed to state a viable claim.  Review is not available for Plaintiffs' APA claims because the Secretary's authority pursuant to which the social media policy was issued is committed to agency discretion and Plaintiffs fall outside of the statutory zone of interests.  In any event, Plaintiffs have not made out a legally sufficient claim under either the APA or the First Amendment.  Consequently, Defendants are entitled to judgment as a matter of law.

## I.    PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS IN THIS CASE

At the outset, Plaintiffs' Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction because Plaintiffs have failed to establish standing.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Raines v.*

*Byrd*, 521 U.S. 811, 818 (1997); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."). In this case, Doc Society and IDA have failed to establish standing to invoke this Court's subject-matter jurisdiction either on behalf of their members or in their capacity as organizations. Their Complaint should therefore be dismissed.

### A.    Standard of review for Rule 12(b)(1)

Because Article III standing is necessary to establish the Court's jurisdiction, Defendants bring their motion pursuant to Federal Rule of Civil Procedure 12(b)(1). Such motions "impose[] on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (citation omitted). Courts "have an affirmative obligation to consider whether the constitutional and statutory authority exists," *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (internal citation omitted), and if a court "concludes that it lacks subject-matter jurisdiction, [it] must dismiss the complaint in its entirety," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). A plaintiff bears the burden of establishing the factual predicates of jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Although a "court must accept as true all well-pleaded factual contentions and draw all reasonable inferences therefrom, [] it need not accept thread-bare recitals of the elements of standing or legal conclusions couched as an assertion of fact." *Marouf v. Azar*, 391 F. Supp. 3d 23, 29 (D.D.C. 2019) (citation omitted).

### B.    Neither Plaintiff has established standing to sue on behalf of its members

An organization cannot sue on behalf of its members unless at least one member would have standing to sue in his or her own right. *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs attempt to bring this lawsuit "on behalf of . . . their non-U.S. members and partners" and "their U.S. members, partners, and audiences." Compl. ¶ 39. They

allege that the social media policy harms their members and partners by chilling their expressive activity. *See id.* ¶¶ 52-64; 74. They further allege that the policy harms their U.S. members, partners, and audiences by depriving them of opportunities to hear from and engage with foreign nationals online, *id.* ¶ 69, and at Plaintiffs' U.S.-based events, *id.* ¶ 73. None of these allegations, however, provides a sufficient basis for associational standing.

1. Plaintiffs cannot establish associational standing by alleging injury to their audiences, partners, and unidentified members

Associational standing must rest on alleged injuries to *members* or "equivalent affiliates." *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25-26 (D.C. Cir. 2002); *see also*, *Am. Legal Found. v. FCC*, 808 F.2d 84, 89-91 (D.C. Cir. 1987). The doctrine is premised on the "theoretical identity" between an organization and its members. *Am. Legal Found.* 808 F.2d at 91 (quoting *Telecomm. Research & Action Ctr. v. Allnet Commc'n Servs., Inc.*, 806 F.2d 1093, 1095 (D.C. Cir. 1986)). Yet Doc Society is not a membership organization, *compare* Compl. ¶ 40 (alleging that Doc Society has "partners" but failing to allege that it has any members), *with id.* ¶ 41 (alleging that IDA has "over 2,700 dues-paying members across fifty-three countries"), so it cannot claim associational standing.

Unlike Doc Society, IDA alleges injuries on behalf of its members, but these allegations are insufficient to establish standing. IDA alleges that the social media policy "burdens the speech and association of [its] non-U.S. members." Compl. ¶¶ 52-64. But the Complaint states that "[m]any" of these non-U.S. members are nonresident aliens—individuals from fifty-two foreign countries who merely "have plans to come to the United States." *Id.* ¶¶ 41-42. Nonresident aliens lack standing to assert First Amendment rights. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 284 (D.C. Cir. 1989) ("[N]onresident aliens are without First Amendment rights" (citation omitted)). IDA cannot establish associational standing to sue on behalf of members who are nonresident aliens because the

alleged burdens on their speech and association would not give them standing to sue on their own behalf. *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972); *DKT Memorial Fund*, 887 F.2d at 285.

Moreover, a plaintiff claiming associational standing must "identify at least one *specific* member who has suffered, or is likely to suffer, an injury in fact." *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 18 (D.D.C. 2018) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-98 (2009)); *see also Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199-200 (D.C. Cir. 2011). IDA has not made this showing. The Complaint describes IDA's membership in general terms, *see* Compl. ¶¶ 42-45, and references the activities of certain non-U.S. members, *see id.* ¶¶ 50-51, 55-56, 58, 60, but it does not identify these non-U.S. members or provide key facts such as their nationality, country of residence, immigration status, and whether they have or will apply for a visa.[9]

In addition to IDA's claim that it may sue on behalf of its members, Plaintiffs purport to bring their legal challenges on behalf of "partners"—organizations and filmmakers with whom they collaborate—and the audiences at their U.S.-based events. Compl. ¶ 39; *see also id.* ¶¶ 4, 7, 40-45. But there is no theoretical link between Plaintiffs and their partners and audiences; the Complaint does not even suggest that these partners and audiences have the attributes of members. *See, e.g.*, *Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, 42 F. Supp. 3d 125, 133-34 (D.D.C. 2014) (holding that membership entails, at a minimum, "electing the leadership of the association, guiding the association's activities, and financing those activities" (citation omitted)); *cf. Hunt*, 432 U.S. at

---

[9] IDA asserts that its non-U.S. members "cannot realistically challenge the [social media policy] themselves," because doing so would require them "to surrender the very anonymity or obscurity they seek to protect." *Id.* ¶ 64. But privacy concerns may be addressed through a motion to file sensitive information under seal. *See, e.g.*, *Yaman v. U.S. Dep't of State*, 786 F. Supp. 2d 148, 151-54 (D.D.C. 2011). They do not excuse noncompliance with the requirements of Article III. Moreover, IDA fails to identify a single U.S. member, even though the asserted privacy concerns apply only to its non-U.S. members. *See* Compl. ¶ 64.

344-45 (allowing a state apple-advertising agency to sue on behalf of apple growers and dealers who "possess[ed] all of the indicia of membership in an organization").  Plaintiffs therefore lack standing to sue on behalf of their partners and audiences.  *See Am. Legal Found.*, 808 F.2d at 89-91 (rejecting an organization's attempt to establish standing by alleging injuries to its "supporters").

In sum, Plaintiffs do not have associational standing in this case because Doc Society is not a membership organization, *see Fund Democracy*, 278 F.3d at 25-26; because IDA cannot assert claims on behalf of its foreign members that they cannot assert themselves, *see DKT Memorial Fund*, 887 F.2d at 284; and because IDA has not specifically identified any allegedly injured member, *see Summers*, 555 U.S. at 497-98.

2.   Even if IDA had identified one or more allegedly injured members, its allegations would be insufficient to establish associational standing

IDA's principal contention is that the social media policy will injure its members by chilling their speech.  *See* Compl. ¶¶ 3, 5, 52-63, 74.  This contention is dubious because many people already associate their names with their social media profiles such that any member of the general public can view their online speech.  Assuming the alleged chill exists, however, it does not give IDA standing.  The social media policy is not causing IDA members an actual or imminent injury, and they cannot manufacture an injury by purporting to self-censor their social media activity in response to hypothetical future harms.

IDA further contends that the social media policy will deprive its U.S. members of opportunities to hear from and engage with non-U.S. individuals online.  *See id.* ¶ 69.  But the social media policy does not proscribe or restrict speech, nor does it burden free association.  And any incidental impact the policy may have on speakers' choices about what to say and how to say it, or individuals' choices about whom to associate with online, does not amount to an Article III injury.  IDA's final contention—that the policy will prevent its U.S. members from engaging with non-U.S.

individuals at IDA events, *see id.* ¶ 73—is simply speculative; the Complaint does not reference any foreign national who declined to attend an IDA event because he or she did not wish to apply for a visa.   In any event, such non-attendance would not be traceable to the social media policy or redressable by its invalidation.   Each alleged ground for standing is addressed below.

