**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DOC SOCIETY and INTERNATIONAL
DOCUMENTARY ASSOCIATION,

                Plaintiffs,

      v.

MICHAEL R. POMPEO, in his official
capacity as Secretary of State, and CHAD F.
WOLF, in his official capacity as Acting
Secretary of Homeland Security,

                Defendants.

**ORAL ARGUMENT REQUESTED**

Civil Case No. 19-cv-3632 (TJK)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**Table of Contents**

Table of Authorities ........................................................................................................ iii

Introduction ......................................................................................................................1

Background ........................................................................................................................2

    I.      Statutory and Regulatory Background ...................................................................2

          A.      The INA and Preexisting Visa Application Requirements ............................. 2

          B.      The Registration Requirement ...................................................................... 3

          C.      Retention and Dissemination of Visa Applicants' Social Media
                Information ................................................................................................... 5

    II.     Plaintiffs and Their Members and Partners ............................................................6

Argument ...........................................................................................................................7

    I.      Plaintiffs Have Standing to Challenge the Registration Requirement and
          Related Retention and Dissemination Policies. .....................................................8

          A.      Plaintiff IDA Has Associational Standing. ................................................... 9

                1.      Individual IDA Members Have Standing. ........................................... 9

                2.      The Interests at Stake Are Germane to IDA's Purpose. ................... 14

                3.      This Suit Does Not Require Participation of Individual
                      Members. .......................................................................................... 14

          B.      Plaintiffs Have Organizational Standing. .................................................... 15

          C.      Plaintiffs Have Third-Party Standing............................................................ 18

    II.     The Registration Requirement Violates the APA......................................................20

          A.      Plaintiffs' Claims Are Within the INA's Zone of Interests. .......................... 20

          B.      Plaintiffs' Claims Are Reviewable Under the APA. ..................................... 23

          C.      The Registration Requirement Exceeds the Secretary's Statutory
                Authority and Raises Serious Constitutional Concerns. ............................... 25

          D.      The Registration Requirement Is Arbitrary and Capricious. ........................ 28

III.    The Registration Requirement and Related Retention and Dissemination
        Policies Violate the First Amendment. .........................................................32

        A.     The Registration Requirement Is Subject to Heightened Scrutiny. ............... 33

        B.     The Registration Requirement Burdens First Amendment Rights. ............... 35

               1.     Anonymous Speech and Private Association .................................... 36

               2.     Compelled Registration of Speech and Associations ........................ 38

               3.     U.S. Listeners' Rights ........................................................ 39

        C.     The Registration Requirement Is Not Sufficiently Tailored to Any
               Legitimate Government Interest and Is Overbroad. ........................................ 40

IV.     Plaintiffs' Claims Against Defendant Wolf Are Facially Plausible. ..........................44

Conclusion ..................................................................................................................45

## Table of Authorities

**Cases**

*Abourezk v. Reagan*,
785 F.2d 1043 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987)......................................... 14, 22, 24

*ACLU v. Clapper*,
785 F.3d 787 (2d Cir. 2015)................................................................................... 13

*Action All. of Senior Citizens of Greater Phila. v. Heckler*,
789 F.2d 931 (D.C. Cir. 1986) .......................................................................... 17, 22

*AFL-CIO v. Chao*,
409 F.3d 377 (D.C. Cir. 2005) ................................................................................ 26

*Am. Acad. of Religion v. Napolitano*,
573 F.3d 115 (2d Cir. 2009)................................................................................... 40

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ................................................................................ 30

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020) ........................................................................... 16, 17

*Am. Library Ass'n v. Barr*,
956 F.2d 1178 (D.C. Cir. 1992) .............................................................................. 12

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) .............................................................................. 29

*Amgen, Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004) ................................................................................ 21

*Animal Legal Def. Fund, Inc. v. Purdue*,
872 F.3d 602 (D.C. Cir. 2017) ................................................................................ 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................ 7

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) .................................................................................. 8

*Baggett v. Bullitt*,
377 U.S. 360 (1964).............................................................................................. 11

*Baird v. State Bar of Arizona,
    401 U.S. 1 (1971) ................................................................. 11, 37, 38, 43

Bowen v. Georgetown Univ. Hosp.,
    488 U.S. 204 (1988) ....................................................................... 25

*Bridges v. Wixon,
    326 U.S. 135 (1945) ....................................................................... 33

Broadley v. U.S. Dep't of Interior,
    615 F.3d 508 (D.C. Cir. 2010) ........................................................ 41

Broadrick v. Oklahoma,
    413 U.S. 601 (1973) ......................................................................... 8

Buckley v. Am. Constitutional Law Found., Inc.,
    525 U.S. 182 (1999) ....................................................................... 10

Buckley v. Valeo,
    424 U.S. 1 (1976) .......................................................................... 37

*Capital Area Immigrant Rights Coal. v. Trump,
    No. 1:19-cv-02117 WL 3436501 (D.D.C. July 24, 2019) .............. 21, 22

Carlson v. Postal Regulatory Comm'n,
    938 F.3d 337 (D.C. Cir. 2019) ........................................................ 29

Cellular Telecomms. & Internet Ass'n v. FCC,
    330 F.3d 502 (D.C. Cir. 2003) ........................................................ 26

Chamber of Commerce of U.S. v. FEC,
    69 F.3d 600 (D.C. Cir. 1995) ........................................................... 8

Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,
    467 U.S. 837 (1984) ................................................................. 25, 26

Clapper v. Amnesty Int'l USA,
    568 U.S. 398 (2013) ................................................................. 12, 13

D.C. v. Dep't of Agric.,
    No. 20-119, 2020 WL 1236657 (D.D.C. Mar. 13, 2020) .................... 30

DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.,
    887 F.2d 275 (D.C. Cir. 1989) ........................................................ 40

Doe v. Harris,
    772 F.3d 563 (9th Cir. 2014) ......................................................... 38

*Edwards v. D.C.,
    755 F.3d 996 (D.C. Cir. 2014) ............................................................... 41, 42, 44

FCC v. AT&T Inc.,
    562 U.S. 397 (2011) ............................................................................................. 25

FDA v. Brown & Williamson Tobacco Corp.,
    529 U.S. 120 (2000) ............................................................................................. 25

Fed. for Am. Immigration Reform, Inc. v. Reno,
    93 F.3d 897 (D.C. Cir. 1996) ............................................................................... 22

Fiallo v. Bell,
    430 U.S. 787 (1977) ............................................................................................. 35

Flaherty v. Ross,
    373 F. Supp. 3d 97 (D.D.C. 2019) ........................................................................ 7

Food & Water Watch, Inc. v. Vilsack,
    808 F.3d 905 (D.C. Cir. 2015) ............................................................................. 17

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
    528 U.S. 167 (2000) ................................................................................... 9, 13, 14

Genuine Parts Co. v. EPA,
    890 F.3d 304 (D.C. Cir. 2018) ............................................................................. 28

Gresham v. Azar,
    950 F.3d 93 (D.C. Cir. 2020) ............................................................................... 30

*GTE Service Corporation v. FCC,
    205 F.3d 416 (D.C. Cir. 2000) ....................................................................... 26, 27

Haig v. Agee,
    453 U.S. 280 (1984) ............................................................................................. 24

Haitian Refugee Ctr. v. Gracey,
    809 F.2d 794 (D.C. Cir. 1987) ............................................................................. 22

Havens Realty Corp. v. Coleman,
    455 U.S. 363 (1982) ....................................................................................... 16, 17

Heckler v. Chaney,
    470 U.S. 821 (1985) ............................................................................................. 23

Hensley v. United States,
    292 F. Supp. 3d 399 (D.D.C. 2018) ..................................................................... 29

*Holder v. Humanitarian Law Project*,
　　561 U.S. 1 (2010) ................................................................................................ 30

*Hotel & Rest. Emps. Union, Local 25 v. Smith*,
　　846 F.2d 1499 (D.C. Cir. 1988) ............................................................................ 9

*Humane Soc'y of the U.S. v. Hodel*,
　　840 F.2d 45 (D.C. Cir. 1988) ............................................................................... 14

*Humane Soc'y of the U.S. v. Vilsack*,
　　797 F.3d 4 (D.C. Cir. 2015) ................................................................................... 8

*Ibrahim v. DHS*,
　　669 F.3d 983 (9th Cir. 2012) ............................................................................... 33

*Ibrahim v. U.S. Dep't of State*,
　　No. 19-610, 2020 WL 1703892 (D.D.C. Apr. 8, 2020) ...................................... 35

*Initiative & Referendum Inst. v. U.S. Postal Serv.*,
　　417 F.3d 1299 (D.C. Cir. 2005) ........................................................................... 44

*Int'l Swaps & Derivatives Ass'n v. CFTC*,
　　887 F. Supp. 2d 259 (D.D.C. 2012) ............................................................... 24, 26

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v.
Brock*,
　　477 U.S. 274 (1986) ............................................................................................. 15

*Kerry v. Din*,
　　135 S. Ct. 2128 (2015) ......................................................................................... 35

*Keyishian v. Bd. of Regents*,
　　385 U.S. 589 (1967) ................................................................................... 11, 37, 40

*Kirwa v. United States Dep't of Def.*,
　　285 F. Supp. 3d 257 (D.D.C. 2017) ............................................................... 24, 25

*Kleindienst v. Mandel*,
　　408 U.S. 753 (1972) ....................................................................... 13, 33, 34, 40

*Laird v. Tatum*,
　　408 U.S. 1 (1972) ....................................................................................... 11, 12, 13

*Lamont v. Postmaster Gen.*,
　　381 U.S. 301 (1965) ...................................................................................... passim

*League of Women Voters of the U.S. v. Newby*,
　　838 F.3d 1 (D.C. Cir. 2016) ........................................................................... 16, 18

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of
    Consular Affairs,*
    104 F.3d 1349 (D.C. Cir. 1997) ......................................................................... 23

*Lepelletier v. FDIC,*
    164 F.3d 37 (D.C. Cir. 1999) ...................................................................... 18, 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ......................................................................................... 21

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................... 8

*Marczak v. Greene,*
    971 F.2d 510 (10th Cir. 1992) .................................................................... 33, 35

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ......................................................................................... 21

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) ........................................................................ 10, 33, 36, 37

*Meese v. Keene,*
    481 U.S. 465 (1987) ......................................................................................... 12

*Motion Picture Ass'n of Am., Inc. v. FCC,*
    309 F.3d 796 (D.C. Cir. 2002) ......................................................................... 28

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1958) ................................................................................... passim

*NAACP v. Trump,*
    298 F. Supp. 3d 209 (D.D.C. 2018) ............................................................ 14, 25

*Nat'l Student Ass'n v. Hershey,*
    412 F.2d 1103 (D.C. Cir. 1969) ................................................................... 12, 14

*Nat'l Treasury Emps. Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) ....................................................................... 17

*Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the
    U.S. v. Kerry,*
    168 F. Supp. 3d 268 (D.D.C. 2016) .................................................................. 35

*Nio v. DHS,*
    385 F. Supp. 3d 44 (D.D.C. 2019) .................................................................... 29

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................... 21

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) ................................................................................. 38

*Pennell v. City of San Jose*,
   485 U.S. 1 (1988) ......................................................................................... 14

*\*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ............................................... 15, 16, 17, 18

*Philipp v. Fed. Republic of Germany*,
   894 F.3d 406 (D.C. Cir. 2018) ....................................................................... 7

*Powers v. Ohio*,
   499 U.S. 400 (1991) ..................................................................................... 19

*Pub. Citizen, Inc. v. Trump*,
   297 F. Supp. 3d 6 (D.D.C. 2018) ................................................................... 9

*Ramirez v. U.S. Immigration & Customs Enf't*,
   338 F. Supp. 3d 1 (D.D.C. 2018) ................................................................... 7

*Reno v. ACLU*,
   521 U.S. 844 (1997) ..................................................................................... 41

*Robbins v. Reagan*,
   780 F.2d 37 (D.C. Cir. 1985) ................................................................. 23, 24

*Ryan, LLC v. Lew*,
   934 F. Supp. 2d 159 (D.D.C. 2013) ....................................................... 19, 20

