**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION,<br><br>                    Plaintiffs,<br><br>    v.<br><br>MICHAEL R. POMPEO, in his official capacity as Secretary of State, CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security,<br><br>                    Defendants. | Case No. 19-cv-03632-TJK |

***AMICI CURIAE* BRIEF OF TWITTER, INC., REDDIT, INC.,**
**AND INTERNET ASSOCIATION IN SUPPORT OF**
**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Patrick J. Carome (DC Bar No. 385676)
Ari Holtzblatt (DC Bar No. 1009913)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Tel.: 202-663-6000
patrick.carome@wilmerhale.com
ari.holtzblatt@wilmerhale.com

Elizabeth Bewley*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA  02109
Tel.: 617-526-6000
elizabeth.bewley@wilmerhale.com

*Counsel for Amici Curiae Twitter, Inc., Reddit, Inc., and the Internet Association*

*\*Of counsel*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 7(o) and Federal Rules of Appellate Procedure 29(a)(4) and 26.1, *amici* Reddit, Inc. ("Reddit") and the Internet Association state that they have no parent corporation, and no publicly traded company owns 10% or more of their stock.

*Amicus* Twitter, Inc. ("Twitter") states that it is a publicly held corporation that has no parent corporation, and no publicly traded company owns 10% or more of its stock.

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICI CURIAE* ..................................................... 1

INTRODUCTION ........................................................................................................... 2

ARGUMENT ................................................................................................................... 4

I.   Anonymous Speech Has Played A Central Role In American History And Continues To Have Vital and Positive Impacts On Modern Life ................................................ 4

II.  The Constitution Limits Compelled Identification Of Anonymous Speakers ................... 8

III. Protection For Anonymous Speech Is Of Crucial Importance To Persons Who Express Themselves On Many Internet Platforms, Including Platforms Such As Twitter and Reddit ............................................................................................................................ 11

IV.  The Registration Requirement And Related Retention And Dissemination Policies Jeopardize The Vital Constitutional Right To Speak Anonymously ............................... 16

   A.   The Registration Requirement And Its Accompanying Retention And Dissemination Policies Chill The Speech Of Those Who Are Subject To It ....... 16

   B.   Because A Substantial Number Of People To Whom The Registration Requirement Applies Have First Amendment Rights, The Requirement Must Survive Strict Scrutiny ................................................................................. 18

   C.   The Registration Requirement Fails Heightened Scrutiny And Is Arbitrary And Capricious ........................................................................................................ 21

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Agency for Int'l Development v. Alliance for Open Society Int'l, Inc.*,
  570 U.S. 205 (2013)...............................................................................................24

*In re Anonymous Online Speakers*,
  661 F.3d 1168 (9th Cir. 2011) .............................................................................11

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
  564 U.S. 721 (2011)...............................................................................................24

*Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*,
  518 U.S. 668 (1996)...............................................................................................24

*Bridges v. Wixon*,
  326 U.S. 135 (1945).........................................................................................19, 20

*Buckley v. American Constitutional Law Foundation, Inc.*,
  525 U.S. 182 (1999)............................................................................................6, 8

*Council for Urological Interests v. Burwell*,
  790 F.3d 212 (D.C. Cir. 2015)...............................................................................23

*Dendrite International, Inc. v. Doe*,
  775 A.2d 756 (N.J. Super. Ct. App. Div. 2001)....................................................15

*In re DMCA Subpoena to Reddit, Inc.*,
  No. 19-mc-80005, 2020 WL 999788 (N.D. Cal. Mar. 2, 2020) ............................13

*Doe v. 2TheMart.com Inc.*,
  140 F. Supp. 2d 1088 (W.D. Wash. 2001).............................................................10

*Doe v. Cahill*,
  884 A.2d 451 (Del. 2005) .........................................................................9, 11, 15

*Doe v. Individuals*,
  561 F. Supp. 2d 249 (D. Conn. 2008)....................................................................15

*Edwards v. District of Columbia*,
  755 F.3d 996 (D.C. Cir. 2014) ..............................................................................21

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)...............................................................................................18

*Kwong Hai Chew v. Colding*,
　344 U.S. 590 (1953)...............................................................................................19, 20

*Landon v. Plasencia*,
　459 U.S. 21 (1982).......................................................................................................18

*McIntyre v. Ohio Elections Commission*,
　514 U.S. 334 (1995).............................................................3, 4, 5, 6, 8, 9, 10, 23, 25

*Miami Herald Publishing Co. v. Tornillo*,
　418 U.S. 241 (1974)..............................................................................................17, 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*,
　463 U.S. 29 (1983).......................................................................................................22

*NAACP v. Alabama ex rel. Patterson*,
　357 U.S. 449 (1958).................................................................................................9, 10

*NAACP v. Button*,
　371 U.S. 415 (1963).....................................................................................................22

*Packingham v. North Carolina*,
　137 S. Ct. 1730 (2017)...............................................................................3, 11, 16, 23

*Padilla v. Kentucky*,
　559 U.S. 356 (2010).....................................................................................................21

*Rafeedie v. INS*,
　795 F. Supp. 13 (D.D.C. 1992)...................................................................................19

*Reed v. Town of Gilbert, Arizona*,
　135 S. Ct. 2218 (2015).................................................................................................10

*Reno v. ACLU*,
　521 U.S. 844 (1997)...............................................................................................11, 21

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
　547 U.S. 47 (2006).........................................................................................................9

*Shoen v. Shoen*,
　5 F.3d 1289 (9th Cir. 1993) ..........................................................................................7

*Sinclair v. TubeSockTedD*,
　596 F. Supp. 2d 128 (D.D.C. 2009)......................................................................11, 15

*United States v. Stevens*,
　559 U.S. 460 (2010).....................................................................................................22

*Talley v. California*,
  362 U.S. 60 (1960) ..........................................................................................4, 6, 9

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ..........................................................................................18, 19

*Watchtower Bible & Tract Society of N.Y., Inc. v. Village of Stratton*,
  536 U.S. 150 (2002) ..........................................................................................8, 9

*Zerilli v. Smith*,
  656 F.2d 705 (D.C. Cir. 1981) ..........................................................................7, 10

**DOCKETED CASES**

*In re DMCA Section 512(h) Subpoena to Reddit, Inc.*,
  No. 3:19-mc-80005 (N.D. Cal. Apr. 22, 2019) ...................................................14

*Glassdoor, Inc. v. Andra Group, LP*,
  No. 17-0463 (Tex. Mar. 30, 2018) .....................................................................15

