**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DOC SOCIETY, *et al.*,

Plaintiffs,

vs.

MICHAEL R. POMPEO, *et al.*,

Defendant.

Civil Action No. 1:19-cv-03632-TJK

**BRIEF OF *AMICI* FAITH-BASED ORGANIZATIONS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**CORPORATE DISCLOSURE STATEMENT**

All *amici* are 501(c)(3) non-profit organizations with no parent company.

# TABLE OF CONTENTS

**IDENTITY AND INTERESTS OF *AMICI CURIAE*** .................. Error! Bookmark not defined.

**RULE 29(a)(4)(E) STATEMENT** .................................................................................... **2**

**INTRODUCTION AND SUMMARY OF ARGUMENT** ....................................................... **2**

**ARGUMENT** ................................................................................................................ **3**

**I. Religious minorities are particularly likely to be impacted by the Registration Requirement.** ........................................................................................................ **3**

**II. Religious minorities are at high risk from sharing their social media information with the US government.** ............................................ Error! Bookmark not defined.

A. Religious minorities in other countries are particularly vulnerable to the US disclosing their social media information with other governments. ....................... 6

B. The social media posts of religious minorities are particularly likely to be misinterpreted by US authorities. ......................... **Error! Bookmark not defined.**

C. Religious minorities are particularly likely to experience adverse consequences from US authorities for social media posts. ......................................................... 9

**CONCLUSION** ............................................................................................................ **12**

**CERTIFICATE OF COMPLIANCE** ......................................... Error! Bookmark not defined.

## IDENTITY AND INTERESTS OF *AMICI CURIAE*[1]

*Amici* are national organizations whose missions are animated by religious faith and/or whose work is in service of a religious community. As such, they are well-suited to present the perspectives of religious minorities and the potential harm of the Registration Requirement at issue in this case to those communities.

*Amicus curiae* **Muslim Advocates** is a national legal advocacy and educational organization formed in 2005, works on the frontlines of civil rights to guarantee freedom and justice for Americans of all faiths. The issues at stake in this case relate directly to Muslim Advocates' work fighting religious discrimination against vulnerable communities, particularly religious minorities.

*Amicus curiae* the **American Friends Service Committee** (AFSC) is a Quaker organization that promotes lasting peace with justice, as a practical expression of faith in action. AFSC values are grounded in Quaker experience and universal truths that are upheld by many faiths and that honor the light of the divine in each person. AFSC works toward a world in which governments and societal institutions are fair and accountable and communities and societies fractured by exclusion and marginalization are healed and transformed, embracing inclusion and equality. Consistent with those values, AFSC joins this brief.

*Amicus curiae* **T'ruah: the Rabbinic Call for Human Rights** is an organization representing more than 2000 rabbis and cantors from all streams of Judaism to act on the Jewish imperative to respect and advance the religious freedom and human rights of all people. As a human rights organization dedicated to supporting America's longstanding, values-driven

---

[1] As noted in the concurrently-filed motion for leave, all plaintiffs and defendants have indicated they do not oppose the filing of this brief.

commitment to serving as a safe haven for immigrants and religious minorities, T'ruah joins this brief.

*Amicus curiae* **the Reconstructionist Rabbinical Association** (RRA), established in 1974, is the professional association of the nearly 350 Reconstructionist rabbis who serve in a variety of leadership roles in North America, Israel, and around the world. As Jews, who have historically suffered from the results of intolerance and discrimination, and consistent with its resolutions, the RRA affirms the basic rights of freedom of religion, the ideals of a pluralistic society, and understands that that threats to religious freedom are unconscionable. Consistent with its members' values, the RRA joins this brief.

## RULE 29(a)(4)(E) STATEMENT

This brief was drafted in whole by *amicus curiae* Muslim Advocates; no counsel to any party to the present case contributed to the drafting of this brief. No party to the present case, nor any counsel to any party to the present case, contributed money to fund the preparation and submission of this brief. No person, other than *amicus curiae* Muslim Advocates, contributed money intended to fund the preparation and submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As Plaintiffs have made clear, the Registration Requirement wastes government resources and, more seriously, will chill the free expression of Americans and visa applicants. In addition to the harms identified by Plaintiffs, the Registration Requirement is especially likely to harm religious minorities, both in the US and abroad. Those who practice religions different from those of the majority of Americans, many of whom are recent immigrants, rely on social media interactions with those overseas for both their social and spiritual lives, which makes their information especially likely to be scrutinized when international social media is gathered.

Religious minorities in other countries also depend on social media as a tool for organizing and dissent, especially through the use of pseudonyms and anonymous accounts.

