**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION,<br><br>            Plaintiffs,<br><br>      v.<br><br>MICHAEL R. POMPEO, in his official capacity as Secretary of State, CHAD. F. WOLF, in his official capacity as Acting Secretary of Homeland Security,<br><br>            Defendants. | Civil Action No. 19-cv-3632 (TJK) |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**................................................................................................................1

**ARGUMENT** ...................................................................................................................2

I.     PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS IN THIS CASE...........2

    A.     IDA has not established standing to sue on behalf of any identified member...........3

        1.     IDA has not identified any of its allegedly injured members. ......................3

        2.     Plaintiffs' allegations fail to demonstrate that any foreign member of IDA would have individual standing to challenge the social media policy. ...................................................................................................5

        3.     Plaintiffs' allegations fail to demonstrate that any U.S. member of IDA would have individual standing to challenge the social media policy........................................................................................................9

    B.     Neither Plaintiff has established standing to sue in its organizational capacity. ...............................................................................................10

    C.     Third-party standing is not an independent basis upon which Plaintiffs can establish standing. ...............................................................................13

II.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER EITHER THE APA OR FIRST AMENDMENT.....................................................................................13

    A.     Plaintiffs are precluded from bringing their APA claims. .......................................14

        1.     Plaintiffs' asserted organizational interests fall outside the zone of interests protected or regulated by the INA. .................................................14

        2.     The Secretary's decisions about what additional information is "necessary" in a visa application is committed to agency discretion..........15

    B.     Plaintiffs' APA claims fail as a matter of law.........................................................18

        1.     The Secretary has authority under § 1202(a) and (c) to issue the social media policy....................................................................................18

        2.     The Supporting Statements demonstrate that the social media policy was the product of sound decision-making.......................................21

    C.     Plaintiffs' First Amendment claim is subject to a deferential standard of review and fail as a matter of law under that standard.............................................23

**CONCLUSION**..................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Am. Library Ass'n v. Barr,*
   956 F.2d 1178 (D.C. Cir. 1992) ........................................................................................8

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Enm't, Inc.,*
   659 F.3d 13 (D.C. Cir. 2011) .........................................................................................10

*American Anti-Vivisection Society v. USDA,*
   946 F.3d 615 (D.C. Cir. 2020) .......................................................................................11

*Arora v. Buckhead Family Dentistry, Inc.,*
   263 F. Supp. 3d 121 (D.D.C. 2017) ...............................................................................25

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .......................................................................................................18

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius,*
   901 F. Supp. 2d 19 (D.D.C. 2012) ...................................................................................4

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
   681 F.3d 427 (D.C. Cir. 2012) .......................................................................................19

*Balt. Gas & Elec. Co. v. NRDC,*
   462 U.S. 87 (1983) .........................................................................................................22

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .......................................................................................................25

*Bender v. Williamsport Area Sch. Dist.,*
   475 U.S. 534 (1986) .........................................................................................................2

*Bridges v. Wixon,*
   326 U.S. 135 (1945) .........................................................................................................7

*Broaderick v. Oklahoma,*
   413 U.S. 601 (1973) .........................................................................................................2

*Californians for Renewable Energy v. U.S. Dep't of Energy,*
   860 F. Supp. 2d 44 (D.D.C. 2012) ...................................................................................4

*Cellular Telecomms. & Internet Ass'n v. FCC,*
   330 F.3d 502 (D.C. Cir. 2003) .......................................................................................20

*Chamber of Commerce of U.S. v. EPA*,
  642 F.3d 192 (D.C. Cir. 2011) .............................................................................................3

*Chamber of Commerce of U.S. v. FEC*,
  69 F.3d 600 (D.C. Cir. 1995) ...............................................................................................2

*Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc*,
  467 U.S. 837 (1984).............................................................................................................19

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)...........................................................................................................3, 9

*Coal. for Mercury-Free Drugs v. Sebelius*,
  725 F. Supp. 2d 1 (D.D.C. 2010), *aff'd*, 671 F.3d 1275 (D.C. Cir. 2012) .....................3

*Ctr. for Biological Diversity v. Trump*,
  --- F. Supp. 3d ---, 2020 WL 164657 (D.D.C., Apr. 2, 2020).....................................17

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
  883 F.3d 895 (D.C. Cir. 2018), as amended on denial of reh'g (Mar. 6, 2018*), cert. dismissed
  sub nom. Detroit Int'l Bridge Co. v. Dep't of State*, 139 S. Ct. 378 (2018)................17

*Dist. No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Mar. Admin.*,
  215 F.3d 37 (D.C. Cir. 2000) ............................................................................................17

*DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*,
  887 F.2d 275 (D.C. Cir. 1989) ....................................................................................5, 6, 8

*Equal Rights Ctr. v. Post Properties, Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) ........................................................................................12

*Faculty, Alumni, and Students Opposed to Racial Preferences v. Harvard Law Review*,
  No. 18-cv-12105, 2019 WL 3754023 (D. Mass. Aug. 8, 2019) ....................................4

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
  28 F.3d 1268 (D.C. Cir. 1994) ..........................................................................................12

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..............................................................................................................21

*Fiallo v. Bell*,
  430 U.S. 787 (1977)..............................................................................................................16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)...........................................................................................................3, 5

*GTE Serv. Corp. v. FCC*,
   205 F.3d 416 (D.C. Cir. 2000) ...................................................................................19

*Haitian Refugee Center v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ...................................................................................14

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ...................................................................................................24

*Heckler v. Chaney*,
   470 U.S. 830 (1985) ...................................................................................................16

*Hotel & Rest. Emps. Union, Local No. 25 v. Smith*,
   846 F.2d 1499 (D.C. Cir. 1988) ...................................................................................4

*Ibrahim v. Department of Homeland Security*,
   669 F.3d 983 (9th Cir. 2012)...............................................................................6, 7, 9

*Int'l Acad. of Oral Med. & Toxicology v. FDA*,
   195 F. Supp. 3d 243 (D.D.C. 2016) ........................................................................3, 4

*Johnson v. Comm'n on Presidential Debates*,
   869 F.3d 976 (D.C. Cir. 2017) ...................................................................................13

*Kerry v. Din*,
   576 U.S. 86, 135 S. Ct. 2128 (2015) ..........................................................................24

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ............................................................................................ *passim*

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004).................................................................................................2, 13

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010)....................................................................................12

*Laird v. Tatum*,
   408 U.S. 1 (1972) .........................................................................................................9

*Landon v. Plasencia*,
   459 U.S. 21 (1982) ....................................................................................................7, 9

*Legal Assistance for Vietnamese Asylum Seekers v. Department of State, Bureau of Consular Affairs*,
   104 F.3d 1349 (D.C. Cir. 1997) ......................................................................15, 16, 17

*Lepelletier v. FDIC*,
  164 F.3d 37 (D.C. Cir. 1999) ................................................................................................13

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..............................................................................................................2

*Marsh v. Ore. Nat. Res. Council*,
  490 U.S. 360 (1989) ............................................................................................................22

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ........................................................................................................18, 23

