## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DOC SOCIETY et al.,<br><br>    *Plaintiffs*,<br><br> v.<br><br>ANTONY J. BLINKEN, *in his official capacity as Secretary of State*, et al.,<br><br>    *Defendants*. | Civil Action No. 19-3632 (TJK) |

### MEMORANDUM OPINION

When the President ordered federal agencies to vet entrants to the United States more thoroughly, the State Department responded by telling visa applicants to disclose their social-media activity. Plaintiffs, two organizations that foster and promote documentary films, say that policy violates the First Amendment and the Administrative Procedure Act. But both claims run headlong into the discretion entrusted to Congress and to the President to set immigration policy and to enforce our immigration laws. Thus, Plaintiffs have failed to state a claim, and the Court will grant Defendants' motion to dismiss the case.

## I. Background

The social-media-disclosure requirement now forms part of the procedure for requesting a visa to enter the United States. So the Court begins with a brief explanation of the legal framework surrounding that procedure. The facts below are drawn from Plaintiffs' complaint because the Court is resolving a motion to dismiss.

### A. Legal Background

Aliens may not be admitted to the United States without a visa. *See* 8 U.S.C. §§ 1181(a), 1182(a)(7). Consular officers may issue visas after a "proper application." *Id.* § 1201(a)(1). The

statutory criteria for a proper application differ slightly between "immigrant" and "nonimmigrant" visas. *See id.* § 1202(a), (c). But both types of applications must include "such additional information necessary to the identification of the applicant . . . and the enforcement of the immigration and nationality laws as may be by regulations prescribed." *Id.*

Many factors can render an alien inadmissible. *See generally* 8 U.S.C. § 1182(a). Statutory grounds for inadmissibility include the alien's health, criminal history, risks to national security, ability to earn income, occupation, immigration history, documentation, and ineligibility for citizenship. *See id.* If a consular officer determines that an alien has any forbidden attribute, she must deny the application. *Id.* For denials based on most statutory grounds, the officer must give the applicant written notice of the denial that "lists the specific provision or provisions of law under which the alien is inadmissible." *Id.* § 1182(b). But no such notice is required if the officer determines that the alien is inadmissible because of his criminal history or for national-security-related reasons. *See id.* § 1182(a)(2)–(3), (b)(3). The State Department maintains an appeals process to review denials applicants wish to contest. ECF No. 31-8 at 12.

Visa applications are submitted via an online form. The forms are substantially similar for immigrant and nonimmigrant applications. *Compare* ECF No. 31-12 *with* ECF No. 31-13. Each form requests detailed information about the applicant's characteristics, life history, and plans for residing in the United States. *See, e.g.*, ECF No. 31-12 at 8–82. All aliens who apply for a visa from abroad complete one of those forms—including aliens who are already permanent residents of the United States, who often apply for new visas or for visa renewals from abroad. ECF No. 1 ("Compl.") ¶ 23.

The government retains the information collected on visa applications, even after it adjudicates the applications. The information is confidential. 8 U.S.C. § 1202(f). But the State

Department stores the information in a database that it shares with several federal agencies, including the Department of Homeland Security ("DHS").  Compl. ¶ 35.  It also may share some stored information with other agencies, Congress, and state, local, tribal, and foreign governments. *Id.* ¶¶ 35–37.  Part of the reason the government retains the information, it says, is to "enforce immigration and nationality laws, a responsibility that does not end once a visa has been granted." ECF No. 44 at 29; *see also* 8 U.S.C. § 1202(f)(2); ECF No. 31-8 at 10; ECF No. 31-9 at 10.

The Secretary of State ("the Secretary") promulgates regulations that interpret the visa-requirement statutes.  *See* 22 C.F.R. § 40.1 *et seq.*  Those regulations permit consular officers to request information beyond that requested by the application forms "whenever the . . . officer believes that the information provided in [the application] is inadequate to permit a determination of the alien's eligibility to receive [a visa]."  *Id.* §§ 41.103(b)(2), 42.63(c).  The regulations also bind consular officers to require applicants to complete the application forms described above.  *Id.* §§ 41.103(b)(1), (3), 42.63(b).  Insofar as those regulations have the "force of law," *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001), they are entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

## B.     Factual Background

### 1.     The Agency Action

The challenged agency action began with an executive order.  In 2017, President Trump directed the heads of four federal agencies to revamp the procedures for vetting visa applications. *See* Exec. Order No. 13,780 § 5(a), 82 Fed. Reg. 13209, 13215 (Mar. 6, 2017).  Broadly, the new program was supposed to increase the government's capacity to verify an applicant's identity, assure his candor, and gauge the likelihood that he would participate in crime or terrorism.  *See id.*

In response, the State Department proposed a change to its online visa forms.  It sought to collect, among other things, information about the social-media platforms an applicant had used

in the five years before the application.[1]  The proposed addition to the forms would also have required applicants to divulge their "identifiers"—that is, the usernames, handles, or other monikers associated with their social-media accounts.  83 Fed. Reg. at 13806–07.  That information would allow the State Department to review an applicant's posts, interactions, and associations.

That proposal's notice-and-comment process generated intense interest.  Roughly ten-thousand comments raised concerns related to free speech and association, privacy, and efficacy. Compl. ¶ 26.  The State Department responded to those comments in sixteen groups for immigrant visas, *see* ECF No. 31-8 at 4–19, and in twenty groups for nonimmigrant visas, ECF No. 31-9 at 5–20.  It noted that its proposal would collect only information that an applicant had shared publicly on social media.  ECF No. 31-8 at 9.  Still, it acknowledged that the collection would nullify the anonymity that some social-media platforms afford their users.  *Id.*  The State Department explained that it would use a collection method that "best safeguards" the information's transmission to the consular officer and then treat the data as confidential under 8 U.S.C. § 1202(f). *Id.* at 9–10.  As for efficacy, it concluded that the proposal would help screen "visa applicants for specific visa ineligibility grounds" and verify their identities.  *Id.* at 14.

The State Department implemented a version of its proposal by adding questions to its visa-application forms.  Compl. ¶ 27.  Visa applicants must now indicate whether they have used any listed social-media platform in the last five years.  Compl. ¶¶ 28–30.  If they have used a listed platform, they must provide the account's identifier, even if the account is pseudonymous.  Compl. ¶¶ 28–31.  Applicants may also provide the same information for social-media platforms that are

---

[1] 60-Day Notice of Proposed Information Collection: Application for Immigrant Visa and Alien Registration, 83 Fed. Reg. 13806, 13806 (Mar. 30, 2018); 60-Day Notice of Proposed Information Collection: Application for Nonimmigrant Visa, 83 Fed. Reg. 13807, 13807 (Mar. 30, 2018).

not listed on the forms.  Compl. ¶¶ 28–30.  Those requirements apply to almost all visa applicants, including those who already reside in the United States but are applying for a new visa from abroad.  Compl. ¶¶ 32–33.

When President Biden took office, he revoked the executive order that prompted the disclosure requirement.  Proclamation No. 10141 § 1, 86 Fed. Reg. 7005, 7005 (Jan. 20, 2021).  The State Department then began a "policy review" that included reconsideration of the requirement.  *See* ECF No. 52 at 1; *see also* ECF No. 54 at 2.  More recently, the State Department represented that it decided not to make "imminent changes" to the requirement, although the policy remains "under discussion."  ECF No. 58 at 1.  Thus, the disclosure requirement remains in place to this day, despite the change in administrations.

### 2.    Plaintiffs

Plaintiffs are two documentary-film organizations that help produce films all over the world.  Compl. ¶¶ 40–41.  The first, Doc Society, helps fund documentary films, in part by hosting events that connect funders and filmmakers.  Compl. ¶ 40.  It also promotes such films in hopes of achieving social change.  *See id.*  The second organization, International Documentary Association ("IDA"), funds and promotes documentary films too, but it also hosts events to help filmmakers with the more practical aspects of their work.  *See* Compl. ¶ 41.

Plaintiffs' activities rely on collaboration with many foreign nationals.  IDA has members in fifty-three countries.  Compl. ¶ 41.  Doc Society has no members, Compl. ¶ 40, but it has "partners" in diverse countries, Compl. ¶ 42.  By "partners," it means "filmmakers, advocates, activists, and other[s]," whom it invites to events and helps make films.  *See* Compl. ¶ 47.  Both organizations host in-person events where "non-U.S. members and partners" must "travel to the United States."  Compl. ¶ 45.  Doc Society also believes that its film-funding efforts depend on the ability of its non-U.S. partners to meet face-to-face with "potential funders or activists."  Compl. ¶ 44.

Many of Plaintiffs' foreign members and partners thus plan to visit the United States and require visas to do so.  Compl. ¶ 42.

Plaintiffs consider social media "an indispensable research, education, and communication tool."  Compl. ¶ 46.  Essentially, they use it to identify new potential projects, members, and partners, to promote films and political messages, and to share resources.  *See* Compl. ¶¶ 47–48.  Their members and partners use it for similar purposes.  *See* Compl. ¶¶ 49–50.  Some of those members and partners use social media pseudonymously, whether out of concern for their safety or to aid in researching groups whose aims they do not share.  *See* Compl. ¶ 51.