> a.   *The alleged chilling effect on IDA members' speech does not create standing*

A plaintiff can establish standing by alleging that he intends to engage in arguably constitutional speech or conduct that is "proscribed by a statute" under which "there exists a credible threat of prosecution."   *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)).   But there is no credible threat of prosecution here because the social media policy does not proscribe any speech or conduct.

IDA asserts that the policy exposes its non-U.S. members to risk of potential future injuries, including "the risk that a U.S. official will misinterpret their speech on social media, impute others' speech to them," subject their visa applications to "additional scrutiny or delayed processing" because of their social media activity, or reveal their pseudonymous social media identifiers.   *See* Compl. ¶¶ 5, 54-61.   But IDA does not claim that these alleged risks are Article III injuries, nor could it given the well-established requirement that a plaintiff allege harm that is concrete and imminent.   *See, e.g.*, *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294-95 (D.C. Cir. 2007) (Kavanaugh, J.) (recognizing "a powerful argument that 'increased-risk-of-harm' claims . . . fail to meet the constitutional requirement that a plaintiff demonstrate harm that is 'actual or imminent, not conjectural or hypothetical'" (quoting *Lujan*, 504 U.S. at 560)); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) ("Were all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury.").

Instead, IDA alleges that because of these risks, the policy has a "chilling effect" on its members' speech. *See, e.g.*, Compl. ¶¶ 3, 5, 52-64, 74. IDA asserts that its non-U.S. members who have been or may someday be asked to provide their social media identifiers on a visa application are engaging in "self-censorship" because they fear "government surveillance" of their online speech and association. *Id.* ¶¶ 52-63. IDA further asserts that its U.S. members are modifying their online behavior out of fear that consular officers might consider their posts when reviewing the social media activity of their non-U.S. contacts. *Id.* ¶ 74.

As an initial matter, IDA's allegation that the social media policy has "a significant chilling effect on [its members'] use of social media," *id.* ¶ 5, is implausible. For IDA members who use social media in their own names, the policy merely makes it easier for Government officials to find information that the IDA members have made public. Absent the policy, the Government could still access the same information by looking up a visa applicant's name on the relevant social media platform. Indeed, the Complaint alleges that the Government reviewed the social media activity of individuals seeking entry to the United States long before the social media policy was created. *See* Compl. ¶¶ 57-58. Thus, with the possible exception of individuals who use pseudonymous social media identifiers, IDA cannot plausibly claim that its members' online speech is materially affected by the social media policy. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 308 (D.D.C. 2017) (finding no standing where "already publicly available information would be rendered more easily accessible" by the challenged government action), *aff'd on other grounds,* 878 F.3d 371 (D.C. Cir. 2017).

In any event, the purported self-censorship is an insufficient basis for standing. The Supreme Court has held that a plaintiff fails to establish standing by alleging that his speech "is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid

governmental purpose." *Laird v. Tatum*, 408 U.S. 1, 10 (1972); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013). And the D.C. Circuit has repeatedly held that plaintiffs cannot establish standing merely by alleging that a government regulation is chilling their speech. *See, e.g.*, *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1193-94 (D.C. Cir. 1992); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378-80 (D.C. Cir. 1984) (Scalia, J.).

As the D.C. Circuit has explained, the chilling-effect doctrine permits a person who has already suffered an Article III injury—*e.g.*, "threatened arrest for specifically contemplated First Amendment activity"—to represent the interests of third parties when challenging a restriction on speech as facially overbroad. *See United Presbyterian Church*, 738 F.2d at 1378-80; *see also Hedges v. Obama*, 724 F.3d 170, 204 (2d Cir. 2013). "'[C]hilling effect' is cited as the *reason* why [a] governmental imposition is invalid rather than as the *harm* which entitles the plaintiff to challenge it." *American Library*, 956 F.3d at 1193 (quoting *United Presbyterian Church*, 738 F.2d at 1378). A "[s]ubjective 'chill'"—particularly a chill allegedly caused by an information-gathering regulation that in no way proscribes or restricts speech—"is not enough to constitute injury-in-fact." *American Library*, 956 F.2d at 1193; *see Hedges*, 724 F.3d at 204.

Accepting Plaintiffs' self-censorship theory of injury would "improperly water[] down the fundamental requirements of Article III." *Clapper*, 568 U.S. at 416. If a plaintiff could sue by merely alleging a chilling effect, it would allow IDA members to "manufacture standing . . . based on their fears of hypothetical future harm that is not certainly impending." *Id.* This dramatic expansion of standing doctrine would establish "the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action"—which is "not the role of the judiciary." *Laird*, 408 U.S. at 15; *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (explaining that limits on Article III standing "ensur[e] that the Federal Judiciary respects 'the proper—and properly limited—role of the courts in a democratic society'") (quoting *Allen v. Wright*, 468 U.S. 737, 750

(1984)).  The law is clear:  neither IDA members' speculative fear of future harms, nor their alleged self-censorship in response to that fear, gives them standing to challenge the social media policy.

> b.  *The alleged burdens on the ability of IDA members in the U.S. to hear from and engage with non-U.S. individuals do not create standing*

Next, IDA claims that the social media policy will harm its U.S. members by "depriv[ing]" them of (1) "opportunities to hear from" non-U.S. individuals online, Compl. ¶ 69; (2) "opportunities to . . . engage with" non-U.S. individuals online, *id.*; and (3) "opportunities to hear from and engage with" non-U.S. individuals in person at IDA's U.S.-based events, *id.* ¶ 73. None of these allegations provides a sufficient basis for Article III standing.

First, the alleged deprivation of "opportunities to hear from" non-U.S. individuals online is merely the flipside of IAD's chilling-effect argument:  if speakers self-censor their online speech, potential listeners cannot receive that speech.  "The Supreme Court generally treats the rights of [speakers and listeners] as 'reciprocal.'"  *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 560 (D.C. Cir. 2019) (en banc) (Katsas, J., concurring in part) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976)).  Although the right to receive information is not mentioned in the First Amendment, it "follows ineluctably from the *sender's* First Amendment right to send" information.  *Martin v. EPA*, 271 F. Supp. 2d 38, 47 (D.D.C. 2002) (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (opinion of Brennan, J.))  A would-be listener's rights are therefore "derivative of the First Amendment rights of the speaker."  *Id.* (citation omitted); *accord Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 592 (7th Cir. 2012); *Penn. Family Inst, Inc. v. Black*, 489 F.3d 156, 165 (3d Cir. 2007).  The chilling effect alleged here does not confer standing on speakers.  *See supra* Section I(B)(2)(a).  It follows *a fortiori* that it does not confer standing on would-be listeners whose rights are wholly derivative of potential speakers' rights.

17

The relationship between the rights of speakers and listeners notwithstanding, IDA's reliance on the First Amendment right to receive speech is misplaced because the social media policy does not prevent anyone from saying anything.  "[T]he D.C. Circuit has recognized that 'listeners . . . can suffer injury from government regulations that prevent speakers from saying what the listeners wish to hear."  *Cato Inst. v. U.S. Sec. & Exch. Comm'n*, --- F. Supp. 3d ---, No. CV 19-0047 (ABJ), 2020 WL 619793, at *8 (D.D.C. Feb. 10, 2020) (quoting *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 856 F.2d 1563, 1566 (D.C. Cir. 1988)).  But such injury occurs only where the government directly interferes with a willing speaker's ability to transfer certain information—*e.g.*, by banning certain books from public school libraries or banning prescription drug advertising.  *See Gregg v. Barrett*, 771 F.2d 539, 548 (D.C. Cir. 1985) (citing *Pico*, 457 U.S. 853, and *Virginia Pharmacy*, 425 U.S. 748); *United States v. Simon*, 664 F. Supp. 780, 786 (S.D.N.Y. 1987) ("[The] right to receive speech becomes cognizable only when an individual has indicated a willingness to speak and is being restrained from doing so."), *aff'd sub nom. Application of Dow Jones*, 842 F.2d 603.