*Saavedra Bruno v. Albright*,
   197 F.3d 1153 (1999) ................................................................................... 35

*Safari Club Int'l v. Jewell*,
   960 F. Supp. 2d 17 (D.D.C. 2013) ............................................................... 21

*\*Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*,
   467 U.S. 947 (1984) ......................................................................... 19, 20, 44

*\*Shelton v. Tucker*,
   364 U.S. 479 (1960) .............................................................................. passim

*Singleton v. Wulff*,
   428 U.S. 106 (1976) ............................................................................... 15, 20

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ................................................................................ 28

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................................ 13

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) ................................................................................ 10

*Talley v. California*,
    362 U.S. 60 (1960) ................................................................... 10, 36, 37

*Terry v. Ohio*,
    392 U.S. 1 (1968) .................................................................................... 42

*Texas Low Income Housing Info. Serv. v. Carson*,
    427 F. Supp. 3d 43 (D.D.C. 2019) ................................................... 17, 18

*Thomas v. Collins*,
    323 U.S. 516 (1945) ................................................................................ 38

*TOMAC v. Norton*,
    193 F. Supp. 2d 182 (D.D.C. 2002) ...................................................... 14

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ............................................................... 14

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ..................................................................... 25, 34

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ..................................................... 33, 40, 41, 42

*Ukrainian-Am. Bar Ass'n, Inc. v. Baker*,
    893 F.2d 1374 (D.C. Cir. 1990) ............................................................. 17

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996) ................................................................................ 14

*United Presbyterian Church in the U.S.A. v. Reagan*,
    738 F.2d 1375 (1984) .............................................................................. 12

*United States v. Cotterman*,
    709 F.3d 952 (9th Cir. 2013) ................................................................. 42

*United States v. Kim*,
    103 F. Supp. 3d 32 (D.D.C. 2015) ........................................................ 42

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990) ........................................................................................... 33

*\*United States v. Witkovich,*
   353 U.S. 194 (1957) ........................................................................................... 28

*United Steel v. Mine Safety and Health Admin.,*
   925 F.3d 1279 (D.C. Cir. 2020) .......................................................................... 29

*Virginia v. Am. Booksellers Ass'n, Inc.,*
   484 U.S. 383 (1988) ........................................................................................... 19

*Warth v. Seldin,*
   422 U.S. 490 (1975) ............................................................................................. 9

*\*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton,*
   536 U.S. 150 (2002) ..................................................................................... passim

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
   139 S. Ct. 361 (2018) ......................................................................................... 23

*Zadvydas v. Davis,*
   533 U.S. 678 (2001) ........................................................................................... 28

**Statutes**

5 U.S.C. § 701 ............................................................................................................ 23

5 U.S.C. § 702 ............................................................................................................ 23

8 U.S.C. § 1101 ............................................................................................... 2, 21, 22

8 U.S.C. § 1104 ......................................................................................................... 35

8 U.S.C. § 1152 ......................................................................................................... 23

8 U.S.C. § 1184 ................................................................................................... 21, 22

8 U.S.C. § 1202 ................................................................................................... passim

**Regulations**

22 C.F.R. § 41.103 .................................................................................................. 3, 27

22 C.F.R. § 42.62 ........................................................................................................ 3

22 C.F.R. § 42.63 ........................................................................................................ 3

Privacy Act of 1974; System of Records Notice, 83 Fed. Reg. 28,062 (June 15, 2018) .................................................................................................. 5

*U.S. Dep't of Homeland Security, System of Records Notice, 82 Fed. Reg. 43,556 (Sept. 18, 2017) ........................................................................... 6, 45

**Other Authorities**

18MillionRising.org, *et. al*, Comment Letter on Proposed Information Collections: Applications for Immigrant Visa and Nonimmigrant Visa 12 (May 29, 2018), *available at* https://perma.cc/2ZFA-ABFD ................................................. 31

Asian Americans Advancing Justice, Comment Letter on Proposed Information Collection: Application for Nonimmigrant Visa 3 (May 29, 2018), *available at* https://perma.cc/2ZFA-ABFD ............................................. 31

Black's Law Dictionary (11th ed. 2019).................................................................. 26

Muslim Advocates, Comment Letter on Proposed Information Collections: Applications for Immigrant Visa and Nonimmigrant Visa 12−13 (May 29, 2018), *available at* https://perma.cc/2ZFA-ABFD .................................... 31

*The Security of U.S. Visa Programs: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 114th Cong. 101 (2016) (statement of Principal Deputy Assistant Sec'y David Donahue), *available at* https://perma.cc/L3U4-TP4S............................................................................................................. 32

*U.S. Dep't of Homeland Security, Privacy Impact Assessment Update for the Automated Targeting System DHS/CBP/PIA-006(e) (Jan. 13, 2017) ......................... 5, 6, 44

**Introduction**

Plaintiffs Doc Society and the International Documentary Association ("IDA"), two U.S.-based documentary film organizations, challenge U.S. Department of State ("State Department") rules requiring nearly fifteen million visa applicants each year—including many of Plaintiffs' members and partners—to register their social media identifiers with the U.S. government (the "Registration Requirement"). This dragnet measure applies to applicants who are in the United States already; to those who are abroad but have substantial connections to the United States; and to those who use pseudonymous social media identifiers to protect themselves from persecution. As a result, the Registration Requirement significantly burdens the expressive and associational rights of Plaintiffs and their members and partners. These burdens are compounded by State Department and U.S. Department of Homeland Security ("DHS") policies providing for the indefinite retention and broad dissemination of visa applicants' social media information. As detailed in Plaintiffs' Complaint, ECF No. 1, and unrebutted in Defendants' memorandum in support of their motion to dismiss ("Defs.' Mem."), ECF No. 31-1, the Registration Requirement is the product of unauthorized and unjustified agency rulemaking and therefore violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). Along with related retention and dissemination policies, it also violates the First Amendment.

Defendants attack Plaintiffs' standing by casting this case as one centered on the rights of foreigners outside the United States, and by glossing over the Registration Requirement's implications for Plaintiffs and their members and partners. Again, however, the Registration Requirement applies even to applicants who currently reside in the United States, as well as to applicants who reside abroad but have substantial connections to the United States. Moreover, the requirement's implications for Plaintiffs and their members and partners are immediate and far-

reaching. The requirement denies Plaintiffs' foreign members and partners their rights to anonymous speech and private association, chills their speech on social media, and deters them from attending Plaintiffs' U.S.-based events. It also deprives Plaintiffs and their U.S. members and partners of opportunities to hear from and engage with filmmakers and others from around the world, which are core to Plaintiffs' missions.[1] These injuries are sufficient to confer standing.

Defendants' argument that Plaintiffs have failed to state claims upon which relief can be granted is equally unpersuasive. As to Plaintiffs' APA claims, Defendants misread the relevant statutory text as well as applicable precedent. The Complaint plainly alleges that the Secretary of State lacked statutory authority to adopt the Registration Requirement, failed to explain his rationale, and ignored record evidence. With respect to Plaintiffs' First Amendment claims, Defendants seek to diminish their burden by arguing that the case centers on the rights of foreigners and warrants only watered-down First Amendment review. Again, this is a mischaracterization of the case. Regardless, the Registration Requirement cannot survive any form of review because it does not further any legitimate government interest and is, in any event, wildly overbroad.

Because Plaintiffs have standing to bring these properly stated claims, which amply meet the pleading requirements, the Court should deny Defendants' motion to dismiss, ECF No. 31.

## Background

### I.    Statutory and Regulatory Background

#### A.    The INA and Preexisting Visa Application Requirements

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, specifies the information that applicants for immigrant and nonimmigrant visas must provide to establish their

---

[1] "Foreign members and partners" refers to members and partners who are not U.S. citizens or permanent residents and who accordingly require U.S. visas to enter or remain in the United States. "U.S. members and partners" refers to those who are U.S. citizens or permanent residents.

identities and their visa eligibility. Applicants for nonimmigrant and immigrant visas must submit, among other things, their names, birthdates and places of birth, nationalities, and "such additional information necessary to the identification of the applicant, the determination of his eligibility for a nonimmigrant visa, and the enforcement of the immigration and nationality laws as may be by regulations prescribed." *Id.* § 1202(c) (nonimmigrant visas); *see id.* § 1202(a) (immigrant visas).

With narrow exceptions, State Department regulations require all individuals applying from abroad for nonimmigrant visas to complete Form DS-160, 22 C.F.R. § 41.103(a)(1), and all individuals applying from abroad for immigrant visas to complete Form DS-260, *id.* § 42.63(a)(1).[2] Both forms pose questions regarding the applicant's identity and eligibility for a visa, including questions regarding the applicant's family, health, travel, work history, and criminal history, as well as questions related to national security. *See* Defs.' Ex. 11, ECF No. 31-12 (DS-260); Defs.' Ex. 12, ECF No. 31-13 (DS-160). Consular officers may also require any additional information they deem necessary to determine visa eligibility. *See* Compl. ¶¶ 20, 22. All immigrant visa applicants must appear for an interview. 22 C.F.R. § 42.62. Most nonimmigrant applicants must also appear for an interview and "provide a biometric, . . . to authenticate identity and additionally verify the accuracy and truthfulness of the statements in the application." *Id.* § 41.103(b)(2).

B.    **The Registration Requirement**

On March 30, 2018, the State Department issued two notices proposing a requirement for nearly all immigrant and nonimmigrant visa applicants to register on their Form DS-160 or DS-260 all social media identifiers (*i.e.*, user names or handles) used on specified social media

---

[2] It is common for foreign nationals who live in the United States to apply for new visas, or to renew their existing visas, from abroad. *See* Compl. ¶ 23. To the extent they do so, they, too, are required to submit Form DS-160 or Form DS-260, as applicable. *Id.*

platforms during the preceding five years. Defs.' Ex. 3, ECF No. 31-4; Defs.' Ex. 4, ECF No. 31-5. The State Department introduced the Registration Requirement pursuant to its asserted authority under the INA, 8 U.S.C. § 1202, and in response to an executive order and a memorandum dated March 6, 2017, Defs.' Ex. 1, ECF No. 31-2; Defs.' Ex. 2, ECF No. 31-3.

These notices received more than ten thousand public comments, nearly all of which opposed the Registration Requirement. *See* Defs.' Ex. 7, at 3–19, ECF No. 31-8; Defs.' Ex. 8, at 4–19, ECF No. 31-9. Thousands of comments raised concerns that the new requirement would undermine the freedoms of speech, expression, and association, invade individuals' privacy, or deter travel to the United States. Defs.' Ex. 7, at 6–15; Defs.' Ex. 8, at 6–15. Hundreds of comments highlighted evidence of the difficulty of deciphering social media communications. Defs.' Ex. 7, at 4–5, 9–10, 19; Defs.' Ex. 8, at 5, 10. Many comments observed that social media screening is an ineffective and unreliable means of verifying individuals' identities, confirming their eligibility for visas, or assessing threats to national security. Defs.' Ex. 7, at 5, 9–10; Defs.' Ex. 8, at 5–10.

Nonetheless, the State Department implemented the proposal on May 31, 2019, updating Forms DS-160 and DS-260 to require visa applicants to disclose all social media identifiers they have used in the preceding five years on twenty specified platforms, including Facebook, Instagram, LinkedIn, Reddit, Twitter, and YouTube, as well as several foreign-based social media sites. Defs.' Ex. 11, at 14; Defs.' Ex. 12, at 6; Compl. ¶¶ 27–28. Applicants are also asked to provide identifiers they have used on other, non-listed platforms if they "wish" to do so. Defs.' Ex. 11, at 14; Defs.' Ex. 12, at 6. The State Department estimates that the Registration Requirement applies to approximately 14.7 million applicants each year. Defs.' Ex. 3, at 2; Defs.' Ex. 4, at 2. The Registration Requirement is mandatory and makes no exception for applicants who have established significant connections to the United States. Nor does it make any exception for

applicants who use pseudonymous social media identifiers. *See* Defs.' Mem. 6.