*Thomas More Law Center v. Becerra*,
  No. 19-255 (U.S. Aug. 26, 2019) .......................................................................9, 12

*Twitter, Inc. v. U.S. Dep't of Homeland Security*,
  No. 3:17-cv-01916 (N.D. Cal. Apr. 6, 2017) ......................................................15

**STATUTES & RULES**

8 U.S.C. § 1202(f) ..........................................................................................................16

Va. Code § 8.01-407.1 ...................................................................................................15

Fed. R. App. P. 29 ...........................................................................................................1

D.D.C. LCvR 7(*o*) ..........................................................................................................1

**OTHER AUTHORITIES**

Alcoholics Anonymous, UNDERSTANDING ANONYMITY (June 2019) ............................7

Bill Libit, *Elements of an Effective Whistleblower Hotline*, Harvard Law School
  Forum on Corporate Governance (Oct. 25, 2014) .............................................6

Emma Remy, Pew Research Center, *How Public and Private Twitter Users in the
  U.S. Compare—and Why It Might Matter For Your Research*, MEDIUM (July
  15, 2019) .............................................................................................................23

Geoffrey R. Stone et al., CONSTITUTIONAL LAW (5th ed. 2005) ....................................6

Joel Simon, *COVID-19 Is Spawning a Global Press-Freedom Crackdown*,
COLUM. JOURNALISM REV. (Mar. 25, 2020)...........................................................17

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, at Part 1, PEW
RESEARCH CENTER (Sept. 5, 2013) ...............................................................11, 12

Min-Seok Pang & Hüseyin Tanriverdi, *Strategic Roles of IT Modernization and
Cloud Migration in Reducing Cybersecurity Risks of Organizations: The Case
of U.S. Federal Government* 3, Fox School of Business Research Paper No.
17-017 (Feb. 27, 2019).........................................................................................17

Niha Masih, *A Court Case in India Takes Aim at Anonymous #MeToo
Accusations*, WASH. POST (Nov. 2, 2019) ............................................................13

U.S. Dep't of State, *Privacy Impact Statement: Consular Consolidated Database*
(Oct. 2018) ...........................................................................................................16

Robert J. Araujo, *International Tribunals and Rules of Evidence: The Case for
Respecting and Preserving the "Priest-Penitent" Privilege under
International Law*, 15 AM. U. INT'L L. REV. 639, 645 (2000) ...................................7

Sai Teja Peddinti et al., *User Anonymity on Twitter*, 15 (3) IEEE SECURITY &
PRIVACY 84-87 (June 2017) .................................................................................12

Sara Baker, *Why Online Anonymity is Critical for Women*, WOMEN'S MEDIA
CENTER (Mar. 11, 2016) ......................................................................................13

Terrence McCoy, *Turkey Bans Twitter—and Twitter Explodes*, WASH. POST (Mar.
21, 2014) ..............................................................................................................16

Thomas Paine, Common Sense (1776), *reprinted in* Thomas Paine, COMMON
SENSE AND OTHER WRITINGS 5 (Gordon S. Wood ed., 2003) ...................................5

Tim Highfield, *News Via Voldemort: The Role of Parody and Satire in Topical
Discussions on Twitter*, AoIR Selected Papers of Internet Research 14.0
(2013)...................................................................................................................14

*Why Do Some Writers Use Pseudonyms?*, THE ECONOMIST (July 25, 2013).................8

Yusuf Tamanna, *"A Form of Damage Limitation:" Why We Use Twitter Alts and
Finstas*, VICE (Apr. 16, 2019) .......................................................................12, 13

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici* Twitter and Reddit are among the world's leading online communication platforms.  Twitter operates the twitter.com platform, which is a global platform for public self-expression and conversation in real time used by over 160 million people every day.  Reddit is an online platform with over 400 million users monthly that brings community and belonging to everyone in the world.  Communities on Reddit are built around users submitting, voting on, and discussing stories and other content relating to their passions.  Reddit users are known only by pseudonymous usernames that in most cases bear no relationship to the user's real name.  Twitter's and Reddit's services support online communities that are modern-day equivalents of the public square, where individuals come together to learn and share the information that shapes their daily lives.  Every day, people across the country and the globe use these services to engage in speech protected by the First Amendment.

*Amicus* the Internet Association represents over forty of the world's leading Internet companies (listed at https://internetassociation.org/our-members/).  It is the only trade association that exclusively represents leading global Internet companies on matters of public policy.  Its mission is to foster innovation, promote economic growth, and empower people through the free and open Internet.

This case presents an issue of concern to *amici* because millions of speakers on Internet platforms choose to participate anonymously, including numerous foreign nationals who currently reside in or plan to travel to the United States.  Relying on the strong commitment of

---

[1] No counsel for any party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than *amici* or their counsel made a monetary contribution intended to fund the brief's preparation or submission.  *See* Fed. R. App. P. 29; D.D.C. LCvR 7(o).

platforms like Twitter and Reddit to the protection of anonymous speech, which is reflected in their privacy policies, those speakers share opinions and information they would not otherwise disclose—whether because of fear of retribution or criticism, a desire to keep sensitive personal information private, or other reasons.  Given the vast quantities of information disclosed on these platforms, and the sensitivity of much of that information, *amici* work vigorously to secure online privacy and anonymity, and have a strong interest in ensuring that government policies do not chill the right to anonymous speech on the Internet.  The Registration Requirement at issue in this case has exactly that kind of chilling effect, by requiring individuals applying for visas to disclose their identifiers on twenty platforms, including Twitter, Reddit, and a number of the platforms represented by the Internet Association.  *See* Compl. ¶ 28.  Inadequate protection for online anonymous speech would dissuade countless speakers from using services such as Twitter, Reddit, and those run by other members of the Internet Association.

## INTRODUCTION

The State Department rules at issue in this case require nearly every individual who applies for a U.S. visa from abroad—some 14.7 million people each year—to disclose to the government the identifiers they have used on any of twenty online communication platforms, including Twitter and Reddit, over the preceding five years (the "Registration Requirement"). As the government fully acknowledges, that information is not only used to make determinations about applicants' visa eligibility, but is also shared broadly to other federal-government agencies to aid them in reaching decisions on deportation and the denial of immigration benefits.  The government also acknowledges that the information can be disclosed to foreign governments under certain circumstances, raising the specter that oppressive or authoritarian regimes could learn the identities of and seek retribution against those who would use social media to critique them.  The rules make no exception for foreign nationals who live in the United States or

otherwise have substantial U.S. connections, requiring such persons to comply if they have

traveled abroad and need a U.S. visa to return to the United States.