This sensitive information is not safe in the hands of the US government, which has shown that it can lose the information inadvertently to spies and hackers or share it willingly with oppressive governments. Further, the easily misunderstood nature of social media posts puts anyone whose social media is reviewed at great risk of being ensnared in the US national security state because of missing context—context that is especially likely to be missing for the posts of religious minorities. Lastly, religious minorities need to fear discriminatory treatment by the US government, both because candidates with religious animus have been successfully elected to office and because such candidates could be elected in the future. Given the many risks that the Registration Requirement poses to religious minorities, the speech of religious minorities will inevitably suffer a significant chill.

## ARGUMENT

### I. Religious minorities are particularly likely to be impacted by the Registration Requirement.

Plaintiffs have made clear that the Registration Requirement violates the First Amendment because it burdens their First Amendment rights by chilling their speech and burdening their right to communicate with foreign nationals outside the United States. *See* (ECF No. 32 at 35-40). Plaintiffs are not alone in suffering these harms; the Registration Requirement's chilling effects are particularly likely to be experienced by religious minorities. Social media is particularly important to religious minorities in the US in part because so many of them are recent immigrants. While religious minorities make up less than 6% of the general

US population,[2] one recent study has estimated they make up a full 25% of recent US long-term permanent residents.[3] Many of these religious minorities are recent immigrants as well; for example, one study estimated that more than half of Muslim immigrants to the US arrived since the year 2000.[4] Social media is thus an important way for those separated from their families and/or birthplaces to maintain community ties.

The government has admitted that it intends to review the social media presence of the visa applicants using the identifiers it collects pursuant to the Registration Requirement. By the nature of social media, reviewing the social media information of one individual necessarily involves reviewing the information of those who interact with that individual. Anyone in the US who has friends or family overseas must consider the likelihood that such a person will ever apply for a visa to enter the US, and then police their own interactions with that person for anything that could confuse and potentially alarm a federal officials. As noted in subsequent sections, many religious minorities have good reason to be concerned that government officials will interpret even innocuous statements as threatening. This means that US persons will end up having to self-censor in order to maintain their overseas community.

Not only will US religious minorities face the problem of censoring their own speech; they will be deprived of speech and the physical presence of spiritual leaders from overseas. Many religious traditions have important members of their religious hierarchies that live

---

[2] Pew Research Center, *Religious Landscape Study*, https://www.pewforum.org/religious-landscape-study/ (last visited May 28, 2020).
[3] Pew Research Center, *The Religious Affiliation of U.S. Immigrants: Majority Christian, Rising Share of Other Faiths* (May 17, 2013), https://www.pewforum.org/2013/05/17/the-religious-affiliation-of-us-immigrants/ (last visited May 28, 2020).
[4] Pew Research Center, *Muslims in America: Immigrants and those born in U.S. see life differently in many ways* (April 17, 2018), https://www.pewforum.org/essay/muslims-in-america-immigrants-and-those-born-in-u-s-see-life-differently-in-many-ways/ (last visited May 28, 2020).

overseas, as well as important educational institutions. The free travel of spiritual leaders and teachers from these regions is an important part of many religions' spiritual traditions. For example, some schools of Soto Zen Buddhism require that "Dharma transmission," the ritual by which a Buddhist priest passes on to a student the ability to teach Zen practices to others, be performed in person.[5] If priests cannot enter the US to perform the ritual, the chain of Dharma transmission is broken. Further, many religions' premiere educational centers are located overseas. Indeed, an attempt by independent group UniRank to list the top 250 Islamic universities in the world failed to include a single one in the US.[6] If educators are unable to enter the US to lecture and research, then students of minority religions will be unable to obtain the best possible education in their traditions. The US also has a long tradition of holding interfaith dialogues where spiritual leaders from around the world meet and find common ground in their different religious traditions. One such conference that traditionally held by the International Association for Religious Freedom traditionally gathers over a hundred delegates.[7] Yet overseas spiritual leaders are now faced with the difficult choice of either choosing not to post anything on social media that could cause problems with the US government or choosing not to travel to the US to take advantage of these opportunities. Either way, those in the US who depend on these spiritual leaders for guidance will be deprived of their voices. This limits the possibilities for spiritual growth and needlessly isolates US practitioners of these religions.

---

[5] Domyo, *Profound, Practical, Mutable: Dharma Transmission in Zen – Part 1*, Zen Studies Podcast (Mar. 9, 2018), https://zenstudiespodcast.com/dharma-transmission-1/ (last visited May 28, 2020).