*Mohon v. Agentra, LLC*,
  400 F. Supp. 3d 1189 (D.N.M. 2019) ..................................................................................19

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) ..............................................................................................................22

*Nat'l Cable & Telecomm. Ass'n. v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ............................................................................................................19

*Nat'l Fair Hous. All. v. Carson*,
  330 F. Supp. 3d 14 (D.D.C. 2018) ......................................................................................12

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ............................................................................................12

*Nat'l Treas. Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ..............................................................................10, 11, 12

*NFFE v. United States*,
  905 F.2d 400 (D.C. Cir. 1990) ............................................................................................17

*People for the Ethical Treatment of Animals v. USDA*,
  797 F.3d 1087 (D.C. Cir. 2015) ..........................................................................................11

*Pub. Citizen, Inc. v. Trump*,
  297 F. Supp. 3d 6 (D.D.C. 2018) ..........................................................................................3

*Renne v. Geary*,
  501 U.S. 312 (1991) ..............................................................................................................2

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997) ............................................................................................................19

*Saavedra Bruno v. Albright*,
  197 F.3d 1153 (D.C. Cir. 1999) ..........................................................................................18

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ...............................................................................................10

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .................................................................................................2

*Tex. Low Income Hous. Info. Serv. v. Carson*,
  427 F. Supp. 3d 43 (D.D.C. 2019) .............................................................10, 11, 12

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) .................................................................................. *passim*

*United Presbyterian Church in the U.S.A. v. Reagan*,
  738 F.2d 1375 (D.C. Cir. 1984) ...........................................................................3, 8, 9

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ...............................................................................................6, 9

*United States ex rel. Turner v. Williams*,
  194 U.S. 279 (1904) .................................................................................................5

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) .................................................................................................6

*W. Wood Preservers Inst. v. McHugh*,
  292 F.R.D. 145 (D.D.C. 2013) .................................................................................4

**Statutes**

5 U.S.C. § 701 ...............................................................................................15, 17

5 U.S.C. § 706 ...............................................................................................19, 20

8 U.S.C. § 1202 .............................................................................................. *passim*

8 U.S.C. § 1101 ...............................................................................................14

8 U.S.C. § 1184 ...............................................................................................14

47 U.S.C. § 251 ...............................................................................................19

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ................................................................2

Federal Rule of Civil Procedure 12(b)(6) .........................................................13, 18

**<u>Regulations</u>**

Exec. Order 13,780, 82 Fed. Reg. 13, 209 (March 6, 2017) ............................................................24

82 Fed. Reg. 16,279 (March 6, 2017) ............................................................................................21

**<u>Other Authorities</u>**

Charles Alan Wright et al., 33 Federal Practice & Procedure (2d ed. 2018) ...................................13

**INTRODUCTION**

Plaintiffs challenge a policy promulgated by the Secretary of State pursuant to 8 U.S.C. § 1202(a) and (c) that requires aliens applying for U.S. visas to disclose social media identifiers used during the preceding five years ("the social media policy").  As Defendants explained in their Motion to Dismiss, Plaintiffs' challenge suffers from two fatal flaws.  First, the two Plaintiffs, Doc Society and the International Documentary Association ("IDA"), lack Article III standing to bring this lawsuit on behalf of allegedly injured members or in their capacity as organizations.  Second, Plaintiffs have failed to state a viable cause of action that allows them to challenge the social media policy.  Plaintiffs' claims under the Administrative Procedure Act ("APA") are not subject to judicial review and, in any event, fail as a matter of law.  Similarly, Plaintiffs' First Amendment claim against the Secretary and the Department of Homeland Security ("DHS") fails as a matter of law under the highly deferential standard of review applicable to that claim, which was most recently reaffirmed by the Supreme Court in *Trump v. Hawaii*. 138 S. Ct. 2392, 2420 (2018).  This case should accordingly be dismissed.

Plaintiffs' brief in opposition to Defendants' motion does nothing to alter this conclusion. Plaintiffs claim that IDA has standing to sue on behalf of its members, but they fail to specifically identify any IDA member, much less demonstrate that any IDA member would have individual standing to bring this case.  Equally unavailing are Plaintiffs' efforts to establish organizational standing.  Plaintiffs fail to show that the social media policy directly conflicts with their missions, impairs their day-to-day operations, or requires them to divert resources from their core activities. And Plaintiffs' claim that the doctrine of third-party standing independently permits them to bring this lawsuit is misguided and should be rejected.

Plaintiffs' Opposition fares no better on the merits of their claims.  Review under the APA is not available because Plaintiffs fall outside the statutorily protected zone of interests and because

there are no judicially manageable standards to apply when reviewing the Secretary's exercise of his discretion under 8 U.S.C. § 1202(a) and (c).  Nor have Plaintiffs plausibly alleged that the social media policy exceeds the Secretary's statutory authority or that the policy was arbitrary and capricious.  Plaintiffs' First Amendment challenge to the policy likewise fails because the policy passes constitutional muster under the applicable deferential standard of review.

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS IN THIS CASE.

This Court must "presume that [it] lack[s] jurisdiction 'unless the contrary appears affirmatively from the record.'"  *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 (1986)).  Plaintiffs have not carried their burden of pleading allegations that show they have Article III standing, and thus their claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

Plaintiffs' Opposition fails to sustain any other conclusion.  To start, there is no merit to Plaintiffs' suggestion that their burden to establish Article III standing is "lower" because they allege that Defendants' conduct chills speech and association, *see* Pls.' Mem. of Law in Opp'n to Mot. to Dismiss ("Pls.' Opp."), ECF No. 32, at 8, and neither of the cases Plaintiffs cite for this proposition offers any support in this regard.  In the first case, the plaintiffs satisfied the usual test for Article III standing by showing a sufficient likelihood that the challenged regulation would be enforced against them, *see Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600, 603-04 (D.C. Cir. 1995); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-161 (2014) (explaining what Article III requires in such cases), while the second case is inapposite because it involved the relaxation of a non-Article III doctrine, *see Broaderick v. Oklahoma*, 413 U.S. 601, 609-13 (1973); *see also Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004).  Allegations of a chilling effect do not alter "the irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

(1992), particularly in the area of foreign affairs, *see, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408-09 (2013); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378-80 (D.C. Cir. 1984) (Scalia, J.).

### A.   IDA has not established standing to sue on behalf of any identified member.

The Complaint asserts that both Doc Society and IDA are suing "on behalf of . . . [their] members, partners, and audiences." Compl., ECF No. 1, ¶ 39. Plaintiffs now concede, however, that Doc Society lacks associational standing because it has no members. *Compare* Pls.' Opp. at 8-9, *with* Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Mot."), ECF No. 31-1, at 11. Plaintiffs also concede that IDA cannot establish associational standing by alleging injuries to "partners" or "audiences." *Compare* Pls.' Opp. at 9-13, *with* Defs.' Mot. at 12-13. Plaintiffs' sole remaining theory of associational standing is that some of IDA's members "would . . . have standing to sue in their own right." Pls.' Opp. at 9 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). This theory fails for the reasons set forth below.