Some of Plaintiffs' members and partners who both need visas and use social media do not wish to divulge their online activities to the State Department.  They fear two types of potential harm.  First, social-media use might disadvantage a user's visa application.  *See* Compl. ¶¶ 57–59.  For example, a consular officer might misinterpret a user's speech or impute to him the speech of others in his network.  *See* Compl. ¶¶ 57–58.  And even if those events do not cause an application to be denied, they may still lead to processing delays.  Compl. ¶ 59.  Second, people other than consular officers—including officials of foreign governments—might learn of a user's posts or associations.  Compl. ¶¶ 60–61.  That could occur by intentional information sharing, Compl. ¶ 60, or through data breaches, which have happened before, Compl. ¶ 61.

Plaintiffs' members and partners have responded in two ways.  Some users have reduced their social-media presence by, for example, avoiding political subjects or by refraining from associating with certain individuals.  *See* Compl. ¶¶ 54–55.  Others have elected not to apply for a visa or visit the United States.  Compl. ¶ 56.

Plaintiffs say both these responses harm them.  When their members and partners reduce their social-media use, Plaintiffs have less information from which they can identify new members,

partners, issues, and potential films.  *See* Compl. ¶¶ 66–68.  When their members and partners refuse to travel to the United States, attendance at Plaintiffs' events declines, and Plaintiffs are able to fund and screen fewer films.  *See* Compl. ¶¶ 70–72.  Plaintiffs have responded by spending more resources to "find and engage with members and partners . . . [,] to support and promote the work of their members and partners[,] and to recruit new members, partners, and projects" given their reduced ability to connect on social media or persuade foreign nationals to visit the United States.  Compl. ¶ 75.

### C.    Procedural History

Plaintiffs filed suit not long after the disclosure requirement took effect.  They bring two claims.  First, they allege that the disclosure requirement violates the Administrative Procedure Act ("APA").  Compl. ¶ 77.  Second, they contend that the requirement transgresses the First Amendment.  Compl. ¶ 78.  They ask the Court to hold the disclosure requirement unlawful, enjoin Defendants from enforcing it, and order them to "expunge all information collected" by the social-media questions.  Compl. at 34.  Defendants move to dismiss.  ECF No. 31.  They contend that Plaintiffs lack standing to challenge the disclosure requirement, ECF No. 31-1 at 20–38, and that they have failed to state a claim, *id.* at 38–56.  Three groups of amici join Plaintiffs in opposing that motion.  ECF Nos. 32, 35-1, 37-1, and 39-1.

With that motion pending, the Court stayed the case after President Biden revoked President Trump's executive order and announced a review of the disclosure requirement.  Minute Order of Mar. 31, 2021.  The Court lifted that stay several months later when Defendants did not withdraw the disclosure requirement.  *See* Minute Order of Aug. 18, 2021; Minute Order of Oct. 20, 2021.  At this point, no policy change appears forthcoming that would moot the case.  *See* ECF No. 58 at 1.  Thus, the Court will resolve Defendants' motion.

## II.      Legal Standards

Defendants' motion relies on Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Under Rule 12(b)(1), Plaintiffs have the burden to establish standing.  *Little v. Fenty*, 689 F. Supp. 2d 163, 166–67 (D.D.C. 2010).  That burden "grows heavier at each stage of the litigation."  *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015).  To survive a motion to dismiss, Plaintiffs need only allege a qualifying "injury resulting from [Defendants'] conduct."  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  The Court must "assume the truth of all material factual allegations in the complaint and . . . grant[ Plaintiffs] the benefit of all inferences that can be derived from the facts alleged."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotation omitted).

Under Rule 12(b)(6), Plaintiffs' complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).  A claim is plausible if "it contains factual allegations that, if proved, would allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quotation omitted).  Again, the Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor."  *Id.* (quotation omitted).  But it must disregard "a legal conclusion couched as a factual allegation."  *Cason v. NFL Players Ass'n*, 538 F. Supp. 3d 100, 109 (D.D.C. 2021) (quotation omitted).

## III.      Analysis

For the reasons explained below, the Court concludes that (1) under this Circuit's binding precedent, Plaintiffs have shown they have organizational standing to bring suit, but (2) they have failed to state a claim under either the APA or the First Amendment.  Thus, for that reason, the Court will grant the motion to dismiss.

### A.   Plaintiffs Have Organizational Standing Because the Disclosure Requirement Allegedly Impedes Their Activities

As a threshold matter, the Court must ensure Plaintiffs have standing.  *See Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 186 (D.D.C. 2020); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  That is, it must ensure that Plaintiffs have "clearly allege[d] facts demonstrating" they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alteration adopted).  The alleged injury must be particular to Plaintiffs; they may not raise a "generally available grievance."  *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam).

Plaintiffs allege two forms of harm.  First, they point to their own injuries.  Compl. ¶ 39.  Courts term that sort of standing "organizational" and treat the entity as they would "an individual plaintiff."  *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*").  Second, Plaintiffs assert the injuries to their "members and partners," both abroad and in the United States.  Compl. ¶ 39.  Courts call that type of standing "associational" and ask whether the entity has identified a particular member who would (1) "have standing to sue in his own right" based on (2) an interest "germane" to the entity's "purpose" and (3) whether the individual's personal participation in the suit is necessary.  *Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011).

The Court concludes that, under this Circuit's precedent, Plaintiffs' allegations of organizational standing are enough to establish subject-matter jurisdiction.  Specifically, Plaintiffs alleged a cognizable injury-in-fact because they have been deprived of information on which their regular activities rely.  Compl. ¶¶ 66–67.  That injury is traceable to Defendants' conduct because the informational vacuum allegedly was caused by the disclosure requirement.  Compl. ¶¶ 54–55.

Likewise, an order vacating the requirement would restore the desired information.  *See id.*  Because that theory of standing can sustain Plaintiffs' challenge at this stage, the Court need not consider Plaintiffs' other theories.

### 1.     Injury-in-Fact

A concrete injury is "foremost" among the standing requirements.  *Steel Co.*, 523 U.S. at 103.  An organization pleads a concrete injury by alleging facts showing that the challenged action has "perceptibly impaired" its "activities," leading to a "drain on the organization's resources."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  By contrast, a "setback to the organization's abstract social interests" is not enough.  *Id.*

Courts in this Circuit use a two-part test to apply that standard.  *Tex. Low Income Hous. Info. Serv. v. Carson*, 427 F. Supp. 3d 43, 52 (D.D.C. 2019).  First, they assess the alleged impairment to the organization's activities.  *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) ("*EPIC I*").  The impediment must frustrate the organization's "daily operations."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *PETA*, 797 F.3d at 1094).  And there must be a "direct conflict between the [defendants'] conduct and the organization's mission."  *Elec. Privacy Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) ("*EPIC II*") (quotation and emphasis omitted).  Second, courts ensure the organization "used its resources to counteract that harm."  *EPIC I*, 878 F.3d at 378 (quoting *PETA*, 797 F.3d at 1094).  That effort cannot be a "self-inflicted budgetary choice."  *Id.* at 379 (quotation omitted).  So litigation costs or extra advocacy efforts do not count.  *Food & Water Watch*, 808 F.3d at 919.

Plaintiffs allege that their organizations have suffered an informational injury because the government has deprived them of desired information.  *See Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84–85 (D.C. Cir. 1991) (describing the premises of "informational standing").  They say

they suffer such harm because the disclosure requirement "deters" their members and partners from sharing information on social media, which undermines their use of social media for research. Compl. ¶¶ 66–68.

Recent caselaw in this Circuit suggests that an informational injury is sufficiently concrete if an organization wishes to use a stream of information in a specific, regular way as part of its established activities.   For example, a plaintiff had a concrete informational injury where an agency's alleged failure to apply a regulatory requirement meant the agency was not issuing reports that would have aided the plaintiff in preparing its *own* educational materials for the public, which it ordinarily did.  *PETA*, 797 F.3d at 1095–96.  Another plaintiff suffered a similar injury where an agency did not promulgate regulations that would have obviated informational materials that it prepared, saving the plaintiff time and money.  *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020).  In both cases, the injury was concrete because the agency action "restrict[ed] the flow of information that [the plaintiffs used] to educate [their] members."  *See Food & Water Watch*, 808 F.3d at 921.  The sum of those cases is that the inability to use recurrent information for an organization's "services," "daily operations," or "activities" can perceptibly impair those activities.  *See Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10, 12–13 (D.C. Cir. 2020) (per curiam) (quotations omitted).