In this case, the social media policy does not prevent the transfer of *any* information.  IDA has not identified any particular speech its members wish to hear, nor has it identified a willing speaker with First Amendment rights who is prevented from speaking.  Instead, IDA alleges that the policy will incidentally affect some (mostly foreign) individuals' choices about what to say and how to say it, leading to a general decrease of the "sharing [of] information on social media."  Compl. ¶ 69; *cf. Cato Inst.*, 2020 WL 619793, at *8.  To find First Amendment injury based on this type of "theory of indirect interference with free speech," as IDA urges, would be "an impermissible expansion of the right to receive information doctrine."  *Gregg*, 771 F.2d at 548.  Indeed, accepting IDA's theory of injury would dramatically expand Article III standing given that many regulations incidentally affect information sharing.  *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986) ("[E]very civil and criminal remedy imposes some conceivable burden on First Amendment

protected activities."); *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965) ("There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.").

Second, IDA has not plausibly alleged that the social media policy interferes with its U.S. members' right to associate with non-U.S. individuals online. The Supreme Court has long recognized a First Amendment "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (citations omitted). And IDA members from the United States allegedly associate with non-U.S. individuals via social media. *See* Compl. ¶ 49. But the policy does not directly burden that association. *Cf. Roberts*, 468 U.S. at 622-23 (identifying various burdens on the right of free association). Plaintiffs allege that their "members and partners are more cautious in associating with others online" because they are concerned that "U.S. officials will impute to visa applicants the speech of others linked to them on social media." *Id.* ¶ 59. This type of self-censorship does not amount to an Article III injury. *See supra* Section I(B)(2)(a). Even if it did, the purported injury would not be fairly traceable to the social media policy because the risk of imputed online speech exists independently of the policy. *See* Compl. ¶¶ 57-58. Indeed, asking visa applicants for their social media identifiers could lessen the risk of government officials misidentifying online speakers or misattributing others' speech to them.

Third, IDA's allegation that the social media policy will deprive its members of opportunities to "hear from and engage with" non-U.S. individuals "in person," Compl. ¶ 73, is also insufficient. The Supreme Court has recognized that "United States citizens [may sue] regarding violations of their personal rights allegedly caused by the Government's exclusion of particular foreign nationals." *Trump v. Hawaii*, 138 S. Ct. at 2416 (citations omitted); *see also Mandel*, 408 U.S. at 762. Here, however, the Complaint does not allege any exclusion of foreign nationals. IDA asserts that two of its members recently decided not to apply for visas. *See* Compl. ¶ 56. But IDA

has not plausibly alleged that their future absence from the United States is fairly traceable to the social media policy; their voluntary decisions not to apply for visas may have been affected by other personal, professional, and economic considerations.  Moreover, IDA has not explained how these two individuals' future absence from the United States will harm IDA's U.S. members.  *Cf. Trump v. Hawaii*, 138 S. Ct. at 2416 (holding that U.S.-citizen plaintiffs were injured by an executive order that kept them "separated from certain relatives who [sought] to enter the country").  Nor would a court order invalidating the social media policy redress the alleged deprivation of opportunities for IDA's U.S. members to engage with non-U.S. individuals in person, because the court's capacity to provide redress depends on "a prediction about the independent action" of third parties—*i.e.*, whether the non-U.S. individuals would apply for visas in the absence of the policy, whether their applications would be approved, and whether they "would consent to associate with" IDA's U.S. members in person.  *See Haitian Refugee Center*, 809 F.2d at 806-07 (holding that an organization's alleged inability to engage with certain foreign nationals in person was not redressable by invalidation of the policy that barred them from entering the country).

For all of these reasons, none of the alleged injuries to IDA members provides a basis for associational standing.

**C.     Neither Plaintiff has established standing to sue in its capacity as an organization.**

Plaintiffs' claim to organizational standing is equally without merit.  When an organization attempts to sue in its own right, it must establish standing in the same manner as an individual.  *See People for the Ethical Treatment of Animals v. USDA.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (*PETA*) (explaining that an organizational plaintiff, "like an individual plaintiff," must "show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision"); *Common Cause v. FEC*, 108 F.3d 413, 417 (D.C. Cir. 1997) (observing that "standing requirements apply with no less force to suits brought by

organizational plaintiffs").  Doc Society and IDA fail to establish organizational standing for two

independent reasons: they have not plausibly alleged an injury-in-fact, and their alleged injuries are

not fairly traceable to the challenged policy.

    1.  <u>Neither Plaintiff has plausibly alleged an injury-in-fact</u>

To satisfy the injury-in-fact requirement, an organization must show a "concrete and

demonstrable injury to [its] activities."  *Am. Soc'y for Prevention of Cruelty to Animals v. Feld

Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S.

363, 379 (1982)).  The D.C. Circuit applies a two-part test for determining whether an organization's

injury is concrete and demonstrable.  *See PETA*, 797 F.3d at 1094.  First, the court asks "whether

the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its

mission."  *Feld Entm't*, 659 F.3d at 25 (citing *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d

1136, 1140 (D.C. Cir. 2011)).  If so, the court proceeds to consider whether the organization has

"diver[ted] [its] resources . . . to counteract" the challenged conduct.  *Equal Rights Center*, 633 F.3d

at 1140; *see Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (internal quotations and

citation omitted).  Doc Society and IDA do not satisfy either element of this test.

    a.  *The social media policy has not injured either organization's interest in
promoting its mission*

An organization is not injured merely because "the challenged conduct affects [its]

activities"; instead, it must show that the conduct "will actually impair [its] activities."  *Feld Entm't*,

659 F.3d at 25.  To do so, the organization "must show a 'direct conflict between the defendant's

conduct and the organization's *mission*."  *Feld Enm't*, 659 F.3d at 25 (quoting *Nat'l Treasury Emps.

Union v. United States*, 101 F.3d 1423, 1430 (D.C.Cir.1996) (*NTEU*)); *see Abigail All. for Better

Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).

The D.C. Circuit has found standing based on impairment of an organization's activities on several occasions, none pertinent here. For example, an organization with a mission "to assist its members and the public in accessing potentially life-saving drugs" was injured by a Government policy barring the sale of investigational new drugs, because the policy directly impaired the organization's efforts to carry out its mission. *Abigail Alliance*, 469 F.3d at 132-33; *see also Abigail Alliance*, 445 F.3d 470, 472 (D.C. Cir. 2006), *vacated on reh'g en banc*, 495 F.3d 695 (D.C. Cir. 2007) (describing the government policy). Similarly, an organization with a mission to "to prevent 'cruelty and inhumane treatment of animals'" had standing to challenge the U.S. Department of Agriculture's "allegedly unlawful failure to apply [protections of the Animal Welfare Act] to birds." *PETA*, 797 F.3d at 1095. The challenged government inaction "directly conflict[ed] with [the organization's] stated mission" and "precluded" it from protecting birds "through its normal process of submitting USDA complaints." *Id.* at 1094 (citation omitted).

In contrast, the D.C. Circuit has held that an organization lacks standing to challenge conduct that does not directly conflict with its mission or impair its activities, even if the conduct makes the organization's activities less efficient or effective. *See, e.g.*, *NTEU*, 101 F.3d at 1430; *Food & Water Watch, Inc. v. Vilsack*, 808 F. 3d 905, 919-21 (D.C. Cir. 2015). In *NTEU*, a labor union allege[d] that the Line Item Veto Act caused it to spend additional funds lobbying the President to achieve its desired policies. 101 F.3d at 1430. But the Act did not prevent the organization from lobbying or force it to change its normal course of operations; it merely "made [its] *activities* more difficult." *Id*. Nor was there a "direct conflict" between the union's mission and the law it sought to challenge. *Id*. Similarly, the plaintiff organization in *Food & Water Watch* alleged that a USDA regulation that caused it to increase the resources it spent advocating for safe food and educating the public about food safety. *See* 808 F.3d at 919-21. The D.C. Circuit held that there was no injury because the challenged regulation did not prevent the organization from engaging in these activities or

otherwise "inhibit[] . . . [its] daily operations'"—in contrast to the government inaction in *PETA*. *Id.* at 919 (quoting *PETA*, 797 F.3d at 1094).