In its final supporting statements, the State Department cited no evidence that the requirement would be a reliable means of identifying visa applicants or determining their visa eligibility. *See generally* Defs.' Ex. 7; Defs.' Ex. 8. It did not provide any rationale for imposing the Registration Requirement on visa applicants whose identification and eligibility determinations pose no difficulties for consular officers. Nor did it explain why the retention of visa applicants' social media information *beyond* their visa eligibility determinations is necessary for its stated purposes. Moreover, it relegated to a single sentence its discussion of previous pilot programs that failed to establish that large-scale social media surveillance would be effective for visa-related purposes. Defs.' Ex. 7, at 5; Defs.' Ex. 8, at 6.[3]

### C.    Retention and Dissemination of Visa Applicants' Social Media Information

The State Department stores information collected through the Registration Requirement in its Consular Consolidated Database ("CCD"), a worldwide "data warehouse." Defs.' Ex. 14, at 1, ECF No. 31-15. DHS and other agencies can access the database for a range of purposes. *Id.* at 13; Privacy Act of 1974; System of Records Notice, 83 Fed. Reg. 28,062, 28,063 (June 15, 2018). In certain circumstances, information from the visa records system is also available to Congress; state, local, and tribal government officials; and foreign governments. 83 Fed. Reg. at 28,063.

DHS retains the social media information collected through the Registration Requirement in at least two different databases. First, it maintains copies of the CCD visa data in its own

---

[3] In 2015, DHS launched pilot programs to test the effectiveness of social media screening for visa-related purposes. Defs.' Ex. 13, at 1–4, ECF No. 31-14. In February 2017, the DHS Inspector General reported that because these pilot programs "lack[ed] criteria for measuring performance to ensure they meet their objectives," they provided only "limited information for planning and implementing an effective, department-wide future social media screening program." *Id.* at 3; *see* Defs.' Ex. 7, at 5 (merely acknowledging pilot programs); Defs.' Ex. 8, at 6 (same).

Automated Targeting System ("ATS"). U.S. Dep't of Homeland Security, Privacy Impact Assessment Update for the Automated Targeting System DHS/CBP/PIA-006(e) ("ATS PIA"), at 2–3 (Jan. 13, 2017). DHS sometimes discloses information in ATS to other agencies and foreign governments. *Id.* at 53–54. At least seventy-eight foreign governments can obtain information from ATS pursuant to existing agreements. Compl. ¶ 36. Second, on information and belief, DHS retains social media information obtained through the Registration Requirement in its Alien File, Index, and National File Tracking System of Records. Compl. ¶ 37. This system of records houses covered individuals' "official immigration record[s]"—including information from State Department forms—in "A-Files" for 100 years after their dates of birth. U.S. Dep't of Homeland Security, System of Records Notice, 82 Fed. Reg. 43,556, 43,556, 43,561, 43,564 (Sept. 18, 2017). In September 2017, DHS announced that A-Files include "social media handles, aliases, associated identifiable information, and search results." *Id.* at 43,557. DHS policy permits the dissemination of A-File information to a number of third parties, including other DHS components, "appropriate Federal, State, local, tribal, territorial, foreign, or international government agencies," and current and prospective employers. *Id.* at 43,558, 43,562.

On information and belief, Defendants and their components rely on information collected through the Registration Requirement to monitor visa applicants' social media activities even after they enter the United States. *See* Compl. ¶ 38; Defs.' Mem. 43–44.

## II.   **Plaintiffs and Their Members and Partners**

Plaintiffs Doc Society and IDA are U.S.-based documentary film organizations that regularly collaborate with foreign filmmakers. Doc Society "enable[s] the creation of documentary films that drive social change and . . . connect[s] those films to global audiences." Compl. ¶ 40. To further its mission, Doc Society hosts "Good Pitch" and other events to facilitate and support

filmmaking partnerships and impact campaigns. *Id.* IDA "support[s] a global community of documentary filmmakers" by "fund[ing] films and filmmakers and host[ing] dozens of screenings, conferences, workshops, and other events throughout the United States each year." *Id.* ¶ 41. Its "Getting Real" conferences bring hundreds of global filmmakers to Los Angeles. *Id.* ¶¶ 41, 72.

Plaintiffs' members and partners include filmmakers from around the world. Compl. ¶¶ 40–41. They use social media to, among other things, promote their work and share their views about political, social, and other issues. *Id.* ¶ 50. Many of Plaintiffs' foreign members and partners have (or had) plans to come to the United States to collaborate with Plaintiffs or to participate in Plaintiffs' events. *Id.* ¶ 42; *see id.* ¶ 44. Because of the Registration Requirement, many of those foreign members and partners are now censoring their remarks on social media or deciding not to apply for U.S. visas. *Id.* ¶¶ 6, 55–56. As a result, Plaintiffs and their U.S. members and partners are deprived of opportunities to hear from and associate with these foreign members and partners, which in turn threatens the success of Plaintiffs' U.S.-based events and organizational missions. *Id.* ¶¶ 7, 66–73; *see id.* ¶¶ 44–45.

## Argument

On a motion to dismiss, the Court must "presume[] that the complaint's factual allegations are true and construe[] them liberally in the plaintiff's favor." *Ramirez v. U.S. Immigration & Customs Enf't*, 338 F. Supp. 3d 1, 21 (D.D.C. 2018); *see Philipp v. Fed. Republic of Germany*, 894 F.3d 406, 409 (D.C. Cir. 2018); *Flaherty v. Ross*, 373 F. Supp. 3d 97, 103 (D.D.C. 2019) (Kelly, J.). To survive a motion to dismiss, the Complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is plausible so long as "the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* Plaintiffs have alleged the facts necessary to establish their standing to challenge the Registration Requirement and related retention and dissemination policies, and Plaintiffs' APA and First Amendment claims amply meet the pleading requirements.

## I.    Plaintiffs Have Standing to Challenge the Registration Requirement and Related Retention and Dissemination Policies.

Plaintiffs readily satisfy the requirements of Article III standing. To establish standing, "a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). This test is, at the pleading stage, a "low bar," *Attias v. Carefirst, Inc.*, 865 F.3d 620, 622 (D.C. Cir. 2017), and a lower one where, as here, government conduct "arguably chill[s]" the exercise of First Amendment rights, *Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995); *see Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973).

Plaintiffs have standing to bring this suit on three independent grounds. First, IDA has associational standing because the Registration Requirement directly burdens its foreign members' anonymous speech and private associations, demonstrably chills their speech and associations on social media, and deters them from applying for U.S. visas to attend IDA's U.S.-based events. This, in turn, deprives IDA's U.S. members of opportunities to hear from these foreign filmmakers both on social media and in person. Second, Doc Society and IDA both have organizational standing because the Registration Requirement compromises their ability to foster cross-border cultural exchange between their foreign and U.S. members and partners, a core part of their organizational missions. Third, Doc Society and IDA have third-party standing because the Registration Requirement impedes their own rights and because they have close relationships with their foreign members, who are hindered in their ability to bring suit. Defendants ignore third-

8

party standing altogether and, with respect to associational and organizational standing, fault Plaintiffs for offering only general allegations of injury. In fact, as discussed below, Plaintiffs' allegations of injury are specific, detailed, and credible.

### A.     Plaintiff IDA Has Associational Standing.

An organization establishes associational standing by showing that: (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). IDA satisfies all three prongs of this test.

### 1.     Individual IDA Members Have Standing.

To satisfy the first prong of the test, an organization "must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). IDA has done so here.[4] The Complaint specifically identifies IDA members who suffer concrete injuries caused by the Registration Requirement. Defendants

---

[4] Defendants fault Plaintiffs for failing to identify in complete detail the members described in the Complaint, Defs' Mem. at 12, but in the case that Defendants principally rely on—*Public Citizen, Inc. v. Trump*—the court found that the plaintiffs had "made no effort—either in their complaint or in the multiple declarations they have submitted—to identify a specific member who [had] suffered" harm. 297 F. Supp. 3d 6, 18 (D.D.C. 2018). Here, in contrast, Plaintiffs have identified numerous individual members and described the harms they suffer because of the Registration Requirement. *See, e.g.*, Compl. ¶ 42. Moreover, to disclose further identifying details about those members, particularly those who use pseudonymous social media identifiers, would "require them to give up the very anonymity or obscurity that they seek to protect." *Id.* ¶ 6. "Naming those members adds no essential information bearing on the injury component of standing." *Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1506 (D.C. Cir. 1988) (opinion of Mikva, J.); *see id.* at 1500 (explaining that union member anonymity did not undermine standing, as "the court need only know that some union members have sought asylum, have been denied, and were probably subjected to the INS' defective procedures and thus detrimentally affected by them").

dismiss the injuries suffered by IDA's foreign members by suggesting that they enjoy no First Amendment rights. Defs.' Mem. 11. As discussed further below, *see infra* Pt. III, however, IDA's foreign members include filmmakers currently residing in the United States who must soon renew their visas, *e.g.*, Compl. ¶ 55, as well as non-resident filmmakers who have "substantial connections to the United States," *id.* ¶ 43. These members enjoy full First Amendment protection.

*First*, the Complaint plausibly alleges that the Registration Requirement injures IDA members who use pseudonymous social media identifiers to speak anonymously and protect the privacy of their associations on social media. Many people use pseudonymous social media identifiers to speak about sensitive or controversial issues, and to shield themselves, their families, or their associates from reprisals by state or private actors. Compl. ¶ 3; *see id.* ¶ 60. A number of IDA's foreign members use pseudonymous social media identifiers for these reasons. *Id.* ¶ 51 (identifying a Syrian IDA member who "uses pseudonymous accounts as a safety measure against political persecution" and "[a]t least three other IDA members" who "use pseudonymous accounts to share their views on political and social issues"). By compelling disclosure of applicants' pseudonymous social media identifiers, *see* Compl. ¶¶ 31, 53; Defs.' Mem. 6, the Registration Requirement injures applicants' First Amendment interests in maintaining their anonymity and protecting the privacy of their online associations. *See, e.g.*, *Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 153, 166 (2002); *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 200 (1999); *see generally McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995); *Talley v. California*, 362 U.S. 60 (1960); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957).

*Second*, the Complaint plausibly alleges that the Registration Requirement burdens the speech of IDA's foreign members—including those who use their real names as social media

identifiers—by conditioning their ability to obtain a significant benefit (a U.S. visa) on their willingness to register their online speech and associations with the U.S. government. Before the Registration Requirement took effect, IDA's foreign members regularly engaged in political and artistic speech on social media. *E.g.*, Compl. ¶ 50 (identifying one IDA member who used social media "to make people aware of important issues addressed in her work—focused on social issues with particular impact on women and children," and another who "used social media in connection with political demonstrations"). Now that the Registration Requirement is in effect, these and other foreign members are censoring their online speech. Compl. ¶ 55 (identifying "one IDA member currently residing in the U.S. Midwest [who] reviewed three years of social media activity and deleted posts criticizing the current U.S. administration in order to avoid any delays on future visa applications"); *id.* ¶ 58 (identifying another "IDA member [who] is less willing to participate in screenings and 'Question & Answer' sessions because his comments may be mischaracterized by others, shared on social media, and then read by the government").[5] Courts have repeatedly, if implicitly, recognized standing where individuals are required to register their beliefs or associations in return for a benefit. *See, e.g.*, *Baird v. State Bar of Arizona*, 401 U.S. 1, 8 (1971) (the government "may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes."); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 592–93 (1967); *see generally Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965); *Shelton v. Tucker*, 364 U.S. 479 (1960); *Baggett v. Bullitt*, 377 U.S. 360 (1964).[6]

---

[5] As the Complaint explains, the chilling effect is exacerbated by the risks that the government will misinterpret visa applicants' speech, improperly impute others' speech to visa applicants, or deliberately or inadvertently disclose visa applicants' speech to other agencies, foreign governments, or third parties. Compl. ¶¶ 57–58, 60–61.