For the many foreign nationals who choose to participate in online speech without

revealing their identity—by, for example, using a pseudonym—the Registration Requirement

requires them to surrender their anonymity in order to travel to the United States.  And in doing

so, the requirement violates the First Amendment rights to speak anonymously and associate

privately.  Those guarantees are deeply rooted in this nation's history, which has long cherished

anonymity's role in guaranteeing a robust marketplace of ideas—one where speakers can choose

to keep their identity and their associations private as "a shield from the tyranny of the majority."

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).  And they have been carefully

guarded by the courts, which have required government officials to show that laws infringing on

anonymous-speech rights are narrowly tailored to serve a compelling interest.

Anonymity is ever more important on the "'vast democratic forums of the Internet'"—

and particularly on social-media platforms, which the Supreme Court has recognized are "the

most important place[] … for the exchange of views[] today."  *Packingham v. North Carolina*,

137 S. Ct. 1730, 1735 (2017).  Such online communication platforms "for many are the principal

sources for knowing current events, checking ads for employment, speaking and listening in the

modern public square, and otherwise exploring the vast realms of human thought and

knowledge."  *Id.* at 1737.  For many people using platforms such as Twitter and Reddit,

anonymity is crucial—a fact that is hardly surprising in light of the vast quantities of information

individuals disclose through online communication platforms, including information about their

political and religious beliefs, their professional and social networks, their health, and their

personal and family relationships.  Twitter and Reddit vigorously guard the right to speak

anonymously for people on their platforms, and anonymous individuals correspondingly communicate on these platforms with the expectation that their identities will not be revealed without a specific showing of compelling need.  That expectation allows the free exchange of ideas to flourish on these platforms.

By requiring speakers to reveal their online identifiers in order to enter the United States—as a blanket matter and without any tailoring to situations where there is a specific need for that information—and by subjecting their online activities to potentially indefinite scrutiny once they are in the country, the Registration Requirement and related retention and dissemination policies chill a vast quantity of speech and associational activity.  That burden on protected activity—particularly the activity of foreign nationals who reside in the United States or otherwise have substantial connections to the United States—cannot withstand First Amendment scrutiny.  The Court should deny the government's motion to dismiss.

## ARGUMENT

### I.   ANONYMOUS SPEECH HAS PLAYED A CENTRAL ROLE IN AMERICAN HISTORY AND CONTINUES TO HAVE VITAL AND POSITIVE IMPACTS ON MODERN LIFE

As the Supreme Court has made clear, anonymous speech represents an "honorable tradition of advocacy and of dissent" that "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).  This "respected tradition," *id.* at 343, played a crucial role in the nation's founding and has continued to shape its history since.

Before the Revolutionary War, proponents of independence often spoke anonymously— no doubt aware that literature supporting the revolutionary cause "easily could have brought down on them prosecutions by English-controlled courts."  *Talley v. California*, 362 U.S. 60, 65

4

(1960).  As just one example, the famous pamphlet *Common Sense*—widely recognized for its

impact on the movement for independence—was originally signed simply, "[A]n Englishman."

*See* Thomas Paine, Common Sense (1776), *reprinted in* Thomas Paine, COMMON SENSE AND

OTHER WRITINGS 5 (Gordon S. Wood ed., 2003).

      After independence, anonymous speech continued to flourish, for the betterment of

society.  Debates over the ratification of the Constitution produced an "outpouring of anonymous

political writing."  *McIntyre*, 514 U.S. at 360 (Thomas, J., concurring in the judgment).  The

"most famous[]" example is the Federalist Papers, written by James Madison, Alexander

Hamilton, and John Jay, which were signed "Publius."  *Id.* at 343 n.6 (majority opinion).  Anti-

Federalist responses similarly came from pseudonymous authors, such as "Cato," "Centinel,"

"The Federal Farmer," and "Brutus"—all believed to have been prominent politicians or jurists.

*Id.*  Records from the first federal elections likewise reflect that anonymous political writings

were the "favorite media for expressing views on candidates."  *Id.* at 369 (Thomas, J., concurring

in the judgment).

      Indeed, anonymous speech was so prevalent—and so valued—in the nation's early

history that Justice Thomas has concluded that protection for it was part of the original meaning

of the First Amendment.  *See McIntyre*, 514 U.S. at 360-369 (Thomas, J., concurring in the

judgment) (tracing the historical record to show that "the First Amendment, as originally

understood, protects anonymous writing," *id.* at 360).  That the framers would have understood

the First Amendment to protect anonymous speech—and the concomitant ability to express

opinions free from political, economic, or social retribution—makes sense: a predominant reason

for enacting the First Amendment was to protect the country from licensing laws like those in

England, which were intended to stifle criticism of the government by requiring authors to

identify themselves.  *See* Geoffrey R. Stone et al., CONSTITUTIONAL LAW 1049-1053 (5th ed. 2005); *Talley*, 362 U.S. at 64.

The "respected tradition of anonymity," *McIntyre*, 514 U.S. at 343, has continued to shape many aspects of modern life, enabling communications that would not otherwise occur. For example, anonymous reporting mechanisms—such as those within corporations and governments, or police tip lines—make individuals "more likely to report or seek guidance regarding potential or actual wrongdoing without fear of retaliation."  Bill Libit, *Elements of an Effective Whistleblower Hotline*, Harvard Law School Forum on Corporate Governance (Oct. 25, 2014), https://bit.ly/3fITCcy (noting that 60% of internal fraud tips in 2013 were made anonymously).  Indeed, publicly traded companies in the United States are required by law to establish such anonymous-reporting mechanisms; one survey showed that some 99% of public companies offer anonymous hotlines as a result.  *Id.*  Government institutions frequently provide similar options to anonymously report suspected fraud, abuse, or criminal activity.  *See, e.g.*, U.S. Gov't Accountability Office, *About GAO: FraudNet*, https://bit.ly/2zE83Ov (last accessed May 27, 2020) (reporting of fraud, waste, abuse, or mismanagement of federal funds); Office of State Inspector Gen., *State Fraud, Waste, and Abuse Hotline*, https://bit.ly/3bv52NK (last accessed May 27, 2020) (same for state of Virginia); U.S. Drug Enforcement Admin., *Do you have a tip for DEA?*, https://www.dea.gov/submit-tip (last accessed May 27, 2020) (reporting page for suspected violations of controlled-substances laws).  Similarly, the use of confidential sources in journalism enables public access to a wide range of information, including revelation of wrongdoing—which is why almost every state shields such sources' identities from disclosure in some way and nearly all federal circuit courts to have considered the issue have determined that the First Amendment provides "a qualified privilege for journalists to resist compelled

discovery," *Shoen v. Shoen*, 5 F.3d 1289, 1292 & n.5 (9th Cir. 1993); *see Zerilli v. Smith*, 656

F.2d 705, 710-712 (D.C. Cir. 1981) (observing that "[c]ompelling a reporter to disclose the

identity of a confidential source raises obvious First Amendment problems," and that "in the

ordinary case [a] civil litigant's interest in disclosure should yield to the journalist's privilege");

Reporters' Comm. for Freedom of Press, *Reporter's Privilege Compendium*,

https://bit.ly/3gwVhSM (last accessed May 27, 2020) (state-by-state information).