[6] *Top Islamic Universities in the World*, UniRank (2020), https://www.4icu.org/top-religious-universities/islamic/ (last visited May 28, 2020).

[7] *The 35th Congress: Reimagine Interfaith*, International Association for Religious Freedom, https://iarf.net/the-35th-congress-reimagine-interfaith/ (last visited May 28, 2020).

### II. Religious minorities are at high risk from sharing their social media information with the US government.

#### A. Religious minorities in other countries are particularly vulnerable to the US disclosing their social media information with other governments.

Not only is the information of religious minorities particularly likely to be scrutinized through the Registration Requirement, religious minorities are particularly likely to be harmed if that information is disclosed to other governments.

Social media is an important tool of political dissent in countries that oppress religious minorities. For example, the so-called "Arab Spring" (a series of pro-democracy protests against dictatorships and theocratic governments in the Middle East that resulted in huge political change) spread in part through the organizing of dissidents on Twitter and Facebook.[8] Much of this dissident speech is anonymous or pseudonymous to help the speaker avoid retaliation from these regimes. By tying the real name of the speaker to these anonymous or pseudonymous accounts, the government's policy is creating very real risks for those speakers—risks that simply would not exist without the Registration Requirement.

While Defendants claim that this information will be kept confidential, the US government has a history of being unable to protect sensitive information. For example, in 2015 hackers (believed to be sponsored by China) famously downloaded the personal information of over four million applicants for federal jobs stored by the Office of Personnel Management, exploiting holes in the technical protections being used to store that data.[9] This event followed numerous other data breaches, including a 2014 incident that compromised the data of 25,000

---

[8] Taylor Dewey *et al.*, *The Impact of Social Media on Social Unrest in the Arab Spring*, Defense Intelligence Agency (2012), https://publicpolicy.stanford.edu/publications/impact-social-media-social-unrest-arab-spring (last visited May 28, 2020).

[9] *Millions of US government workers hit by data breach*, BBC News (June 5, 2015), https://www.bbc.com/news/world-us-canada-33017310 (last visited May 28, 2020).

employees of the Department of Homeland Security,[10] a 2006 incident that compromised computers in the US Department of Commerce,[11] and a 2018 incident in which State Department employees' personally identifiable information was exposed, among countless others.[12] In addition, US government employees sometimes work for repressive regimes as spies, stealing information from within the government. Federal employees have been convicted for spying on behalf of countries like Russia, Cuba, Israel, and others.[13] Notably, in 2017, an employee of the US State Department pled guilty to sharing confidential government documents with the Chinese government.[14] China's human rights abuses against its Muslim Uighur religious minority are well-documented.[15] It is difficult to believe that China would be uninterested in the identities of Uighur dissidents if it knew that information was in the hands of US authorities. Furthermore, the public only knows about these events because the improper access was discovered and the government took the additional step of publicly revealing them, so the most sophisticated misappropriations of US data may still be ongoing and/or unknown to the general public. Under these circumstances, religious minorities can reasonably fear that information they share with the US government pursuant to the Registration Requirement is not guaranteed to stay private.

[10] *Id.*
[11] *Id.*
[12] Charlie Osborne, *State Department reveals data breach, employee information exposed*, ZDNet Zero Day (Sept. 19, 2018), https://www.zdnet.com/article/state-department-reveals-email-data-leak/ (last visited May 28, 2020).
[13] *Notable US Spies Fast Facts*, CNN (Apr. 24, 2020), https://www.cnn.com/2014/06/09/us/imprisoned-u-s-spies---fast-facts/index.html (last visited May 28, 2020).
[14] *Former State Department Employee Pleads Guilty to Conspiring with Foreign Agents*, Dep't of Justice (Apr. 24, 2019), https://www.justice.gov/opa/pr/former-state-department-employee-pleads-guilty-conspiring-foreign-agents (last visited May 28, 2020).
[15] Lindsay Maizland, *China's Repression of Uighurs in Xinjiang*, Council on Foreign Relations (Nov. 25, 2019), https://www.cfr.org/backgrounder/chinas-repression-uighurs-xinjiang (last visited May 28, 2020).

Nor is the inadvertent disclosure of their information by the US government the only thing visa applicants need to fear. The US government also voluntarily shares information with other countries, including countries that oppress religious minorities. Many examples of such sharing are cited in the Complaint (*see* Compl. ¶ 60), including the US reportedly cooperating with Turkey in 2020 to locate Kurdish dissidents.[16] Visa applicants belonging to minority religions could be understandably fearful that the US will find itself politically motivated to curry favor with a government that is in a position to oppress the visa applicant.