### 1.   IDA has not identified any of its allegedly injured members.

To establish associational standing, IDA must "identify at least one *specific* member who has suffered, or is likely to suffer, an injury in fact." *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 18 (D.D.C. 2018) (emphasis in original); *see, e.g.*, *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199-200 (D.C. Cir. 2011); *Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243, 264 (D.D.C. 2016). Plaintiffs claim that "[t]he Complaint specifically identifies" "numerous individual members [of IDA,]" Pls.' Opp. at 9 & n.4, but, in reality, the Complaint offers vague descriptions of eight unnamed IDA members and thus falls well short of actually identifying any of them, *see* Compl. ¶¶ 51, 55-56, 58.

This Court has repeatedly held that "an organization cannot base standing on injury to its unnamed members." *Coal. for Mercury-Free Drugs v. Sebelius*, 725 F. Supp. 2d 1, 13 (D.D.C.

3

2010), *aff'd*, 671 F.3d 1275 (D.C. Cir. 2012); *see id.* at 9-10 n.7; *Int'l Academy of Oral Med.*, 195 F. Supp. 3d at 264-65; *Californians for Renewable Energy v. U.S. Dep't of Energy*, 860 F. Supp. 2d 44, 48 (D.D.C. 2012).  Yet Plaintiffs seek to bypass this requirement, citing a decades-old opinion that "carr[ied] no weight and determine[d] no law of the circuit," *Hotel & Rest. Emps. Union, Local No. 25 v. Smith*, 846 F.2d 1499, 1500 (D.C. Cir. 1988) (en banc) (opinion of Mikva, J.).  *See* Pls.' Opp. at 9 n.4 (citing *Smith*, 846 F.2d at 1500, 1506).[1]  Plaintiffs also assert that naming IDA's foreign members would "require them to give up the very anonymity or obscurity that they seek to protect."  *Id.*  But Defendants have drawn Plaintiffs' attention to this Court's procedures for protecting sensitive information, *see* Defs.' Mot. at 12 n.9, and Plaintiffs do not explain why they have not even tried to use them.  Moreover, Plaintiffs offer no justification for their failure to name, or even reference, a single U.S. member of IDA whom the social media policy allegedly injures.

In any event, Plaintiffs have not described any IDA member in sufficient detail to show that he or she could bring this suit in an individual capacity.  *Cf. Faculty, Alumni, and Students Opposed to Racial Preferences v. Harvard Law Review*, No. 18-cv-12105, 2019 WL 3754023, at *5-*8 (D. Mass. Aug. 8, 2019) (denying associational standing where the plaintiffs failed to supply enough descriptive information about their unnamed members to allow the Court to conclude that any of them would have individual standing).  The Complaint contains vague references to eight foreign members of IDA: four who allegedly "use pseudonymous social media identifiers," Pls.' Opp. at 10 (citing Compl. ¶ 51); two who are allegedly "[self-]censoring their online speech," *id.* at 11 (citing Compl. ¶¶ 55, 58); and two more who allegedly "have decided not to apply for U.S. visas," *id.* at 12

---

[1] One judge in this District has suggested, in dicta, that a plaintiff association "need not identify the affected members by name at the pleading stage."  *See Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012) (Jackson, J.).  *But see W. Wood Preservers Inst. v. McHugh*, 292 F.R.D. 145, 148 (D.D.C. 2013) (referencing D.D.C. cases that have held otherwise and noting that Judge Jackson's statement was dicta).

(citing Compl. ¶ 56).[2]  Plaintiffs do not specify where seven of these eight people reside, even though this fact may determine whether any of them would have individual standing to bring this suit.  *See, e.g.*, *DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 284 (D.C. Cir. 1989) ("[A]liens beyond the territorial jurisdiction of the United States are generally unable to claim the protections of the First Amendment.").  Plaintiffs allege that the remaining individual "currently resid[es] in the U.S. Midwest," Pls.' Opp. at 11, but they obscure other facts that may determine whether this person would have individual standing, such as his or her nationality, immigration status, and whether he or she plans to leave the United States and apply for a visa.[3]  Without more information about these eight unnamed aliens, the Court cannot conclude that any of them "would . . . have standing to sue in their own right," *Laidlaw*, 528 U.S. at 181.

> 2. Plaintiffs' allegations fail to demonstrate that any foreign member of IDA would have individual standing to challenge the social media policy.

In addition to their failure to identify individual IDA members, Plaintiffs' allegations of injury to foreign members of IDA rest on the incorrect premise that an alien located outside of United States may assert First Amendment rights in connection with his or her visa application.  The Supreme Court has held that aliens in this position—who are outside of the country and seeking entry—cannot assert First Amendment rights.  *See Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) (holding that an unadmitted alien could not challenge his exclusion on First Amendment grounds); *id.* at 771 (Douglas, J., dissenting) ("[A]n alien who seeks admission[] has no First Amendment rights while outside the Nation."); *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904)

---

[2] The Complaint references two additional foreign members of IDA who allegedly "use social media," but does not allege that they have been injured by the social media policy.  *See* Compl. ¶ 50.

[3] Although Plaintiffs acknowledge that permanent residents do not need visas, *see* Pls.' Opp. at 2 n.1, they make no attempt to square this fact with their vague allegation that an unnamed individual "currently residing in the U.S. Midwest" expects to submit "future visa applications," *id.* at 11.

(similar); *see also United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).  Similarly, the D.C. Circuit has held that "aliens beyond the borders of the United States" who are "not within the custody or control of the United States" enjoy "no First Amendment protection," and are therefore "without standing to assert [First Amendment] claims."  *DKT Mem'l Fund*, 887 F.2d at 284-85.

Largely ignoring these cases, Plaintiffs assert that some foreign members of IDA residing abroad "enjoy full First Amendment protection" because they have "substantial connections to the United States."  Pls.' Opp. at 10; *see id.* at 1, 4, 33-34; Compl. ¶¶ 1, 33, 43.  Plaintiffs cite only two cases in support of this assertion, *see* Pls.' Opp. at 33, neither of which governs the standing analysis here.  The first case, *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), concerned a Mexican national who *was* physically present in the United States.  The Supreme Court held that he could not claim a violation of the Fourth Amendment with respect to U.S. agents' search of his residence in Mexico because he had not "developed substantial connections with this country."  *Id.* at 262, 271-72.  Far from supporting Plaintiffs' position, *Verdugo-Urquidez* indicates that the Fourth Amendment protects only "the people of the United States" and does not "restrain the actions of the Federal Government against aliens outside of the United States territory."  *Id.* at 266; *see also id.* at 265 (suggesting that the same is true of the First Amendment).