The Circuit has, however, consistently rejected allegations of informational injury based solely on an organization's lack of access to discrete, one-off pieces of information.  It has sometimes characterized such allegations merely as harm to the organization's generalized advocacy or lobbying efforts.  *E.g.*, *Food & Water Watch*, 808 F.3d at 921.  So a plaintiff cannot show a concrete informational injury from only a single instance of missing information, even if it wishes to use that information to create educational materials.  *See EPIC I*, 878 F.3d at 378–79.  In such

cases, the alleged harm "sound[s] in pure issue advocacy." *EPIC II*, 892 F.3d at 1256.  Only the interruption of a regular "flow of information" connected to an organization's ongoing activity is sufficient to show that the organization has been injured for standing purposes. *Food & Water Watch*, 808 F.3d at 921.

Moreover, under this Circuit's precedent, organizational plaintiffs' standing to seek recurrent information for specific, established activities does not depend on the organization's legal entitlement to the information.[2]  If "information is essential to the injured organization's activities and . . . the lack of the information will render those activities infeasible," all that is needed is "a plausible link between the agency's action, the informational injury, and the organization's activities." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 122 (D.C. Cir. 1990).  That rule may well clash with the precept that an injury-in-fact is an invasion of a "legally protected interest." *PETA*, 797 F.3d at 1102–03 (Millett, J., dubitante) (quoting *Lujan*, 504 U.S. at 560).  But it is the law of this Circuit, which this Court is bound to follow.

Thus, Plaintiffs have adequately alleged impairment to their activities—the first part of the test for organizational standing—by describing this "plausible link."  The regular activity they wish to continue is the use of information posted on social media for research.  Compl. ¶¶ 67–68. They explain the many ways they use that tool to provide their services.[3]  Plaintiffs have further

---

[2] That is, a recurrent-information plaintiff need not show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016); *see also FEC v. Akins*, 524 U.S. 11, 20–25 (1998).

[3] Compl. ¶ 67 ("Doc Society [uses social media] to identify films to honor at its awards ceremonies [and] to research issues to explore in new programs . . . .  Doc Society also relies on social media to identify new issues to address in its programs.  Through Twitter, Doc Society identified [partners] whom it then connected with documentary filmmakers . . . ."); Compl. ¶ 68 ("IDA . . . follows numerous documentary filmmakers on [social media].  IDA pays close attention

alleged that the disclosure requirement makes its continued reliance on social media infeasible because many individuals whose speech they wish to receive have stopped speaking on relevant topics.  Compl. ¶¶ 54–55.  That allegation is plausible because Plaintiffs have explained why the disclosure requirement has induced these individuals' silence.  Compl. ¶¶ 57–61.  And the allegation is not speculative because Plaintiffs have explained that information on which they had been relying has already disappeared.  Compl. ¶¶ 54–55.

Plaintiffs have also alleged a "direct conflict" between the disclosure requirement and their "mission[s]."  *EPIC II*, 892 F.3d at 1255 (quotation and emphasis omitted).  Defendants say Plaintiffs have shown only "indirect[ ]" effects, ECF No. 44 at 18, but that argument ignores relevant caselaw.  The Circuit has explained that the direct-conflict requirement "exists because, if the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission, then it is entirely speculative whether the challenged practice will actually impair the organization's activities."  *PETA*, 797 F.3d at 1095 (quotation omitted and alteration adopted).  So regardless of whether an agency targeted its action at an organization's mission, a direct conflict exists if the action "hamper[s]" the agency's "stated mission" "in a non-speculative manner."  *Id.* That is true here because, like in *PETA*, Plaintiffs have plausibly alleged that the agency action has made their mission harder to accomplish.  *See id.* at 1095–96; Compl. ¶¶ 39–41 (explaining that Plaintiffs' missions include enabling the production and dissemination of documentary films).  For the reasons already explained, the disclosure requirement directly conflicts with those missions.

Plaintiffs have also satisfied the second part of the organizational-standing test.  They

---

to what filmmakers are saying on Twitter and Facebook to inform its educational and advocacy efforts on their behalf.  For example, through social media IDA has discovered a number of cases of filmmaker censorship, which IDA has then investigated in order to assist the censored filmmakers and to alert its membership to the threats they may face in different countries.  IDA addresses these and similar issues in [its programming].").

allege they diverted resources to counteract the informational harm.  They explain that, because of social media's reduced efficacy, they expend more "time, staff resources, and funding to find and engage with members and partners."  Compl. ¶ 75.  Defendants point out that Plaintiffs do not "identify any other activities from which they have 'diverted' resources," but that observation is irrelevant.  ECF No. 44 at 20.  Defendants identify no case that requires Plaintiffs to specify which activities have yielded to their increased efforts to counter the agency action, and the Court can find none.  Every organization has finite resources, so any increase in expenditures leaves less available for other purposes, making such a requirement unnecessary.  All Plaintiffs must do is allege they have used more resources in a way they otherwise would not have.  *See EPIC I*, 878 F.3d at 379.

Nor is Plaintiffs' injury self-inflicted in the relevant sense.  True, Plaintiffs voluntarily spend the extra resources, but that fact does not address the relevant question.  *See Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140–41 (D.C. Cir. 2011).  An injury is not self-inflicted if money is spent "in response to, and to counteract, the effects of the defendants' [conduct]."  *Id.* at 1140.  Plaintiffs allege that they now need more resources to accomplish the same tasks they performed before the disclosure requirement.  Compl. ¶¶ 67–68, 75.  And they have drawn a "direct causal link between the [requirement] and [their] expenditures."  *EPIC I*, 878 F.3d at 379 n.7; Compl. ¶¶ 55–61.  So they have pled an organizational, informational injury-in-fact.

### 2.    Traceability and Redressability

Of course, an injury is not the only standing requirement Plaintiffs must satisfy.  Organizations, like other plaintiffs, must also allege facts showing "traceability" and "redressability."  *Tex. Low Income Hous.*, 427 F. Supp. 3d at 57.  Plaintiffs' allegations establish both elements.

Traceability and redressability are two sides of the same coin.  The former element requires that the injury results from "the challenged action of the defendant," not "from the independent

action of some third party not before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976). The latter element requires that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotations omitted). Those elements are closely linked because vitiating an injury's cause usually at least mitigates the injury. *See Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017–18 (D.C. Cir. 1997). But they are still distinct because the former concerns the relationship between the injury and the defendant's conduct, while the latter concerns the relationship between the injury and the requested relief. *West v. Lynch*, 845 F.3d 1228, 1235–36 (D.C. Cir. 2017).

The difficulty for Plaintiffs is that they are not the subject of Defendants' conduct because they are not visa applicants. Instead, the injury to Plaintiffs materializes through the social-media decisions of third parties, for whom, as Defendants point out, the visa-application requirements of the United States government are "one of many factors" they consider in deciding what to say. ECF No. 44 at 19. Accordingly, Plaintiffs face "a considerably tougher row to hoe." *Tex. Low Income Hous.*, 427 F. Supp. 3d at 58. They must allege facts that allow the Court plausibly to infer how those third parties have acted and will act in response to an order in Plaintiffs' favor. *See Lujan*, 504 U.S. at 562.

Still, the Circuit has recognized that even an injury inflicted by third parties can be traceable to the government and redressable by an order to the government. That is true where the factual allegations present "substantial evidence of a causal relationship between the government policy and the third-party conduct." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004), *abrogated on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017). Courts must inquire into the "logic" of the allegations; the allegation of causality itself is not enough. *See Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d

1267, 1275–78 (D.C. Cir. 2007).  On the redressability element, that assessment means asking whether "the new status quo is held in place by other forces," so that even an order eliminating the original cause of the injury will not now redress it.  *Id.* at 1278.

Plaintiffs' allegations show plausible traceability and redressability.  They explain, relying on the explanations of some of their members and partners, that many now refrain from relevant speech on social media because they fear the views they share, even pseudonymously, "will be used against them during the visa process."  Compl. ¶ 55.  But those same people "previously used social media" to contribute to the information streams on which Plaintiffs rely.  *Id.*  Those allegations are not bare attributions because Plaintiffs explain in detail why their members and partners fear the disclosure requirement's effects.  Compl. ¶¶ 57–63.  And Plaintiffs seek an order that would eliminate the collection and storage of social-media identifiers and nullify its prior impact.  *See* Compl. at 34.  The most logical inference from those allegations, accepted as true, is that the order Plaintiffs request would restore the information on which they rely.  In other words, their allegations present "substantial evidence of a causal relationship" between the social-media silence and the disclosure requirement, *Nat'l Wrestling*, 366 F.3d at 941, and there is no reason to think the "new status quo is held in place by other forces," *Renal Physicians*, 489 F.3d at 1278.

Plaintiffs' reliance on the explicit reasoning of the relevant third parties distinguishes this case from others in which traceability and redressability were found speculative.  For example, the plaintiff in *Texas Low Income Housing* had alleged only that the legal change would "remov[e] an impediment" to the desired behavior of a third party and would make that behavior "far easier." 427 F. Supp. 3d at 59–60 (emphasis omitted).  With no concrete reason to believe that the third party *would* behave differently, this Court disregarded those allegations as "conjecture."  *Id.* at 60. So too in *National Wrestling*, where the plaintiffs could show no more than that a favorable order

16

would create "better odds" that their desired result would materialize.  366 F.3d at 939.  Here, by contrast, the allegations show strong evidence that the sole "disincentive" to the third parties' otherwise-desired conduct is the agency action.  *See Block v. Meese*, 793 F.2d 1303, 1308–09 (D.C. Cir. 1986); *see also Tozzi v. U.S. Dep't of Health and Hum. Servs.*, 271 F.3d 301, 308–09 (D.C. Cir. 2001) (finding that an agency action was a "substantial factor" in third parties' decisions (quotation omitted)).