Citing *NTEU* and *Food & Water Watch*, this Court recently held that a Texas fair-housing organization was not injured by a federal agency's alleged failure "to require Houston to comply with its federal civil rights obligations." *Tex. Low Income Hous. Info. Serv. v. Carson*, --- F. Supp. 3d ----, No. 18-644 (TJK), 2019 WL 6498816, at *5-*8 (D.D.C. Dec. 3, 2019). The organization failed to show that "its ability to provide services" was impaired or that "its 'daily operations' were impeded," *id.* at *6 (quoting *Food & Water Watch*, 808 F.3d at 919). It claimed that the agency's inaction had contributed to "persistent segregation" in Houston, which in turn "ma[de] it more difficult for [the organization] to accomplish its mission." *Id.* at *5. This was "plainly insufficient"; as the Court explained, "standing must be based on more than an allegation that an agency's actions, or lack thereof, have put more distance between an organization and the ends it seeks." *Id.*

Here, Doc Society alleges that its mission is "to enable the creation of documentary films that drive social change and to connect those films to global audiences." Compl. ¶ 40. Similarly, IDA's alleged "mission is to support a global community of documentary filmmakers in order to foster a more informed, compassionate, and connected world." *Id.* ¶ 41. Plaintiffs claim that the social media policy makes it more difficult for them to use social media to "learn about the work of their members and partners across the world" and "foster cross-border discussion within their global communities," Compl. ¶ 66; to "identify[] films to honor at [Doc Society] awards ceremonies" and "measure the impact of these films," *id.* ¶ 67; and to "circulate information about resources available to [IDA] members" and "promote [IDA] events," *id.* ¶ 68. Plaintiffs further claim that the policy "jeopardizes the success" and "diminishes the impact" of their U.S.-based events that "depend[] on the in-participation of non-U.S." individuals. *Id.* ¶¶ 71-72.

These allegations fall short of establishing an organizational injury. The social media policy does not interfere with Plaintiffs' daily operations or otherwise impair Plaintiffs' ability to use social media and hold events in furtherance of their documentary-filmmaking missions. At most, Plaintiffs have alleged that the policy will diminish social media activity and future U.S. visa applications, thereby inhibiting their efforts to promote documentary filmmaking to some extent. This type of indirect effect on an organization's activities is "plainly insufficient" to create standing. *Tex. Low Income Housing*, 2019 WL 6498816, at *5; *see NTEU*, 101 F.3d at 1430. Moreover, there is no "direct conflict" between the social media policy and Plaintiffs' documentary-filmmaking missions. *See NTEU*, 101 F.3d at 1430. Any conflict between the State Department's decision to ask visa applicants for their social media identifiers and Plaintiffs' missions is plainly indirect because it rests on speculative intervening steps, *i.e.*, that foreign nationals significantly alter their behavior on social media or decline to apply for a visa based on speculative fears about what the government might do with information collected under the social media policy.

b. *Doc Society and IDA have not adequately alleged that they diverted resources to counteract the effects of the social media policy*

The second element of the D.C. Circuit's test for organizational injury requires a plaintiff to show that it "diver[ted] [its] resources . . . to counteract" the challenged conduct. *Equal Rights Center*, 633 F.3d at 1140; *see Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 42 (D.D.C. 2018). The plaintiff must demonstrate that it has spent "operational costs beyond those normally expended" to carry out its mission. *Fair Hous. All.*, 330 F. Supp. 3d at 42 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011)). Here, too, Plaintiffs' allegations fall short.

Plaintiffs allege that the social media policy "forces Doc Society and IDA to divert time, staff resources, and funding to find and engage with members and partners who are now reluctant to speak publicly on social media or travel to the United States; to support and promote the work of

24

their members and partners; and to recruit new members, partners, and projects."  Compl. ¶ 75.  But engaging with members and partners, supporting their work, and inviting foreign filmmakers to travel to the United States for events are Plaintiffs' normal operating activities; they do not allege changing their normal operations or launching new programs.  *Cf. Fair Hous. All.*, 330 F. Supp. 3d at 49 (rejecting organizational plaintiffs' diversion-of-resources allegation because "even without the [challenged Government action], they would be engaged in the same activity").  Plaintiffs speculate that non-U.S. individuals' fears about the policy will make Plaintiffs' activities less effective; but even if that were true, it would not require them to increase their operating costs.  *Cf. id.* at 49-50.  Accordingly, Plaintiffs' assertion that they have diverted resources in response to the social media policy is too conclusory to support standing.  *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (explaining that "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice" to survive a motion to dismiss (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).

     2.  Plaintiffs' alleged injuries were not caused by the social media policy

     Even if Doc Society and IDA could show a "concrete and demonstrable injury," they would still need to satisfy the causation requirement of standing.  *Feld Entm't*, 659 F.3d at 25-27; *see PETA*, 797 F.3d at 1093.  Causation is "substantially more difficult to establish" where, as here, "the plaintiff is not himself the object of the government action or inaction he challenges."  *Lujan*, 504 U.S. at 562; *see Clapper*, 568 U.S. at 413-14 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors" (citation omitted)).  An organization that is not itself regulated by a Government policy cannot establish standing to challenge that policy by choosing to spend resources in response to its potential impact on others.  *See, e.g.*, *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1430-34 (D.C. Cir. 1995) (holding that an organization lacked standing to challenge a law, even though it had expended

resources to educate its members and others about it, because the law did "not force[] [the organization] to expend [those] resources"); *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (holding that an organization cannot establish causation where its alleged injury stems from "own budgetary choices"); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 801 (D.C. Cir. 1987) (rejecting claim of organizational standing where the alleged injury to the organization was "an unintended side effect" of a government policy of interdicting certain vessels carrying undocumented aliens); *see also La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (explaining that an organization "must . . . show that it would have suffered some other injury if it had not diverted resources to counteracting" the government action it wishes to challenge).

Plaintiffs' alleged organizational injuries were not caused by the social media policy, but by their own budgetary choices. *See BMC Marketing*, 28 F.3d at 1276. The policy does not regulate the organizations, require them to change their activities, or force them to expend resources. *See Nat'l Taxpayers Union*, 68 F.3d at 1434. Its alleged effect on Plaintiffs is contingent on speculation about how non-U.S. individuals will respond to the possibility that they may someday be asked to provide their social media identifiers on a U.S. visa application. That being so, Plaintiffs' alleged injuries were "incurred in response to a speculative threat." *Clapper*, 568 U.S. at 416. Organizations cannot "manufacture standing merely . . . based on their fears of hypothetical future harm that is not certainly impending," any more than individuals can. *Id.* (citation omitted).

Accepting Plaintiffs' theory of organizational injury would "take standing principles . . . over the brink." *PETA*, 797 F.3d at 1101 (Millett, J., dubitante) (punctuation omitted). If this type of speculative, indirect burden on online communications constitutes an Article III injury, practically any group with a social media presence would have standing to challenge a broad array of Government actions. *Cf. id.* at 1099 (expressing concern that courts are allowing "organizations

[to] get standing on terms that the Supreme Court has said individuals cannot"). Accordingly, Plaintiffs have not plausibly alleged that they have organizational standing to challenge the social media policy.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER EITHER THE APA OR FIRST AMENDMENT

In addition to Plaintiffs' lack of standing, the Complaint should be dismissed pursuant to Rule 12(b)(6) because Plaintiffs have failed to plead a viable challenge to the social media policy under either the APA or the First Amendment. The APA challenge fails at the threshold of that analysis because the Secretary's authority to act is committed to agency discretion by law and because Plaintiffs are not within the statutory zone of interests. In any event, Plaintiffs' APA claims are legally not viable, nor is their First Amendment challenge to the social media policy and related data-retention requirements. Thus, even if Plaintiffs had Article III standing, their Complaint should still be dismissed.[10]

## A.   Standard of review for Rule 12(b)(6)

A motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a plaintiff's complaint." *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017) (citation omitted). "In ruling on a motion to dismiss for failure to state a claim, the court must accept as true all of the factual allegations contained in the complaint, and construe the complaint in favor of the plaintiff . . . ." *Wells v. Hense*, 235 F. Supp. 3d 1, 6 (D.D.C. 2017) (citations and internal quotation marks omitted). However, the Court should neither draw inferences unsupported by well-pleaded allegations nor accept legal conclusions cast as factual allegations. *Id*. Rather, to survive

---

[10] Plaintiffs assert no cause of action against the Secretary of Homeland Security: their APA challenge expressly applies only to the Secretary of State, *see* Compl. ¶ 77, and their First Amendment claim fails to attribute any unconstitutional action to DHS, *see id*. ¶ 78. To the extent the Court concludes differently, Plaintiffs' claims against DHS still must be dismissed for the reasons discussed below.

a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).  Plaintiffs' claims under the APA and First Amendment fail to meet this standard.