[6] The government need not flat-out prohibit speech in order to cause a cognizable First Amendment injury. *Contra* Defs.' Mem. at 18. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972) ("[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental

*Third*, the Complaint plausibly alleges that, by conditioning their ability to obtain U.S. visas on their willingness to register their online speech and associations with the U.S. government, the Registration Requirement deters IDA's foreign members from pursuing significant personal and professional opportunities in the United States. Many of these members "had plans to come to the United States, or have plans to come to the United States in the near future" to collaborate with IDA or participate in IDA's events, among other things. Compl. ¶ 42. A number of these members "intend or intended to apply for O-1 visas as artists of extraordinary ability or for I visas as representatives of the foreign media." *Id.* Because of the Registration Requirement, however, some of these members have decided not to apply for U.S. visas, forgoing professional pursuits and opportunities to collaborate with other IDA members here. *Id.* ¶ 56 (identifying "one IDA member [who] has decided not to accept future work in the United States despite significant past work experience as a journalist here," and another "Turkish IDA member who is currently working on a documentary project with U.S. partners abroad [and] has decided against applying for a U.S. visa," both because of the Registration Requirement).

Defendants argue that these three injuries are insufficient to support standing, characterizing them as the kind of "subjective chill" rejected in *Laird v. Tatum*, 408 U.S. 1, *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), *American Library Association v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992), and *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (1984). Defs.' Mem. 15–16. Unlike in those cases, where plaintiffs challenged government surveillance programs based merely on the speculation—not the certainty—that they themselves would be subject to surveillance, here "the challenged exercise of governmental power

---

regulations that fall short of a direct prohibition against the exercise of First Amendment rights."); *Meese v. Keene*, 481 U.S. 465, 467–69 (1987); *Nat'l Student Ass'n v. Hershey*, 412 F.2d 1103, 1117–19 (D.C. Cir. 1969).

[is] regulatory, proscriptive, or compulsory in nature," and IDA's foreign members are "either presently or prospectively subject to the regulations, proscriptions, or compulsions" at issue. *Laird*, 408 U.S. at 11–12. The Registration Requirement is mandatory and, except for narrow exceptions, universally applicable. Compl. ¶¶ 31, 54, 62; Defs.' Ex. 3, at 2; Defs.' Ex. 4, at 2. IDA's foreign members know with certainty that they will be compelled to disclose their social media identifiers if they apply for U.S. visas. Therefore, the injuries Plaintiffs allege are incurred not "in response to a speculative threat," *Clapper*, 568 U.S. at 416; *see* Defs.' Mem. 16–17, 26, but rather in response to an immediate and unequivocal demand. *Cf. Laidlaw*, 528 U.S. at 184; *ACLU v. Clapper*, 785 F.3d 787, 801 (2d Cir. 2015).[7]

*Finally*, the Complaint plausibly alleges that, by chilling the speech of IDA's foreign members on social media and deterring them from attending IDA events in the United States, the Registration Requirement deprives IDA's U.S. members of opportunities to hear from these foreign filmmakers online and in person. Compl. ¶¶ 69, 73 (explaining that U.S. members attend Plaintiffs' U.S.-based events "to view films from around the world and to hear from and respond to the creators and subjects themselves," but that, because of the Registration Requirement, they "no longer have as many opportunities to engage with those individuals in person"). This deprivation constitutes a cognizable injury for purposes of standing. *See Kleindienst v. Mandel*, 408 U.S. 753, 764–65 (1972) (recognizing U.S. citizen's First Amendment interest in "hav[ing] [an] alien enter and to hear him explain and seek to defend his views" (citation omitted)); *Lamont*,

---

[7] Defendants misconstrue this case as a pre-enforcement challenge. *See* Defs.' Mem. at 14 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)). Plaintiffs are complaining not of the possibility that the Registration Requirement might be enforced against their members and partners in the future, but of the Registration Requirement's application to their members and partners now.

381 U.S. at 306–07 (recognizing First Amendment interest in receiving information from abroad); *Abourezk v. Reagan*, 785 F.2d 1043, 1050–51 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).

### 2.    The Interests at Stake Are Germane to IDA's Purpose.

For good reason, Defendants do not dispute that the interests at stake in this suit are germane to IDA's purpose. The second prong of the associational standing test is "undemanding," requiring "mere pertinence between litigation subject and organizational purpose." *NAACP v. Trump*, 298 F. Supp. 3d 209, 226 (D.D.C. 2018) (quoting *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)). Litigation that "aims to enhance the [organization]'s success in its central missions is sufficiently germane." *TOMAC v. Norton*, 193 F. Supp. 2d 182, 190–91 (D.D.C. 2002) (citation omitted), *aff'd sub nom. TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006). IDA's purpose—"to support a global community of documentary filmmakers in order to foster a more informed, compassionate, and connected world" by "fund[ing] films and filmmakers and host[ing] dozens of screenings, conferences, workshops, and other events throughout the United States each year," Compl. ¶ 41—directly aligns with the interests at stake in this suit. *Cf. Nat'l Student Ass'n v. Hershey*, 412 F.2d at 1120; *NAACP v. Trump*, 298 F. Supp. 3d at 226; *TOMAC*, 193 F. Supp. 2d at 190–91.

### 3.    This Suit Does Not Require Participation of Individual Members.

The third prong of the associational standing test considers whether "the claim asserted []or the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181. While "an association's action for damages running solely to its members would be barred," *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996), a suit for declaratory or injunctive relief would not, *see generally Pennell v. City of San Jose*, 485 U.S. 1 (1988); *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers*

*of Am. v. Brock*, 477 U.S. 274 (1986). Here, Plaintiffs' request for declaratory and injunctive relief does not turn on the particularities of IDA's individual members. It would be neither more convenient nor more efficient if IDA's individual members brought this suit. Moreover, it would be unduly burdensome to require IDA's individual members to appear themselves, because in doing so they would "draw the government's attention to their expressive and associational activities—that is, . . . surrender the very anonymity or obscurity they seek to protect." Compl. ¶ 64; *see id.* ¶ 6; *cf. Singleton v. Wulff*, 428 U.S. 106, 117–18 (1976).

### B.    Plaintiffs Have Organizational Standing.

Plaintiffs likewise have organizational standing, which requires claims of "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.* ("*PETA*"), 797 F.3d 1087, 1093 (D.C. Cir. 2015) (citation omitted). Courts ask "first, whether the agency's action or omission to act 'injured the [organization's] interest' and, second, whether the organization 'used its resources to counteract that harm.'" *Id.* at 1094 (alteration in original) (citation omitted). The Complaint satisfies this inquiry.

*First*, the Registration Requirement injures Plaintiffs because it deters their foreign members and partners from applying for U.S. visas and participating in their U.S. events. Crucial to Plaintiffs' missions is hosting screenings, workshops, conferences, and events that unite filmmakers and other partners from around the world in the United States. Compl. ¶¶ 40–41; *see id.* ¶¶ 44–45, 70–73. Because of the Registration Requirement, some of Plaintiffs' foreign members and partners are no longer applying for U.S. visas and are therefore unable to participate in Plaintiffs' U.S.-based events. Compl. ¶ 56. The Registration Requirement thus diminishes the

impact of these events, making Plaintiffs less attractive to potential funders and impairing their "discrete programmatic concerns." *PETA*, 797 F.3d at 1093 (citation omitted); Compl. ¶¶ 71–72.

*Second*, the Registration Requirement chills the online expressive and associational activities of Plaintiffs' foreign members and partners, compromising Plaintiffs' ability to gather information and ideas central to their missions. Plaintiffs use Twitter, Instagram, Facebook, and other platforms to develop new programs, discover new film projects, decide whom to invite to their events, research concerns confronting filmmakers, and issue calls to action. Compl. ¶¶ 46–48. Until relatively recently, Plaintiffs' foreign members and partners were eager to share their work, experiences, views, and concerns on social media. *Id.* ¶ 50. Now, because of the Registration Requirement, many IDA members and Doc Society partners who have applied or who intend to apply for U.S. visas curtail their online speech. *Id.* ¶¶ 54–55. Some have "deleted past posts, altered or limited their speech, or entirely dropped out of certain groups on social media," while others "have stopped posting or commenting on political or social issues entirely." *Id.* ¶ 55. The Registration Requirement thus impedes Plaintiffs' efforts to gather and disseminate information online, *id.* ¶¶ 66–68, which "perceptibly impair[s]" their "daily operations," *PETA*, 797 F.3d at 1094–95; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (recognizing injuries from ongoing practices that impeded nonprofit organization's efforts to provide counseling and referral services to its community); *League of Women Voters of the U.S. v. Newby* ("*LWV*"), 838 F.3d 1, 9 (D.C. Cir. 2016) (holding that "new obstacles" on voter registration forms "unquestionably make it more difficult for the [organizations] to accomplish their primary mission of registering voters, . . . provid[ing] injury for purposes both of standing and irreparable harm").

The D.C. Circuit recognized this kind of impediment to the free flow of information as an injury in fact in *PETA* and, most recently, in *American Anti-Vivisection Society v. U.S. Department*

16

*of Agriculture* ("*AAVS*"), 946 F.3d 615 (D.C. Cir. 2020). In both cases, the court concluded that animal rights groups suffered injuries from the agency's failure to apply animal welfare protections to birds, which impeded the flow of bird-related information that the groups would have relied on to educate their membership. As in both *PETA* and *AAVS*, the Registration Requirement has "perceptibly impaired" Plaintiffs' "organizational interests by depriving [them] 'of key information that [they] rel[y] on' to fulfill [their] mission[s]." *AAVS*, 946 F.3d at 619 (quoting *PETA*, 797 F.3d at 1095); *see also Havens Realty,* 455 U.S. at 378–79; *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986); *cf. Ukrainian-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1378 (D.C. Cir. 1990).

The concrete and immediate injuries to Plaintiffs' interests here contrast with the speculative, future injuries alleged in the cases cited by Defendants. *See* Defs.' Mem. 22–23. In *National Treasury Employees Union v. United States*, the court dismissed a challenge to the Line Item Veto Act after concluding that it presented merely hypothetical hurdles to the union's legislative advocacy efforts. 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("NTEU did not allege" that a favorable appropriations bill "was subjected to the President's item veto power," or that such a bill "was modified in Congress as a result of a threatened exercise of the item veto power."). In *Food & Water Watch, Inc. v. Vilsack*, the court dismissed a challenge to a new policy in the absence of any explanation as to how the policy actually restricted the flow of information used by the plaintiff organization to educate its members. 808 F.3d 905, 921 (D.C. Cir. 2015). Finally, in *Texas Low Income Housing Information Service v. Carson*, this Court ruled that the plaintiff organization lacked standing because its "chain of allegations" contained "overly speculative" links predicting "future events," such as a city's response to agency enforcement action not yet taken. 427 F. Supp.

3d 43, 54 (D.D.C. 2019) (Kelly, J.). The Court further noted that the organization had *not* "alleged that [the agency's] inaction has impaired its ability to research, analyze, or educate." *Id.* at 56.

Here, for the reasons discussed above, *see supra* Pt. I.A.1, Plaintiffs are not speculating as to how their foreign members and partners will react to the Registration Requirement—which is already impairing, and will continue to impair, Plaintiffs' research and outreach efforts. *See* Compl. ¶¶ 54–56, 67–68. Plaintiffs have also had "to divert time, staff resources, and funding to find and engage with members and partners who are now reluctant to speak publicly on social media or travel to the United States; to support and promote the work of their members and partners; and to recruit new members, partners, and projects." Compl. ¶ 75. Absent these additional expenditures, Plaintiffs' U.S.-based events—a core component of their overall missions—would suffer a greater loss of participation, interest, and ultimately, funding. *Id.* ¶¶ 71–72. Where, as here, "an organization expends resources 'in response to, and to counteract, the effects of the defendants' alleged [unlawful conduct] rather than in anticipation of litigation,' it has suffered a 'concrete and demonstrable injury' that suffices for purposes of standing." *PETA*, 797 F.3d at 1097 (alterations in original) (citations omitted); *see LWV*, 838 F.3d at 9 (explaining that plaintiff organizations' "expenditures are merely a symptom of [their] programmatic injury").