      In a number of contexts, moreover, anonymity allows individuals to share personal

information that they would not otherwise disclose.  Many who seek help for addiction or

mental-health issues, for example, rely on the guarantee of anonymity.  *See, e.g.*, Alcoholics

Anonymous, UNDERSTANDING ANONYMITY 5-6 (June 2019), https://bit.ly/2Wz7YEE ("[M]ost

newcomers … find admission of their alcoholism so painful that it is possible only in a protected

environment.  Anonymity is essential for this atmosphere of trust and openness."); Substance

Abuse and Mental Health Services Admin., *National Helpline: Frequently Asked Questions*,

https://bit.ly/3dWWlNK (last accessed May 27, 2020) (mental-health hotline that does not

request "any personal information" from callers).  Similarly, those who seek spiritual and

religious guidance have often done so under the veil of anonymity.  As early as the Middle Ages,

for example, "the absolute obligation of the secrecy of the confessional was imposed on the

entire" Catholic Church, with confessors advised never to "indicat[e] the person" whose

confession they had heard.  Robert J. Araujo, *International Tribunals and Rules of Evidence: The

Case for Respecting and Preserving the "Priest-Penitent" Privilege under International Law*, 15

AM. U. INT'L L. REV. 639, 645 (2000).  Indeed, one of the earliest cases establishing the

common-law privilege for penitential and religious communications involved a priest's refusal to

identify an individual who had revealed a theft during confession.  *Id.* at 659-660.

Anonymity plays a key role in a wide range of other communications, too.  In the arts, "[g]reat works of literature have frequently been produced by authors writing under assumed names," *McIntyre*, 514 U.S. at 341 & n.4—whether to avoid fallout for controversial material, to minimize bias on the part of readers, or simply as a creative act, *see Why Do Some Writers Use Pseudonyms?*, THE ECONOMIST (July 25, 2013).  And in the political arena, anonymity remains as significant as ever.  It is "perhaps best exemplified" by a practice that operates in full force today—"the secret ballot, the hard-won right to vote one's conscience without fear of retaliation." *McIntyre*, 514 U.S. at 343.  Court decisions have also highlighted the continued importance of anonymous advocacy for handbill distributors, *McIntyre*, 514 U.S. at 341-342, petition circulators, *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999), and door-to-door canvassers discussing their religious or political beliefs, *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 153, 165-167 (2002).  Allowing such speakers to convey their political, ideological, and religious views without fear of retaliation, ostracism, or loss of privacy enhances the "marketplace of ideas." *McIntyre*, 514 U.S. at 342.

By allowing people to speak freely without fear of retribution or loss of privacy, anonymous speech has allowed for crucial information exchange in virtually every sphere of society—from politics, to religion, to the arts, to business—throughout the nation's history.

## II.    THE CONSTITUTION LIMITS COMPELLED IDENTIFICATION OF ANONYMOUS SPEAKERS

Relying heavily on the historical importance of anonymous speech, the Supreme Court has held that an "author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre*, 514 U.S. at 342.  As such, justification for burdening a speaker's right to remain anonymous requires proof of a compelling governmental

interest, and the restriction must be narrowly tailored to serve that interest.  *Id.* at 347.  Applying

these standards, the Supreme Court has repeatedly invalidated laws trenching on the First

Amendment right to speak anonymously.  *See, e.g.*, *Watchtower*, 536 U.S. 150; *McIntyre*, 514

U.S. at 334; *Talley*, 362 U.S. 60.

Similarly, the Supreme Court has rigorously protected the closely related First

Amendment right to privacy in group associations, observing that "[i]t is hardly a novel

perception that compelled disclosure of affiliation with groups engaged in advocacy may

constitute [an] effective … restraint on freedom of association."  *NAACP v. Alabama ex rel.*

*Patterson*, 357 U.S. 449, 462 (1958).  "Inviolability of privacy in group association," the Court

has observed, "may in many circumstances be indispensable to preservation of freedom of

association, particularly where a group espouses dissident beliefs."  *Id.*  The Court has therefore

"held laws unconstitutional that require disclosure of membership … for groups seeking

anonymity," *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 69

(2006), recognizing that such rules "allow officials and persons who accidentally or maliciously

gain access to [members'] identities to expose and penalize their views—serious ills that

freedom of association prevents," Pet. for Writ of Certiorari 18, *Thomas More Law Center v.*

*Becerra*, No. 19-255 (U.S. Aug. 26, 2019) (arguing that California's rules requiring nonprofits to

disclose donors' identities violates the First Amendment).

Notably, constitutional protection extends to remaining anonymous *after* having spoken.

That is because "[t]he possibility of losing anonymity in [the] future … could intimidate

anonymous [speakers] into self-censoring their comments or simply not commenting at all."

*Doe v. Cahill*, 884 A.2d 451, 457 (Del. 2005).  In other words, concern that one's identity may

later be revealed "chill[s] potential [speakers] from exercising their First Amendment right to

speak anonymously." *Id.*; *cf. Zerilli*, 656 F.2d at 712 ("Unless potential sources are confident that compelled disclosure is unlikely, they will be reluctant to disclose any confidential information to reporters").  Indeed, anonymous speech rights "would be of little practical value if … there was no concomitant right to remain anonymous after the speech is concluded."  *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1093 (W.D. Wash. 2001).