**B. The social media posts of religious minorities are particularly likely to be misinterpreted by US authorities.**

Religious minorities face risks not only from other governments, but from the US government itself. This is not a case where people with nothing to hide have nothing to fear; law enforcement routinely overreacts and punishes religious minorities for innocuous statements.

Correctly interpreting messages on social media depends to a large extent on shared context. When that context is missing or incomplete, misinterpretations can result in serious harm to the people whose posts are misinterpreted. Some of the missing context may be linguistic. For example, in 2017, some Palestinians posted "good morning" in Arabic in a Facebook post and were arrested by Israeli police when Facebook's auto-translate feature translated it as "attack them."[17] Some of the missing context may be social; for example, a California man who sent a payment marked "Dash" from his Chase account had his funds seized by the US Treasury Department on the theory that they had been headed for the terrorist group

---

[16] John Haltiwanger, *The US shared intelligence with Turkey that may have helped it target the Kurds in Syria*, Business Insider (Oct. 10, 2019), https://www.businessinsider.com/us-shared-intelligence-turkey-may-have-aided-attack-on-kurds-2019-10?op=1 (last visited May 28, 2020).

[17] Linley Sanders, *Facebook Apologizes After Translation of 'Good Morning' Post Sees Palestinian Arrested by Israeli Police*, Newsweek (Oct. 25, 2017), https://www.newsweek.com/palestinian-arrested-israel-police-after-facebook-mistranslation-692464 (last visited May 28, 2020).

"Daesh"—when in fact "Dash" was the name of his dog and the payment was to his dogwalker.[18] Some of the ignorance may be cultural; for example, Chicago police engaged in a three-day manhunt for a Muslim man who used a hand clicker while on a bus while dressed in Middle Eastern clothing.[19] While police regarded this as suspicious behavior, the man was in fact using the hand clicker to keep track of his daily prayers, a common practice throughout the Islamic world.[20] For many religious minorities, their social media presence often requires all three of these contexts in order to be interpreted correctly.

### C. Religious minorities are particularly likely to experience adverse consequences from US authorities for social media posts.

Religious minorities are particularly likely to be targeted by the US government for discriminatory action. For example, terrorist watchlists in the US are filled with hundreds of thousands of people who have no ties to any violent event but nonetheless are routinely searched or, in extreme circumstances, refused the ability to travel altogether, based on nothing but sketchy third-hand information.[21] Once placed on one of these watchlists, the government does not permit a meaningful way for an individual to challenge or correct whatever statements landed them on the watchlist.[22] In addition, the government does not perform any kind of organized

---

[18] Nicole Lyn Pesce, *Chase Bank blocks California man's online payment over service dog's 'terrorist' name*, N.Y. Daily News (Mar. 28, 2016), https://www.nydailynews.com/life-style/chase-bank-blocks-online-payment-dog-terrorist-article-1.2579947 (last visited May 28, 2020).

[19] Mike German & Jay Stanley, *Fusion Center Update*, ACLU (July 2008), https://www.aclu.org/files/pdfs/privacy/fusion_update_20080729.pdf (last visited May 28, 2020).

[20] *Id*.

[21] Jeremy Scahill & Ryan Devereux, *The Secret Government Rulebook for Labeling You a Terrorist*, The Intercept (July 23, 2014), https://theintercept.com/2014/07/23/blacklisted/ (last visited May 28, 2020).

[22] *U.S. Government Watchlisting: Unfair Process and Devastating Consequences*, ACLU (Mar. 2014), https://www.aclu.org/other/us-government-watchlisting-unfair-process-and-devastating-consequences (last visited May 28, 2020).

review of the existing watchlisted parties.[23] Being watchlisted could accordingly be a life sentence.

Sharing social media information with the government increases the odds that a member of a religious minority will end up watchlisted. While the government persists in maintaining its secrecy about the rules governing these watchlists, leaked guidelines show the government does permit First Amendment-protected activity like religion and speech to be used as criterion to list someone where they are linked to *any* other "derogatory" criteria.[24] In one case known to Muslim Advocates, a Muslim woman crossing into the US from Canada started experiencing enhanced searches and delays at the border after a Customs and Border Protection searched her phone during a routine stop. A subsequent public records request revealed that the agent searching her phone had made special note of the fact that she followed a certain imam on Facebook—an event which likely precipitated her subsequent difficulties. Given these guidelines and the potential for their abuse, it is unsurprising that the watchlists seem to feature a disproportionate number of Muslim names on them[25]—even though most terrorist attacks in the US are committed by non-Muslims.[26] The Registration Requirement, by requiring the sharing of social media information with the US government, thus increases the risk that the sharing person will be placed on a terrorist watchlist.