Plaintiffs also cite an out-of-circuit case, *Ibrahim v. Department of Homeland Security*, 669 F.3d 983 (9th Cir. 2012), which involved a foreign national who had spent four years at Stanford University pursuing a Ph.D; left the United States to attend a Stanford-sponsored conference in Malaysia, "intend[ing] her stay abroad to be brief"; and was prevented from returning to this country.  *Id.* at 997.  Over a dissent, the Ninth Circuit held that the student's connections to the United States enabled her to invoke the First Amendment in contending that her name had been placed on the No-Fly List by mistake.  *Id.*  The court's analysis of her right to bring constitutional

6

claims began with "the uncontested proposition that if Ibrahim had remained in the United States, she would have been able to assert claims under the First and Fifth Amendments to challenge her placement on the government's terrorist watchlists," *id.* at 994, and concluded by finding that she did not lose her ability to assert them by traveling overseas, *id.* at 996-97.  The court also made clear, however, that the student could not "challenge the revocation of her visa," *id.* at 993, in light of Congress' authority "to prescribe terms and conditions for entry and re-entry of aliens," *id.* at 997.  Thus, even assuming the court's analysis was correct, *Ibrahim* does not support Plaintiffs' broad assertion that an alien located overseas enjoys First Amendment rights if he or she has "substantial connections" to the United States, *see* Pls.' Opp. at 1, 10, 33-34, much less that such an alien may assert First Amendment rights in connection with a U.S. visa application.  And to the extent that *Ibrahim* is inconsistent with *Turner*, *Mandel*, and *DKT Memorial Fund*, this Court is bound by the latter trio of cases.

IDA likewise cannot establish a First Amendment injury to its "foreign members . . . currently residing in the United States."  Pls.' Opp. at 10; *see id.* at 1, 33-34; Compl. ¶¶ 1, 33, 43, 55.  "Once an alien gains admission to our country and begins to develop the ties that go with permanent residence," he or she is entitled to First Amendment rights.  *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *see generally Bridges v. Wixon*, 326 U.S. 135 (1945).  The social media policy does not apply to legal permanent residents, however, because they do not require visas.  *See* Supporting Statement for Paperwork Reduction Act Submission, Application for Immigrant Visa ("IVSS") at 1, ECF No. 31-8; Supporting Statement for Paperwork Reduction Act Submission, Application for Nonimmigrant Visa ("NIVSS") at 1, ECF No. 31-9; *accord* Pls.' Opp. at 2 n.1.  And there is no merit to Plaintiffs' suggestion that the social media policy is being applied to aliens who are temporarily present in the United States.  *See* Pls.' Opp. at 10-11, 13 n.7.  Such aliens may someday be subject to the social media policy, but only if they leave the United States and

subsequently apply for a new visa—at which point they are "aliens beyond the borders of the United States" who enjoy "no First Amendment protection," *DKT Mem'l Fund*, 887 F.2d at 285.

Plaintiffs suggest that an alien who is temporarily admitted to the United States retains First Amendment rights after his or her departure and can assert those rights with respect to future visa applications. *See* Pls.' Opp. at 10, 33-34. But Plaintiffs do not cite a single case recognizing this principle, and it cannot be squared with *Mandel*, *Turner*, *DKT Memorial Fund*, or even *Ibrahim*. *Mandel* is particularly instructive. The plaintiff in that case had been "admitted to the United States temporarily in 1962 and again in 1968," first "as a working journalist" and subsequently "to speak at a number of universities and colleges." 408 U.S. at 756. Despite these prior visits, the Supreme Court held that he could not assert First Amendment rights when he applied for a new visa in 1969. *Id.* at 756, 762; *accord id.* at 771 (Douglas, J., dissenting).

Even if IDA's foreign members had First Amendment rights to assert, the D.C. Circuit has made clear that Plaintiffs cannot establish standing by alleging that a regulation is chilling their speech. *See, e.g.*, *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1193-94 (D.C. Cir. 1992); *United Presbyterian Church*, 738 F.2d at 1378-80. Plaintiffs mischaracterize the facts of the former case and ignore the holding of the latter. *See* Pls.' Opp. at 12-13 (attempting to distinguish these cases on the ground that they involved "plaintiffs [who] challenged government surveillance programs based merely on the speculation—not the certainty—that they themselves would be subject to surveillance"). In *American Library Association*, booksellers alleged that because of anti-obscenity regulations, they would "be chilled from producing or distributing sexually frank constitutionally protected speech." *See* 956 F.2d at 1192-94; *cf.* Compl. ¶¶ 54-63 (alleging that because of the social media policy, foreign nationals will be chilled from speaking freely on social media). And in *United Presbyterian Church*, then-Judge Scalia explained that a "chilling effect" is simply not an Article III injury; rather, the chilling-effects doctrine allows a plaintiff who has "suffered some concrete

harm (past or immediately threatened) apart from the 'chill' itself" to argue that a law restricting speech is overly broad.  738 F.2d at 1378-79 & n.1; *see also Clapper*, 568 U.S. at 417-18 ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.") (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)).

Similarly, IDA's foreign members cannot establish standing to challenge the social media policy by declining to apply for U.S. visas in the first place, *see* Pls.' Opp. at 12.  An alien who seeks to enter this country "may not do so under any claim of right."  *Knauff*, 338 U.S. at 542. Rather, entry is a "privilege granted by the sovereign United States Government . . . . only upon such terms as the United States shall prescribe."  *Id.*  It follows that an alien who applies for a U.S. visa cannot challenge the terms and conditions under which the Government denies his or her visa application, and, conversely, that an alien who chooses *not* to apply for a U.S. visa cannot challenge the terms and conditions under which he or she *could have* applied.  *See, e.g.*, *Landon*, 459 U.S. at 32; *Mandel*, 408 U.S. at 762; *Knauff*, 338 U.S. at 542; *Ibrahim*, 669 F.3d at 993.  Moreover, any opportunity that such aliens forego by failing to apply for U.S. visas is a self-inflicted injury; the harm stems from a voluntary choice not to submit a U.S. visa application, motivated by speculative fears about potential consequences of disclosing social media identifiers.  *See Clapper*, 568 U.S. at 415-18; *cf.* Compl. ¶ 56 (asserting that two unidentified IDA members have decided not to apply for U.S. visas based on unspecified fears about the social media policy).

3.   Plaintiffs' allegations fail to demonstrate that any U.S. member of IDA would have individual standing to challenge the social media policy.

While IDA's U.S. members of course have First Amendment rights, they are not subject to the social media policy, and Plaintiffs have not plausibly alleged that any of them would have standing to challenge it.  *See* Pls.' Opp. at 13.  As the Supreme Court recently explained, "United

States citizens [may sue] regarding violations of their personal rights allegedly caused by the Government's *exclusion of particular foreign nationals*." *Trump v. Hawaii*, 138 S. Ct. at 2416 (emphasis added) (citing *Mandel*, 408 U.S. at 762). Here, Plaintiffs have not alleged the exclusion of any particular foreign national—much less a foreign national who otherwise would have engaged with an identified U.S. member of IDA. *See* Pls.' Opp. at 13; *cf. Mandel*, 408 U.S. at 762 (involving the exclusion of a particular Communist scholar who otherwise would have spoken at the plaintiffs' U.S. events). Nor have Plaintiffs alleged that any foreign national has been, or will be, excluded pursuant to the social media policy—which, unlike the regulations at issue in *Hawaii* and *Mandel*, is not even a ground for exclusion. Plaintiffs cannot conjure up an Article III injury by speculating that the policy will someday "deter[]" (not prevent) an unidentified foreign national from attending an unspecified IDA event, thereby depriving unidentified U.S. citizens of an opportunity to hear from him or her in person. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499-500 (2009) (explaining that speculation about a possible future injury does not satisfy Article III).