Thus, at this stage, Plaintiffs have shown organizational standing to challenge the disclosure requirement.  That conclusion, of course, relies on the Court's assumption that Plaintiffs' allegations are true and on its drawing of inferences in their favor.  *See Osborn*, 797 F.3d at 1063–64.  At later stages of litigation, Plaintiffs could "no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (quoting *Lujan*, 504 U.S. at 561) (cleaned up).  But this Court has jurisdiction to reach the merits, so Defendants' Rule 12(b)(1) motion will be denied.

### B. Plaintiffs Have Not Stated an APA Claim Because the Visa-Application Statute Presents a Judicially Unmanageable Standard

Plaintiffs' first claim arises under the APA.  They ask this Court to "set aside" the disclosure requirement as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority."  Compl. ¶ 77; *see also* 5 U.S.C. § 706(2)(A), (C).[4]  Plaintiffs explain that their APA claim has two aspects.  First, they say the Secretary lacked the statutory authority to impose the disclosure requirement.  ECF No. 32 at 32.  Second, they contend that the rulemaking process was arbitrary and capricious.  *Id.*

---

[4] Plaintiffs also bring a claim under 5 U.S.C. § 706(2)(B), which directs courts to set aside agency actions that are "contrary to constitutional right, power, privilege, or immunity."  *See* Compl. ¶ 77.  But that aspect of their APA claim is coterminous with their second claim under the First Amendment, so the Court will address it later.

Defendants attempt to refute those claims, but they also interpose two threshold obstacles to APA review. First, they argue that Congress committed to the Secretary the discretion to decide what information a proper visa application must contain. ECF No. 31-1 at 28–31. If that is true, the agency action is not reviewable under the APA. 5 U.S.C. § 701(a)(2). Second, they maintain that Plaintiffs fall outside the zone of interests of the Immigration and Nationality Act ("INA") and so cannot sue under its legal requirements. ECF No. 31-1 at 43–44. If either of those obstacles has merit, the Court must dismiss Plaintiffs' APA claim under Rule 12(b)(6). *See Sierra Club v. Jackson*, 648 F.3d 848, 853–55 (D.C. Cir. 2011) (agency discretion); *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 588 (D.C. Cir. 2022) (statutory zone of interests). In the end, the first obstacle proves insurmountable, so the claim must be dismissed.

The APA's "presumption of judicial review" is superseded if an "agency action is 'committed to agency discretion by law.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), and 5 U.S.C. § 701(a)(2)). An action is unreviewably committed to agency discretion in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). That "exception" is "generally" limited to actions in "areas traditionally committed to agency discretion." *Dep't of Commerce*, 139 S. Ct. at 2568.[5] But it also applies if the statutory text "heralds Congress's judgment

---

[5] Examples include "a decision not to institute enforcement proceedings," *Dep't of Commerce*, 139 S. Ct. at 2568 (citing *Heckler v. Chaney*, 47 U.S. 821, 831–32 (1985)), "a decision by an intelligence agency to terminate an employee in the interest of national security," *id.* (citing *Webster v. Doe*, 486 U.S. 592, 600–01 (1988)), "the allocation of funds from a lump-sum appropriation," *Weyerhaeuser*, 139 S. Ct. at 370 (citing *Lincoln*, 508 U.S. at 191), and "a decision not to reconsider a final action," *id.* (citing *ICC v. Locomotive Eng'rs*, 482 U.S. 270, 282 (1987)).

to commit the decision exclusively to agency discretion." *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 632 (D.C. Cir. 2020) (interpreting a statute that textually gave an agency head "sole and unreviewable discretion" (quoting 8 U.S.C. § 1225(b)(1)(A)(iii)(II))).

Defendants invoke that exception here. They claim that "Congress has given the Secretary of State broad discretion over the visa application process." ECF No. 31-1 at 40. They observe that visa applications lie "at the intersection of foreign policy and national security." *Id.* at 42. And they contend that the relevant statutes lack "any substantive standards against which to measure" the legality of this agency action. *Id.* at 41.

The relevant statutes require visa applications to be made "in such form and manner" "as shall be by regulations prescribed." 8 U.S.C. § 1202(a), (c). Both statutes specifically list, as information that applicants "shall state," an applicant's "full and true name" and his "date and place of . . . birth." *Id.* Applications for immigrant visas must also contain "any other name" an applicant has used "or by which he has been known" and his "age and sex." *Id.* § 1202(a). Those for nonimmigrant visas must also contain an applicant's "nationality, the purpose and length of his intended stay in the United States," and "his marital status." *Id.* § 1202(c). Finally, both statutes require an applicant to state "such additional information necessary to the identification of the applicant" "and the enforcement of the immigration and nationality laws as may be by regulations prescribed." *Id.* § 1202(a), (c).[6] The Secretary pointed to that final clause as authority to enact the disclosure requirement. *See* ECF No. 31-8 at 2; ECF No. 31-9 at 2.

The Circuit confronted a similar question about Section 1202(a) in *Legal Assistance for Vietnamese Asylum Seekers v. Department of State*, 104 F.3d 1349 (D.C. Cir. 1997) ("*LAVAS*").

---

[6] Section 1202(c) also contains the phrase "necessary to . . . the determination of his eligibility for a nonimmigrant visa."

The dispute in *LAVAS* concerned the place where an applicant could apply for an immigrant visa. *See id.* at 1350. Section 1202(a) allows applications to be made "at such place as shall be by regulations prescribed." That "broad language," the court explained, "grants to the Secretary discretion to prescribe the place at which aliens apply for immigrant visas without providing substantive standards against which the Secretary's determination could be measured." *Id.* at 1353. And the decision where to permit applications is the sort of action that "counsels against [judicial review]" because it requires the "balancing [of] complex concerns involving security and diplomacy." *Id.* So the Circuit held that the venue decision was committed to agency discretion by law. *Id.*

Defendants reason that "*LAVAS* compels dismissal of the Plaintiffs' APA claims." ECF No. 31-1 at 41. The Court disagrees. Deciding what information to require on a visa application is not the sort of decision "traditionally committed to agency discretion." *Dep't of Commerce*, 139 S. Ct. at 2568. And the statute contains a "meaningful standard" that, in the abstract, is capable of judicial application. *Weyerhaeuser*, 139 S. Ct. at 370.

Decisions traditionally committed to agency discretion are those over which Congress lacks or has relinquished shared control. *See Lincoln*, 508 U.S. at 191–92; *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 99–100 (D.C. Cir. 2021). Although that is often true "[i]n the foreign affairs arena," *Detroit Int'l Bridge Co. v. Canada*, 883 F.3d 895, 903 (D.C. Cir. 2018), a mere connection to a core executive power does not render a decision unreviewable, *see, e.g., Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906–07 (2020) (holding that a decision that created a "program for conferring affirmative immigration relief" was reviewable). Even in areas related to foreign affairs and national security, actions may have a "focus for judicial review." *Id.* at 1906 (quoting *Chaney*, 470 U.S. at 832). Such a focus exists where Congress has

asserted control "by putting restrictions in the operative statute[ ]." *Shawnee Tribe*, 984 F.3d at 100 (quoting *Lincoln*, 508 U.S. at 193).

Sections 1202(a) and (c) contain several restrictions that provide a focus for judicial review. For one thing, both statutes require visa applications to contain specific elements. For another, the clauses under which the Secretary claimed authority for this action restrict the "additional information" to that "necessary" for various purposes. 8 U.S.C. § 1202(a), (c). Those attributes distinguish this part of the statute from that in *LAVAS*, where Congress provided only that the decision would be made by regulation, leaving the decision "entirely to the discretion of the Secretary." 104 F.3d at 1353. The presence of those limitations means that the statutes carry "no presumption of non-reviewability." *Shawnee Tribe*, 984 F.3d at 100.

Nor does the Court lack "law to apply." *Shawnee Tribe*, 984 F.3d at 99 (quotations omitted). Defendants point out that the phrase "may be . . . prescribed" in the statute implies that the Secretary has discretion. ECF No. 31-1 at 41–42 (citing *Haig v. Agee*, 453 U.S. 280, 294 n.26 (1981) (noting that "'may' expressly recognizes substantial discretion")). Maybe so, but Defendants do not answer the further question—"Discretion over *what*?" The word "may" modifies only the clause "be by regulations prescribed." That is, the Secretary has discretion over the decision whether to require additional information. 8 U.S.C. § 1202(a), (c). If he does so, the statute requires that the "additional information" be "necessary" to the listed purposes. *Id.* If Congress had intended to place no limitations on what kind of information the Secretary could require, it could have said nothing—as it did in the language analyzed in *LAVAS*. *Id.* § 1202(a) (Applications shall be "in such form and manner and at such place as shall be by regulations prescribed."). Its decision to limit the information—and even to do so in different ways for immigrant and nonimmigrant visas—shows that the word "necessary" limits the Secretary's discretion. *See City of Arlington v.*

*FCC*, 569 U.S. 290, 296 (2013) ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion.").