**B.     Plaintiffs' APA claims fail as a matter of law because they cannot overcome threshold barriers under the APA and because the claims are legally insufficient**

Plaintiffs raise three APA challenges to the Secretary of State's promulgation of the social media policy:  (1) that the policy exceeds the Secretary's statutory authority, (2) that the policy violates the First Amendment, and (3) that the policy is arbitrary and capricious.  These claims fail as a matter of law because they cannot meet two key threshold requirements for APA review and because, even accepting Plaintiffs' allegations as true, the Secretary did not violate the APA.

1.   <u>Plaintiffs' claims are not subject to review under the APA</u>

Judicial review of the social media policy is unavailable under the APA because (a) the Secretary's exercise of his statutory authority under 8 U.S.C. § 1202 is committed to agency discretion, thereby leaving the Court with no meaningful standard by which to review the policy, and (b) Plaintiffs are not within the zone of interests regulated by the statute.  Each point is discussed in turn below.

a.   *The Secretary's authority under 8 U.S.C. § 1202 is committed to agency discretion by law, as the D.C. Circuit has recognized*

Dismissal of Plaintiffs' APA claims is first warranted because the decision about what information the Department of State may require on a visa application is committed to agency discretion by law.  *See* 5 U.S.C. § 702(a)(2).[11]  Action is committed to agency discretion where a statute is drawn in such a manner that a "court would have no meaningful standard against which to

---

[11] A claim challenging an agency decision committed to agency discretion by law is not jurisdictionally deficient and therefore must be dismissed pursuant to Rule 12(b)(6).  *See Sierra Club v. Jackson*, 648, F.3d 848, 854 (D.C. Cir. 2011).

judge the agency's exercise of discretion." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (citation omitted). In this situation, "meaningful judicial review is impossible." *Id.*; *see also Delta Air Lines, Inc. v. Ex.-Im. Bank of U.S.*, 718 F.3d 974, 976-77 (D.C. Cir. 2013) ("[A]gency action is committed to agency discretion by law and thus judicially unreviewable when there is 'no law to apply.'" (citation omitted)). In determining whether an action is committed to agency discretion, courts consider "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action," taking account of formal and informal policy statements and regulations. *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 81 (D.D.C. 2013) (citation omitted).

Congress has given the Secretary of State broad discretion over the visa application process in 8 U.S.C. § 1202. In fact, the D.C. Circuit has previously held that § 1202(a)—one of the two statutory provisions that Plaintiffs claim was violated in this case—contains no judicially manageable standards that would allow for APA review. *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) ("*LAVAS*"). That case concerned a challenge to the Department of State's consular venue policy for Vietnamese and Laotian nationals seeking immigrant visas. *Id.* at 1350. The venue policy was issued pursuant to § 1202(a), which states that applications for immigrant visas shall be made "in such form and manner and at such place as shall be by regulations prescribed." In dismissing the plaintiffs' APA claims, the D.C. Circuit held that venue decisions were committed to agency discretion for two reasons. First, the statutory language authorizes the Secretary of State to "prescribe the place at which aliens apply for immigrant visas without providing substantive standards against which the Secretary's determination could be measured." *Id.* at 1353. Such determinations are instead "left entirely to the discretion of the Secretary of State." *Id.* Second, the "nature of the administrative action counsels against review of plaintiffs' claim," namely that the

Department of State "is entrusted by a broadly worded statute with balancing complex concerns involving security and diplomacy." *Id.* Consequently, the court held that the plaintiffs' APA claims were unreviewable because there is "no law to apply." *Id.*

The D.C. Circuit's decision in *LAVAS* compels dismissal of the Plaintiffs' APA claims in this case. As in *LAVAS*, the agency's statutory authority for its action here is derived from § 1202(a) (for immigrant visa applications), as well as § 1202(c) (for nonimmigrant visa applications). The relevant language in these two provisions is nearly identical. The provisions stipulate that a foreign national completing a visa application must provide his or her full and true name, age, sex, date and place of birth, and—mirroring the language examined by the D.C. Circuit in *LAVAS*—"such additional information necessary to the identification of the applicant and the enforcement of the immigration and nationality laws as may be by regulations prescribed."[12] § 1202(a). As in *LAVAS*, Congress's decision to empower the Secretary to ask visa applicants for whatever information he or deems "necessary" leaves the Court without any substantive standards against which to measure the Secretary's exercise of that authority. This conclusion is further bolstered by Congress's use of the word "may" in entrusting the Secretary with authority to determine the type of information to be sought from visa applications. *See Haig v. Agee*, 453 U.S. 280, 294 n.26 (1981) (observing that, in the context of statutory language, Congress's use of the word "'may' expressly recognizes substantial discretion" (citation omitted)). Congress gave the Secretary of State exclusive control

---

[12] The statutory requirements for information necessary on the application forms varies slightly, but that difference does not alter the analysis here. For example, applicants for immigrant visas must provide any aliases, while applicants for nonimmigrant visas must note their marital status. *See* § 1202(a), (c). The discretion afforded to the Secretary of State to ask for information on applications for nonimmigrant visas is also slightly broader: in addition to requesting information necessary to identify the application and enforce immigration laws, the Secretary may request information necessary to "the determination of [the applicant's] eligibility for a nonimmigrant visa." § 1202(c).

over what questions to ask in both immigrant and nonimmigrant visa application forms, without providing for any standard for reviewing the Secretary's exercise of that authority.

The second factor relied upon by the D.C. Circuit in *LAVAS*—the nature of the administrative action—likewise weighs in favor of concluding that the decision about what information to seek on visa application forms is committed to agency discretion.  Here, the visa application forms implicate the same balancing of "complex concerns involving security and diplomacy" that the *LAVAS* court concluded were not subject to judicial second-guessing, given the "complicated foreign policy matters" involved.  *LAVAS*, 104 F.3d at 1353; *see also Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 903 (D.C. Cir. 2018) ("In the foreign affairs arena, the court lacks a standard to review the agency action" because, generally, "judgments on questions of foreign policy and national interest . . . are not subjects fit for judicial involvement." (citation omitted)).  If anything, the social media policy is deserving of more deference than the decision at issue in *LAVAS* given that it lies at the intersection of foreign policy and national security.  *See Trump v. Hawaii*, 138 S. Ct. at 2421 (observing that Executive decision-making is entitled to particular deference where it concerns the "sensitive and weighty interests of national security and foreign affairs" (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010)).  Because of the lack of any judicially manageable standards by which to evaluate the social media policy, combined with the considerable deference afforded to the Executive in the area of foreign affairs and national security, the determination about what additional information is needed from immigrant and nonimmigrant visa applicants is committed to the Secretary's discretion.  Plaintiffs' APA challenges to that decision must be dismissed.

      b. *Plaintiffs' Asserted Organizational Interests Fall Outside the Zone of Interests Regulated by § 1202*

Plaintiffs' APA claims fail for the additional reason that Plaintiffs are not within the zone of interests protected by § 1202. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 812 (D.C. Cir. 1987) (holding that to satisfy the zone-of-interests test, a plaintiff must show that "the particular interest [he or she is] asserting in [the] litigation" arguably falls within the "zone of interests" protected or regulated by the statute that has allegedly been violated (citation omitted)). A plaintiff need not show that his interest is directly protected or regulated by the statute; he need only assert an interest that has "more than a 'marginal[] relationship' to the statutory purpose." *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922 (D.C. Cir. 1989) (*HWTC*) (alterations omitted) (quoting *Clarke Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). The plaintiff's interest must only be "arguable from the face of the statute," *Haitian Refugee Center*, 809 F.2d at 812 (citation omitted); "the benefit of any doubt goes to the plaintiff," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 225 (2012). All the same, the zone-of-interest limitation applies to every statutorily created cause of action and serves the important purpose of "prevent[ing] litigation by parties 'whose suits are more likely to frustrate than to further statutory objectives.'" *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (quoting *HWTC*, 885 F.2d at 922).