## C.    Plaintiffs Have Third-Party Standing.

Finally, Plaintiffs have third-party standing to assert the First Amendment rights of their members and partners. Defendants do not address this ground for standing at all. The D.C. Circuit has recognized "three prudential considerations to be weighed when determining whether an individual may assert the rights of others: (1) 'The litigant must have suffered an "injury in fact," . . .' (2) 'the litigant must have a close relation to the third party,' and (3) 'there must exist some hindrance to the third party's ability to protect his or her own interests.'" *Lepelletier v. FDIC*,

164 F.3d 37, 43 (D.C. Cir. 1999) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). When rights

of free speech, particularly anonymous free speech, are at stake, the Supreme Court has allowed

an organization to assert those rights on behalf of its members or customers. *See, e.g.*, *Virginia v.*

*Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988). And "where the claim is that a statute

is overly broad in violation of the First Amendment, the Court has allowed a party to assert the

rights of another without regard to the ability of the other to assert his own claims." *Sec'y of State*

*of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 957 (1984). Particularly given the courts'

"relaxed" application of the prudential requirements for third-party standing in cases involving

First Amendment claims, *see id.* at 956, Plaintiffs have met those requirements here.

*First*, as explained above, *supra* Pt. I.B, Plaintiffs suffer concrete and continuing injuries

caused by the Registration Requirement.

*Second*, Plaintiffs have a "close relation" to their members and partners, whose interests

they will zealously and competently represent in this suit. This criterion "is intended to ensure that

there is 'an identity of interests between the parties such that the plaintiff will act as an effective

advocate of the third party's interests.'" *Ryan, LLC v. Lew*, 934 F. Supp. 2d 159, 166 (D.D.C.

2013) (citation omitted); *see Lepelletier*, 164 F.3d at 45 ("*[J]us tertii* standing does not require a

perfect match."). Plaintiffs' interests are entirely intertwined with their members' and partners'

interests here: Plaintiffs' foreign members and partners seek to apply for U.S. visas while

maintaining their online anonymity and speaking freely on social media; and Plaintiffs and their

U.S. members seek to hear from those same foreign members both online and in person. *See*

Compl. ¶ 76 ("The requirement disrupts Plaintiffs' relationships with their members and partners,

which Plaintiffs have spent years working to develop and strengthen."). All seek the same result—

the invalidation of the Registration Requirement. Plaintiffs will unquestionably act as effective

advocates of their members' and partners' interests in pursuit of this relief. *See Munson*, 467 U.S. at 958 ("Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents."); *Ryan*, 934 F. Supp. 2d at 166–67.

*Third*, Plaintiffs' foreign members and partners are hindered in their ability to protect their expressive and associational interests in this case. The Supreme Court has recognized third-party standing where individuals' assertion of the right at issue would essentially defeat it. *See NAACP*, 357 U.S. at 459; *cf. Singleton*, 428 U.S. at 118 (recognizing privacy concerns as sufficient hindrance to filing suit). This is the case here, where challenging the Registration Requirement would require Plaintiffs' foreign members and partners to draw the government's attention to the very expressive and associational activities they seek to protect, a particular risk for those members and partners using pseudonymous identifiers. Compl. ¶ 64; *see id.* ¶ 6.

## II.     The Registration Requirement Violates the APA.

Plaintiffs have plausibly alleged that the Registration Requirement violates the APA for two reasons. First, it exceeds the Secretary's authority under the INA because it is not "necessary" to achieve the relevant statutory purposes, and because it violates the First Amendment. Second, it is the product of an arbitrary and capricious rulemaking. In arguing that Plaintiffs' claims are nonreviewable, Defendants misapply the APA's permissive zone-of-interests test, overlook the presumptive reviewability of agency actions, and misconstrue the statutory language at issue. And in arguing that the Complaint fails to state a claim, Defendants ignore the Complaint's clear statements articulating the Registration Requirement's substantive and procedural shortcomings.

### A.     Plaintiffs' Claims Are Within the INA's Zone of Interests.

Plaintiffs' claims fall within the INA's zone of interests, a test that Defendants concede is not demanding. *See* Defs.' Mem. 32. The test asks "whether a legislatively conferred cause of

action encompasses" the asserted claim. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). Because agency actions are "presumptively reviewable," courts apply the test permissively. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citation omitted). "Congruence of interests, rather than identity of interests, is the benchmark." *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004).

Plaintiffs meet this permissive test because the Registration Requirement impacts Plaintiffs' organizational missions, and IDA members are directly subject to the Registration Requirement. *See supra* Pt. I.A–B. Courts routinely find that organizational plaintiffs fall within the INA's zone of interests. *See, e.g.*, *Capital Area Immigrant Rights Coal. v. Trump* ("*CAIR Coal.*"), No. 1:19-cv-02117, 2019 WL 3436501, at *1 (D.D.C. July 24, 2019) (Kelly, J.) (finding organizations within INA's zone of interests given allegation that the challenged "rule will disrupt their day-to-day ability to provide legal representation and other services for recent migrants"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019) (finding organizations within INA's zone of interests); *cf. Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 56–58 (D.D.C. 2013) (concluding association fell within zone of interests where agency action "directly regulated" its members). The Court should reach the same conclusion here.

The INA expressly permits foreign nationals pursuing professional interests in film, media, and the arts to apply for, and obtain, visas. *See, e.g.*, 8 U.S.C. § 1101(a)(15)(B) (addressing representatives of "foreign press, radio, film, or other foreign information media"); *see also id.* § 1184(c)(3) (addressing applicants "seeking entry for a motion picture or television production"). But the Registration Requirement conditions the ability of Plaintiffs' foreign members and partners to obtain these and other visas on their willingness to register their speech and associations with the U.S. government, burdening their online expression and impairing Plaintiffs' organizational

interests in having them attend Plaintiffs' U.S.-based events. Plaintiffs' challenges to the Registration Requirement therefore fall within the INA's zone of interests. *See, e.g.*, *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 939 (D.C. Cir. 1986) (holding organization within zone of interests because challenged regulations made "it more difficult for the organizations to assist [constituents] to know, enjoy, and protect their rights under the ADA").

Neither case cited by Defendants compels a different result. In *Federation for American Immigration Reform, Inc. v. Reno*, the organizational plaintiff did not assert the interests of Cuban immigrants who were directly subject to the challenged parole rule, but rather the interests of U.S. residents against "diminish[ed] employment opportunities and crowd[ed] public schools," 93 F.3d 897, 899 (D.C. Cir. 1996), which the court considered a "diffuse" harm outside the statutory zone of interests, *id.* at 903. Here, by contrast, Plaintiffs assert the interests of individuals directly subject to the Registration Requirement, as well as Plaintiffs' own interests in hearing from and associating with these individuals. In *Haitian Refugee Center v. Gracey*, the court's reasoning hinged on its determination that provisions of the Refugee Act and INA did not evidence Congress's intent to protect an organization's interest in providing legal assistance to asylum-seekers. 809 F.2d 794, 813 (D.C. Cir. 1987). Here, as noted above, the INA expressly contemplates that foreign press and film representatives will obtain visas to pursue professional opportunities in the United States. 8 U.S.C. §§ 1101(a)(15)(B), 1184(c)(3); *see also Abourezk*, 785 F.2d at 1047, 1050–51 (holding that organizations that had invited foreign nationals to attend meetings or address audiences in the United States were within INA's zone of interests). More recent cases have concluded that nearly identical interests fall within the INA's zone of interests, evidencing a more expansive understanding of the test consistent with recent Supreme Court precedent. *See, e.g.*, *CAIR Coal.*, 2019 WL 3436501, at *1.

22

B.      Plaintiffs' Claims Are Reviewable Under the APA.

Any person or organization "adversely affected or aggrieved by agency action within the meaning of a relevant statute[] is entitled to judicial review thereof." 5 U.S.C. § 702. While the APA excepts from this clear presumption of judicial review actions that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), courts interpret this exception "quite narrowly" and apply it only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citation omitted); *see Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *Robbins v. Reagan*, 780 F.2d 37, 46 (D.C. Cir. 1985). Defendants assert that this narrow exception applies here, *see* Defs.' Mem. 28–31, but neither the INA's statutory framework, nor the cases on which Defendants rely, support this argument.

Defendants rely chiefly on *Legal Assistance for Vietnamese Asylum Seekers v. Department of State, Bureau of Consular Affairs* ("*LAVAS*"), 104 F.3d 1349 (D.C. Cir. 1997), but that case is inapposite. Addressing the Secretary's authority to prescribe consular venue locations, *LAVAS* focused exclusively on a portion of 8 U.S.C. § 1202(a) stating that foreign nationals must apply for visas "at such place as shall be by regulations prescribed." *LAVAS*, 104 F.3d at 1353 (emphasis omitted). It did not address the portion of § 1202(a) at issue here: the Secretary's authority to collect additional information from visa applicants. Significantly, in concluding that consular venue determinations were unreviewable, the court relied on a separate provision of the INA, which stated that "[n]othing in this paragraph shall be construed to limit the authority of the Secretary of State to determine . . . the locations where [visa] applications will be processed." *Id.* at 1351 (quoting 8 U.S.C. § 1152(a)(1)). This provision—not § 1202(a)—usurped any "standard against which to measure" the Secretary's actions. *Id.* at 1353.

23

Here, unlike in *LAVAS*, there *are* meaningful standards against which to measure the agency's decision. Relying on § 1202(a)'s use of the words "necessary" and "may," Defendants claim that the Secretary of State has limitless authority to "determine the type of information to be sought from visa applications." Defs.' Mem. 30.[8] But "[t]he mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely nonreviewable . . . unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Robbins*, 780 F.2d at 45; *see Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 257, 266 (D.D.C. 2017).

The Secretary promulgated the Registration Requirement pursuant to language authorizing the agency to collect "such additional information necessary to the identification of the applicant, the determination of his eligibility for a . . . visa, and the enforcement of the immigration and nationality laws as may be by regulations prescribed." 8 U.S.C. § 1202(c); *accord id.* § 1202(a). "Necessary" does not, as Defendants suggest, give the Secretary carte blanche to require any additional information whatsoever. *See Int'l Swaps & Derivatives Ass'n v. CFTC*, 887 F. Supp. 2d 259, 271−72 (D.D.C. 2012) (rejecting argument that "the 'necessary' language actually imposes no substantive requirement at all"). Rather, any additional information must be "necessary" to confirming applicants' identities, determining their visa eligibility, or enforcing the immigration laws. *See* 8 U.S.C. § 1202(a), (c). Thus, the INA's intricate eligibility and enforcement provisions provide the standards against which to judge the Secretary's discretion. *Cf. Abourezk*, 785 F.2d at 1051 ("[T]he [INA] lists thirty-three distinctly delineated categories that conspicuously provide standards to guide the Executive in its exercise of the exclusion power.").

---

[8] Defendants' reliance on *Haig v. Agee*, 453 U.S. 280 (1984), is also misplaced. *Haig*, which does not analyze the INA or APA § 701(a)(2), deals with an entirely separate question, namely, the Secretary of State's discretion to revoke a passport.

Defendants' assertion that the Secretary's action is unreviewable because it involves "foreign policy and national security" fares no better. Defs.' Mem. 31. The invocation of "national security" does not, on its own, render agency action unreviewable. *See, e.g.*, *Kirwa*, 285 F. Supp. 3d at 266 (explaining that national security concerns do not give agencies "carte blanche authority to act in contravention of the Constitution or applicable statutes"). Indeed, numerous cases have reached the merits of statutory claims concerning immigration decisions. *See, e.g.*, *Trump v. Hawaii,* 138 S. Ct. 2392, 2407 (2018); *NAACP v. Trump*, 298 F. Supp. 3d 209, 234 (D.D.C. 2018).

### C. The Registration Requirement Exceeds the Secretary's Statutory Authority and Raises Serious Constitutional Concerns.