Case law makes clear that protections for anonymous speech and privacy in group association serve a number of important purposes, all aimed at augmenting the "marketplace of ideas," *McIntyre*, 514 U.S. at 342.  As the Supreme Court has explained, protecting anonymous speech alleviates "fear of economic or official retaliation" and "concern about social ostracism" as a result of unpopular speech.  *Id.* at 341-342.  Likewise, shielding disclosure of group associations avoids revealing members' private beliefs, and thus avoids "expos[ing group] members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility."  *NAACP*, 357 U.S. at 462-463.  Apart from protecting speakers, anonymity also promotes speakers' autonomy and choice in conveying the content of their work—key First Amendment values.  As the Supreme Court has emphasized, "the identity of the speaker is no different from other components of [a] document's content that the author is free to include or exclude."  *McIntyre*, 514 U.S. at 348; *see id.* at 342 (the choice to remain anonymous is like any other "decision[] concerning omissions or additions to the content of a publication").  And thus governmental attempts to require disclosure of a speaker's identity, like other regulations dictating the content of a message, must be narrowly cabined lest they be used "to suppress disfavored speech," *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2229 (2015).

Protections for anonymous speech apply equally to anonymous speech on the Internet. There is, as the Supreme Court explained in the Internet's early days, "no basis for qualifying the

level of First Amendment scrutiny that should be applied to this medium." *Reno v. ACLU*, 521 U.S. 844, 870 (1997).  Consistent with that guidance, courts have widely recognized that "First Amendment protection … extends to anonymous internet speech."  *Doe v. Cahill*, 884 A.2d at 456; *accord, e.g.*, *Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 134 (D.D.C. 2009); *In re Anonymous Online Speakers*, 661 F.3d 1168, 1172-1173 (9th Cir. 2011).

### III.   PROTECTION FOR ANONYMOUS SPEECH IS OF CRUCIAL IMPORTANCE TO PERSONS WHO EXPRESS THEMSELVES ON MANY INTERNET PLATFORMS, INCLUDING PLATFORMS SUCH AS TWITTER AND REDDIT

As the Supreme Court recently observed, "the most important place[] … for the exchange of views[] today" is "cyberspace—the 'vast democratic forums of the Internet' in general, … and social media in particular."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (quoting *Reno*, 521 U.S. at 868).  People use online communication platforms "to gain access to information and communicate with one another about it on any subject that might come to mind," often disclosing sensitive personal information and political or ideological viewpoints. *Id.* at 1737.  For example, they may "debate religion and politics," "share vacation photos," or "look for work."  *Id.* at 1735.  Or they may "petition their elected representatives and otherwise engage with them in a direct manner"; in fact, "Governors in all 50 states and almost every Member of Congress have set up [Twitter] accounts for this purpose."  *Id.*  These sites "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."  *Id.* at 1737.

Perhaps unsurprisingly—given the vast number and types of communications such websites allow—the ability to remain anonymous on those platforms is critically important. According to one survey, "[a] clear majority" of respondents (59%) "say that people should have the ability to use the internet completely anonymously."  Lee Rainie et al., *Anonymity, Privacy, and Security Online*, at Part 1, PEW RESEARCH CENTER (Sept. 5, 2013),

https://pewrsr.ch/3bu7CUb. More than a third of Internet users have steered clear of a website because it asked for their real name; a quarter have posted online comments without revealing their identity; and a quarter have used a temporary username or email address. *Id.* On Twitter, at least a quarter of accounts do not disclose a person's full name. *See* Sai Teja Peddinti et al., *User Anonymity on Twitter*, 15 IEEE SECURITY & PRIVACY 84-87 (May/June 2017). And the true number of anonymous accounts may be substantially higher than that, as some accounts use what appear to be full names that are pseudonyms. *Id.* On Reddit, users are known only by pseudonymous usernames that in most cases bear no relationship to the user's real name; a user need not disclose her name or even her email address to sign up for an account. The same considerations that drive speakers to communicate anonymously in the analog world operate fully in the digital one; if anything, those motivations are likely *more* pronounced online, given the vast reach of cyber communications.

Specifically, many speakers use Internet forums like Reddit and Twitter to make statements that might provoke criticism or retaliation from their communities. Some employ anonymous Twitter accounts to convey disfavored political views or other information that could expose them to social stigma or loss of employment. For example, one Indonesian government employee told a reporter that "anonymity [wa]s crucial" for his Twitter account because he feared the social and professional repercussions of revealing his sexual orientation; "[b]eing gay in an Islamic country like Indonesia is still risky," he reported, "and my entire life has been built here." *See* Yusuf Tamanna, *"A Form of Damage Limitation:" Why We Use Twitter Alts and Finstas*, VICE (Apr. 16, 2019), https://bit.ly/2WszwM8 (recounting interviewees' rationales for using secondary social media accounts—sometimes called "alt" or, in the case of the platform Instagram, "finsta" accounts—often not associated with their real names). In another case, an

12

anonymous Reddit user, a lifelong Jehovah's Witness, used a Reddit forum to criticize the fundraising and data-collection practices of his religion's leadership. *See In re DMCA Subpoena to Reddit, Inc.*, No. 19-mc-80005, 2020 WL 999788 (N.D. Cal. Mar. 2, 2020) (quashing subpoena attempting to unmask that user). He valued anonymity "because he was deeply concerned about being ostracized, shunned, or disfellowshipped by the Jehovah's Witness community for voicing criticism or doubts about the organization." *Id.* at *1. Anonymity can also keep victims of violence and harassment safe from retribution by concealing their activities or location. *See* Sara Baker, *Why Online Anonymity is Critical for Women*, WOMEN'S MEDIA CENTER (Mar. 11, 2016), https://bit.ly/3enMmkX; Niha Masih, *A Court Case in India Takes Aim at Anonymous #MeToo Accusations*, WASH. POST (Nov. 2, 2019), https://wapo.st/36zRKP2 (researcher observing that "[a] large momentum for the #MeToo movement has come from the fact that people could maintain their anonymous identity").

Other online speakers use anonymity to protect their privacy when discussing sensitive personal issues. For instance, a Reddit forum (i.e., a "subreddit") called StillTrying provides a space for people dealing with infertility issues—a topic many might choose not to discuss without the shield of anonymity. *See* https://www.reddit.com/r/stilltrying/ (last accessed May 27, 2020). Countless similar subreddits provide support forums for those experiencing grief, depression, physical or sexual abuse, and other challenges. *See* https://www.reddit.com/r/GriefSupport/; https://www.reddit.com/r/depression/; https://www.reddit.com/r/survivorsofabuse/ (last accessed May 27, 2020). Those using anonymous accounts for these reasons cite the importance of anonymity in allowing them to speak freely about their life circumstances. *See* Tamanna, *supra* (Twitter user explaining that she used an anonymous account to "talk openly about [an] eating disorder and depression" and

"f[i]nd [a] community"; another anonymous social-media user noting that "the ease of talking about mental health anonymously was second to none").