Religious minorities must also guard against the possibility that either a current or future administration will wish to take actions against them out of animus or for political gain. Muslims,

---

[23] *Id*.
[24] *See* Scahill & Devereaux at 9 n.21, *supra*.
[25] Jeremy Scahill & Ryan Devereux, *Watch Commander*, The Intercept (Aug. 5, 2014), https://theintercept.com/2014/08/05/watch-commander/ (last visited May 28, 2020).
[26] Jibril Qoobey, *Majority of terrorists who have attacked America are not Muslim, new study finds*, Idil News (July 3, 2019), https://www.idilnews.com/2019/07/03/majority-of-terrorists-who-have-attacked-america-are-not-muslim-new-study-finds/ (last visited May 28, 2020).

for example, cannot ignore that President Trump has expressed open hostility and an intent to target them for special government scrutiny. In 2015, while campaigning for president, Mr. Trump announced on his website that "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States."[27] Echoing his views that Islam is a problem, Trump further advocated for the suspicionless surveillance of Muslims and mosques, stating: "[J]ust to say it clear—I want surveillance of these people. I want surveillance if we have to, and I don't care. . . . I want surveillance of certain mosques."[28] He also stated that he would be in favor of requiring Muslims to register in a government-run database.[29] Since being elected president, President Trump has openly moved to implement many of these policies, including banning virtually all immigration from a number of Muslim-majority countries in his Muslim Ban[30] and canceling Global Entry travel credentials for individuals from those countries.[31] Nor is President Trump the only example of an executive branch candidate promising action against religious minorities. Among many other examples, David Duke, a former leader of the Ku Klux Klan who made many openly anti-Semitic comments, ran for president in 1988 and 1992.[32] While Duke was not elected president, he was able to win the Democratic vice-presidential primary in New Hampshire in 1988

---

[27] Press Release, Trump-Pence, *Donald J. Trump Statement on Preventing Muslim Immigration* (Dec. 7, 2015), https://web.archive.org/web/20170508054010/ https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration (Internet Archive record on May 8, 2017).

[28] Lauren Carroll, *In Context: Donald Trump's comments on a database of American Muslims,* Politifact (Nov. 24, 2015), http://www.politifact.com/truth-o-meter/article/2015/nov/24/donald-trumps-comments-database-american-muslims/ (last visited May 28, 2020).

[29] *Id.*

[30] *Muslim Advocates Condemns Expanded Muslim Ban*, Muslim Advocates (Jan. 31, 2020), https://muslimadvocates.org/2020/01/muslim-advocates-condemns-expanded-muslim-ban/ (last visited May 28, 2020).

[31] Justin Bachman, *The Mad U.S. Scramble to Dump 'Trusted Travelers'*, Bloomberg (Feb. 8, 2018), https://www.bloomberg.com/news/articles/2018-02-08/how-trump-s-travel-ban-hurt-trusted-travelers (last visited May 28, 2020).

[32] *About David Duke*, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate/extremist-files/individual/david-duke (last visited May 28, 2020).

in spite of his record of religious animus.[33] With many candidates and even government officials voicing openly hostility, applicants could reasonably fear that the sensitive information they share with the government could be used by this administration—or future administrations—to take action against disfavored groups. To protect religious minorities against these harms and the others mentioned above requires this Court to enjoin the Registration Requirement and stop the government from gathering this information.

## CONCLUSION

This Court should deny Defendants' Motion to Dismiss.

Dated: May 28, 2020

Respectfully submitted,

By: /s/ Matthew W. Callahan

Matthew W. Callahan, D.C. Bar 888324879
Muslim Advocates
P.O. Box 34440
Washington, D.C. 20043
matthew@muslimadvocates.org

*Counsel for Amici*

[33] *NH US Vice President – D Primary*, Our Campaigns, https://www.ourcampaigns.com/RaceDetail.html?RaceID=393638 (last visited May 28, 2020).

**CERTIFICATE OF COMPLIANCE**

I hereby certify on this 28th day of May, 2020, that:

This brief complies with the length limitations of Local Rule 7(o)(4) because it does not exceed 25 pages and with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 3,417 words, not including those parts of the brief excluded by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief was prepared on a computer, using Microsoft Word, in Times New Roman (proportionally spaced) typeface with serifs, 12-point type, and double-spaced.

*/s/ Matthew W. Callahan*
Matthew W. Callahan