      **B.**      **Neither Plaintiff has established standing to sue in its organizational capacity.**

In addition, Plaintiffs have not demonstrated an organizational injury that is fairly traceable to the social media policy. A plaintiff seeking to establish organizational standing "must show a 'direct conflict between the defendant's conduct and the organization's *mission*." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Enm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Nat'l Treas. Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("*NTEU*")); *see, e.g.*, *Tex. Low Income Hous. Info. Serv. v. Carson*, 427 F. Supp. 3d 43, 53 (D.D.C. 2019) (Kelly, J.). Yet Plaintiffs have not even argued that there is a "direct conflict" between the social media policy and Plaintiffs' documentary-filmmaking missions. *Cf.* Pls.' Opp. at 6, 15-16 (arguing that the social media policy indirectly affects Plaintiffs' ability to carry out their missions); *id.* at 21 (asserting that the policy "impacts Plaintiffs' organizational missions").

Nor have Plaintiffs plausibly alleged that the social media policy "is already impairing, and will continue to impair," their daily activities. Pls.' Opp. at 18. Nebulous allegations that "some" of Plaintiffs' "members and partners" are self-censoring their online speech or declining to apply for U.S. visas do not support the inference that the social media policy is "impair[ing] [Plaintiffs'] daily operations." *See* Pls.' Opp. at 16. At most, Plaintiffs' allegations suggest that the social media policy "makes it [slightly] more difficult for [IDA and Doc Society] to accomplish [their] mission[s]." *See Tex. Low Income Housing*, 427 F. Supp. 3d at 54. This is "plainly insufficient" to establish organizational injury. *Id.* ("[S]tanding must be based on more than an allegation that an agency's actions, or lack thereof, have put more distance between an organization and the ends it seeks."); *see NTEU*, 101 F.3d at 1430 (holding that it is not enough to "allege[] that a defendant's conduct has made the organization's activities more difficult") (emphasis omitted)).

Plaintiffs' reliance on *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015) (*PETA*), and *American Anti-Vivisection Society v. USDA*, 946 F.3d 615 (D.C. Cir. 2020) (*AAVS*), is misplaced. In each of those cases, an organization sought to compel a federal agency to provide certain information that the organization relied on to fulfill its mission. *See AAVS*, 946 F.3d at 619 (holding that the agency's alleged inaction had "depriv[ed]" the plaintiff organization of certain "key information"); *PETA*, 797 F.3d at 1094-95 (same). Here, the social media policy does not "depriv[e]" Plaintiffs of any information, Pls.' Opp. at 17; rather, it is one of many factors that third-party speakers may consider when deciding what to say on social media. Nor have Plaintiffs identified any "key information that [they] rel[y] on to fulfill [their] mission[s]" and can no longer obtain because of the challenged policy. *Id.* Instead, they make only general allegations that certain unidentified aliens are "less willing" to engage with them, *id.* at 11, or have chosen to "curtail their online speech," *id.* at 16, because of concerns about the policy.

Furthermore, Plaintiffs have not plausibly alleged that they "diver[ted] [their] resources . . . to counteract" the challenged conduct. *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011); *see Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 42 (D.D.C. 2018). Plaintiffs assert that, in response to the social media policy, they have "divert[ed] time, staff resources, and funding" to various forms of engagement with their members and partners.  Pls.' Opp. at 18 (quoting Compl. ¶ 75).  But these were the organizations' core activities before the social media policy went into effect, and Plaintiffs fail to identify any other activities from which they have "diverted" resources.  *See id.*

Finally, Plaintiffs run afoul of D.C. Circuit cases holding that an organization cannot establish standing by spending resources in response to a regulation unless it was "forced . . . to expend [those] resources."  *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1430-34 (D.C. Cir. 1995); *see Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); *see also La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).  Plaintiffs assert that they must expend additional resources or else the social media policy will cause their U.S.-based events to "suffer a . . . loss of participation, interest, and ultimately, funding," *id.* at 18, and that "they anticipate that their online engagement with non-U.S. members and partners will decrease" no matter how much they spend, Compl. ¶ 75, but these allegations are pure speculation.

In sum, Plaintiffs are not themselves subject to the social media policy and have not plausibly alleged that the policy's effect on third parties will impair their daily operations, as opposed to potentially making some of their activities less efficient.  *See NTEU*, 101 F.3d at 1430; *Tex. Low Income Housing*, 427 F. Supp. 3d at 54.  Nor have they plausibly alleged that the policy has forced them to divert resources away from their core activities.  *See National Taxpayers Union*, 68 F.3d at 1434.  For these reasons, they lack organizational standing.

C.      **Third-party standing is not an independent basis upon which Plaintiffs can establish standing.**

In a final effort to establish standing, Plaintiffs erroneously claim that the doctrine of third-party standing provides an "independent ground[]" upon which they may bring this lawsuit.  Pls.' Opp. at 8; *see id.* at 18-20.  The doctrine of third-party standing is not a basis for Article III standing; instead, it serves as an additional prudential barrier that a party seeking to assert the rights of others must satisfy.  *See, e.g.*, *Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999) (explaining that a plaintiff seeking to assert the rights of others "must show that he has standing under Article III, *and* that he satisfies third party, or *jus tertii*, standing requirements"); Charles Alan Wright et al., 33 Federal Practice & Procedure § 8343 (2d ed. 2018).  Because Plaintiffs lack Article III standing, *see supra* Parts I.A, I.B, there is no reason for this Court to consider this additional, prudential limitation on standing.[4]  *See Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 984 (D.C. Cir. 2017) (Pillard, J., concurring) (arguing that a court cannot consider prudential limitations on standing without first establishing that Article III standing exists).

II.     **PLAINTIFFS FAIL TO STATE A CLAIM UNDER EITHER THE APA OR FIRST AMENDMENT.**

Even if Plaintiffs had Article III standing to sustain this lawsuit, their claims should still be dismissed pursuant to Federal Rule of Procedure 12(b)(6) for failure to state a claim.  Plaintiffs' Opposition fails to demonstrate that Plaintiffs' organizational interests fall within the zone of interests protected or regulated by the Immigration and Nationality Act.  Nor does it show that

---

[4] While the Supreme Court's application of the third-party standing doctrine in the First Amendment context "ha[s] been quite forgiving," *also Kowalski*, 543 U.S. at 130, Plaintiffs cannot assert First Amendment rights on behalf of nonresident aliens who have no such rights to begin with, *see supra* Part I.A.2.

judicial review of the social media policy is available under the APA.  And on the merits, Plaintiffs'

APA and First Amendment claims fail as a matter of law.

A.       **Plaintiffs are precluded from bringing their APA claims.**

As discussed in Defendants' Motion to Dismiss, Plaintiffs cannot bring their APA claims

because (1) they fall outside the statutory zone of interests and (2) the Secretary's determinations

about what additional information is "necessary" is committed to his discretion by law.

1.       Plaintiffs' asserted organizational interests fall outside the zone of interests protected or regulated by the INA.