Still, as Defendants observe, the legal standard must also be "judicially manageable." ECF No. 44 at 25 (quotation omitted); *see also Physicians for Social Resp. v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020) (quotation omitted). In the usual sense, it is. True, the word "necessary" is fraught with possible interpretations. *See Nat. Res. Def. Council v. Thomas*, 838 F.2d 1224, 1237 (D.C. Cir. 1988) (explaining that the word's meaning "varies with context"). But courts confront and resolve that sort of ambiguity routinely. *See, e.g.*, *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 601 (D.C. Cir. 2007) (finding judicially manageable the statutory standard "necessary for safety"). Federal courts have long wrestled versions of this precise question. *See, e.g.*, *M'Culloch v. Maryland*, 17 U.S. 316, 413–14 (1819) ("The word 'necessary' . . . has not a fixed character, peculiar to itself. It admits of all degrees of comparison; and is often connected with other words, which increase or diminish the impression the mind receives of the urgency it imports."). Yet they have found answers. *See, e.g.*, *id.* at 421.

But other cases on which Defendants rely, such as *Center for Biological Diversity v. Trump*, 453 F. Supp. 3d 11 (D.D.C. 2020), ultimately persuade the Court to dismiss the claim. As these cases explain, applying some statutory standards "calls for sensitive judgments that Congress plainly intended" another branch of government to make. *Id.* at 38 (quotation omitted). For example, a judgment whether "military construction is 'necessary' . . . crosses the line into military policy." *Id.* And "the federal judiciary is ill-equipped to conduct reviews of the nation's military policy." *Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 406 (D.C. Cir. 1990). The lesson of these cases is that courts must consider the *purpose* for which a statutory subject is to be judged necessary and avoid policy decisions entrusted to other branches of government.

Evaluating Plaintiffs' APA claim would require the Court to intrude on a similar policy decision entrusted to another branch of government.  No matter what construction of "necessary" is right, evaluating the claim would involve, for both types of visas, determining what information is necessary to aid "enforcement of the immigration and nationality laws."  *See* 8 U.S.C. § 1202(a), (c).  But the law-enforcement value of the information at issue, if any, materializes only in the individual decisions whether to admit a particular noncitizen or to revoke a particular noncitizen's visa.  That is, whether the information is necessary to enforce the law in a particular situation depends on a decision about how the law *should* be enforced in that situation.  And that is precisely the sort of decision that calls for the executive branch to "balance factors peculiarly within its expertise."  *Regents of the Univ. of Cal.*, 140 S. Ct. at 1906; *see also Chaney*, 470 U.S. at 831.  Notably, the merits of the government's enforcement decisions in this area are judicially unreviewable.  *See Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999).  Thus, the Court could not judge the necessity of the information without impermissibly "second guessing the Secretary's assessment of [its law-enforcement] value" to officials in their exercise of judicially unreviewable executive power.  *See Center for Biological Diversity*, 453 F. Supp. 3d at 38.

For that reason, at least one statutory purpose that might justify collecting the information presents no "subject[ ] fit for judicial involvement."  *District No. 1, Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000).  The Court cannot determine whether the statutory standard for necessity is satisfied without weighing "the Executive's . . . judgments on questions of foreign policy[,] national interest," and enforcement discretion.  *See id.*  So it must dismiss Plaintiffs' APA claim under Rule 12(b)(6).  *Sierra Club*, 648 F.3d at 853–55.

### C.      Plaintiffs Have Not Stated a First Amendment Claim Because the Disclosure Requirement is Rationally Connected to Legitimate Government Interests

Plaintiffs' second claim is that the disclosure requirement violates the First Amendment.

Compl. ¶ 78.  They explain that the requirement implicates the rights "to speak anonymously, to associate privately, and to receive information and ideas."  ECF No. 32 at 44.  They assert that the requirement further offends the Constitution by its overbreadth.  *Id.*  To evaluate Defendants' motion to dismiss that constitutional claim, the Court must decide first what tier of judicial scrutiny applies.[7]  That is a "purely legal question" and so is appropriate for resolution on a motion to dismiss.  *See Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Defendants say the Court's review here must be "limited given that the policy concerns a condition of entry into the United States by a foreign national."  ECF No. 31-1 at 50.  They therefore argue that the Court should apply a "deferential standard" of review.  *Id.*  Under that standard, they contend, the requirement passes muster because it "advance[s] the Government's legitimate national-security interest in sufficiently screening and vetting foreign nationals before they are allowed to enter the country."  *Id.* at 56.

The Court agrees with Defendants that it must tread carefully.  That is because the "admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"  *Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).  But even when that principle applies, courts must "engage[ ] in a circumscribed judicial inquiry" if the action "burdens

---

[7] *See, e.g.*, *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395–96 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 579 (2023) (explaining that, "[a]t the motion-to-dismiss stage" on rational-basis review, "the plaintiff must plausibly allege facts showing that no reasonably conceivable state of facts could provide a rational basis for the challenged policy"); *Brown v. District of Columbia*, 390 F. Supp. 3d 114, 123–24 (D.D.C. 2019) (explaining that, where the application of a higher tier of scrutiny might depend on factual questions, "courts typically do not reach the merits of a First Amendment challenge at the motion-to-dismiss stage" (emphasis omitted)); *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 36–38 (D.D.C. 2015) (dismissing a First Amendment claim under Rule 12(b)(6) after concluding that the plaintiff had not plead facts "that must be analyzed with strict scrutiny").

the constitutional rights of a U.S. citizen." *Id.* at 2419; *see also Kleindienst v. Mandel*, 408 U.S. 753, 765–70 (1972) (asking only whether the immigration decision was facially based on "a legitimate and bona fide reason").  It follows that courts must also evaluate the burdens on the constitutional rights of foreign nationals, if those exist.[8]  The Court thus begins by defining the scope of the constitutional rights at issue.

### 1.    Constitutional Rights at Issue

Plaintiffs describe three ways in which they say the disclosure requirement burdens some individuals' constitutional rights.  First, Plaintiffs argue that the chilling effect of the requirement—that is, its disincentive to speech and association—deprives U.S. citizens of the rights to hear the speech of would-be visa applicants and to associate with them.  ECF No. 32 at 51–52.  Second, they contend that the government has impermissibly conditioned eligibility for a benefit on the registration of visa applicants' speech and associations.  *Id.* at 50–51.  Third, they say the requirement unlawfully erases visa applicants' protected anonymity in their online speech and associations.  *Id.* at 48–49.

Plaintiffs' first theory—which relies on the purported generalized right of U.S. citizens to *hear* the unidentified speech of unidentified persons—is flawed.  Although the Supreme Court has recognized the "right to receive information and ideas," *Mandel*, 408 U.S. at 762 (quotation omitted), and the right to "associate for expressive purposes," *Roberts v. U.S. Jaycees*, 468 U.S. 609,

---

[8] The Supreme Court has never held that burdens on the constitutional rights of foreign nationals trigger even a circumscribed judicial inquiry in this area because, as reflected in *Trump v. Hawaii*, *Mandel*, and other such cases, the relevant foreign nationals had no such rights.  *See Trump v. Hawaii*, 138 S. Ct. at 2419; *Mandel*, 408 U.S. at 762; *Kerry v. Din*, 576 U.S. 86, 88 (2015) (plurality opinion).  But to the extent foreign nationals are protected by the U.S. Constitution, *see generally Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 200–03 (D.C. Cir. 2001), the Court sees no reason to treat burdens on their rights differently than those on the rights of citizens.  The content of those rights is, after all, the same no matter who possesses them.  *See id.* at 203–209 (applying the ordinary due-process standards to foreign organizations).

622–23 (1984), it has done so only in the context of specific speech and specific associations.  In

*Mandel*, for instance, the Court recognized that U.S. citizens were entitled to "hear, speak, and

debate with" a particular noncitizen who had been denied entry into the country.  408 U.S. at 762.

Similarly, in *Lamont v. Postmaster General*, the government refused to deliver specific mail con-

sidered "communist political propaganda" unless a recipient affirmed he wished to receive it.  381

U.S. 301, 303–04 (1965).  The Court held that requirement was an "unconstitutional abridgement

of the addressee's First Amendment rights."  *Id.* at 307.  Plaintiffs cite no case supporting the idea

that U.S. citizens can claim a generalized right to hear more speech from or to form more associ-

ations with unidentified persons.