Here, each Plaintiff asserts an organizational interest in collaborating with foreign individuals, both online and in person, in furtherance of documentary filmmaking. *See* Compl. ¶¶ 40-41 (describing the organizations' documentary-filmmaking missions); *id.* ¶¶ 66-68, 70-72 (asserting that the social media policy harms their interest in collaborating with non-U.S. individuals both online and in person). Although § 1202(a) and (c) govern the visa application process, these provisions neither protect nor regulate *Plaintiffs'* own interest in collaborating with foreign nationals

on documentary-filmmaking projects.  *See Haitian Refugee Center*, 809 F.2d at 813 ("[O]n its face, the statute appears to regulate or protect only the interest of aliens in applying for asylum."); *id.* at 815 (finding that a provision of the INA concerning asylum "evinces no intent to protect or regulate" U.S. persons' "interests in association with" non-U.S. individuals); *see also Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996) (immigration-restriction advocacy organization was outside the zone of interests of INA provisions governing the entry of foreign nationals).[13]   Because Plaintiffs' interest in collaborating with foreign partners is only marginally related to the terms and conditions under which aliens may apply for U.S. visas, Plaintiffs fall outside the applicable zone of interests, and accordingly APA review is not available to them in this case.  *See Haitian Refugee Center*, 809 F.2d at 815.

    2.  Plaintiffs' APA claims fail as a matter of law

Given that the Secretary's decisions under § 1202 are committed to agency discretion by law and that Plaintiffs fall outside the zone of interests that statute protects, the Court should dismiss Plaintiffs' APA claims without addressing them further.  Even if that were not the case, however, dismissal would still be warranted because they fail as a matter of law.  Plaintiffs' constitutional claim under 5 U.S.C. § 706(2)(B) is duplicative of their free-standing First Amendment challenge; Defendants explain below why that claim is legally deficient.  *See infra* Section II(C).

With respect to Plaintiffs' other two APA claims—that the policy is arbitrary and capricious and that it was issued in excess of the Secretary's statutory authority, *see* § 706(2)(A), (C)—the Complaint is devoid of explanation as to why Plaintiffs contend the policy was issued in excess of statutory authority or why it is arbitrary and capricious, and these claims could be dismissed on this

---

    [13] The zone-of-interests test might result in a different outcome if Plaintiffs demonstrated an interest in bringing a particular foreign national to this country *and* the challenged statute barred them from doing so.  *See Abourezk v. Reagan*, 785 F.2d 1043, 1050-51 (D.C. Cir. 1986).  The Complaint, however, contains no such allegation.

basis alone.  *See Iqbal*, 556 U.S. at 678 (ruling that dismissal is warranted where a complaint simply "tenders naked assertion[s] devoid of further factual enhancement." (citation omitted)); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" in order to survive a Rule 12(b)(6) motion to dismiss).  This deficiency is especially evident for Plaintiffs' excess-of-statutory authority claim, which Plaintiffs mention just one time in their Complaint, as part of a laundry list of alleged APA violations.  *See* Compl. ¶ 77.  But even setting aside these pleading defects, both claims still fail as a matter of law.

a.  *The Secretary's decision to issue the social media policy was not arbitrary or capricious but was instead the product of reasoned decision-making*

Accepting the allegations in the Complaint as true, the record from the Secretary's decision-making process cited by the Plaintiffs makes clear that the social media policy was neither arbitrary nor capricious.  When evaluating an APA claim, a "reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (citation omitted).  "This inquiry must be searching and careful, but the ultimate standard of review is a narrow one."  *Id*. (citation and internal quotation marks omitted).  As the Supreme Court has cautioned, a reviewing "court is not to substitute its judgment for that of the agency," and it should uphold even "a decision of less than ideal clarity" so long as "the agency's path may reasonably be discerned."  *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 513-14 (2009) (citation and internal quotation marks omitted).  Ultimately, the question is whether the agency's decision is "within the bounds of reasoned decisionmaking."  *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983).

Generally speaking, there exist four scenarios where an agency's final action can be adjudged to be arbitrary or capricious:  where it (1) "relied on factors which Congress has not

34

intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) reached a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins*., 463 U.S. 29, 43 (1983).  Tellingly, Plaintiffs do not allege in their Complaint that any of these four scenarios are present in this case and, indeed, none are.

Regarding the first scenario, Plaintiffs cannot plausibly claim the Department of State relied on factors Congress precluded it from considering.  The statutory authority gives the Department the discretion to solicit information from visa applicants as the Department deems "necessary" to confirm the identity of the applicant, make eligibility determinations, and enforce immigration laws. 8 U.S.C. § 1202(a), (c).  As discussed throughout this brief, the Executive enjoys broad discretion in exercising this authority given its implications for both foreign policy and national security.  *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. at 2421.  The final decisional documents make clear that the Secretary focused expressly on these factors when requiring the additional data collection.  *See* IVSS at 3; NIVSS at 3 ("This information collection is essential for confirming the applicant's identity and determining whether an applicant is eligible for a [] visa.").  Nor do Plaintiffs claim that the Secretary failed to consider an important aspect of the problem, the second *State Farm* scenario indicative of arbitrariness.  To the contrary, the Secretary explained the rationale for the decision in the Supporting Statements, responding in full to the questions posed by the Office of Management and Budget.  *See generally* IVSS; NIVSS.  Moreover, the Secretary provided advanced notice of the changes to both immigrant and nonimmigrant visa applications, solicited comments on the proposed changes, and responded to those comments in the final supporting statements.  *Id*.; s*ee also New LifeCare Hosps. of N.C., LLC v. Azar*, 416 F. Supp. 3d 11, 21 (D.D.C. 2019) (observing that an agency's decision is entitled to a "presumption of regularity" (quoting *Citizens to Preserve Overton*

*Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).  Neither the first nor the second *State Farm* ground for invalidating an agency action is present in this case.

Plaintiffs likewise fail to mention the latter two *State Farm* scenarios in their Complaint, and the Supporting Statements make clear that neither exists.  Regarding the third factor, the bases cited for the social media policy do not run counter to the evidence before the agency.  Comments on the proposed policy largely focused on privacy and free speech issues, with commenters presenting the agency with hypothetical scenarios and generalized concerns.  *See* INVSS at 3-19; NIVSS at 3-19.  The Department of State responded to these comments in the Supporting Statements.  *Id.*  Finally, the fourth *State Farm* scenario is not analogous to the instant case.  Far from being "so implausible" as to not be the product of agency expertise, the social media policy is part of a broader Executive Branch effort to strengthen screening and vetting tools, and the Executive is considered to have considerable expertise in the areas of immigration and national security..

Rather than explaining why they believe the social media policy to be arbitrary or capricious, Plaintiffs make passing references to a purported lack of evidence in support of the policy, *see* Compl. ¶ 27, all of which fail on the face of the Complaint and the referenced documents.  Plaintiffs first assert that the Secretary "cited no evidence indicating that social media screening . . . is a reliable means of identifying visa applicants or determining their visa eligibility."  *Id.*  But that is not a sufficient basis on which an APA challenge may proceed, particularly in the areas of national security and foreign policy.  *See Humanitarian Law Project*, 561 U.S. at 34 (explaining that, in these fields, "information can be difficult to obtain and the impact of certain conduct difficult to assess," such that demands for "hard proof" or "specific evidence" would be a "dangerous requirement," one squarely at odds with the deference afforded to the Executive).  Instead, "conclusions must often be based on informed judgments rather than concrete evidence, and that reality affects what [courts] may reasonably insist on from the Government."  *Id*. at 34-35.