The Complaint explains in clear and plain terms that the Registration Requirement exceeds the Secretary's statutory authority because it is not necessary to identify visa applicants, make eligibility determinations, or enforce the immigration laws. Compl. ¶¶ 8, 27, 77. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Defendants suggest that the Secretary has unfettered license to promulgate any rule he "believes" *could* be "necessary" under the INA. Defs.' Mem. 38; *see id.* at 37. But that position ignores the statutory text and ventures an interpretation that raises serious constitutional concerns.

The threshold inquiry is "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). Viewing the statute holistically, courts give undefined terms their ordinary meaning and reconcile the language to the statutory framework as a whole. *See FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). If Congress's intent "is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. If, however, "the

statute is silent or ambiguous with respect to the specific issue," courts assess "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

Here, Congress constrained the Secretary's rulemaking authority to collect additional information only as "*necessary*" to (1) "the identification of the [visa] applicant," (2) "the determination of his eligibility," and (3) "the enforcement of the immigration and nationality laws." 8 U.S.C. § 1202(c) (emphasis added); *see id.* § 1202(a). "Necessary" is the language of limitation, not of limitless discretion. *See* Oxford English Dictionary (defining term as "[i]ndispensable, vital, essential; requisite"); Black's Law Dictionary (11th ed. 2019) (defining term as "needed for some purpose or reason; essential"). Accordingly, the D.C. Circuit has repeatedly held that Congress's use of the word "necessary" is limiting. In *GTE Service Corporation v. FCC*, for example, the court invalidated an FCC rule interpreting "necessary" to mean "useful." 205 F.3d 416, 422 (D.C. Cir. 2000) ("Something is *necessary* if it is *required* or *indispensable* to achieve a certain result."); *see also AFL-CIO v. Chao*, 409 F.3d 377, 386, 390 (D.C. Cir. 2005) (invalidating rule seeking information unnecessary to prevent circumvention of the statute's reporting requirements); *Int'l Swaps*, 887 F. Supp. 2d at 271−72.[9]

As alleged in the Complaint, the Secretary made no effort to justify the dragnet collection of visa applicants' social media identifiers as *necessary* to enforcing the immigration laws. *See* Compl. ¶¶ 8, 27. Indeed, the Secretary cited "no evidence" whatsoever that the Registration

---

[9]    While the D.C. Circuit in *Cellular Telecommunications & Internet Association v. FCC* explained that a narrow definition of "necessary" is not invariably required, it still recognized the word's limiting force. 330 F.3d 502, 512 (D.C. Cir. 2003) (upholding interpretation of "necessary" as "referring to the existence of a strong connection between what the agency has done by way of regulation and what the agency permissibly sought to achieve"). Further, like in *GTE*, the risks of accepting a broad interpretation of "necessary"—here, unjustified interference with First Amendment rights—support rejection of such an interpretation. *See* 205 F.3d at 423 (emphasizing that "a broader construction of 'necessary' . . . might result in an *unnecessary* taking of private property"); *cf. Cellular Telecomms.*, 330 F.3d at 511 ("We face no such concerns in this case.").

Requirement is "likely to be an effective, let alone necessary, means of serving" its statutory purposes. *Id.* ¶ 8. While Defendants claim that the Registration Requirement will "prove helpful" to eligibility determinations by identifying fraud or validating employment relationships, Defs.' Mem. 6, such an interpretation of necessary—which is tantamount to a claim of "usefulness"—is precisely the type of reasoning rejected in *GTE*, 205 F.3d at 422, 424. Further, the information collected here is likely to be of limited usefulness, given the well-documented difficulties of accurately interpreting social media communications. *See* Compl. ¶¶ 8, 24, 26.

The Complaint plausibly alleges that the Registration Requirement is decidedly *unnecessary* in light of the INA's detailed scheme for identifying and evaluating visa applicants. *See id.* ¶¶ 18–22, 27. As explained in the Complaint, the visa application forms ask for a range of biographical information, including extensive questions related to the applicant's "family, health, travel, work history, and criminal history," as well as a number of questions "related to national security." *Id.* ¶¶ 19, 21. Most applicants must also appear for an in-person interview with a consular officer, during which nonimmigrant visa applicants must "provide a biometric . . . to authenticate identity and additionally verify the accuracy and truthfulness of the statements in the application at the time of interview." *Id.* at ¶ 22 (quoting 22 C.F.R. § 41.103(b)(2)). Existing regulations authorize consular officers to request any additional information, including social media information, they deem necessary to verify individual applicants' identities or to determine their visa eligibility. *See id.* ¶¶ 20, 22. Given this detailed scheme, the Registration Requirement's dragnet measures are unnecessary "to serve the government's legitimate interests in adjudicating visa applications, enforcing the immigration laws, or protecting national security." *Id.* ¶ 8.

Finally, even if this Court determines that § 1202(a) and (c) are ambiguous, the Court should reject the Secretary's interpretation of the statute because it raises serious First Amendment

concerns. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems," a court should "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001) (citation omitted); *see Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002) (interpreting FCC's authority so as "[t]o avoid potential First Amendment issues"). The Supreme Court has applied this logic in the context of the INA, narrowly interpreting regulatory authority in *United States v. Witkovich* to prevent the INA from transgressing constitutional limits. 353 U.S. 194, 199, 201–02 (1957); *see also Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (The Court has "read significant limitations into other immigration statutes in order to avoid their constitutional invalidation."). The same reasoning applies here given that, for the reasons discussed below, *infra* Pt. III, the Registration Requirement violates the First Amendment.

### D.     The Registration Requirement Is Arbitrary and Capricious.

Plaintiffs have also adequately pled that the Registration Requirement is arbitrary and capricious under the APA because the Secretary failed to offer a reasoned explanation for the Registration Requirement and failed to address the substantial evidence showing that the requirement is ineffective. *See* Compl. ¶ 27. An agency's actions are arbitrary and capricious—and thus invalid—"if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Animal Legal Def. Fund, Inc. v. Purdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (alteration in original) (citation omitted). An agency "cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018);

*see Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 343–44 (D.C. Cir. 2019). Nor can it proffer a rationale that is inconsistent with the evidentiary record. *Nio v. DHS*, 385 F. Supp. 3d 44, 47 (D.D.C. 2019). Here, the Secretary failed to articulate a cogent explanation for his actions.

    *First*, the Complaint plausibly alleges that the Secretary failed to provide an adequate rationale for the Registration Requirement. Compl. ¶ 27. "[I]t is not enough for there to be some plausible basis for [an agency] decision; the [agency] must express its reasons for reaching that decision." *Hensley v. United States,* 292 F. Supp. 3d 399, 411 (D.D.C. 2018) (Kelly, J.); *see United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279, 1285 (D.C. Cir. 2020) (invalidating agency action because "the record lacks a reasonable justification"); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("Conclusory statements will not do."). The Secretary provided no such explanation here, relying on a conclusory statement that "[t]his information collection is essential for confirming the applicant's identity and determining whether an applicant is eligible for a . . . visa." Defs.' Ex. 7, at 3; Defs.' Ex. 8, at 3; *see* Compl. ¶ 27. Defendants assert—with little support from the record—that "[s]ocial media information can be used to detect identi[t]y fraud and other grounds that render an applicant ineligible to enter the country." Defs.' Mem. 37. But an unsupported statement that information "can" be used to verify identity or determine visa eligibility is not an explanation as to why it is *necessary* for those purposes. Nor did the Secretary explain why it is necessary to retain social media information beyond visa eligibility determinations. *See* Compl. ¶ 27. Defendants simply recite the purported statutory basis for the Registration Requirement. *See* Defs.' Mem. 37. But a statement that the Secretary believes he may do something is not an explanation of *why* he did it. And it certainly does not explain why the collection and long-term retention of visa applicants' social media information is necessary for the

29

stated statutory purposes. Thus, the Secretary engaged in precisely the sort of opaque and conclusory reasoning that renders an agency rulemaking process arbitrary and capricious.

Defendants argue that the Secretary is not required to provide "hard proof" or "specific evidence" that its policies are effective in "areas of national security and foreign policy." Defs.' Mem. 36. But the case on which Defendants rely—*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)—did not involve an APA challenge and does not stand for the generalized proposition that agencies deserve special deference when addressing national security concerns. It expressly notes that "precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Id.* at 34. Plaintiffs are, moreover, not holding the agency to a higher standard of proof than the law requires; they are simply challenging the Secretary's failure to provide *any* reasoned justification for its actions. *See* Compl. ¶¶ 26−27.

*Second*, the Secretary failed to reconcile, or in many cases even contend with, evidence that the Registration Requirement is an ineffective means of achieving its purported aims. He instead "[n]odd[ed] to concerns raised by commenters only to dismiss them in a conclusory manner," which "is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020); *see Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017); *D.C. v. Dep't of Agric.*, No. 20-119, 2020 WL 1236657, at *14 (D.D.C. Mar. 13, 2020) ("[W]hen faced with considerable evidence that its preferred measure was inappropriate or incomplete in the precise context defined by the statute, the agency needed to provide a meaningful response to that evidence and 'articulate a satisfactory explanation for its action.'") (citation omitted).

Here, "hundreds of comments highlighted evidence showing that social media communications," which "are difficult, if not impossible, to interpret accurately," are "an

ineffective and unreliable means of verifying individuals' identities, confirming their eligibility for visas, and assessing any threat they might pose to national security." Compl. ¶ 26. Numerous organizations noted that "social media presence is a poor metric for determining security risks" given its "highly idiosyncratic" and "context-, conversation-, language-, and culture-specific" characteristics. Asian Americans Advancing Justice, Comment Letter on Proposed Information Collection: Application for Nonimmigrant Visa 3 (May 29, 2018). Accordingly, social media analysis tends to produce "inaccurate and biased" results. *See* 18MillionRising.org, *et. al*, Comment Letter on Proposed Information Collections: Applications for Immigrant Visa and Nonimmigrant Visa 12 (May 29, 2018) (citation omitted). As one organization noted, "DHS has recognized in internal documents" that "'information in [social media] accounts did not produce clear links to national security concerns, even for those applicants who were found to pose a potential national security threat.'" Muslim Advocates, Comment Letter on Proposed Information Collections: Applications for Immigrant Visa and Nonimmigrant Visa 12−13 (May 29, 2018).[10]

The Secretary did not meaningfully engage with *any* of these comments. Rather than address the challenges of interpreting social media information, the Secretary simply "acknowledge[d] that the context and circumstances of the applicant, culture, country conditions, the nature of the account, and other postings will inform the interpretation of any social media post." Defs.' Ex. 7, at 10−11; Defs.' Ex. 8, at 11. The Secretary took a similar tack in response to comments highlighting the shortcomings of pilot programs designed to test social media screening. While he acknowledged "the February 2017 DHS Office of Inspector General Report," which found that pilot programs failed to establish the effectiveness of social media screening as a visa

---

[10] Compilations of public comments to the Registration Requirement are available at: https://perma.cc/2ZFA-ABFD (DS-160);  https://perma.cc/PLM5-SV9X (DS-260).

vetting tool, he made no effort to explain how social media screening actually effecutated that end. Defs.' Ex. 7, at 5; Defs.' Ex. 8, at 6; *see* Compl. ¶¶ 24, 27. Instead, he offered perfunctory truisms that "[s]ocial media screening capabilities and effectiveness continue to evolve" and "[t]he Department is constantly working to find mechanisms to improve [its] screening processes." Defs' Ex. 7, at 5.[11] The Secretary's failure to meaningfully address commenters' significant concerns demonstrates a lack of reasoned decisionmaking that is, at its core, arbitrary and capricious.

## III.   The Registration Requirement and Related Retention and Dissemination Policies Violate the First Amendment.

Plaintiffs have plausibly alleged violations of their First Amendment rights and those of their members and partners—including the right to speak anonymously, to associate privately, and to receive information and ideas—and that the Registration Requirement sweeps far more broadly than necessary to serve the government's ends. Given Defendants' failure to demonstrate that the requirement actually achieves those ends, and given the availability of far less restrictive means of achieving those same ends, Plaintiffs have adequately pled that the Registration Requirement cannot pass constitutional muster.