Still others opt for anonymity as a means of creative expression. For example, some parody accounts on Twitter use pseudonyms comically or satirically. *See* Twitter, Parody, Newsfeed, Commentary, and Fan Account Policy, https://help.twitter.com/en/rules-and-policies/parody-account-policy (last accessed May 27, 2020) (describing what makes something a "parody account"). Accounts in that category purport to share the thoughts of such figures as Star Wars villain Darth Vader, actor Chuck Norris, writer Edgar Allan Poe, and Queen Elizabeth II. Others take on parody personas as a way of criticizing government policies or expressing other political or ideological views. *See* Tim Highfield, *News Via Voldemort: The Role of Parody and Satire in Topical Discussions on Twitter*, AoIR Selected Papers of Internet Research 14.0 (2013), https://bit.ly/3gfLHni (accounts satirizing politicians "become performances of political engagement").

Whatever the motivation behind their choice to speak anonymously, such users reasonably expect that their identities will remain private. Twitter and Reddit policies clearly protect speakers' anonymity. All one needs to create a Reddit account, for example, is a username and password; the username "doesn't have to be related to [a user's] real name." Reddit Privacy Policy (January 10, 2020), https://www.redditinc.com/policies/privacy-policy-january-10-2020. Similarly, individuals can "use Twitter under a pseudonym if [they] prefer not to use [their] name." Twitter Privacy Policy (Jan. 1, 2020), https://twitter.com/en/privacy. Twitter and Reddit, along with other Internet companies, have fought to protect user anonymity before courts and government agencies (including before the State Department regarding the policy at issue in this case). *See, e.g.*, Reddit, Inc.'s Joinder in Motion to Quash, *In re DMCA*

*Section 512(h) Subpoena to Reddit, Inc.*, No. 3:19-mc-80005 (N.D. Cal. Apr. 22, 2019); Brief of Amici Curiae Internet Technology Companies, *Glassdoor, Inc. v. Andra Group, LP*, No. 17-0463 (Tex. Mar. 30, 2018); Complaint, *Twitter, Inc. v. U.S. Dep't of Homeland Security*, No. 3:17-cv-01916 (N.D. Cal. Apr. 6, 2017); Twitter, Inc., Comment on DOS-2018-0002-0001 (May 28, 2018), https://perma.cc/9NGU-8YAV.

And both courts and state legislatures, recognizing the vital constitutional interests at stake, have imposed a high bar to unmask anonymous online speakers via litigation.  Indeed, courts across the country have applied heightened scrutiny to litigants' attempts to unmask anonymous online speakers in civil litigation, requiring plaintiffs to notify the anonymous speaker of their claims, to withhold action to allow the speaker an opportunity to be heard, and to make a number of showings—for example, that their claims are legally and factually viable, that there is sufficient evidence to support *prima facie* each element of the cause of action, and that the strength of the plaintiff's case and the need for disclosure outweigh the speaker's First Amendment rights.  *See Sinclair*, 596 F. Supp. 2d at 132 (explaining the standards courts have imposed "in cases involving discovery seeking the identification of anonymous Internet speakers"); *Doe v. Cahill*, 884 A.2d 451, 460 (Del. 2005) (setting out one such standard); *Dendrite Int'l, Inc. v. Doe*, 775 A.2d 756, 760-761 (N.J. Super. Ct. App. Div. 2001) (setting out another such standard).  Legislatures, too, have limited parties' ability to discover the identity of anonymous Internet speakers.  *See, e.g.*, Va. Code § 8.01-407.1.  Those judicial and legislative judgments properly recognize the danger in requiring an anonymous speaker's identity to be revealed with insufficient justification: doing so risks "intimidat[ing] or silenc[ing speakers] in the public sphere."  *Doe v. Individuals*, 561 F. Supp. 2d 249, 254-256 (D. Conn. 2008).

15

IV.     THE REGISTRATION REQUIREMENT AND RELATED RETENTION AND DISSEMINATION
        POLICIES JEOPARDIZE THE VITAL CONSTITUTIONAL RIGHT TO SPEAK ANONYMOUSLY

        A.     The Registration Requirement And Its Accompanying Retention And
               Dissemination Policies Chill The Speech Of Those Who Are Subject To It

        The Registration Requirement and its accompanying retention and dissemination policies

unquestionably chill a vast quantity of speech.  Given that online communication platforms allow

users to gain information about and discuss "topics 'as diverse as human thought,'" *Packingham*,

137 S. Ct. at 1735-1736, access to individuals' identifiers allows the government to develop a

detailed picture of virtually every aspect of their lives—including their ideological and religious

views, their professional, political, and social networks, and their sensitive personal information.

And it reveals that information not just on a prospective basis, but retrospectively too, allowing

officials to review any communications an individual has *ever* made using that identifier.

        The requirement renders that staggering quantity of information subject to review by the

State Department and the many other government entities, including law-enforcement agencies,

with which the Department is permitted to share identifiers.  Defs.' Mem. in Support of Mot. to

Dismiss ("MTD") 8; *see also* Privacy Impact Statement: Consular Consolidated Database (CCD)

8, https://bit.ly/2yYdfgl (Oct. 2018).  As the government acknowledges, the speech and

associations revealed can be used to decide not only whether to grant immigration benefits, but

also whether to impose severe penalties such as deportation.  *See* MTD 42-44.  The government

also readily acknowledges that the information can be shared with foreign governments under

certain circumstances, including to further law-enforcement investigations in those countries.

MTD 8; *see* 8 U.S.C. § 1202(f).  That possibility has significant import for those online speakers

who use anonymity to criticize the practices of foreign governments—especially foreign

governments that have historically retaliated against social-media users or even attempted to shut

down social-media use altogether to stamp out criticism.  *See, e.g.*, Terrence McCoy, *Turkey*

*Bans Twitter—and Twitter Explodes*, WASH. POST (Mar. 21, 2014), https://wapo.st/2yepogJ (noting Turkey's decision to block Twitter after its prime minister became "ensnared in a scandal inflamed by social media").  Those concerns are particularly acute now, as governments around the world have cracked down on online speakers who question authorities' handling of the COVID-19 health crisis.  *See* Joel Simon, *COVID-19 Is Spawning a Global Press-Freedom Crackdown*, COLUM. JOURNALISM REV. (Mar. 25, 2020), https://bit.ly/2X7sE5P (noting detentions and other adverse actions taken against social-media commentators and reporters).