Defendants' Motion established that the zone-of-interests test bars Plaintiffs' APA claims.

*See* Defs.' Mot. at 29-33.  In their Opposition, Plaintiffs apparently concede that 8 U.S.C. § 1202—

the statutory basis for the social media policy—does not protect or regulate their interest in

collaborating with foreign documentary filmmakers online and in person.  *Compare* Defs.' Mot. at

33 (raising this argument), *with* Pls.' Opp. at 20-22 (failing to respond).  Instead, Plaintiffs assert

that they satisfy the zone-of-interests test because two other provisions of the INA "permit[] foreign

nationals pursuing professional interests in film, media, and the arts to apply for, and obtain, visas."

Pls.' Opp. at 21 (citing 8 U.S.C. §§ 1101(a)(15)(B), 1184(c)(3)).  This argument should be rejected.

To begin, Plaintiffs mischaracterize these two statutory provisions.  Section 1101(a)(15)(B)

*excludes* "representative[s] of foreign press, radio, film, or other foreign information media coming

to engage in such [a] vocation" from the "B" visa category.  And Section 1184(c)(3) imposes a

special limitation on the circumstances under which the Secretary of Homeland Security may

approve an employer's petition to import an "alien[] seeking entry for a motion picture or television

production."  Neither provision evinces a congressional intent to protect or regulate Plaintiffs'

generalized interest in associating with foreign filmmakers.  *See Haitian Refugee Center v. Gracey*,

809 F.2d 794, 813, 815 (D.C. Cir. 1987).

Plaintiffs also claim that they satisfy the zone-of-interests test because "IDA members are directly subject to the [social media policy]." Pls.' Opp. at 21. But Defendants have not disputed that IDA would pass the zone-of-interests test if it had *associational* standing to sue on behalf of aliens whom the INA directly regulates. Rather, Defendants' position is that Plaintiffs' *organizational* interests fall outside of the statutory zone of interests. *See* Defs.' Mot. at 32-33. And even if Plaintiffs had suffered an organizational injury, they would not be able to satisfy the zone-of-interests test by purporting to assert the First Amendment interests of nonresident aliens who do not even possess First Amendment rights. *See supra* Part I.A.2.

2. The Secretary's decisions about what additional information is "necessary" in a visa application are committed to agency discretion.

Also without merit are Plaintiffs' efforts to escape the conclusion that judicial review is not available for their APA claims because decisions about what additional information to collect in visa applications is committed to the Secretary's discretion. *See* 5 U.S.C. § 701(a)(2). First, Plaintiffs try to distinguish the D.C. Circuit's finding of non-reviewability in *Legal Assistance for Vietnamese Asylum Seekers v. Department of State, Bureau of Consular Affairs* ("*LAVAS*"), which concerned a consular-venue provision promulgated by the Secretary. *See* 104 F.3d 1349, 1350 (D.C. Cir. 1997). Plaintiffs make much of the fact that, during the pendency of that case, Congress enacted a separate section of the Immigrant and Nationality Act ("INA") stating that nothing in that section of the INA was intended to infringe on the Secretary's authority to determine where visa applications will be processed. *Id*. at 1351. But this newly-enacted provision was not, as Plaintiffs suggest, the end of the court's inquiry. Rather, the court went on to examine both the text of the statutory provision at issue and the nature of the administrative action, concluding that, in light of the "lack of guidance provided by the statute and the complicated factors involved in consular venue

determinations," the court had no law to apply in reviewing the Secretary's determinations.  *Id*. at 1353.

That same analysis compels the conclusion that judicial review of the social media policy is unavailable.  The near-identical language in § 1202(a) and (c) sets forth certain information that must be provided by an applicant and empowers the Secretary to request whatever additional information he deems "necessary."  This "broad language" suggests that determinations about what information to collect in addition to that specified by Congress is left to the Secretary's discretion.  *See LAVAS*, 104 F.3d at 1353.  And similar to the consular-venue policy at issue in *LAVAS*, information for visa application purposes concerns "a complicated balancing of a number of factors which are peculiarly within the agency's expertise."  *See id*. (quoting *Heckler v. Chaney*, 470 U.S. 830, 831 (1985).  Indeed, the *LAVAS* court specifically took note of the "long-standing tradition" of courts not "second-guessing executive branch decisions involving complicated foreign policy matters," *id*., and given that Plaintiffs here are challenging the Secretary's exercise of authority under the same statutory provision, the social media policy is deserving of equal deference.  *See also Hawaii*, 138 S. Ct. at 2418 ("For more than a century, [the Supreme] Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" (quoting *Fiallo v. Bell,* 430 U.S. 787, 792 (1977))).

Second, Plaintiffs focus on the fact that the relevant statutory language authorizes the Secretary to require additional information "necessary" to identifying the applicant and enforcing immigration and nationality laws.[5]  *See* Pls.' Opp. at 24.  According to Plaintiffs, the word

---

[5] As Defendants noted in their Motion, §§ 1202(a) and (c) use slightly different language, *see* Defs.' Mot. at 30 n.12, but that distinction is not material here, given that both provisions include the word "necessary."

"necessary" tethers the Secretary's authority to the subsequent language (identifying applicants and enforcing immigration and nationality laws), thereby providing a meaningful standard by which the Secretary's decisions can be judged. *Id.* But this point is not conclusive of the § 701(a)(2) analysis; among other defects, it omits any examination of the "nature of the agency action at issue" under *LAVAS*. In any event, even if there are "standards to apply" under § 1202, the Secretary's decision may still be committed to agency discretion by law if those standards are not "judicially manageable." *See Ctr. for Biological Diversity v. Trump*, --- F. Supp. 3d ---, 2020 WL 164657, at *16 (D.D.C., Apr. 2, 2020) (citing *LAVAS*, 104 F.3d at 1353). The court in *Center for Biological Diversity*, for example, held to be unreviewable the Secretary of Defense's decision to devote certain funds to the construction of a border wall, despite the fact that the court could "objectively" review the Secretary's exercise of his statutory authority. *Id.* (describing the Secretary's decision as one that "crosses the line into military policy," which courts are reluctant to second-guess); *see also NFFE v. United States*, 905 F.2d 400, 405 (D.C. Cir. 1990) (declining to review decisions by the Defense Secretary about base closings and realignment despite the fact that the relevant statute contained "nine specific criteria to be considered in making base closing decisions").

The "complicated foreign policy matters" at issue in this case are no less weighty and deserving of deference. As courts have repeatedly observed, "generally judgments on questions of foreign policy and national interest . . . are not subjects fit for judicial involvement." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 903 (D.C. Cir.) (citation omitted), as amended on denial of reh'g (Mar. 6, 2018*), cert. dismissed sub nom. Detroit Int'l Bridge Co. v. Dep't of State*, 139 S. Ct. 378 (2018) (holding that the Secretary's issuance of a permit for building a bridge to Canada was committed to agency discretion by law); *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 41 (D.C. Cir. 2000) (holding that the Maritime Administration's conditional grant of applications to transfer registry of eight vessels from the

United States to the Republic of the Marshall Islands was not subject to APA review because the driving factors for the decision were "national defense, the adequacy of the merchant marine, foreign policy, and the national interest").  This point applies with particular force here, given that "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."  *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see also* S*aavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.  Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." (citation omitted)).