Put another way, Plaintiffs' theory conflicts with the precept that "freedom of speech pre-

supposes a willing speaker."  *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 856 F.2d 1563,

1566 (D.C. Cir. 1988) (alteration adopted) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens

Consumer Council*, 425 U.S. 748, 756 (1976)).  The Supreme Court has described speakers' rights

and listeners' rights as "reciprocal."  *Va. Citizens*, 425 U.S. at 757.  For that reason, some courts

have concluded that a listener's right is "derivative of the First Amendment rights of the speaker."

*See Martin v. EPA*, 271 F. Supp. 2d 38, 47 (D.D.C. 2002).  That is not always the case—the

speakers in *Mandel* and *Lamont* lacked First Amendment rights—but that framing still captures

the idea that rights to free speech and association exist only vis-à-vis specific expressive activity.

*See also Cato Inst. v. SEC*, 438 F. Supp. 3d 44, 53–54 (D.D.C. 2020); *Hardy v. Hamburg*, 69 F.

Supp. 3d 1, 19–20 (D.D.C. 2014).  Thus, to rely on listeners' rights, Plaintiffs must "identify a

willing speaker" who "would provide the information" some would-be listener or associate "would

like to receive."  *Competitive Enter. Inst.*, 856 F.2d at 1566.

Plaintiffs' complaint does not approach that specificity.  Instead, Plaintiffs allege that the

disclosure requirement "deprives [U.S. citizens] of opportunities to hear from and engage with [noncitizens]" and that citizens "no longer enjoy" online interactions "to the same extent they previously did." Compl. ¶ 69. And they fear that their in-person events will suffer from reduced attendance, diluting their associational benefits. Compl. ¶ 73. These allegations fail to identify a particular instance of speech that any person wishes to—but cannot—hear. And that aspect of these allegations takes them far afield from the relevant caselaw. The general desire to interact more online is quite different than the desire to "hear, speak, and debate with" a particular noncitizen who, despite wishing to speak in a specific instance, has been prevented from doing so. *See, e.g., Mandel*, 408 U.S. at 762. In the end, Plaintiffs cite no case in which any court has recognized such a nebulous First Amendment theory. Thus, it does not support a First Amendment claim.

That leaves Plaintiffs' second and third burden theories. Unlike their first, these theories rely on the First Amendment rights of *noncitizens* interested in applying for a relevant visa. So a quick detour is necessary to determine the extent to which any such rights exist in the first place. Plaintiffs argue that noncitizens "enjoy full First Amendment protection" if they have "substantial connections to the United States." ECF No. 32 at 22, 46. The caselaw, however, does not see it that way.

The "substantial connections" language comes from *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). There, the Court used that phrase to reject a criminal defendant's argument that the Fourth Amendment protected him against the search of his two homes in Mexico. *Id.* at 262, 270–71. The defendant was present in the United States when his homes were searched, but he was brought here by law-enforcement officers and held against his will. *Id.* at 271. The Court rejected the view that his physical presence here was enough to confer constitutional rights, requiring instead that an alien both "come within the territory of the United States *and* develop[ ]

substantial connections with this country." *Id.* (emphasis added).

The Supreme Court recently reaffirmed that both conditions are necessary.  In rejecting the view that "the First Amendment could extend to foreign organizations operating abroad," the Court described as "long settled" the principle that "foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution."  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) (citing, among other cases, *Verdugo-Urquidez*, 494 U.S. at 265–75).  The Court acknowledged that "foreign citizens *in the United States* may enjoy certain constitutional rights," but it emphasized the territorial limitations of that rule.  *See id.*

Plaintiffs' position about First Amendment protections, then, mistakes a necessary condition for a sufficient one.  A foreign citizen who both is present in and has "substantial connections" to the United States has First Amendment rights.  *Nat'l Council of Resistance*, 251 F.3d at 203.  But once she leaves the country or areas under its territorial control, those personal constitutional rights vanish.  *See Agency for Int'l Dev.*, 140 S. Ct. at 2086.[9]

Plaintiffs have alleged that many noncitizens affected by the disclosure requirement have "substantial connections to the United States."  Compl. ¶ 43.  The facts supporting that conclusion include the existence of noncitizens who live here, have family here, and work and attend school

---

[9] Of course, that is not to say that a foreign citizen abroad lacks rights relating to property that remains in the United States.  A foreigner who "acquires or holds property in this country may invoke the protections of the Constitution when that property is placed in jeopardy by government intervention."  *Nat'l Council of Resistance*, 251 F.3d at 204.  The D.C. Circuit has long recognized that "a foreign national residing outside the United States" may retain a "substantial connection" to the country and so retain constitutional protection vis-à-vis her property holdings.  *Rahimov v. Gacki*, No. 19-2554 (JEB), 2020 WL 1911561, at *4–5 (D.D.C. Apr. 20, 2020) (collecting cases).

Nor does the Court here express any view about the constitutional rights of noncitizens in United States custody, a question the Circuit recently declined to decide categorically.  *See Al-Hela v. Biden*, 66 F.4th 217, 226–28 (D.C. Cir. 2023) (en banc); *id.* at 249–60 (Rao, J., concurring in the judgment in part and dissenting in part) (arguing that "constitutional rights do not extend to aliens without property or presence in the sovereign territory of the United States").

here.  *Id.*  Accepting those allegations as true, the disclosure requirement ultimately will affect U.S. residents who have "accepted some societal obligations" here and thus have a substantial connection to the country.  *See Verdugo-Urquidez*, 494 U.S. at 273.

Still, the requirement applies only to visa applications "from abroad."  Compl. ¶ 23.  Even if it is "common," as Plaintiffs allege, for U.S. residents to leave the country and so submit visa applications "from abroad," *id.*, the requirement definitionally applies only to "foreign citizens outside of U.S. territory," *Agency for Int'l Dev.*, 140 S. Ct. at 2086.  No applicant, then, has First Amendment rights when she submits the application.

Returning to Plaintiffs' theories, their second theory of constitutional burden is that the government may not require "individuals to register their speech or associations with the government as a condition of" their admissibility to the country.  ECF No. 32 at 50.  It relies on cases such as *Shelton v. Tucker*, where a state had required every public schoolteacher or professor "to file annually an affidavit listing without limitation every organization to which he has belonged or regularly contributed within the preceding five years."  364 U.S. 479, 480 (1960).  That requirement, the Supreme Court held, was an unconstitutional "interference with personal freedom" in part because the teachers served "at the absolute will of those to whom the disclosure must be made."  *Id.* at 486.  But even assuming consular officers exercise comparable authority over visa applications, those cases are inapposite because, as explained above, the applicants have no constitutional "right of free association" to protect.  *Id.*  For this reason, Plaintiffs' second theory does not support a claim under the First Amendment either.

That leaves Plaintiffs' third theory.  That theory—the idea that the disclosure requirement erases *future* visa applicants' online anonymity and thereby discourages their speech and associations, ECF No. 32 at 48–49—is much broader in scope than the second.  Plaintiffs allege that these

noncitizens forgo speech and associations *before* they need to apply for a visa. *See* Compl. ¶ 55. In other words, those who know they will someday need a visa renewed—including those who now live in the United States and have substantial connections here—"have deleted past posts, altered or limited their speech, or entirely dropped out of certain groups on social media." *Id.* Because the accompanying harms occur while the noncitizens are still in the United States, this aspect of the disclosure requirement *does* bear on their First Amendment rights.

The rights to speak and associate of these noncitizens include, typically, the rights to do so anonymously, even where a person has already revealed aspects of his identity. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 198–200 (1999). For that reason, "compelled disclosure, in itself, can seriously infringe on privacy of association and belief." *Buckley v. Valeo*, 424 U.S. 1, 64 (1976). The Supreme Court has thus held unconstitutional, for example, a requirement that petition circulators wear name badges, *Am. Const. L. Found.*, 525 U.S. at 197–200, a requirement that literature related to political campaigning contains the name and address of the author, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348–53 (1995), a requirement that door-to-door canvassers get municipal permits, *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–69 (2002), and a requirement that all handbills contain the name of the writer and the name and address of the sponsor, *Talley v. California*, 362 U.S. 60, 64–65 (1960). Plaintiffs compare the noncitizens affected by the disclosure requirement to the plaintiffs in these cases. *See* ECF No. 32 at 48–49.

But these cases are all distinguishable for the same reason: they all involved direct restrictions on speech, not abstract disincentives to speech. That is, the disclosure requirement in those cases was a precondition of speech, not a consequence of a later decision to apply for a benefit. *See Am. Const. L. Found.*, 525 U.S. at 188–89; *McIntyre*, 514 U.S. at 338 & n.3;

*Watchtower Bible*, 536 U.S. at 154–57; *Talley*, 362 U.S. at 60–61.  Plaintiffs have not alleged that they must divulge their social-media identifiers before they can speak or associate on those platforms.  And the Supreme Court has explained that a disclosure requirement's timing is significant and that a speaker's "interest in anonymity is greatest" when she speaks.  *Am. Const. L. Found.*, 525 U.S. at 199.  Thus, the Court noted that "*McIntyre* left room" for some requirements that take effect after speech occurs.  *Id.* at 200.