Plaintiffs next fault the Secretary for allegedly not explaining why social media identifiers need to be collected from nearly all visa applicants, rather than just those applicants who pose difficulties for consular officers' identification and eligibility determinations. Compl. ¶ 27. This argument is meritless: the very purpose of visa applications is to "obtain *all* information necessary to appropriately screen" applicants. IVSS at 13; NIVSS at 13 (emphasis added). Social media information can be used to detect identify fraud and other grounds that render an applicant ineligible to enter the country, and in some instances an applicant's social media profile may be the only source of that information. But the Department of State cannot know *ex ante* whether someone presents identification and eligibility concerns, and cannot be expected to assess the value of information from a social media profile without first looking at the profile itself.

Plaintiffs' final grievance—that the Secretary failed to explain why the retention of social media information beyond visa eligibility determinations is necessary, *see* Compl. ¶ 27—ignores the authorizing statutory language as well as the Secretary's stated justification for collecting the information. Section 1202(a) and (c) permit the Secretary to request information from visa applicants necessary for "the enforcement of the immigration and nationality laws," a use that is not limited to the visa eligibility determination process. The Presidential Memorandum directing the Secretary to strengthen the screening and vetting protocols echoes this post-visa use of information, instructing that any new protocols should focus on, among other things, collecting "all information necessary to rigorously evaluate all grounds of inadmissibility or *deportability, or grounds for the denial of immigration benefits*." Pres. Mem., 82 Fed. Reg. at 16279 (emphasis added). The Supporting Statements for both immigrant and nonimmigrant visa applications expressly reference these authorities when explaining why the information collection and retention is necessary. *See* IVSS at 1; NIVSS at 1. Far from devoid of explanation, the decision-making record referred to in the Complaint makes clear that the Secretary's decision as it pertains to the retention of information

is firmly rooted in the authorizing authorities and supporting documents for the social media policy.[14]  For all of these reasons, Plaintiffs' arbitrary-and-capricious claim fails as a matter of law. Dismissal of this claim is therefore warranted.

> b. *The Secretary's decision to issue the social media policy was not in excess of statutory authority*

Plaintiffs' claim that the Secretary exceeded his statutory authority in issuing the social media policy is equally deficient as a matter of law.  As discussed above, § 1202(a) and (c) give the Secretary broad discretion to request information from visa applicants "necessary to" (1) identification of the applicant, (2) enforcing immigration and nationality laws, or (3) determining eligibility for a nonimmigrant visa.  The social media requirement stemmed directly from the Secretary's determination that such information is necessary for identification and eligibility purposes.  *See* IVSS at 3; NIVSS at 3.  "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion," *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013), and here Congress gave the Secretary the authority to request information he believes is "necessary" to fulfill these congressionally-mandated missions.  As the D.C. Circuit noted in *LAVAS*, § 1202 contains "a congressional grant of discretion as broadly worded as any we are likely to see," and because "the exercise of that discretion occurs in the area of foreign affairs," courts should be extremely reluctant to second-guess the Secretary's exercise of that authority.  *LAVAS*, 104 F.3d 1353 (quoting *DKT Memorial Fund Ltd.*, 887 F.2d at 282).  The Court

---

[14] To the extent Plaintiffs' arbitrary-and-capricious claim is based on the proportion of supportive versus critical comments received by the agency in response to the public notice, *see* Compl. ¶ 26 ("Only eighty-seven comments expressed support for the Registration Requirement."), it would still fail.  An agency is obligated to "consider and respond to significant comments received during the period for public comment," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citation omitted), but there is no obligation to cease rulemaking just because an agency receives critical comments.  That is especially true in this case, where the Secretary received more than 2,000 comments opposed to the policy change but that offered no explanation for that opposition.  *See* IVSS at 3; NIVSS at 4.

should accordingly dismiss Plaintiffs' unexplained and unsupported claim that the Secretary exceeded his statutory authority.

**C.     Plaintiffs fail to state a First Amendment claim**

In addition to their claims under the APA, Plaintiffs bring a free-standing First Amendment challenge to the social media policy as well as to the "related retention and dissemination policies." Compl. ¶ 78.  To the extent Plaintiffs have standing to challenge these policies, well-established Supreme Court precedent, including the Court's recent decision in *Trump v. Hawaii*, makes clear that the Court's inquiry is limited given that the policy concerns a condition of entry into the United States by a foreign national.  The challenged policies pass muster under this deferential standard.

1.     Supreme Court precedent makes clear that a deferential standard of review applies to the social media policy, given its foreign affairs and national security implications

On multiple occasions, the Supreme Court has observed that "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."  *Mathews v. Diaz*, 426 U.S. 67, 81 (1976).  The rationale for affording Congress and the Executive significant latitude in this area is two-fold:  first, immigration policy "may implicate [the United States'] relations with foreign powers" and second, such policy "must be defined in the light of changing political and economic circumstances."  *Id.* Accordingly, decisions about the nation's immigration laws "are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary."  *Id.*; *accord Fiallo v. Bell*, 430 U.S. 787, 798 (1977) ("[I]t is clear from our cases . . . that [challenged immigration policies] are policy questions entrusted exclusively to the political branches of our Government, and we have no judicial authority to substitute our political judgment for that of the Congress."); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976) ("[T]he power over aliens is of a political character and therefore subject only to narrow judicial review." (citation omitted)).

39

Given that "plenary congressional power to make policies and rules for exclusions of aliens has long been firmly established," *Kleindienst v. Mandel*, 408 U.S. at 769-70, the Court applies a deferential standard of review in cases challenging Executive actions taken pursuant to congressionally delegated authority.  *Id*. at 769-70.  As here, the constitutional right at stake in *Mandel* was a First Amendment right—the right of U.S. citizens to hear from and meet with a Belgian-Marxist and academic invited to embark on a U.S. speaking tour whose request for a waiver of ineligibility for a temporary nonimmigrant visa had been denied.  *Id*. at 759.  Reviewing the Plaintiffs' claim, the Court was satisfied that the reason given for the waiver denial was "facially legitimate and bona fide" and ended its inquiry there.  *Id*. at 769-70. ("[T]he courts will neither look behind the exercise of [an agency's discretion over immigration law], nor test it by balancing its justification against the First Amendment interests of [the challengers].").  Such limitations on a court's review "has particular force in the area of national security, for which Congress has provided specific statutory directions pertaining to visa applications by noncitizens who seek entry to this country."  *Kerry v. Din*, 576 U.S. 86, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring); *see also Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979).

The Supreme Court recently reaffirmed the principle that control over admission of foreign nationals into the United States is vested in the political branches and that a court's "inquiry into matters of entry and national security is highly constrained."  *Trump v. Hawaii*, 138 S. Ct. at 2420 & n.5 (rejecting application of a "free-ranging inquiry . . . in the national security and foreign affairs context").  In that case, the plaintiffs brought, among other claims, a First Amendment challenge to a Presidential Proclamation placing restrictions on the ability of nationals of eight foreign countries to enter the United States, based on the Executive's assessment that the targeted countries lacked sufficient information-sharing and identity-management protocols and practices to identify security threats.  *Id*. at 2403-06.  Rejecting plaintiffs' Establishment Clause claim under the First

Amendment, the Court declined to rule whether the *Mandel* standard of review applied.  *Id*. at 2420.

The Court instead held that Plaintiffs' claim failed even assuming that courts may "look behind the

face of" Executive action to the extent of applying rational basis review.  *Id*.  Under that standard,

a court asks whether the challenged action "is plausibly related to the Government's stated objective

to protect the country and improve the vetting processes."  *Id*. at 2420.  Such a policy passes

constitutional muster, moreover, "so long as it can reasonably be understood to result from a

justification independent of unconstitutional grounds."  *Id*.

       Whether it be the *Mandel* test or rational basis review as employed by the Court in *Trump v.

Hawaii*, the challenged policies are plainly entitled to a deferential standard of review here.  To

begin, the social media policy was initiated as part of an Executive branch-wide effort to guard

against terrorist attacks, including such acts committed by foreign nationals.  Exec. Order No.