Defendants understate the Registration Requirement's First Amendment implications. Suggesting that this case principally concerns the rights of foreigners who cannot invoke the protections of the First Amendment, Defendants contend that the Court should evaluate the Registration Requirement under a watered-down version of First Amendment scrutiny. But that

---

[11] Notably, neither the public notices nor the final supporting statements mention the State Department's own pilot program to test the effectiveness of social media screening in vetting visa applicants. *See The Security of U.S. Visa Programs: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 114th Cong. 101 (2016) (statement of Principal Deputy Assistant Sec'y David Donahue), *available at* https://perma.cc/L3U4-TP4S. The Secretary failed either to cite evidence supporting the Registration Requirement or to justify the Registration Requirement despite a failed or inconclusive pilot program, which is fatal to the agency's APA defense here.

suggestion is untenable. First, some of Plaintiffs' foreign members and partners already reside in the United States and have to apply for new visas in order to continue their lives and their work here. *See, e.g.*, Compl. ¶¶ 43, 55. They are unquestionably entitled to First Amendment protections. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."). Second, many of Plaintiffs' foreign members and partners who have applied, plan to apply, or have abandoned plans to apply for U.S. visas currently reside outside the United States but have established significant connections here, such that they, too, are entitled to First Amendment protections. Compl. ¶ 43; *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *Ibrahim v. DHS*, 669 F.3d 983, 997 (9th Cir. 2012). Finally, Plaintiffs and their U.S. members and partners enjoy First Amendment rights to hear from and meet with foreign nationals. *See Lamont*, 381 U.S. at 305–06; *Mandel*, 408 U.S. at 763–64.

### A.  The Registration Requirement Is Subject to Heightened Scrutiny.

Because the Registration Requirement burdens anonymous speech and curtails the right to associate, it is subject to strict scrutiny. *See, e.g.*, *McIntyre*, 514 U.S. at 347; *NAACP*, 357 U.S. at 460–61. Accordingly, the Registration Requirement can be upheld only if the government demonstrates that it is narrowly tailored to achieve a compelling government interest. Even if it did not burden these core First Amendment rights, the Registration Requirement would be subject to intermediate scrutiny, under which Defendants bear the burden of justifying the requirement as narrowly tailored to achieve a substantial government interest. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) (applying intermediate scrutiny to content-neutral regulation).[12]

---

[12] For reasons discussed below, Defendants' argument that the Court should apply only rational basis review (or "*Mandel*" review) is wrong. The Registration Requirement would fail even under rational basis review, however, because it is not reasonably supported by the record. *See supra* Pt. II.C–D; *Marczak v. Greene*, 971 F.2d 510, 517 (10th Cir. 1992).

Defendants argue that the Court should apply the least stringent standard of scrutiny here because the challenged regulations relate to immigration, foreign affairs, and national security. Defs.' Mem. 39–42. But the cases Defendants rely on differ from this one in two important respects. First, as noted above, here Plaintiffs assert not only their own First Amendment rights as U.S.-based organizations, but also the First Amendment rights of foreign members and partners who currently reside in the United States and those with substantial connections to the United States. While some of the cases Defendants cite, *see id.*, involved challenges brought by U.S. organizations, they focused principally on foreigners outside the United States who lacked substantial connections to the United States and, therefore, lacked their own First Amendment rights. The Court should decline Defendants' invitation to extend those cases here, where the challenged regulation directly burdens individuals with First Amendment rights.

Second, whereas the cases cited by Defendants involved challenges to the government's *substantive* admissibility decisions, this case involves a challenge to *procedural* application requirements. This distinction is critical. Courts have deferred to the government's substantive admissibility decisions because these decisions directly implicate Congress's plenary power over immigration. As the Court explained in *Mandel*, "[w]hen the Executive exercises" the power to exclude foreign nationals from the United States "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." 408 U.S. at 770. Thus, in *Trump v. Hawaii*, the Court denied a preliminary injunction against the President's substantive determination as to the inadmissibility of individuals from certain countries, invoking *Mandel* while applying something akin to rational basis review to plaintiffs' Establishment Clause challenge. 138 S. Ct. 2392, 2419–23 (2018); *see*

34

*also Kerry v. Din*, 135 S. Ct. 2128, 2140–41 (2015) (Kennedy, J., concurring) (applying *Mandel* to visa denial); *Fiallo v. Bell*, 430 U.S. 787, 795 (1977) (applying *Mandel* to categorical entry classification); *Marczak*, 971 F.2d at 517 (equating *Mandel* review with rational basis review).

But those cases do not control this one. Unlike the individual visa denial at issue in *Mandel* and the categorical visa denial at issue in *Trump v. Hawaii*, the Registration Requirement imposes a procedural requirement on all visa applicants; it makes no substantive determination as to the admissibility of any applicant subject to it. Nor could it, since the INA does not delegate that authority to the State Department. *See* 8 U.S.C. § 1104(a); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156 (1999) ("The INA confers upon consular officers exclusive authority to review applications for visas, precluding even the Secretary of State from controlling their determinations."). As a result, this case does not squarely implicate Congress's plenary immigration power or the doctrine of consular nonreviewability. *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the U.S. v. Kerry*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016) ("[T]he doctrine of consular nonreviewability is not triggered until a consular officer has made a *decision* with respect to a particular visa application."); *see also Ibrahim v. U.S. Dep't of State*, No. 19-610, 2020 WL 1703892, at \*4 (D.D.C. Apr. 8, 2020)). *Mandel* and its progeny therefore do not apply here, and the Court should review the Registration Requirement and related retention and dissemination policies under ordinary First Amendment scrutiny.

**B.     The Registration Requirement Burdens First Amendment Rights.**

The Registration Requirement burdens the online speech and associations of nearly fifteen million people each year, including some who already reside in, or who have significant ties to, the United States. These burdens result in the kinds of chilling effects that the Supreme Court has recognized as especially offensive to the First Amendment.

### 1.    Anonymous Speech and Private Association

Plaintiffs have adequately pled that the Registration Requirement violates the rights of their foreign members and partners to speak anonymously and associate privately online. "[A]n author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment." *McIntyre*, 514 U.S. at 342; *see also Watchtower Bible*, 536 U.S. at 160; *Talley*, 362 U.S. at 64–65. And "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP*, 357 U.S. at 462; *see id.* at 460–62.

By compelling visa applicants to disclose any social media identifiers they have used on specified platforms during the preceding five years—including pseudonymous identifiers—the Registration Requirement unquestionably burdens the applicants' right to speak anonymously online. The decision to maintain anonymity "may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *Watchtower Bible*, 536 U.S. at 166 (citation omitted). Requiring individuals to identify themselves to government officials in connection with their expressive activities "necessarily results in a surrender of [their] anonymity." *Id.*; *see* Compl. ¶¶ 1, 3, 5, 31, 53. Defendants concede as much. *See* Defs.' Mem. 6. Moreover, Plaintiffs' foreign members and partners use pseudonymous social media identifiers to speak about political or controversial topics, fearful of retaliation against them or their family members. Compl. ¶¶ 5, 51, 53, 60. These fears are well founded: Defendants' retention and dissemination policies pose the risk that U.S. officials will disclose applicants' pseudonymous identifiers to foreign governments, reveal the identifiers inadvertently, or fail to protect the identifiers from unlawful access by third parties, *id.* ¶¶ 5, 60–61; and repressive regimes around the world have targeted filmmakers, journalists, activists, and

dissidents for their anonymous speech online, *id.* ¶ 60. Given the potential for retaliation, "[t]here can be no doubt that [requiring author identification] would tend to restrict freedom to distribute information and thereby freedom of expression." *Talley*, 362 U.S. at 64.

The Registration Requirement also burdens visa applicants' right to protect the privacy of their online associations. The First Amendment protects the "freedom to engage in association for the advancement of beliefs and ideas" against unjustified disclosure demands by the government. *NAACP*, 357 U.S. at 460. Some of Plaintiffs' foreign members and partners use pseudonymous social media identifiers to protect their privacy while associating with others online. *See, e.g.*, Compl. ¶ 51. By compelling them to disclose their pseudonymous identifiers, the Registration Requirement forces them to expose their online associations. The Supreme Court has "repeatedly found" that such "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 64 (1976).

Defendants attempt to dismiss these claims in a single sentence, arguing that the Registration Requirement "applies only to individuals who choose to apply for visas and enables access only to the public-facing sections of an applicant's social media account." Defs.' Mem. 44. But the fact that Plaintiffs' foreign members and plaintiffs could choose not to apply for U.S. visas does not undermine the burden the Registration Requirement places on them. *See Baird*, 401 U.S. at 7; *Keyishian*, 385 U.S. at 606. Nor does the fact that consular officers may access only public-facing sections of an applicant's social media accounts. The right to speak anonymously is exercised, more often than not, publicly. *See Watchtower Bible*, 536 U.S. at 167 ("The fact that circulators revealed their physical identities did not foreclose our consideration of the circulators' interest in maintaining their anonymity."); *McIntyre*, 514 U.S. at 337.

37

### 2. Compelled Registration of Speech and Associations

More broadly, the Registration Requirement unconstitutionally conditions the ability of Plaintiffs' foreign members and partners to obtain a U.S. visa on their willingness to register their speech and associations with the government. The Supreme Court has repeatedly invalidated rules requiring individuals to register their speech or associations with the government as a condition of their eligibility for a benefit—whether receipt of the mail, public employment, or license to practice law. *See, e.g.*, *Baird*, 401 U.S. at 7–8; *Lamont*, 381 U.S. at 307; *Shelton*, 364 U.S. at 490. As the Court has explained, such "affirmative obligation[s]," *Lamont*, 381 U.S. at 307, act as "limitation[s] on the unfettered exercise of . . . First Amendment rights" and are "almost certain to have a deterrent effect" on the exercise of those rights, *id.* at 305; *see Thomas v. Collins*, 323 U.S. 516, 540 (1945) ("[A] requirement that one must register before he undertakes to make a public speech . . . is quite incompatible with the requirements of the First Amendment.").[13]

The Registration Requirement imposes such an affirmative obligation on Plaintiffs' foreign members and partners, *see* Compl. ¶ 28, dramatically chilling their expressive and associational activities. Many of Plaintiffs' foreign members and partners used social media "to show their work; draw attention to human rights abuses; connect with other filmmakers, artists, and advocates; and engage with the same social and political issues that they address in their films." *Id.* ¶ 5; *see id.* ¶ 50. Under the Registration Requirement, however, those who have applied or intend to apply for U.S. visas face "the risk that a U.S. official will misinterpret their speech on social media, impute

---

[13] This longstanding precedent carries equal force in the digital age. The Supreme Court has recognized the singular importance of social media for the exchange of views today. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017). Accordingly, lower courts have recognized First Amendment harms flowing from registration requirements relating to online activity. *See, e.g.*, *Doe v. Harris*, 772 F.3d 563, 573 (9th Cir. 2014) (invalidating California law that "condition[ed] Internet speech with a new identifier on a registrant's affirmative act of sending written notice to the police within 24 hours," which imposed a "substantial" burden on protected speech).

others' speech to them, or subject them to additional scrutiny or delayed processing because of the views they or their contacts have expressed." *Id.* ¶ 5; *see id.* ¶¶ 54, 57–61. In response, many of Plaintiffs' foreign members and partners "now use social media more cautiously, use it less, or no longer use it at all for speech that could be construed as controversial or political." *Id.* ¶ 6; *see id.* ¶¶ 54–55, 57–58. Others have abandoned plans to pursue film collaborations and other professional opportunities in the United States. *Id.* ¶¶ 6, 56.

The Supreme Court's decision in *Shelton v. Tucker*, 364 U.S. 479, is instructive. That case addressed a requirement that state school instructors file an affidavit listing every organization to which they had belonged or contributed within the preceding five years. The Court noted that the resulting burden on teachers' rights of free speech and association "is conspicuously accented when the teacher serves at the absolute will of those to whom the disclosure must be made." *Id.* at 486. The Registration Requirement likewise compels applicants to disclose information revealing at least five years' worth of expressive and associational activity to the officers charged with determining whether to grant them a visa. As in *Shelton*, this "comprehensive interference with associational freedom goes far beyond what might be justified in the exercise of the" government's legitimate inquiry into the identities and eligibility of visa applicants. *Id.* at 490.