Moreover, every disclosure of an individual's online identifiers increases the risk of further exposure, whether as a result of leaks, hacking attempts, or other data breaches.  That concern is hardly theoretical; cybersecurity incidents in the U.S. federal government increased more than tenfold from 2006 to 2014, exposing agencies to "grave" security risks.  Min-Seok Pang & Hüseyin Tanriverdi, *Strategic Roles of IT Modernization and Cloud Migration in Reducing Cybersecurity Risks of Organizations: The Case of U.S. Federal Government* 3, Fox School of Business Research Paper No. 17-017 (Feb. 27, 2019), https://bit.ly/2LBRUvR.  Even if federal officials do not deliberately share identifiers, then, the collection and retention of that information in databases nevertheless increases the likelihood that individuals' identities will become broadly known outside the federal government, including by the precise people from whom anonymous speakers most wish to shield their identities.

Faced with those severe consequences, any speaker who can envision applying for or renewing a visa using the application forms at issue in this case—and even some speakers with no such plans—"might well conclude that the safe course is to avoid controversy" by "blunt[ing] or reduc[ing]" their speech.  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 257 (1974).

17

The policy therefore "inescapably 'dampens the vigor and limits the variety of public debate,'" *id.*—the precise ill that the First Amendment was enacted to prevent.

> **B.      Because A Substantial Number Of People To Whom The Registration Requirement Applies Have First Amendment Rights, The Requirement Must Survive Strict Scrutiny**

The government hinges its constitutional defense on the argument (MTD 39-42) that rational-basis review applies in spite of the policy's burden on anonymous-speech rights.  That is incorrect: a substantial number of the applications of the Registration Requirement (and its accompanying retention and dissemination policies) trigger heightened scrutiny.  And as explained in the next subsection, they fail that rigorous test, meaning the entire requirement must fall as unconstitutionally overbroad.

The government's bid for rational-basis review misses a key point: the rationale behind the Supreme Court's cases applying a deferential standard of review to decisions related to the admission of foreign nationals is limited to requests for "*initial admission* to the United States." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (emphasis added).  Such requests seek a "privilege" and the requestor enjoys "no constitutional rights regarding his application."  *Id.* (citing such cases as *Fiallo v. Bell*, 430 U.S. 787, 792 (1977), and *Kleindienst v. Mandel*, 408 U.S. 753 (1972)); *see also Kleindienst*, 408 U.S. at 762 (foreign national seeking entry lacked residency or other significant connection to the United States).  But "once an alien gains admission to our country and begins to develop the ties that go with permanent residence[,] his constitutional status changes accordingly."  *Plasencia*, 459 U.S. at 32.  Foreign nationals receive constitutional protections when they have had "significant voluntary connection[s] with the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).  Thus, "it has long been settled that aliens within the United States enjoy the protection of the First Amendment; 'once an alien

lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders …. includ[ing] those protected by the First … Amendment.'"  *Rafeedie v. INS*, 795 F. Supp. 13, 22 (D.D.C. 1992) (quoting *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring)); *accord Bridges*, 326 U.S. at 148 ("[f]reedom of speech and of press is accorded aliens residing in this country)"; *Verdugo-Urquidez*, 494 U.S. at 271 (citing *Bridges* for that proposition); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (same).

The Registration Requirement chills the speech of a significant number of individuals—including some of plaintiffs' members and partners—who have precisely such "substantial connections to the United States."  Compl. ¶ 43.  Indeed, many of those individuals currently live in the United States but will need to renew their visas to continue that residency in the future. *Id.*; *see also* Cong. Research Serv., R45040, *Immigration: Nonimmigrant (Temporary) Admissions to the United States* 23 (Sept. 10, 2019) (average population of "resident nonimmigrants"—that is, "foreign nationals admitted on nonimmigrant visas whose classes of admission are associated with stays long enough to establish a residence"—is "2.3 million on any given day").  For example, someone living in the United States whose visa is due to expire and who wishes to travel abroad—say, to visit family—will be required to renew that visa from abroad to be allowed to reenter the country.  And that means providing the online identifiers mandated by the Registration Requirement.  Individuals who anticipate renewing a visa would thus reasonably forecast that the Registration Requirement may apply to them in the future—and as a result permit government officials to review their social media activities undertaken through any pseudonym they have used within the five years preceding any visa application from abroad. Such individuals are presently censoring their speech as a result of the policy.  *See* Pls.' Opp. to

Mot. to Dismiss ("Opp.") 11, 34.  In none of the cases the government cites did the Supreme Court apply deferential review to a government regulation that burdened protected speech by foreign nationals currently residing in the United States, nor could it do so without running afoul of clear precedent, *see Bridges*, 326 U.S. at 148.  *See* MTD 39-42.

Moreover, the Registration Requirement imposes cognizable burdens on the speech of some U.S. residents who are *not* currently in the country.  For example, a lawful permanent resident (LPR) who travels abroad and does not return to the United States within the period provided by his green card or a re-entry permit generally must complete form DS-260 and its concomitant Registration Requirement.  *See* U.S. Dep't of State, Returning Resident Visas, https://bit.ly/3bJFU6c (last accessed May 27, 2020).  That is true even after an LPR qualifies for "returning resident status," meaning that the State Department has found that he has not surrendered his permanent residency and should not be treated as a first-time applicant for admission.  *Id.*  Those LPRs are imminently subject to the Registration Requirement and the deprivation of anonymity it entails.  And the First Amendment protects them from that deprivation just as it would if the deprivation occurred while they were within the United States.  LPRs do not lose their constitutional rights simply because they travel abroad; rather, courts "assimilate [their] status to that of an alien continuously residing and physically present in the United States."  *Kwong Hai Chew*, 344 U.S. at 596 (LPR returning from travel was entitled to due process, even if a first-time entrant was not).

Additionally, the Registration Requirement continues to chill the speech of a significant number of foreign nationals who currently reside in the United States and have *already* disclosed their social-media identifiers to the government.  In the year since the requirement has been in effect, virtually everyone applying for a visa from abroad has had to provide those identifiers.

20

Hundreds of thousands, if not millions, of those individuals have since taken up residency in the United States and therefore are entitled to First Amendment protections.  As the government readily admits, however, it retains the social-media identifiers it receives through the Registration Requirement and shares that information with other agencies to allow them to "assess[] the grounds for deportability of foreign nationals in the country or for the denial of immigration benefits," MTD 44.  Knowing that the government has retained their social-media identifiers and may use their online activity to assess whether they may remain in the country, many individuals will choose to curtail their speech now and in the future.  The risk that they will steer clear of a wide range of protected online speech and associational activity is particularly heightened given "the severity of deportation—'the equivalent of banishment or exile,'" *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010)—and the uncertainty surrounding the uses to which social-media information might be put.