For all of these reasons, decisions pursuant to § 1202(a) and (c) about what additional information should be required of visa applicants beyond that specified by Congress are committed to the discretion of the Secretary.

**B.     Plaintiffs' APA claims fail as a matter of law.**

Even if Plaintiffs' challenge to the social media policy were reviewable under the APA, dismissal would still be warranted because the policy neither exceeds the Secretary's authority under §1202 nor is arbitrary or capricious.  Each issue is addressed in turn below.

1.     The Secretary has authority under § 1202(a) and (c) to issue the social media policy.

Plaintiffs' claim that the Secretary exceeded his statutory authority fails because the social media policy fits comfortably within the scope of that authority under § 1202.  Lacking any supporting justification for this claim,[6] *see* Defs.' Mot. at 38-39, Plaintiffs make clear that their

---

[6] Plaintiffs' failure to provide any supporting justification for their excess-of-statutory-authority claim in and of itself constitutes sufficient grounds for dismissal pursuant to Rule 12(b)(6).  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that "[a] pleading that offers labels and

objection is to *why* the Secretary exercised his discretion but do not question *whether* the Secretary has the discretion in the first place.

Claims brought under § 706(2)(A) challenging the exercise of statutory authority are reviewed using the familiar two-step *Chevron* framework. *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012). At the first step of that test, the court asks "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (explaining that, at *Chevron* step one, a court must "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute"). Plaintiffs do not contend that § 1202 speaks "to the precise question at issue" in this case, *i.e.*, whether the Secretary has authority to promulgate the social media policy; indeed, the cases relied upon by Plaintiffs indicate as much. *See GTE Serv. Corp. v. FCC*, 205 F.3d 416, 421 (D.C. Cir. 2000) (concluding that the word "necessary" as used in 47 U.S.C. § 251(c)(7) was "ambiguous in [its] meaning"). Accordingly, Plaintiffs have forfeited any argument at *Chevron* step one.

Instead, Plaintiffs devote their Opposition to *Chevron* step two, disputing the Secretary's construction of § 1202. *See* Pls.' Opp. at 26-27. At this step, courts defer to the agency's interpretation so long as the construction is "a reasonable policy choice for the agency to make." *Nat'l Cable & Telecomm. Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (citation omitted); *see also Mohon v. Agentra, LLC*, 400 F. Supp. 3d 1189, 1220 (D.N.M. 2019) ("[I]f the agency's decision makes it to step two, it is upheld almost without exception."). Plaintiffs focus on

---

conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement" are insufficient to sustain a cause of action (citation and internal brackets and quotation marks omitted)).

the word "necessary" in § 1202, asserting that the Secretary may exercise his discretion to collect additional information only where such collection is necessary to identifying visa applicants, determining the eligibility of an applicant, or enforcing immigration or nationality laws.  *See* Pls.' Opp. at 26.  But this discussion is beside the point.[7]  Defendants agree that § 1202 requires a determination that the additional information required is "necessary," which is why the Secretary made clear in the Supporting Statements that the social media policy is "necessary" and "essential for confirming [a visa] applicant's identity and determining whether an applicant is eligible for a [] visa."  IVSS at 2-3; NIVSS at 2-3; *see also* IVSS at 5, 10; NIVSS at 6, 10-11 (explaining how information from social media profiles is used for these purposes).  Nor can Plaintiffs plausibly claim that the information required by the social media policy is never "necessary" to the purposes listed in § 1202(a) and (c), given their acknowledgment that the Government may at least sometimes legitimately use social media information to investigate visa applicants.  *See* Compl. ¶ 10.

Rather, the driving force behind Plaintiffs' argument appears to be their disagreement with why the Secretary reached the determination that the social media policy is necessary.  *See* Pls.' Opp. at 26-27 (arguing that "the Secretary made no effort to justify" the policy, that "the Secretary cited no evidence" in support of the policy, and that the information "is likely to be of limited usefulness" (internal quotation marks omitted)).  This argument does not concern whether the Secretary had the statutory authority to make a determination that collecting certain information was necessary, but rather pertains to whether the Secretary's determination was sufficiently sound, *i.e.*, not arbitrary and capricious.  As discussed below, that claim fails.  Nor does the fact that Plaintiffs have pled a constitutional violation affect the construction of the Secretary's authority under § 1202.

---

[7] Plaintiffs' discussion of the word "necessary" is not dispositive of the § 706(2)(A) analysis.  As Plaintiffs recognize in a footnote, "necessary" does not always have the limited meaning Plaintiffs ascribe to it here.  *See Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 512 (D.C. Cir. 2003) (rejecting the argument that "necessary" means "absolutely required" or "indispensable").

If anything, the scope of review applicable to Plaintiffs' First Amendment claims demonstrate that the Secretary enjoys very broad discretion when promulgating policies that govern what information is required of visa applicants. *See* Defs.' Mot. at 39-42.

        2.   <u>The Supporting Statements demonstrate that the social media policy was the product of sound decision-making.</u>

Plaintiffs' Opposition also fails to rescue their claim that the social media policy is arbitrary and capricious. Plaintiffs repeat their assertion that the Secretary failed to provide an adequate rationale for the policy, *see* Pls.' Opp. at 29-30, but that contention is belied by the Supporting Statements issued in compliance with the Paperwork Reduction Act. The Secretary at multiple points in the Statements noted that the information is being collected to enable consular officers to confirm an applicant's identity and determine visa eligibility. *See* IVSS at 2, 3, 10, 13; NIVSS at 2, 3, 10-11, 13. Elaborating on this point, the Secretary explained how social media information is used by consular officials for these purposes, including to assess potential visa fraud and other grounds for ineligibility. *See* IVSS at 5, 10-11; NIVSS at 5-6, 10-11. Plaintiffs profess bewilderment about why information collected from visa applications would be retained after an eligibility determination is made, *see* Pls.' Mot. at 29, but the Supporting Statements make clear that the information is used not only for those purposes but also to enforce immigration and nationality laws, a responsibility that does not end once a visa has been granted, *see* IVSS at 2 (citing Pres. Mem., 82 Fed. Reg. 16,279 (March 6, 2017)); *id.* at 9 (citing 8 U.S.C. § 1202(f)); NIVSS at 1-2, 9 (same). In short, because "the agency's path may reasonably be discerned" from the Supporting Statements, Plaintiffs' claim must be dismissed. *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 513-14 (2009) (citation omitted).

Plaintiffs also miss the mark when they fault the Secretary for purportedly failing to engage with public comments received on the proposed information collection. *See* Pls.' Opp. at 30-32.