Still, that room is limited.  Even a subsequent disclosure requirement may trigger heightened scrutiny, *Doe v. Reed*, 561 U.S. 186, 195–96 (2010), particularly where challengers show "a reasonable probability that the compelled disclosure of personal information will subject them to threats, harassment, or reprisals from either Government officials or private parties," *id.* at 200 (quoting *Buckley*, 424 U.S. at 74).  Although such a requirement is a "more subtle [form of] governmental interference" with speech, the fact that disclosure may risk harm to speakers means that the "rights of free speech and free association . . . need breathing space to survive." *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 544 (1963) (quotations omitted).

The most prominent case in which the Supreme Court applied those principles is *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958).  There, Alabama sought to enforce against the NAACP a requirement "to qualify before doing business" in the state.  *Id.* at 451.  During the enforcement proceeding, Alabama demanded the "names and addresses" of all NAACP "'members' and 'agents'" in the state, which plaintiffs argued burdened their associational rights after the fact.  *Id.* at 453.  The Court held that compelled disclosure of the membership lists would "abridge the rights of its rank-and-file members to engage in lawful association."  *Id.* at 460.  It recognized "that compelled disclosure of affiliation with groups engaged in advocacy" could be "as effective a restraint on freedom of association" as "direct action to restrict the right."  *Id.* at 461–62 (citations

omitted).  Because of the members' justified fears that disclosure would lead to reprisals, the Court found the disclosure "likely to affect adversely" their associational rights.  *Id.* at 462–63.

More recently, the Supreme Court reaffirmed that a subsequent disclosure requirement "burden[s] . . . associational rights" if it creates a "risk of a chilling effect on association."  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021).  The risk itself, or the "'*possible* deterrent effect'* of disclosure" is enough.  *Id.* at 2388 (quoting *NAACP*, 357 U.S. at 461).  That is true even where the disclosed information is not publicly available, where the government assures those affected that the data will be treated as confidential, and where not all associates share the desire for anonymity.  *Id.*

Plaintiffs' complaint satisfies the standard reflected in these cases for a First Amendment claim.  They allege more than a mere risk that the disclosure requirement will chill online speech and association—they say it is already happening.  Compl. ¶ 55.  They plausibly attribute that phenomenon to the same concerns accepted by the Court in *NAACP* and *Americans for Prosperity*—fears that they will suffer reprisals because of their speech or associations, whether from the United States or from foreign governments.  Compl. ¶¶ 57–61.  And that chilling effect materializes, in some cases, long before a noncitizen must apply for a visa, including while he lives in the United States and remains protected by the Constitution.  *See* Compl. ¶ 55.

Thus, "the protections of the First Amendment are triggered" by Plaintiffs' allegations.  *Ams. for Prosperity*, 141 S. Ct. at 2389.  So the Court proceeds to determine the level of scrutiny it must apply to evaluate whether they state a valid First Amendment claim.

### 2.    The Degree of Judicial Scrutiny

Ordinarily, the Court's conclusion that the disclosure requirement burdens First Amendment rights would compel "exacting scrutiny" of the rule.  *See Ams. for Prosperity*, 141 S. Ct. at

2382–83 (plurality opinion) (rejecting an argument that strict scrutiny should apply instead).[10]
Under exacting scrutiny, the government has the onus to show the burden's lawfulness.  *Clark v.
Library of Congress*, 750 F.2d 89, 94 (D.C. Cir. 1984).  So if exacting scrutiny applied, the Court
would likely deny Defendants' motion to dismiss because it challenges only the legal sufficiency
of Plaintiffs' complaint.  *See, e.g.*, *Brown*, 390 F. Supp. 3d at 126–27.

But Defendants point to a countervailing principle:  This case, they say, concerns "a con-
dition of entry into the United States by a foreign national."  ECF No. 31-1 at 50.  For that reason,
they advocate a much more deferential standard of review.  *Id.* at 50–53.  Plaintiffs reply that the
rule "imposes [only] a procedural requirement" and so does not implicate the rationale for courts'
deferring to the other branches of government.  ECF No. 32 at 45–47.

The Court agrees with Defendants.  Two cases are especially relevant to this question:
*Mandel* and *Trump v. Hawaii.*

In *Mandel*, the Supreme Court observed that "ancient principles of the international law of
nation-states," reflected in a long line of its cases, establish that "the political branches of govern-
ment" have exclusive control over the admission and exclusion of aliens.  408 U.S. at 765–66
(quotation omitted).  So where Congress has given the executive branch discretion to make immi-
gration decisions, and the executive has provided "a facially legitimate and bona fide" explanation,
"courts will neither look behind the exercise of that discretion, nor test it by balancing its justifi-
cation against the First Amendment interests of those who" challenge that decision.  *Id.* at 770.
Later, the Court explained that *Mandel*'s rationale does not depend on "the nature of the policy

---

[10] *See also Republican Nat'l Comm. v. Pelosi*, 602 F. Supp. 3d 1, 34–35 (D.D.C. 2022)
(explaining that surviving exacting scrutiny requires the strength of the government's interest to
reflect the seriousness of the burden the action imposes and that the action is narrowly tailored to
further the government's interest without substantial overbreadth), *vacated as moot*, 2022 WL
4349778 (D.C. Cir. Sept. 16, 2022).

choice at issue," such as national security. *Fiallo*, 430 U.S. at 795–96. Instead, it applies to all cases "in the area of immigration and naturalization" because "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are outside courts' "power . . . to control." *Id.* (quotations omitted). Judicial inquiry under that standard, limited though it is, is often called "*Mandel* review." *See, e.g.*, *Udugampola v. Jacobs*, 70 F. Supp. 3d 33, 42–45 (D.D.C. 2014).

The Supreme Court most recently discussed *Mandel* review in *Trump v. Hawaii*. There, it appeared to affirm that the standard applies when courts are asked to "'probe and test the justifications' of immigration policies." 138 S. Ct. at 2419 (quoting *Fiallo*, 430 U.S. at 799). It even offered an expansive "upshot" of the *Mandel* line of cases: that judicial "inquiry into matters of entry and national security is highly constrained." *Id.* at 2419–20. But it did not actually *apply* *Mandel* review. *See id.* at 2420. Instead, the Court "assume[d]" that rational-basis review applied and—because the contested policy satisfied that higher tier of scrutiny—did not settle the issue of which methodology to use. *See id.* at 2420–23. That resolution did not "purport to alter *Mandel*." *Yafai v. Pompeo*, 924 F.3d 969, 973–74 (7th Cir. 2019) (opinion of Barrett, J.). The Court simply assumed that rational-basis review applied "at the request of the government." *Id.* at 973; *see also Trump v. Hawaii*, 138 S. Ct. at 2420.

Defendants here request a similar assumption. Although they mainly argue that the Court should apply *Mandel* review, ECF No. 31-1 at 51–52, they rely on *Trump v. Hawaii* to suggest that the Court might also assume that rational-basis review applies, *id.* at 52.

Plaintiffs try to distinguish those cases on two grounds. First, they point out that *Mandel* and *Trump v. Hawaii* "focused principally on foreigners outside the United States who . . . lacked

their own First Amendment rights." ECF No. 32 at 46.  This case is different, they explain, because it concerns "the First Amendment rights of [organizations and people] who currently reside in the United States."  *Id.*  Second, they observe that those cases concerned what they call "substantive admissibility decisions"—that is, decisions about whether aliens may enter the United States.  *Id.* at 46–47 (emphasis omitted).  The disclosure requirement, they claim, is "a procedural requirement on all visa applicants[ that] makes no substantive [admissibility] determination."  *Id.* at 47.

Plaintiffs' first argument misconstrues the Supreme Court's decisions.  The premise of judicial review in *Mandel* and *Trump v. Hawaii* was that the challenged actions burdened the constitutional rights of U.S. citizens.  *See Mandel*, 408 U.S. at 762–65; *Trump v. Hawaii*, 138 S. Ct. at 2419.  The same was true in other cases in which the Court applied *Mandel* review.[11]  If Plaintiffs mean to assert that a special situation is present where the rightsholder is the same person whose entry into the United States may be affected, they cite no case for that novel proposition.  And the Court sees no reason to treat some First Amendment rightsholders as more equal than others.  Besides, the rationale for applying *Mandel* review is categorical; it depends on the type of "decision[ ] made by the Congress or the President," not the identity of the person asserting the right or the severity of the asserted burden.  *See Fiallo*, 430 U.S. at 796 (quotation omitted).

Plaintiffs' second argument is also unpersuasive.  For starters, even if the Court were to accept Plaintiffs' substance-procedure distinction, it is not clear that the disclosure requirement "makes no substantive determination as to the admissibility of any applicant," as they say.  ECF

---

[11] *See, e.g.*, *Fiallo*, 430 U.S. at 794–95 (rejecting the argument that the Court should apply greater scrutiny because the challenged action "infringed upon the due process rights of citizens and legal permanent residents"); *Din*, 576 U.S. at 101–06 (Kennedy, J., concurring in the judgment) (applying *Mandel* review to conclude that any right to due process held by a U.S. citizen was satisfied); *Cardenas v. United States*, 826 F.3d 1164, 1167 (9th Cir. 2016) (holding that Justice Kennedy's opinion in *Din* is "controlling").