13780, 82 Fed. Reg. at 13,209.  This Executive Order served as a basis for the Presidential

Proclamation at issue in *Trump v. Hawaii*, which the Court evaluated pursuant to rational basis

review in light of its "legitimate grounding in national security concerns" and foreign affairs

dimension.  *Trump v. Hawaii*, 138 S. Ct. at 2418-21.  Because the social media policy at issue here

stems from the same Executive Branch effort to improve screening and vetting protocols, it is

entitled to review under the same standard previously employed by the Supreme Court.

       The social media policy, furthermore, constitutes the type of "condition[] of entry" that the

Supreme Court has long entrusted to the judgment of the political branches.  *See Harisiades v.

Shaughnessy*, 342 U.S. 580, 596-97 (1952) (Frankfurter, J., concurring) ("The conditions for entry

for every alien . . . have been recognized as matters solely for the responsibility of the Congress and

wholly outside the power of this Court to control."); *accord Trump v. Hawaii*, 138 S. Ct. at 2419

(clarifying that a deferential standard of review applies "across different contexts and constitutional

claims," including to "broad executive action" related to admission and immigration law).  *See*

*Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 514 (D. Md. 2019) (observing that "[t]here is little daylight" between *Trump v. Hawaii* and the plaintiffs' "constitutional challenge to an Executive Branch policy concerning the entry of foreign nationals into the country" in determining that rational basis review applies).

2. Because they are plausibly related to the objectives of strengthening screening protocols and enforcing immigration law, the social media policy and related uses of information collected satisfy rational basis review

The Complaint and documents cited therein make clear that the challenged policies pass constitutional muster, even if rational basis review applies.[15]  Under that standard, Defendants need only show that the challenged policies are "plausibly related to the Government's stated objectives." *Trump v. Hawaii*, 138 S. Ct. at 2420.  Accepting of Plaintiffs' allegations as true, the challenged policies satisfy this standard.  *See id.* ("[I]t should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny.").

The social media policy plausibly relates to the broader Executive Branch goal of strengthening screening and vetting protocols of foreign nationals entering the country.  As in *Trump v. Hawaii*, the request for additional information is "expressly premised on [the] legitimate purpose[]" of ensuring that foreign nationals who seek to enter the United States can be "adequately vetted." 138 S. Ct. at 2421.  Screening and vetting protocols associated with the visa process "play a crucial role in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States."  Exec. Order 13,780, 82 Fed. Reg. at 13,209, and the social media policy was part of a greater effort aimed at "preventing the entry into the United States of foreign nationals who may aid, support, or commit violent, criminal, or

---

[15] For purposes of this motion, Defendants assume that rational basis review applies. Because the *Mandel* standard of review is more deferential to the Government, the challenged policies would likewise satisfy that standard.

other terrorist acts," and "ensuring the proper collection of all information necessary to rigorously evaluate all grounds of inadmissibility or deportability, or grounds for the denial of other immigration benefits."  Pres. Mem., 82 Fed. Reg. at 16,279.

The social media policy advances the Government's legitimate interest in strengthening its screening and vetting protocols.  Information from social media profiles is used for two main purposes:  (1) confirming a visa applicant's identity and (2) determining the visa eligibility of the applicant.  IVSS at 3; NIVSS at 3.  With respect to identity verification, publicly available social media information may be used to assess potential visa fraud, which is relevant to a visa eligibility determination.  IVSS at 5; NIVSS at 6 (citing need to have information to validate legitimate relationships or employment status and to detect misrepresentations that disguise potential threats). In addition to fraud, information gleaned from social media activity can be evidence of activity, ties, or intent that are related to these bases for visa denials.  IVSS at 10; NIVSS at 10. An applicant's social media profile may contain information that is relevant to any of the visa eligibility criteria. *See* 8 U.S.C. § 1182 (listing grounds for ineligibility, including a foreign national's health, criminal record, risk of being a security threat, and likelihood of becoming a public charge).[16]

Any challenge Plaintiffs purport to assert regarding Defendants' retention and dissemination of information obtained from the social media policy—which does not provide access to information that is not generally available to the public on a social media platform—does nothing to rescue their First Amendment claim.[17]  The Government plainly has a legitimate national-security interest in

---

[16] The timing of the request for this information, furthermore, is designed to ensure that officials evaluating visa applications have as much current information about an applicant as possible.  A visa applicant is required to complete only one form per visa application, so requiring disclosure as part of that application process ensures that consular officials who evaluate an applicant's eligibility have up-to-date information.  *Id*. at 3.

[17] This aspect of Plaintiffs' First Amendment claim is insufficiently pled.  To begin, Plaintiffs fail to identify which policies they believe to be "related" to the social media policy and

"detecting foreign nationals who may commit, aid or support acts of terrorism," Exec. Order 13,780, 82 Fed. Reg. at 13,209, as well as in assessing the grounds for deportability of foreign nationals in the country or for the denial of immigration benefits, *see* Pres. Mem, 82 Fed. Reg. at 16,279. And cooperative sharing of information collected from the social media policy plausibly advances these interests by ensuring that each agency has as much available information as possible when seeking to detect security threats and enforce immigration laws. The Government's retention and use of information collected via the social media policy therefore satisfies rational basis review.

Plaintiffs offer three conclusory assertions in support of their First Amendment claim, all of which have been addressed above and thus warrant only brief mention here. First, Plaintiffs claim that the social media policy "den[ies] the right to anonymous speech and private expressive association." Compl. ¶ 78. But, as explained, the social media policy applies only to individuals who choose to apply for visas and enables access only to the public-facing sections of an applicant's social media account. *See supra*, Section I(B)(2)(b). Second, Plaintiffs assert that the social media policy "deters expressive and associational activity" in a manner that is "not sufficiently tailored to any legitimate government interest." Compl. ¶ 78. Again, as explained above, the social media policy is tailored to meet significant policy concerns in the areas of foreign policy and national security. Finally, Plaintiffs allege, without elaboration, that the policy is "overbroad," *id.*;

---

thus unconstitutional. *See Jefferson v. Harris*, 170 F. Supp. 3d 194, 219-20 (D.D.C. 2016) (holding that the plaintiff's failure to identify "any part of a rule, regulation, policy, procedure, or guidance document" that he believed to be unlawful deprived the defendant of having "fair notice" of his claim and "the grounds upon which it rests" (citation omitted)). Plaintiffs fail to specify whether it is the Department of State or Department of Homeland Security policies being challenged, and which policies specifically. This lack of detail leaves Defendants to guess as to what exactly Plaintiffs are challenging.[17] In addition, Plaintiffs fail to provide any explanation as to how and why the Government's policies violate the First Amendment. *See Twombly*, 550 U.S at 555 ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004))).

elsewhere, they suggest that the policy is not sufficiently tailored because it applies to "millions of visa applicants each year whose identifications and eligibility determinations pose no difficulties for consular officials," *id*. ¶ 27.  As explained, this contention puts the cart before the horse:  the information enhances a consular officer's ability to make a final determination about an applicant's identity and eligibility.  *See supra*, Section II(B)(2)(a).  For some applicants, the only source of potentially disqualifying information may be information gleaned from their public-facing social media profiles.  *Id*.  Thus, none of the supporting reasons Plaintiffs offer for their claim have merit.

In sum, the social media policy and use of the information collected advance the Government's legitimate national-security interest in sufficiently screening and vetting foreign nationals before they are allowed to enter the country by ensuring that the Department is able "to obtain all information necessary to appropriately screen all prospective travelers."  IVSS at 13; NIVSS at 13.  Plaintiffs' First Amendment challenge must accordingly be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion and dismiss Plaintiff's Complaint pursuant to Rule 12(b)(1) for lack of standing.  Alternatively, the Court should dismiss Plaintiffs' Complaint for failure to state a claim under Rule 12(b)(6).


Dated:  April 15, 2020                        Respectfully submitted,

                                             JOSEPH H. HUNT
                                             Assistant Attorney General

                                             ANTHONY J. COPPOLINO
                                             Deputy Branch Director

                                               /s/ *Nathan M. Swinton*
                                             NATHAN M. SWINTON
                                             JOSEPH DeMOTT
                                             Trial Attorneys
                                             U.S. Department of Justice

Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel:  (202) 305-7667
Fax:  (202) 616-8470
E-mail:  Nathan.M.Swinton@usdoj.gov

*Counsel for Defendants*