### 3.       U.S. Listeners' Rights

By deterring Plaintiffs' foreign members and partners from speaking and associating freely online or from applying for U.S. visas to attend Plaintiffs' U.S.-based events, the Registration Requirement burdens the First Amendment rights of Plaintiffs and their U.S. members and partners to hear from and meet with those individuals. "The first amendment secures to persons in the United States the respect of our government for their right to communicate and associate with foreign individuals and organizations, as well as with individuals and organizations stateside."

39

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 303 (D.C. Cir. 1989) (Ginsburg, J., concurring in part and dissenting in part); *see Mandel*, 408 U.S. at 764; *Lamont*, 381 U.S. at 305–06; *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 117 (2d Cir. 2009).

The Registration Requirement deprives Plaintiffs' U.S. members and partners of opportunities to hear from and engage with foreign members online and in person. U.S. members and partners "rely on social media to learn about new projects from filmmakers working around the world and to engage with Plaintiffs' [foreign] members and partners about their work," Compl. ¶ 49. Because the Registration Requirement deters Plaintiffs' foreign members and partners from speaking as freely online, it deprives Plaintiffs' U.S. members and partners of opportunities to hear from and engage with those individuals online. *Id.* ¶ 69. Further, because the Registration Requirement deters foreign members and partners from attending Plaintiffs' U.S.-based events, it deprives U.S. members and partners of opportunities to engage with those individuals in person. *Id.* ¶ 73. The Registration Requirement's "deterrent effect[s]," *Lamont*, 381 U.S. at 307, thus limit "the unfettered exercise of the . . . First Amendment rights" of Plaintiffs' U.S. members and partners to receive ideas and information from abroad, *id.* at 305.

## C.     The Registration Requirement Is Not Sufficiently Tailored to Any Legitimate Government Interest and Is Overbroad.

"Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Keyishian*, 385 U.S. at 604 (citation omitted). Accordingly, even under intermediate scrutiny, Defendants bear the burden of justifying the Registration Requirement as a narrowly tailored means of achieving legitimate government interests. First, "draw[ing] reasonable inferences based on substantial evidence," *Turner*, 512 U.S. at 666, the government must demonstrate that the harms it seeks to address "are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way,"

*id.* at 664. Second, the government must show "that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 662 (citation omitted). The Registration Requirement fails both prongs of this analysis.

*First*, Defendants have not shown that the Registration Requirement "will in fact alleviate . . . in a direct and material way" any difficulties they may have in confirming visa applicants' identities or determining their visa eligibility. *Turner*, 512 U.S. at 664. Plaintiffs do not contest that these are important government interests. But, as detailed in the Complaint, "the State Department cited no evidence" that the Registration Requirement "is likely to be an effective, let alone necessary, means of serving those interests," and it "disregarded contrary evidence in the administrative record." Compl. ¶ 8. As noted above, hundreds of comments presented evidence showing that it is extremely difficult to interpret social media communications accurately—particularly across different languages and cultures—and highlighted DHS's documented failures to establish the effectiveness of social media screening in connection with visa eligibility determinations. *See id.* ¶¶ 8, 24, 26. In response, the government merely asserted that collecting social media identifiers is "essential" for confirming visa applicants' identities and determining their visa eligibility. Defs.' Ex. 7, at 3; Defs.' Ex. 8, at 3. Such conclusory assertions are plainly inadequate to carry Defendants' burden here. *See Watchtower Bible*, 538 U.S. at 168; *Reno v. ACLU*, 521 U.S. 844, 879 (1997) ("Particularly in the light of the absence of any detailed findings . . . we are persuaded that the [statute] is not narrowly tailored if that requirement has any meaning at all."); *Edwards v. D.C.*, 755 F.3d 996, 1005–06 (D.C. Cir. 2014); *Broadley v. U.S. Dep't of Interior,* 615 F.3d 508, 522 (D.C. Cir. 2010) ("It is not sufficient that a 'regulation . . . contributes marginally to [the government's] interest.'" (alterations in original) (citation omitted)).

*Second*, the Registration Requirement burdens "substantially more speech than is necessary to further the government's legitimate interests." *Turner*, 512 U.S. at 662 (citation omitted). To determine whether the Registration Requirement is sufficiently tailored to the task at hand, the Court must "ask whether it is possible substantially to achieve the Government's objective in less burdensome ways. . . ." *Edwards*, 755 F.3d at 1009 (citation omitted) (concluding that the existence of less restrictive means was "fatal" to the challenged regulatory scheme); *see Shelton*, 364 U.S. at 488. The Registration Requirement sweeps in substantially more speech than necessary to further the government's stated interests in at least two respects.

At the outset, the Registration Requirement casts a dragnet far wider than necessary to achieve the government's stated ends. In other contexts, courts require the government to articulate some level of individualized suspicion before conducting similarly intrusive surveillance. *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 21 (1968) (requiring an officer "to point to specific and articulable facts which . . . reasonably warrant [an] intrusion" upon constitutionally protected interests); *United States v. Cotterman*, 709 F.3d 952, 966 (9th Cir. 2013) ("It is the potential unfettered dragnet effect that is troublesome."); *United States v. Kim*, 103 F. Supp. 3d 32, 57 (D.D.C. 2015). Here, the Registration Requirement subjects to undue government scrutiny the online speech and associations of millions of individuals each year, including those whose visa applications raise no suspicions, or even any questions, for consular officers. Compl. ¶¶ 1, 28, 31–33. Much of this information has no apparent bearing on applicants' eligibility for a visa. *See, e.g.*, *id.* ¶ 50. And consular officers already have the authority to demand additional information—including social media identifiers—from individual applicants if necessary to confirm their identities or determine their visa eligibility. *See id.* ¶¶ 20, 22. Because all visa applicants have "already supplied" the government "with extensive personal and professional information to assist its determination[s],"

*Baird*, 401 U.S. at 7, *see* Compl. ¶¶ 19, 21, the requirement that they further facilitate access to their online expression and associations is not necessary to achieve those ends. *See Shelton*, 364 U.S. at 487–88 ("The question is whether the State can ask every one of its teachers to disclose every single organization with which he has been associated over a five-year period.").

Additionally, the Registration Requirement and related retention and dissemination policies facilitate surveillance of applicants' speech and associations far into the future. Defendants concede that the government's policies "contemplate that information collected through the Registration Requirement will be retained indefinitely, disseminated widely within the U.S. government, and, in some circumstances, disclosed to foreign governments." Compl. ¶ 34; *see id.* ¶¶ 35–38; Defs.' Mem. 8, 43–44. These policies enable Defendants to continue their surveillance of visa applicants far beyond the point at which they have determined visa eligibility. As a result, the Registration Requirement "indefinitely chills visa applicants' expressive and associational activities before they enter the United States, and . . . after they enter the United States as well." Compl. ¶ 63. Defendants attempt to justify these significant burdens on First Amendment rights by citing broad government interests in detecting threats to national security and enforcing the immigration laws. Defs.' Mem. 43–44. They do not venture an explanation as to how the indefinite retention and permissive dissemination of *all* visa applicants' social media information is necessary to serve those interests or any less burdensome than alternative means, except to say its practices "ensur[e] that each agency has as much available information as possible when seeking to detect security threats and enforce immigration laws." *Id.* at 44. Defendants' maximalist approach cannot be squared with any First Amendment tailoring requirement.

For the same reasons, the Registration Requirement is unconstitutionally overbroad. "In the First Amendment context, . . . a law may be invalidated as overbroad if 'a substantial number

of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Edwards*, 755 F.3d at 1001 (citation omitted); *see Munson*, 467 U.S. at 967–68; *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1312–13 (D.C. Cir. 2005). As explained above, the Registration Requirement applies to millions of visa applicants each year, many of whom raise no questions for consular officers. Compl. ¶¶ 1, 28, 32. The Registration Requirement and related retention and dissemination policies thus subject a substantial number of applicants to unnecessarily expansive surveillance of their speech on social media and are unconstitutionally overbroad. *See Watchtower Bible*, 536 U.S. at 168; *Edwards*, 755 F.3d at 1001.

## IV.   Plaintiffs' Claims Against Defendant Wolf Are Facially Plausible.

Plaintiffs have plausibly alleged that their injuries stem not just from the Registration Requirement, but also from DHS's "related retention and dissemination polices." Compl. ¶ 78; *see id.* ¶¶ 34–38. Plaintiffs have also concretely identified "which policies they believe to be 'related' to the social media policy and thus unconstitutional." *Contra* Defs.' Mem. 43–44 n.17.

As Plaintiffs have alleged, DHS's policy is to maintain copies of information that originally appears in the State Department's CCD, including social media identifiers collected for visa vetting purposes. Compl. ¶ 36. These copies are stored in DHS's ATS database, which is designed to "provide a consolidated view of data about a person or entity." *Id.* (quoting ATS PIA 1). And in turn, DHS shares information from ATS with other agencies and, most troubling of all, with foreign governments. Compl. ¶ 36. Indeed, the U.S. government has information-sharing agreements with at least seventy-eight foreign governments allowing them to obtain information from the ATS. *Id.*

Plaintiffs have also plausibly alleged that DHS retains social media information collected through the Registration Requirement in A-Files, which contain individuals' "official immigration

record[s]"—including information from State Department forms—and are maintained for 100 years after their dates of birth. Compl. ¶ 37; *see* 82 Fed. Reg. at 43,556, 43,561, 43,564. In 2017, DHS announced that A-Files include individuals' social media information. *Id.* Under DHS policy, the agency may disseminate A-File information to "appropriate Federal, State, local, tribal, territorial, foreign, or international government agencies," current and prospective employers, and others. *Id.* (quoting 82 Fed. Reg. at 43,558, 43,562). Moreover, Plaintiffs plausibly alleged on information and belief that DHS and its components "rely on information collected through the Registration Requirement to monitor visa applicants' social media activities even after they enter the United States." Compl. ¶ 38. Immigration and Customs Enforcement, a DHS component, has publicly confirmed it will monitor the social media activities of 10,000 visa holders per year. *Id.*

Defendants do not dispute these facts; they concede that information collected through the Registration Requirement is retained indefinitely and disseminated broadly. *See, e.g.*, Defs.' Mem. 8, 44; *see also* Defs.' Ex. 14, at 3, 13. As described above, such indefinite retention and broad dissemination of visa applicants' social media information facilitate surveillance in the future, create a significant risk that the U.S. government will share applicants' social media information with foreign governments, and expose visa applicants' data to potential security breaches. *See supra* Pt. III.C. These risks indefinitely chill the online expressive and associational activities of Plaintiffs' foreign members and partners and are directly traceable to DHS. *Id.*

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss. Should the Court conclude that the Complaint fails to establish standing or state a claim for relief, however, Plaintiffs respectfully request leave to amend the Complaint.

May 27, 2020

Respectfully submitted,

/s/ *Faiza Patel*
Faiza Patel*
Harsha Panduranga*
Brennan Center for Justice
    at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271
patelf@brennan.law.nyu.edu
(646) 292-8310

/s/ *Carrie DeCell*
Carrie DeCell (D.C. Bar No. 1015491)
Jameel Jaffer (D.C. Bar No. MI0067)
Katie Fallow*
Anna Diakun*
Leena Charlton*
Knight First Amendment Institute
    at Columbia University
475 Riverside Drive, Suite 302–304
New York, NY 10115
carrie.decell@knightcolumbia.org
(646) 745-8500

/s/ *Rachel Levinson-Waldman*
Rachel Levinson-Waldman*
Brennan Center for Justice
    at NYU School of Law
1140 Connecticut Avenue, NW
11th Floor, Suite 1150
Washington, D.C. 20036
levinsonr@brennan.law.nyu.edu
(202) 249-7190

/s/ *Paul C. Curnin*
Paul C. Curnin*
Sarah Eichenberger (D.C. Bar No. D00430)
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
pcurnin@stblaw.com
(212) 455-2000

*admitted *pro hac vice*

*Counsel for the Plaintiffs*

46