Thus, even accepting the government's premise that rational-basis review applies to the mine-run constitutional challenge to an admission or exclusion decision, heightened First Amendment scrutiny applies to at least the three categories of individuals just described.

## C.    The Registration Requirement Fails Heightened Scrutiny And Is Arbitrary And Capricious

Under heightened scrutiny, the burden is on the government to present "evidence" that "the problems it sought to thwart actually exist," and that the regulation imposed "is an appropriately tailored antidote." *Edwards v. District of Columbia*, 755 F.3d 996, 1009 (D.C. Cir. 2014).  Indeed, the government bears the "burden … to explain why a less restrictive provision would not be as effective as" the measure imposed.  *Reno*, 521 U.S. at 879.  The government has made no such showing.  As plaintiffs have explained, the evidence before the State Department in fact showed that social-media screening is *not* a reliable means of vetting individuals for visas.

Compl. ¶¶ 26-27; Opp. 4-5, 41.  And in enacting the policy, the government did not explain why the Registration Requirement was necessary for the many applicants whose identification and eligibility determinations pose no difficulty for consular officers or why the retention of identifiers after eligibility determinations were made was necessary.  Opp. 5, 42-43.  Before this Court, the government makes no attempt to argue that the policy survives heightened scrutiny; to the contrary, it suggests that the policy's goal was to *maximize* the intrusion on individuals' anonymity and associational rights "by ensuring that each agency has *as much available information as possible*" about visa applicants.  MTD 43-44 (emphasis added).  Its failure to defend the policy under a heightened standard is fatal.

Moreover, because the applications to individuals with significant U.S. connections (just discussed) make up a significant number of the policy's applications, the Registration Requirement is facially invalid as overbroad.  *See United States v. Stevens*, 559 U.S. 460, 473 (2010) ("a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep'").  That doctrine properly recognizes that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."  *NAACP v. Button*, 371 U.S. 415, 433 (1963).[2]

The government's failure to consider the requirement's constitutionality as applied to foreign nationals with significant connections to the United States, such as residency, also amounts to an "entire[] fail[ure] to consider an important aspect of the problem"—rendering the Registration Requirement and accompanying policies arbitrary and capricious.  *Motor Vehicle*

---

[2] Any argument by the government that these applications, as a factual matter, are not "significant" in number would of course make clear that at the very least, plaintiffs' First Amendment claim should survive the motion-to-dismiss stage.

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  It is too late now for the government to attempt to rectify that omission; in assessing the reasonableness of agency action, courts "look to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations."  *Council for Urological Interests v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

The government's remaining argument that the requirement comports with anonymity and associational-privacy guarantees spans a sentence, urging that the policy (1) "enables access only to the public-facing sections of an applicant's social media account" and (2) "applies only to individuals who choose to apply for visas."  MTD 44.  The government also contends—only in its standing argument—that the policy does not chill speech because "many people already associate their names with their social media profiles."  MTD 13.  These points are inapposite.

As to the first, the public-facing sections of individuals' accounts are the most meaningful place to post speech for widespread distribution.  Just as the anonymous handbill distributor in *McIntyre* chose public physical spaces to maximize the impact of her speech, so too are online speakers entitled to speak anonymously in the virtual equivalent—the "modern public square," *Packingham*, 137 S. Ct. at 1732.  The value of a public-facing online forum is clear from the number of people who avail themselves of it—on Twitter, for example, the vast majority of accounts are public.  *See* Emma Remy, Pew Research Center, *How Public and Private Twitter Users in the U.S. Compare—and Why It Might Matter For Your Research*, MEDIUM (July 15, 2019), https://bit.ly/3dWw16w (finding just 13% of adult U.S. Twitter users keep their feeds private).  Eliminating that option unquestionably burdens speech, even if private forums remain available.  And more fundamentally, whether a post is public or private, revealing the identity of its author transforms the very nature of the disclosure by linking information to a

specific person; for example, an anonymous online discussion of the details of a patient's medical condition becomes—if his identity is disclosed—a revelation of a particular patient's most intimate secrets.  Such disclosures are clearly significant even if a speaker has some ability to shield certain communications from government readers.

What exactly the government means by its second argument is less clear.  To the extent it intends to argue that the social media policy does not explicitly "prevent anyone from saying anything," MTD 18, but simply imposes a condition (loss of anonymity) on those who apply for visas, that is irrelevant.  The First Amendment forbids unjustified *burdens* on protected speech just as it forbids unjustified *prohibitions*.  *See, e.g., Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 736-737 (2011) (provision burdened speech where "the direct result of" speech by one political candidate "is additional funding to [his] political adversaries").  Nor can the government evade First Amendment scrutiny by recasting a burden as the denial of a benefit.  "Recognizing that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights," the "modern 'unconstitutional conditions' doctrine holds that the government may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit."  *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 674-675 (1996) (internal citations and quotation marks omitted); *accord Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (noting that a condition on the grant of a benefit "can result in an unconstitutional burden on First Amendment rights").  Whether framed as a burden or as a condition on the grant of a benefit, then, Registration Requirement cannot pass muster.

Finally, the fact that some users choose to disclose their names, MTD 13, patently does not lessen the rights of those who do not disclose their identity. Nothing in the Supreme Court's anonymous-speech cases hinges on how common the decision to speak anonymously happened to be; like all First Amendment rights, the right to anonymity protects minority practices as much as (if not more than) majority ones. *See McIntyre*, 514 U.S. at 357. Regardless, as explained above, anonymity is hardly some rare practice on Internet communication platforms. To the contrary, it is a crucial part of the way people interact in cyberspace.

## CONCLUSION

The government's motion to dismiss plaintiffs' complaint should be denied.

May 28, 2020

Respectfully submitted,

*/s/ Patrick J. Carome*
Patrick J. Carome (DC Bar No. 385676)
Ari Holtzblatt (DC Bar No. 1009913)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Tel.: 202-663-6000
patrick.carome@wilmerhale.com
ari.holtzblatt@wilmerhale.com

Elizabeth Bewley*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: 617-526-6000
elizabeth.bewley@wilmerhale.com

*Counsel for Amici Curiae Twitter, Inc., Reddit, Inc., and the Internet Association*

*\*Of counsel*