The vast majority of the Supporting Statements are devoted to summarizing comments received and the Secretary's responses to those comments. *See* IVSS at 3-19; NIVSS at 3-19. Plaintiffs focus on comments expressing concern that social media communications are challenging to interpret and are an ineffective way of identifying an individual or making a visa determination. *See* Pls.' Opp. at 30-31. With respect to the former, the Secretary addressed those concerns by noting that "consular officers evaluate all available information" and make "determination[s] based on the totality of the circumstances," with an awareness that "the context and circumstances of the applicant, culture, country conditions, the nature of the account, and other postings will inform the interpretation of any social media post." IVSS at 10-11; NIVSS at 10-11. With respect to the latter, the Secretary addressed those concerns by noting a consular officer's obligation to "evaluate all available information" and describing how social media information is used in adjudications, including during review of "evidence of activity, ties, or intent that are grounds for visa denial." IVSS at 10; NIVSS at 11. There is no basis to conclude that the Secretary "failed to consider an important aspect of the problem" that may have been raised in these comments. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

Furthermore, although Plaintiffs express dissatisfaction with the Secretary's discussion in the Supporting Statements of the 2017 DHS Office of Inspector General Report, *see* Pls.' Opp. at 31-32, they fail to explain how the Secretary's response evinces a failure to consider "the relevant factors" or "a clear error of judgment," *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (citation omitted). Ultimately, the social media policy falls well "within the bounds of reasoned decisionmaking." *See Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983).

C.      **Plaintiffs' First Amendment claim is subject to a deferential standard of review and fail as a matter of law under that standard.**

Decades of Supreme Court case law make clear that a deferential standard of review applies to Plaintiffs' free-standing First Amendment claim.  Because immigration laws and policy implicate the United States' relationships with foreign partners and "must be defined in the light of changing political and economic circumstances," the Court has held that "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."  *Mathews v. Diaz*, 426 U.S. at 81.  Consistent with this recognition, the Court has applied two highly deferential standards of review when evaluating constitutional challenges to immigration policies.  *See Int'l Refugee Assistance Project v. Trump*, No. 19-1990 (4th Cir. June 8, 2020), slip. op. at 26-28.  In *Mandel*, the Court considered only whether the Government's stated reason for the challenged action was "facially legitimate and bona fide."  408 U.S. at 769-70 ("The courts will neither look behind the exercise of [an agency's discretion over immigration law], nor test it by balancing its justification against the First Amendment interests of [the challengers].").  More recently, in *Trump v. Hawaii*, the Supreme Court reviewed a Presidential Proclamation—which stemmed from the same Executive Order that was the basis for the social media policy—and held that the plaintiffs' challenge to that Proclamation failed even if the Court were to look behind the face of the policy for purposes of rational basis review. 138 S. Ct. at 2420.  In so doing, the Court employed a two-step test:  (1) whether the challenged action "is plausibly related to the Government's stated objective" and (2) whether the policy "can reasonably be understood to result from a justification independent of unconstitutional grounds."  *Id*.  The social media policy survives review under either standard.  *See* Defs.' Mot. at 42-45.

Plaintiffs' arguments for a more searching standard of review should be rejected.  First, Plaintiffs try to distinguish this case from "some of the cases" cited in Defendants' Motion to

Dismiss on the ground that "they focused principally on foreigners outside the United States who lacked substantial connections to the United States." Pls.' Opp. at 34. But this purported distinction does not apply to *Mandel* and *Hawaii*, both of which involved alleged violations of the First Amendment rights of U.S. citizens. *See Hawaii*, 138 S. Ct. at 2416; *Mandel*, 408 U.S. at 762. Even assuming that some of Plaintiffs' foreign members and partners have First Amendment rights to assert here, *but see supra* Part I.A.2, there is no reason to think that a higher level of First Amendment scrutiny applies where the rights (if any) of foreigners are asserted alongside those of U.S. citizens. And Plaintiffs cite no cases to support this novel suggestion. *See* Pls.' Opp. at 34.

Second, Plaintiffs argue that a more rigorous standard of review applies because the social media policy constitutes a "procedural application requirement." Pls.' Opp. at 34-35. This argument is equally deficient. Deference to the political branches in the area of immigration policy sweeps broadly, encompassing virtually "*any policy* toward aliens," *Hawaii*, 138 S. Ct. at 2418 (emphasis added) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952)); *see also Harisiades*, 342 U.S. at 596-97 (1952) (Frankfurter, J., concurring) ("The *conditions for entry* of every alien . . . have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control." (emphasis added)). And the Supreme Court on multiple occasions has applied a deferential standard of review to policies that would qualify as "procedural" under Plaintiffs' definition. *See, e.g.*, *Kerry v. Din*, 576 U.S. 86, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring) (holding that "respect for the political branches' broad power over the creation and administration of the immigration system extends to determinations of how much information the Government is obliged to disclose about a consular officer's denial of a visa to an alien abroad").

Under either *Mandel* or the rational basis test applied in *Trump v. Hawaii*, the social media policy passes constitutional muster. The policy plausibly relates to the Executive Branch's goal of

strengthening screening and vetting protocols for foreign nationals who seek to enter the country, especially with regard to "detecting foreign nationals who may commit, aid, or support acts of terrorism and [] preventing those individuals from entering the United States."  *See* Exec. Order 13780, 82 Fed. Reg. 13,209, 13,209 (March 6, 2017).  In addition, the policy advances this goal by enabling the Government to collect information that can be used to confirm a visa applicant's identity and to determine the applicant's eligibility for entry.  *See* IVSS at 3; NIVSS at 3.  Plaintiffs' First Amendment challenge to the social media policy must accordingly be dismissed as a matter of law.  *See also* Defs.' Mot. at 42-43.

Plaintiffs' purported challenge to DHS's "retention and dissemination" policies should likewise be dismissed.  *See* Defs.' Mot. at 44-45.  In addition to suffering from the same standing defects and being subject to the deferential standard of review discussed above, this claim fails to identify with requisite specificity which policies are being challenged and how they violate the First Amendment.  *See* Defs.' Mot. at 43 n.17.  Plaintiffs' Opposition cites allegations in the Complaint where Plaintiffs alleged the existence of certain DHS retention policies, but they point to no allegations where they explain how these policies purportedly violate their First Amendment rights. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that a pleading "must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action" (citation omitted)).[8]

---

[8] Plaintiffs' request to amend their Complaint, *see* Pls.' Opp. at 45, should be denied because any amendment would be futile. *Arora v. Buckhead Family Dentistry, Inc.*, 263 F. Supp. 3d 121, 134–35 (D.D.C. 2017) ("[L]eave to amend should be denied when amendment would be futile . . . including, most notably, when the proposed claim would not survive a motion to dismiss." (internal citations and quotation marks omitted)).  Because Plaintiffs' claims fail as a matter of law, Plaintiffs cannot cure those defects with amended pleadings.

## **CONCLUSION**

For the foregoing reasons, as well as for the reasons stated in Defendants' original motion, the Court should grant Defendants' motion and dismiss Plaintiffs' Complaint.

Dated:  June 10, 2020                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Branch Director

  /s/ *Nathan M. Swinton*
NATHAN M. SWINTON
JOSEPH J. DEMOTT
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel:  (202) 305-7667
Fax:  (202) 616-8470
E-mail:  Nathan.M.Swinton@usdoj.gov

*Counsel for Defendants*