No. 32 at 47.  Plaintiffs took great pains to explain that a visa applicant must divulge the requested information to complete her application.  *See* Compl. ¶¶ 28–33 (explaining that the requirement applies to "nearly all applicants," that it is "mandatory and makes no exception," and that it "applies nearly universally").  Violating the rule thus makes an applicant inadmissible.  *See* 8 U.S.C. § 1201(a)(1) (conditioning both types of visas on a "proper application").  In other words, the rule states a "condition[ ] of entry," which the Supreme Court has explicitly recognized as a type of action subject to *Mandel* review.  *Fiallo*, 430 U.S. at 796 (quotation omitted).[12]

That said, there is no reason to think Plaintiffs' substance-procedure distinction matters. As Defendants point out, ECF No. 44 at 32, the Supreme Court has justified *Mandel* review on the grounds that "[*a*]*ny policy* toward aliens is vitally and intricately interwoven with

_____

[12] Reference to the substance-procedure distinction in choice-of-law analysis crystalizes the conclusion that the disclosure requirement is more accurately characterized as substantive. Although the Supreme Court long ago tried neatly to divide truly substantive rules from truly procedural ones, *see Guaranty Tr. Co. v. York*, 326 U.S. 99, 109 (1945), it has since explained that "every procedural variation" can, under the right circumstances, control the outcome of a process, *see Hanna v. Plumer*, 380 U.S. 460, 468–69 (1965).  So courts must consider whether the rule at issue is so significantly related to the resolution of the dispute that its application is likely to influence a party's *ex ante* choice of forum.  *See Hanna*, 380 U.S. at 469; *Burke v. Air Serv. Int'l, Inc.*, 685 F.3d 1102, 1109 (D.C. Cir. 2012).  Put another way, a rule is substantive if it is "bound up with the definition of the rights and obligations of the parties," not "merely a form and mode of enforcing" existing rights and obligations.  *See Byrd v. Blue Ridge Rural Elec. Co-op, Inc.*, 356 U.S. 525, 536 (1958).

Applied here, the question is whether the information provided in the disclosure section of the application is likely to make a "material difference" in a consular officer's eventual admission decision.  *Cf. Kohlrautz v. Oilmen Participation Corp.*, 441 F.3d 827, 831 (9th Cir. 2006).  And framed that way, even Plaintiffs must concede that the disclosure requirement is a substantive part of the visa-application process.  Their interest in challenging the requirement stems, after all, from their fears, and those of their members and partners, that the information collected under the requirement will be used by consular officers to delay, deny, or revoke visas.  *See* Compl. ¶¶ 57–59. Indeed, they have alleged that the disclosure requirement now forms such an important part of the visa-application process that some of their "members and partners are no longer applying for U.S. visas—and are foregoing personal, educational, and professional opportunities" to avoid it. Compl. ¶ 56.  Their selective attempts to diminish the disclosure requirement as mere procedural red tape cannot withstand scrutiny.

contemporaneous policies in regard to the conduct of foreign relations and the war power." *Trump v. Hawaii*, 138 S. Ct. at 2418 (quotation omitted and alteration adopted).  And Justice Kennedy's controlling concurrence in *Din* applied *Mandel* review to the question of "how much information the Government is obliged to disclose about a . . . denial of a visa."  *See* 576 U.S. at 106.  The amount and type of information an applicant receives after a denial cannot possibly be more substantive than the amount and type of information an applicant must provide to be considered for admission.

So although there is no reason to think that *Mandel* review has been displaced, this Court will follow the Supreme Court's lead in *Trump v. Hawaii* and assume that rational-basis review applies.  That is for two reasons.  First, like in *Trump v. Hawaii*, the government has invited the Court to do so.  *See* 138 S. Ct. at 2420; ECF No. 31-1 at 52; ECF No. 44 at 32–33.  Second, that assumption does not affect the outcome.  A policy that survives rational-basis review will of course survive *Mandel* review and, as the Court will explain, the disclosure requirement breezes through rational-basis review.

### 3.    Rational-Basis Review

Rational-basis review begins with "a strong presumption" that the challenged action is valid.  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993).  Plaintiffs have the burden to negate "every conceivable basis" that might support the requirement.  *Id.* at 315 (quotation omitted).  Under that standard, courts "hardly ever" hold a policy unconstitutional.  *Trump v. Hawaii*, 138 S. Ct. at 2420.  The Court would need to conclude that the law's only purpose is the "bare desire to harm a politically unpopular group," *id.* (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)), or that it is "inexplicable by anything but animus," *id.* (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)).

At the pleading stage, the Plaintiff "must plausibly allege facts showing that no reasonably conceivable state of facts could provide a rational basis for the challenged policy." *Sanchez.*, 45 F.4th at 396. Even the possibility that the government relied on "rational speculation unsupported by evidence or empirical data" is enough to defeat a complaint. *Id.* at 398 (quoting *Beach*, 508 U.S. at 315). If a "conceivably rational justification" for the policy is "readily apparent," the Court must dismiss the claim. *Id.*

The disclosure requirement is far from inexplicable. Plaintiffs do not contest that the proffered interests of "confirming visa applicants' identities [and] determining their visa eligibility" are "important government interests." ECF No. 32 at 53. Instead, they claim the government "cited no evidence" that the disclosure requirement will advance those interests. *Id.* (quotation omitted). But as the Court has just explained, the government does not have to do so. *See Sanchez*, 45 F.4th at 396. And given the amount of personal information that can be gleaned from many social-media users' accounts, the disclosure requirement is "is self-evidently (and rationally) connected" to those ends. *Id.* at 398.

Plaintiffs also find fault with the requirement's breadth, noting that it applies to all applicants absent "individualized suspicion." ECF No. 32 at 54. Defendants think that argument "puts the cart before the horse" because, in many cases, the government does not know which applicants may warrant further scrutiny until it reviews their social-media activity. ECF No. 31-1 at 56. The Court agrees with Defendants. It is at least conceivable that some visa applicants' claims appear true until they are compared with a more objective record of their biographical details and associations. And in one way, the requirement's universality counts in its *favor* under rational-basis review. If the requirement applies to nearly all applicants, it would be hard to conclude that the motivation behind it was an "irrational prejudice" against applicants from any particular subgroup.

*Cf. Trump v. Hawaii*, 138 S. Ct. at 2420 (quotation omitted).

Nor is it irrational to retain the information past the disposition of an application, as Plaintiffs suggest.  ECF No. 32 at 55.  The government explains that it retains the information to help enforce immigration and national-security laws prospectively, such as by monitoring visa holders for "grounds for deportability" or the denial of future benefits.  ECF No. 31-1 at 54–55.  Again, that rationale is self-evidently connected to inarguably legitimate government interests.  *Cf. Pinho v. INS*, 249 F.3d 183, 190 (3d Cir. 2001) (describing "foreign relations, national security policy, and compliance with on-going government programs" as "legitimate government interests").

At bottom, Plaintiffs do not seriously engage with the rational-basis standard.  Their argument rests mainly on their contention the Court has rejected—that heightened scrutiny applies, shifting the burden to the government.  *See* ECF No. 32 at 52–56 (contending that Defendants cannot carry their burden "even under intermediate scrutiny").  Under rational-basis review, their position amounts to a challenge based on the "effectiveness and wisdom" of the disclosure requirement.  *See Trump v. Hawaii*, 138 S. Ct. at 2421.  Even if they are right when they call the requirement unwise and ineffective, that is no basis for the Court to "substitute [its] assessment" for that of the executive branch.  *Id.*  The disclosure requirement is rationally connected to legitimate government interests.  Thus, Plaintiffs have not stated a First Amendment claim.

\*      \*      \*

Finally, Plaintiffs ask for leave to amend their complaint given the Court's conclusion that they have not stated a claim.  *See* ECF No. 32 at 57.  Yet ultimately, the main deficiency in their complaint stems not from inadequate detail or correctable mistakes, but from the nature of the

government action they challenge.[13]  For that reason, the Court finds that further allegations consistent with those already pled could not cure the deficiency and so will dismiss the complaint with prejudice.  *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (per curiam).

## IV.   Conclusion

For all the above reasons, the Court will grant Defendants' motion to dismiss insofar as it seeks dismissal for failure to state a claim.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: August 11, 2023

---

[13] As explained above, the sole area in which the Court found Plaintiff's complaint lacking in specificity was in its failure to allege any particular U.S. citizen who wanted to hear the particular speech of any particular noncitizen whom the disclosure requirement dissuaded from speaking.  But the Court cannot fathom—and Plaintiffs have not proposed—how under these circumstances the complaint could be amended to address these deficiencies in a way that would make a difference under rational-basis review.